FILED: **10/27/14**
U.S. DISTRICT COURT
EASTERN DISTRICT COURT
DAVID J. MALAND, CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 1:08-CR-36** |
| **v.** | : | **CIVIL NO.** 1:14CV539 |
| | : | **THIS IS A CAPITAL CASE** |
| **JOSEPH EBRON, Defendant.** | : | |

## DEFENDANT JOSEPH EBRON'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

**Claudia Van Wyk**
**Billy H. Nolas**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EASTERN DISTRICT
OF PENNSYLVANIA
Suite 545W- The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
Phone: 215-928-0520
Fax: 215-928-0826
claudia_vanwyk@fd.org
billy_nolas@fd.org

*Counsel for Joseph Ebron*

**Eric M. Albritton**
Texas Bar No. 00790215
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
Phone: (903) 757-8449
Fax: (903) 758-7397
ema@emafirm.com

*Counsel for Joseph Ebron*

October 27, 2014

**Table of Contents**

Table of Contents.................................................................................................................i

Table of Authorities ........................................................................................................ v

STATEMENT OF THE CASE........................................................................................ 1

    A.   INTRODUCTION ................................................................................................. 1

    B.   PROCEDURAL HISTORY..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    A.   THE PREPARATION FOR TRIAL........................................................................ 2

    B.   DEFENSE TEAM INTERACTIONS WITH RESOURCE COUNSEL......................... 13

    C.   THE TESTIMONY AT TRIAL.............................................................................. 16

    D.   EVIDENCE THAT COULD HAVE BEEN PRESENTED AT TRIAL......................... 40

        1.   Evidence Available to Support the Defense
            at the Guilt-Innocence Phase ..................................................................... 40

        2.   Evidence Available to Rebut the Aggravating Factors ............................. 41

        3.   Available Mitigating Evidence ................................................................... 43

ARGUMENT .................................................................................................................. 53

I.   TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE GUILT-
    INNOCENCE PHASE OF TRIAL. ........................................................................... 53

    A.   TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT READILY
        AVAILABLE EVIDENCE TO SUPPORT THE DEFENSE ON WHICH THEY
        RELIED AT TRIAL. ......................................................................................... 53

        1.   Counsel Failed to Interview and Present Numerous Witnesses Who Could Have
            Reported Marwin Mosley's Incriminating Admissions and Other Evidence That
            Would Have Supported the Defense. ........................................................... 53

            a)   Deficient Performance ......................................................................... 54

            b)   Prejudice ............................................................................................. 57

        2.   Counsel Rendered Ineffective Assistance By
            Failing to Request Relevant Discovery. ..................................................... 61

            a)   Trial Counsel Performed Deficiently in Failing to Seek Relevant Discovery........ 61

            b)   Counsel's Deficient Performance in Failing to Request Adequate Discovery
                Prejudiced  Ebron.............................................................................. 63

    B.   TRIAL COUNSEL FAILED TO FAMILIARIZE THEMSELVES WITH,
        OR OBTAIN RECORDS RELATING TO, THE CRIMINAL HISTORY
        OF THE GOVERNMENT'S STAR WITNESS, CHARLES SHERMAN...................... 64

        1.   Deficient Performance ................................................................................ 65

        2.   Prejudice .................................................................................................... 69

C.    TRIAL COUNSEL FAILED TO OBJECT TO IMPERMISSIBLE TESTIMONY OR EVIDENTIARY RULINGS............................................................................... 71

D.    TRIAL COUNSEL FAILED TO CONDUCT A TIMELY INTERVIEW OF JAMES "RAT" CARPENTER, AND FAILED TO PREPARE AND PREVENT THE INTRODUCTION OF AN UNCHARGED PRISON INFRACTION. ..................................................................................................... 74

E.    COUNSEL FAILED TO OBJECT TO THE QUASI-EXPERT SPECULATIVE TESTIMONY OF BOP OFFICIALS, WHICH INVADED THE JURY'S PROVINCE AND EMBRACED THE ULTIMATE ISSUE. ........................................ 80

F.    COUNSEL IMPROPERLY CROSS-EXAMINED COOPERATING WITNESSES, MINIMIZING THE EXTENT OF BENEFITS THEY HAD RECEIVED FOR THEIR TESTIMONY.......................................................................................... 84

G.    COUNSEL RENDERED INFFECTIVE ASSISTANCE LEADING TO THE IMPROPER INTRODUCTION OF  EBRON'S PRIOR MURDER CONVICTION............................................................................................... 86

    1.    Counsel's Failure to Identify the Governing Legal Standard Led to the Introduction of Ebron's Prior Murder Conviction........................................... 87

    2.    Counsel Forced Ebron to Testify Against His Wishes, Apparently Believing That His Conviction Would Be Admitted Regardless of Whether He Testified........................................................................... 90

    3.    Counsel Waived Any Opportunity for Ebron to Contest the Admission of His Conviction on Appeal by Introducing the Conviction on Direct Examination. ......... 91

H.    COUNSEL FAILED TO OBJECT TO JURY INSTRUCTIONS THAT DID NOT SUBMIT ANY LESSER-INCLUDED OFFENSE AND DID NOT EXPLAIN THAT AN ACCOMPLICE MAY HAVE A LESS CULPABLE MENTAL STATE THAN A PRINCIPAL. ............................................................................... 92

I.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE GOVERNMENT'S REQUEST THAT EBRON BE FORCED TO WEAR A STUN BELT THROUGHOUT THE TRIAL. ............................................................. 98

    1.    Stun Belts Can Cause Substantial Physical and Psychological Damage.................... 99

    2.    Counsel Performed Deficiently in Failing to Object to the Use of a Stun Belt........ 100

    3.    Wearing the Stun Belt Prejudiced Ebron............................................................. 101

J.    THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S GUILT-INNOCENCE PHASE DEFICIENCIES PREJUDICED THE DEFENSE AT BOTH PHASES OF TRIAL............................................................................................. 101

II.    TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE.................................................................................... 102

A.    TRIAL COUNSEL FAILED TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE GOVERNMENT'S CASE IN AGGRAVATION OR TO PRESENT EVIDENCE PROVIDING CONTEXT FOR THE AGGRAVATING FACTORS. .......................................................................... 102

1.    Trial Counsel Failed to Conduct an Adequate Investigation Designed to Rebut the "Substantial Planning and Premeditation" and "Heinous and Cruel" Statutory Aggravators. ................................................................. 102

2.    Counsel Failed to Conduct an Investigation to Rebut the "Prior Life Sentence" Aggravating Factor. ........................................................... 105

a)    Deficient Performance ....................................................... 106

b)    Prejudice ........................................................................ 108

3.    Counsel Failed to Prepare and Present an Adequate Response to the "Future Danger" Aggravating Factor. ...................................... 109

B.    COUNSEL FAILED TO CONDUCT A CONSTITUTIONALLY ADEQUATE BACKGROUND INVESTIGATION AND, AS A RESULT, PREPARED AND PRESENTED A CONSTITUTIONALLY INADEQUATE CASE IN MITIGATION THROUGH LAY WITNESSES AND EXPERTS. ............................... 112

1.    Counsel's Insufficient Background Investigation Constituted Deficient Performance. ........................................................... 112

2.    Counsel's Deficient Background Investigation Prejudiced Ebron at the Penalty Phase. ............................................................... 115

C.    COUNSEL'S DEFICIENCIES INDIVIDUALLY AND CUMULATIVELY PREJUDICED THE DEFENSE AT THE PENALTY PHASE. ................................ 120

III.    PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY BY THE INCLUSION OF A JUROR WHO LIED IN HIS QUESTIONNAIRE AND DURING VOIR DIRE ON GROUNDS WHICH, IF THAT JUROR HAD RESPONDED CORRECTLY, WOULD HAVE PROVIDED THE DEFENSE WITH A VALID CHALLENGE FOR CAUSE. .................................................................................. 121

IV.    THE GOVERNMENT DENIED EBRON'S RIGHTS TO DUE PROCESS OF LAW, TO CONFRONT HIS ACCUSERS, AND TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BY SUPPRESSING FAVORABLE MATERIAL EVIDENCE. ........................................................................... 123

A.    THE GOVERNMENT FAILED TO DISCLOSE REPORTS OF CONVERSATIONS AND ARGUMENTS BETWEEN MOSLEY AND EBRON IN WHICH EBRON WAS OVERHEARD TELLING MOSLEY THAT BARNES WAS NOT SUPPOSED TO BE KILLED. ................................... 123

B.    THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY FORMS AND INTERVIEWS IN THE POSSESSION OF THE BUREAU OF PRISONS AND OTHER RELATED INVESTIGATIVE AGENCIES. ...................................... 125

1.    Mass Interview Forms ................................................................. 126

2.    SIS Report. ............................................................................... 126

3.    After Action Report ................................................................... 127

V.    THE GOVERNMENT DENIED EBRON'S RIGHT TO DUE PROCESS OF LAW, TO CONFRONT HIS ACCUSERS, AND TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BY PRESENTING, OR FAILING TO CORRECT, FALSE TESTIMONY OF ITS KEY WITNESS, CHARLES SHERMAN ................................................................. 128

A.    SHERMAN'S FALSE TESTIMONY ............................................................ 129

B.    THE GOVERNMENT KNEW, OR SHOULD HAVE KNOWN, THAT SHERMAN'S TESTIMONY WAS FALSE. ................................................... 130

C.    SHERMAN'S FALSE TESTIMONY WAS MATERIAL............................................. 130

VI.    THE GOVERNMENT DENIED EBRON THE RIGHT TO DUE PROCESS OF LAW, TO CONFRONT HIS ACCUSERS, AND TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BY PRESENTING FALSE TESTIMONY OF ITS CORRECTIONS EXPERT, GREG HERSHBERGER. .................................................. 132

A.    HERSHBERGER'S FALSE TESTIMONY ................................................... 133

B.    HERSHBERGER'S FALSE TESTIMONY WAS MATERIAL. ................................. 134

VII.    PETITIONER WAS DENIED A FAIR TRIBUNAL IN VIOLATION OF HIS FIFTH AND SIXTH AMENDMENT RIGHTS TO DUE PROCESS ................... 135

VIII.    THE CUMULATIVE EFFECT OF THE CONSTITUTIONAL ERRORS THAT PERMEATED THE TRIAL REQUIRES RELIEF. ....................................... 136

PRAYER FOR RELIEF ................................................................. 137

## TABLE OF AUTHORITIES

### Federal Cases

*Adams v. Quarterman*, 324 F. App'x 340 (5th Cir. 2009) ........................................................ 115

*Beck v. Alabama*, 447 U.S. 625 (1980) .................................................................. 93, 94

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................... 123, 124

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ............................................................. 136

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ........................................................... 135

*Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) ...................................................... 136

*Ebron v. United States*, 134 S.Ct. 512 (2013) ............................................................. 2

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) ...............................................103

*Keeble v. United States*, 412 U.S. 205 (1973) ................................................................. 93

*Kyles v. Whitley*, 514 U.S. 419 (1995) ...................................................................... 136

*Lara v. United States Parole Comm'n*, 990 F.2d 838 (5th Cir. 1993)................................... 95, 96

*Lyons v. McCotter*, 770 F.2d 529 (5th Cir. 1985) ........................................................ 89

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984) ............................. 121, 122

*Napue v. Illinois*, 360 U.S. 264 (1959) .............................................................. passim

*Ohler v. United States*, 529 U.S. 753 (2000) .................................................. 91

*Reynoso v. Giurbino*, 462 F.3d 1099 (9th Cir. 2006) ................................................. 84

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) .............................................. 93

*Riddle v. Cockrell*, 288 F.3d 713 (5th Cir. 2002.................................................... 71, 80

*Rompilla v. Beard*, 545 U.S. 374 (2005) .............................................................. passim

*Rosemond v. United States*, 572 U.S. ___, 134 S. Ct. 1240 (2014) ...................................... 93, 97

*Schmuck v. United States*, 489 U.S. 705 (1989) ........................................................ 93

*Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004) ............................................................ 75

*Steinkuehler v. Meschner*, 176 F.3d 441 (8th Cir. 1999) ............................................... 84

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................... passim

*Summit v. Blackburn*, 795 F.2d 1237 (5th Cir. 1986 .................................................. 103

*United States v. Agurs*, 427 U.S. 97 (1976) ............................................... 130, 134, 135

*United States v. Bagley*, 473 U.S. 667 (1985) ................................................... 125, 126

*United States v. Barham*, 595 F.2d 231 (5th Cir. 1979) ............................................ 131

*United States v. Browner*, 889 F.2d 549 (5th Cir. 1989) .............................................. 93

*United States v. Collins*, 690 F.2d 431 (5th Cir. 1982) ................................................ 93

*United States v. Durham*, 287 F.3d 1297 (11th Cir. 2002) ......................................... 100

*United States v. Ebron*, 683 F.3d 105 (5th Cir. 2012) ..........................................2, 105

*United States v. Mullins*, 315 F.3d 449 (5th Cir. 2002) ............................................... 91

*United States v. Sanders*, 964 F.2d 295 (4th Cir. 1992) .............................................. 89

*United States v. Snarr*, 704 F.3d 368 (5th Cir. 2013) ............................................ 93, 94

*United States v. White*, 972 F.2d 590 (5th Cir. 1992) ..................................................93

*Ward v. Dretke*, 420 F.3d 47 (5th Cir. 2005) ....................................................... 71, 80

*Wiggins v. Smith*, 539 U.S. 510 (2003) ...................................................................... 102

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................................... 102

## **Constitutions**

U.S. Const. amend. VI .......................................................................... 53, 61, 102, 103

## Federal Statutes

18 U.S.C. § 6132 ........................................................................................................... 89

18 U.S.C. § 1111(a) ...................................................................................................... 96

18 U.S.C. § 1112(a) ...................................................................................................... 95

18 U.S.C. § 3592(c)(6) ................................................................................................ 103

18 U.S.C. § 3592(c)(9) .......................................................................................... 42, 103

18 U.S.C. § 609.05(3)(b) .............................................................................................. 89

28 U.S.C. § 2255 ..................................................................................................... 1, 139

## State Case

*People v. Mar*, 52 P.3d 95 (Cal. 2002) ....................................................................... 99

## Other

Philip H. Yoon, The "Stunning" Truth: Stun Belts Debilitate, They Prejudice, and They May Even Kill, 15 Cap. Def. J. 383 (2003) ........................................................................ 99

## Rules

Fed. R. Crim. P. 16(a)(1)(E)(i) ........................................................................ 63, 64, 67

Fed. R. Evid. 404(b) ..................................................................................................... 76

Fed. R. Evid. 609 ........................................................................................... 70, 86, 87, 88

**STATEMENT OF THE CASE**

**A. INTRODUCTION[1]**

1.      Joseph Ebron was tried, convicted, and sentenced to death for a murder planned by others.  He testified in his own defense at the guilt-innocence phase, and his attorneys presented numerous mitigating factors at the penalty phase.  His attorneys did not, however, support his defense with the fruits of a constitutionally adequate investigation.  Although this Court appointed counsel three years before trial, and a full complement of supporting team members as soon as the government filed its death notice, the defense team interviewed only one witness in person before the month when the trial began, and only a handful before the trial ended.  Counsel never uncovered abundant, readily available evidence that could have demonstrated why the jurors should not convict Ebron of first-degree murder or sentence him to death, and otherwise performed deficiently in the course of trial.  Counsel's deficiencies deprived Ebron of the effective assistance of counsel.  In addition, the government failed to disclose material exculpatory information before or during trial, and a juror who had concealed a disqualifying bias from the Court participated in deliberations at all three phases of trial.  Both of these non-disclosures deprived Ebron of due process of law.  The Court should grant him post-conviction relief.

**B. PROCEDURAL HISTORY**

2.      The government originally charged movant Joseph Ebron and codefendants Marwin Mosley and Michael Bacote with the May 5, 2005, murder of Keith Barnes at the United States Penitentiary ("USP") in Beaumont, Texas.  Houston attorney Katherine Scardino was formally appointed to represent Ebron on April 26, 2006, almost a year after the homicide.  (Case # 1:07-cr-00142, Doc. No.  6).  Mosley died in late 2006.  On August 15, 2007, Ebron was

---

[1] Transcript references in this motion are cited by date and page number.

indicted with Bacote and Charles Sherman (who later testified for the government) for first-degree murder and conspiracy.  (Doc. 20.)  The government filed notice of intent to seek the death penalty against Ebron and Bacote on September 11, 2007 (Docs. 30, 31).

3.      On March 6 and 19, 2008, this Court severed Ebron's and Sherman's cases from Bacote's (Docs. 135, 140).[2]  Ebron stood trial (under Docket No. 1:08-cr-00036) before this Court and a jury from April 20 to May 8, 2009, and was convicted of first-degree murder and conspiracy on May 11, 2009.  The jury found him eligible for the death penalty on May 13 and sentenced him to death on May 18, 2009.  The court formally imposed death on Count 1 and life imprisonment on Count 2 on May 18 and June 26, 2009, respectively (Docs. 177, 196).

4.      Ebron appealed and, on May 30, 2012, the Court of Appeals for the Fifth Circuit affirmed the conviction and sentence.  The court held that the record did not support the submission of the "substantial planning and premeditation" aggravating factor, but that the district court's error in submitting it was harmless.  *United States v. Ebron*, 683 F.3d 105, 152-53 (5th Cir. 2012).  The United States Supreme Court denied *certiorari* on November 4, 2013. *Ebron v. United States*, 134 S.Ct. 512 (2013).

5.      Ebron has filed, concurrently with this motion, an unopposed motion to stay these proceedings and hold them in abeyance while he pursues post-conviction relief on a prior Washington, D.C., conviction that was an aggravating factor at his capital trial.

### STATEMENT OF FACTS

**A.  THE PREPARATION FOR TRIAL**

6.      Ms. Scardino knew from the time of her 2006 appointment that this could be a capital case; shortly after Assistant United States Attorney ("AUSA") Joe Batte filed charges, he

---

[2] The government later withdrew the death notice as to Bacote after his attorneys argued he was ineligible for the death penalty because of his intellectual disability.  He pled guilty and received a sentence of 336 months.   (Docs. 250, 288, 291, 319, 322).

asked counsel for the defendants to "come see his boss and tell him why he should not" seek death.

7. This was Ms. Scardino's first federal capital trial. Within days of her appointment, she associated with Shelli Schade, a social worker, with the expectation that she would serve as a mitigation specialist, though the district court did not formally appoint Ms. Schade for another year. Even after her appointment, Ms. Schade limited her work to meeting with Ebron, compiling to-do lists and reviewing discovery, and collecting records. She never interviewed any witness, except her client, throughout her work on the case.

8. After the government gave notice of its intent to seek death on September 11, 2007, the Court appointed Jimmy Phillips as second counsel for Ebron. Ms. Scardino sought and obtained the Court's approval for the retention of a mitigation specialist (Ms. Schade), an investigator (J.J. Gradoni), and a mental health expert. In support of his retention for the case, Mr. Gradoni wrote to Ms. Scardino, listing the investigative services he would provide to prepare for both the guilt phase and the penalty phase:

> In a case of this nature we normally provide the following investigative activities:
> - Interviews with Defendant.
> - Interviews with inmates who may possess knowledge about the incident and/or the players (it should be noted that it may be necessary to travel to other prisons to interview inmates who have been transferred from the Beaumont facility).
> - Interview Guards and prison personnel.
> - Conduct background investigations regarding both potential defense witnesses and government witnesses.
> - Interview government witnesses.
> - Develop information for mitigation.
> - Travel to the decedent's home area to conduct background investigation.
> - Follow leads developed in the course of our investigation.

Mr. Gradoni performed almost none of these tasks in more than eighteen months assigned to the case. He did not begin investigating until Mach 2009, the month when jury selection began. He never interviewed any inmates who had any personal knowledge about the incident and did not meet Ebron until February 24, 2009.

9.    Ms. Scardino instructed her secretary to print her emails; her file documents her interactions with her team. She and Ms. Schade each visited Ebron in July and November 2006. Ebron gave Ms. Schade contact information for his aunt Alice Anderson and his stepmother, Denise Ebron, along with the names of his sister Latina and brother William. Nevertheless, no defense team member made any attempt to contact any family members for over a year. Ms. Scardino and Ms. Schade themselves conducted *no* witness interviews between their first meeting with Ebron in summer 2006 and the time of trial in spring 2009. Anderson called Ms. Scardino in summer 2007, but Ms. Scardino simply passed the message to Ms. Schade and told her she could call Anderson at a later time.[3]

10.    The investigation remained at a virtual standstill during the year before trial, even as Ms. Scardino was required to provide the names of witnesses and experts to the court. In May 2008, without having interviewed a single witness, Ms. Scardino noted that the case had "[n]o MH [mental health] issues." That same month, Ms. Scardino wrote a note to herself to "see sister Latina Ebron," but, as described below, no one from the defense team did so until almost a year later, when the trial was already almost over. On June 19, 2008, Ms. Scardino emailed Ms. Schade and Dr. Compton asking them for "a list of people we are going to have testify" about Ebron's mental health, so that she could provide the list to the court. Ms. Schade responded, listing Denise Ebron (Ebron's stepmother), Alice Anderson and Pala Mae Davis (two of his

---

[3] Although Ms. Scardino indicated in her message to Ms. Schade that she had "spoken to" Anderson, her file contains no record of an interview and she indicated in her email that she was delegating to Ms. Schade the task of compiling a "history."

aunts), Latina and William Ebron (his siblings), Michael Dade (a probation officer who had prepared a presentence report on Ebron), and potential experts Rebecca Bradley, Lisa Greenman, and Ronald Davidson. None of the witnesses had been interviewed and the defense mental health expert (not included in Ms. Schade's list) had not yet evaluated Ebron. Ms. Schade listed Greenman and Bradley because she had seen them at a conference and Davidson because he had written a report about the juvenile facility where Ebron was once incarcerated. She wrote, "Not sure if we will use them or not but at least you can list something by the deadline."

11.     Ms. Scardino retained Kristi Compton, a clinical psychologist who made her first of two visits to Ebron on June 25, 2008. Ebron gave Dr. Compton a detailed history that she later cited in her report. She took no further action in the case until November. Meanwhile, Ms. Scardino missed the court's deadline of October 8, 2008, for providing notice of the experts she planned to call, and had to move for permission to file a late notice.

12.     On November 17, 2008, Dr. Compton interviewed Joseph Ebron's stepmother, Denise Ebron. This was the first, and one of only a small handful of, family interviews conducted by the defense team. Dr. Compton indicated that she would interview Ebron's aunts by phone, because she did not think "the feds" would approve her bill to travel to both Las Vegas (where she had interviewed Denise Ebron) and Washington, D.C. (where the aunts lived). She did not actually interview the aunts, by phone, until January 2009, shortly before Ms. Scardino had to turn her report over to the prosecution.

13.     Meanwhile, during the six months before trial, the defense team had discussions that focused on two main areas of mitigation — establishing Ebron's background and functioning, and rebutting the government's case for future dangerousness — without actually conducting an independent investigation of either. With little to no evidence compiled on either

5

Ebron's background or the criminal convictions underlying the future danger aggravating factor, their discussions had a skeptical tone. Dr. Compton wrote about the "no future danger" theory: "I am really trying to find anything to hang my hat on that would show he is not a threat in prison." She inquired about interviewing prison guards, but Ms. Scardino, too, was skeptical that they could provide helpful information. On November 17, 2008, without having interviewed or arranged for the interview of any family or background witnesses except Denise Ebron, Ms. Scardino wrote to Ms. Schade and Dr. Compton:

> [O]ur mitigation will be Kristi and his childhood. Agree or not? Kinda hard to argue that he won't be a danger to "society" when he killed when he was not in prison and also allegedly while he was in prison. Where can we send him? Mars?

14. On September 23, 2008, Ms. Scardino had written to James Aiken, a retired warden and prison adjustment consultant, to learn if he would be interested in working with Ebron's defense. She asked if Aiken had ever qualified as an expert in Texas, but did not inquire whether he had any exposure to the federal Bureau of Prisons ("BOP"). Aiken agreed to work with the defense.

15. Ms. Scardino also asked Dr. Compton to include a future danger discussion in her report, and continued planning a "no future danger" theory of mitigation. Ms. Schade wrote to Ms. Scardino on January 29, 2009, "I would say that she [Dr. Compton] needs to focus on the fact that he is ACCUSED of committing murder in prison." Ms. Scardino apparently shared this advice with Dr. Compton, who responded:

> The only problem is that I will only be testifying if he is convicted? Right? Or will I be testifying in the guilt/innocence phase and punishment phase? Further, even without his current conviction, two previous murders indicate risk and the context of both will need to be explained in order to reduce risk. Again, I am hitting a brick wall. I am comparing his record with actuarial methods and it is not looking good. And there is no use to

presenting testimony that can be validly and easily refuted by the government experts.

16.    Apparently to support the "no future danger" theory, Ms. Schade compiled lists of correctional and mental health personnel who worked for the BOP and had had contact with Ebron.  But no one from the defense team interviewed the individuals on the lists, and Ms. Scardino did not seek permission from the court, or negotiate with the prosecution, to contact them.

17.    Shortly before trial, the defense made a token gesture toward investigating family background.  Dr. Compton interviewed Ebron's paternal aunt, Pala Mae Davis, by phone on January 15, 2009, and another paternal aunt, Alice Anderson, and first cousin, Daisy Anderson Dickens, by phone on January 29, 2009.  On January 22, 2009, Dr. Compton advised Ms. Scardino (based only on her one meeting with Denise Ebron and the phone call on January 15, and in contradiction of some of what she reported learning from Ebron himself) that "no trauma in home, trauma on street."  She met with Ebron once more to administer additional testing on February 18, 2009.

18.    In the final weeks of trial preparation, Ms. Scardino expressed interest in the potential contributions of family witnesses, but no one conducted any other interviews and no one traveled to Washington, D.C., where Ebron grew up.  On February 20, only a month before jury selection began, Ms. Scardino listed tasks for her investigator, Mr. Gradoni, including, "work with Shelli [Schade] - final mit wits.  Need subpoenas? Call them"  In an email to the team that same day, she told Ms. Schade and Mr. Gradoni, "you need to work together to get witnesses ready for penalty phase . . . I am getting nervous.  I want to hear from JJ and Shelli that you guys have the witness issue under control and I don't have to worry about it . . . ??"

19.    By early March, Ms. Scardino was very concerned about the status of the mitigation investigation.  She wrote in an email:

> We worked on witness list and exhibit list this last weekend.  Except that I did not have your list — which I am looking at now.  There are no addresses, phone numbers, etc. and I do not know if you have talked to any of them.  I need a good, solid working list of witnesses to include on our list – which is due March 10.

Ms. Schade sent Ms. Scardino a list on March 6, and wrote to Joseph's sister Latina and maternal aunt, Debra Ann Wiseman, on March 8, asking them if they would be willing to speak, but Ms. Scardino emailed Ms. Schade that it was "a bit late to be looking for family members."  Ms. Scardino was not satisfied with Ms. Schade's first witness list.  In an email written March 10 (the day her witness list was due to the court), she wrote:

> Shelli – I am looking at your list – it is only names – Other than for general information, this is worthless to help me complete a witness list.  I have to have addresses, phone numbers, and a summary of who these people are.  And, I will not put someone on my witness list who no one has talked to.  So, please – help me with this.

Ms. Scardino's list, submitted the same day and amended on March 12, consisted mostly of experts and BOP personnel, and included only six persons who had known Ebron before he went to prison: his stepmother Denise Ebron, his brother William Ebron, his aunts Alice Anderson and Pala Mae Davis, and his biological mother and sister, Ernestina Wiseman and Latina Ebron.  Dr. Compton had interviewed Denise Ebron once in person and the aunts once by phone; no one had interviewed the other three.  On another copy of the witness list in Ms. Scardino's file, Ernestina Wiseman's name is crossed out, with the erroneous notation "deceased."  While Ms. Scardino listed numerous BOP personnel, including correctional officers and mental health professionals, as witnesses, the record does not reflect that any defense team member interviewed any of them

8

before trial.  Ms. Scardino asked Dr. Compton to telephone a staff psychologist, Dr. Jerry Smith, shortly before the trial began, but the file does not show that Dr. Compton ever did so.[4]

20.   On April 1, Ms. Schade contacted Dr. Compton by email, at Ms. Scardino's request, to ask for an outline or rough draft of Dr. Compton's testimony.  As yet, however, no one from the defense had interviewed any family members beyond the handful Dr. Compton had interviewed.  Dr. Compton warned Ms. Schade to "recall that my testimony will be limited."  On April 3, Ms. Scardino's secretary emailed Ms. Schade to ask, "we need to subpoena someone else other than a family member to talk about his earlier life.  A probation officer, etc.  Anyone you can think of??"

21.   On April 8, Dr. Compton emailed Ms. Scardino a "suggested outline" of her testimony.  She planned to rely on family members but had not actually talked to them yet.  The outline included a section entitled "future dangerousness is relative."  Dr. Compton ended the section with a warning, which was crossed out by hand in Ms. Scardino's file, indicating:

> Note: The future dangerousness outline is a weak argument (just to let you know).  Statistically, if convicted he will meet the actuarial threshold for high risk.  I am sure I will [be] questioned about this and I will have to respond in line with the available research.  However, no one has a crystal ball and no one can definitively say who will or will not commit future acts of violence.

Ms. Scardino's notes on the outline included notations to "address resiliency – learn from role models — brain development — ability to make good choices."

22.   Ms. Scardino's investigator, J.J. Gradoni, conducted the only other witness interviews, some during the trial and the guilt phase deliberations.  Mr. Gradoni first met with Ebron on February 24, 2009, about a month before jury selection began.  By March 5, three

---

[4] Ms. Scardino later subpoenaed Dr. Smith and called him to testify briefly, at the penalty phase, interviewing him shortly before his testimony.  Dr. Smith indicated that Ebron had been rated as a low threat to self or others, and had behaved pleasantly to the doctor, during his time in segregated housing after the homicide.

weeks before jury selection, Mr. Gradoni had sent Ms. Scardino a list of inmates, but had not yet interviewed any of them. He told her that he would not have time to conduct the interviews – except for the inmates already subpoenaed by Bacote's lawyer – before Ms. Scardino had to file her witness list. He could not interview the others, who were incarcerated out of state or had been released, until after the deadline. He suggested she might want to list all the inmates to "CYA."

23.    On February 20, 2009, Ms. Scardino reviewed the small number of "mass interview" reports the government had turned over in discovery. She asked Mr. Gradoni to speak to those inmates, but the record does not reflect that she ever made any request to discover other mass interview reports that the government had not turned over.

24.    Mr. Gradoni spoke to only one of the inmates named in the mass interview reports, Roy Wells. He conducted his few witness interviews in March and April, beginning about ten days before jury selection. At USP Beaumont on March 18, he spoke to inmates Wells, Michael Surrell, and Edgar Hayes (the inmate Muslim leader), none of whom lived in the unit where the homicide occurred and none of whom had any direct knowledge of what happened.

25.    Mr. Gradoni also determined the BOP location or release status of a number of inmates who had been interviewed by BOP or FBI officers shortly after the homicide, or who had been placed on the witness list by defense attorneys for co-defendant Bacote, but he took no further action if they were not on the government's witness list. He attempted to interview two government witnesses awaiting the trial in the Federal Correctional Center in Houston, but both (not surprisingly) declined to speak to him. Similarly, Mr. Gradoni attempted to visit government witness Lamont Bailey in Houston, but learned from AUSA Batte that he had been

moved, was no longer "in the area," and would not be available until the trial began.  He was not interviewed.

26.     On April 12 (a week before trial), complaining to her team about their belated issuance of subpoenas and record requests, Ms. Scardino wrote, "I am not happy that I am here wondering what evidence I am going to have for the punishment phase of this trial...I keep thinking of the writ lawyer about 2 to 5 years from now calling me asking why I did not have all his life records? And I am the one who has to respond."  Ms. Schade replied that perhaps the case might have proceeded more smoothly if Ms. Scardino had called regular meetings.

27.     In the last few days before trial, Ms. Scardino, apparently hoping that other witnesses on the government's list would be available to the defense, emailed Mr. Batte, "are there any witnesses you have designated that would not be available to us during the guilt phase?"  But her plan did not work.  Mr. Batte responded that his list included witnesses who would not be traveling to Beaumont because they would not be called.

28.     By this time, it was too late for significant travel.  Mr. Gradoni made the first of only two out-of-town witness trips on April 19, the day before the testimonial portion of the trial began, when he interviewed James Carpenter at USP Coleman, in Florida.  Mr. Gradoni learned that Carpenter had helpful information; he testified for the defense nine days later, on April 28.  The belated discovery of this defense witness compelled the Court to authorize his transport at short notice and substantial cost.  Mr. Gradoni telephoned Carpenter's trial attorney and had her fax him a document.  But he never interviewed any other inmate witnesses, including numerous inmates who lived in the unit where the homicide occurred, or who appeared in the videotapes shown at trial or the BOP and FBI documents provided in discovery.

29.    Mr. Gradoni's only other interview-related activities were to: (1) attempt to locate inmate James Jackson through the inmate locator, an attempt he abandoned when too many names came up;[5] and (2) travel to Washington, D.C., on May 8 to 9 (during the guilt-innocence phase deliberations).  In Washington, he attempted without success to find three witnesses to Ebron's prior adult homicide case, his trial attorney in that case, and his attorney in his prior juvenile homicide case. Mr. Gradoni used a misspelling of one witness's name on the inmate locator, and conducted no follow-up after learning that another witness had relocated to Little Rock.  He made one visit to Ebron's biological mother and sister.  At Ebron's request, he looked into "neighborhood violence," but confined his efforts to driving around with a local investigator.

30.    The testimonial portion of the guilt-innocence trial began on April 20, 2009.  The defense presented only four witnesses at the guilt-innocence phase: Ebron, Carpenter, pathologist Stephen Pustilnik, and a prison employee who described the layout of Barnes's cell.  Except for Carpenter and the inmates Mr. Gradoni saw on his one visit to USP Beaumont on March 18, he had made no efforts to interview any other inmates who were not on the government's witness list.  The government witnesses he had attempted to interview had, not surprisingly, refused to speak to him.  His entire roster of witness interviews, all conducted in the month before, or during, trial, comprised the three inmate interviews in Beaumont, one inmate interview in Florida, and two family interviews in Washington, D.C.

31.    The penalty "selection" phase began on May 13, 2009.  To prepare, the defense had interviewed only six family members, three by phone (Ebron's paternal aunts and first cousin) and three in person (his stepmother, biological mother, and sister).  Two additional

---

[5] Later, during the second day of guilt phase deliberations, Ms. Scardino wrote a note: "Next trial: (1) find Joseph Jackson, Florence, interview re seeing D in Funk's [Mosley's] cell before murder."

family members, Ebron's younger brother and his stepmother's sister, were subpoenaed without any interview except for whatever preparation they received immediately before their testimony. The defense had interviewed no other persons who had known Ebron's parents or who had known Ebron in his early years, his school years, his teenage years, or during his incarceration.

## B. DEFENSE TEAM INTERACTIONS WITH RESOURCE COUNSEL

32.     During her trial preparation, Ms. Scardino received advice from Richard Burr, the federal death penalty resource counsel for her district.[6]  She and Ms. Schade contacted Mr. Burr soon after Ms. Scardino's appointment, and he wrote to them explaining the types of support he could offer and providing reference materials.

33.     In May 2008, Ms. Scardino planned to attend a training seminar that Mr. Burr was helping to present, and asked him what to bring with her.  Mr. Burr responded with a list of questions the trainers would ask Ms. Scardino, and she made notes of her planned responses:

> 1 - Mitigation themes and how they relate to guilt phase defense theory [*Ms. Scardino wrote, "Institutional failure, poverty, sexual abuse."*]
>
> 2 - Mental health issues – competency [*Ms. Scardino wrote, "Yes"*], waiver issues (like Miranda waivers, reliability of inculpatory statements (if any), guilt phase relevance (e.g., lack of or impaired intent), mitigation [*Ms. Scardino circled "intent," and wrote, "no mental health issues."*]
>
> 3 - Aggravation - what it is and how you are doing in developing ways to counter it
>
> 4 - Jury selection - procedure the judge intends to use (use of questionnaires, division between judge-conducted and counsel-conducted voir dire, method of striking, individual/collective voir dire, sequestered voir dire)
>
> 5 - Defense Initiated Victim Outreach - whether you have thought about this and how to go about it [*Ms. Scardino wrote, "None."*]

---

[6] The Office for Defender Services of the Administrative Office of the United States Courts, beginning in 1997, established the Federal Death Penalty Resource Counsel project to provide advice and consultation to court-appointed and federal defender attorneys engaged in the defense of capital prosecutions in the federal courts.

13

6 - Client relationships - with counsel, mitigation specialist, investigator, paralegal; with his family; with others (in jail), with others (out of jail)

7 – Defense team dynamics -- how are things with co-counsel, within team, and with team in relation to client. [*Ms. Scardino wrote, "Great!"*]

During the conference, Ms. Scardino and Mr. Phillips had a breakfast meeting with Mr. Burr, who received the impression that they had not made much progress in their investigation.

34.    In December 2008, Mr. Burr offered to meet with Ms. Scardino and her team, hoping to advise them on the investigation and presentation of their case in mitigation.  The meeting did not take place until January 22, 2009, two months before jury selection began.  Ms. Scardino and Mr. Phillips met with Mr. Burr in person, with Dr. Compton and Ms. Schade participating by phone.  Mr. Burr was surprised to find how unprepared the team was and how unfamiliar they seemed with specific details of their client's life.  He told them that they were far from ready for trial, and urgently recommended that they seek a continuance.  They did not do so.

35.    Although the team had interviewed almost no one who had known Ebron, Ms. Scardino and Dr. Compton told Mr. Burr that there was "no trauma in home, trauma on street."[7] Mr. Burr learned from the team about reports that Ebron had grown up in a violent neighborhood.  He suggested that they learn "who were the six to ten people who were closest" to Ebron during his developmental period, whether he had any experiences of death, and what had happened to the friends.  As Ms. Scardino wrote in her notes, Mr. Burr stressed that chronic exposure to trauma has a "huge impact on people."

36.    Ms. Scardino and her team did not follow this advice, either.  The defense team conducted no other background investigation interviews until Mr. Gradoni's interview of

---

[7] As set forth above, Ms. Scardino and Dr. Compton based this on Dr. Compton's interviews of Ebron and his stepmother and her telephone calls with his aunt and cousin.

Ebron's biological mother and sister during the guilt phase deliberations, more than three months after the January meeting with Mr. Burr.

37.     On February 18, anxious about Ms. Scardino's unpreparedness for trial, Mr. Burr emailed her asking whether she planned to seek a continuance and offering to help if she did. She did not accept that help or seek a continuance.  Mr. Burr emailed again on February 26, asking if he could help and offering to meet, but the meeting never took place.  Mr. Burr emailed again on April 15, a few days before the testimonial portion of trial began, asking again if the team needed help.  Ms. Scardino confided her confusion about the trifurcated federal trial.  She asked Mr. Burr to explain whether she should present her experts during the second, "eligibility" phase, "or does that come later?"  She noted that she had read the published opinion affirming Ebron's prior murder conviction in Washington, D.C., and found it "pretty interesting."  No one from her team, however, had yet made any efforts to investigate the prior murder.

38.     Ms. Scardino asked Mr. Burr's advice about whether her client should testify. On April 16, he emailed her that the decision whether to call her client depended on "a huge number of factors — such as how he is likely to behave and emote on cross, whether there are hard facts that call his story into question, whether there are soft facts that call his story into question – and how he would deal with these hard or soft contradictory facts on cross or how you can support him with other evidence, how believable you think he is, and whether you think he is actually telling the truth."  Not having conducted an independent investigation, however, Ms. Scardino could not assess all the relevant factors, and she called her client as a witness without knowing what other evidence was available to present, or support, his version of events.

## C.  THE TESTIMONY AT TRIAL

39.     At trial, the government's theory was that Mosley and Bacote solicited Ebron to join a conspiracy to kill Barnes during the evening meal time.  Ebron testified that he thought he was joining an effort to "run [Barnes] up top," that is, to convince Barnes to check himself into administrative segregation for his safety, because of his status as a "snitch."   On the key questions of knowledge and intent, the case was a credibility contest between Ebron and the government's main witness, Charles Sherman.

40.     Sherman testified that a new inmate whom the other inmates eventually identified as Keith Barnes arrived on Sherman's unit, the DB unit, on the evening of May 6, 2005. 4/20/09, 172.  Sherman and several inmates from Washington, D.C. ("DC"), suspected that the new inmate, who gave them a Muslim name, was the same person who had testified against an associate of theirs, James "Rat" Carpenter, at his murder trial in DC.  Carpenter was incarcerated in another BOP facility.  Marwin "Funk" Mosley asked Sherman and Michael "Rags" Bacote to find out if the new inmate was the person who had "snitched" on Carpenter.  4/20/09, 192-97, 4/28/09, 1739, 1743.

41.     The next day, May 7, Sherman and Bacote learned Barnes's real name and informed Mosley.  4/20/09, 198, 200, 4/20/09, 200.  According to Sherman, Mosley announced, "I'll kill him."  He claimed that he, Bacote, and Mosley went to talk to Antone White, the "shot caller" for the DC crew at the prison.  White told Mosley he should just "run [Barnes] up top," but Sherman testified that Mosley insisted that Barnes should be killed, at which point White said that he would have nothing to do with it.  4/20/09, 202-08.

42.     According to Sherman, Mosley mentioned that Ebron, who knew Carpenter, also knew of Barnes.  4/20/09, 210.  Later that afternoon, Sherman claimed, the three inmates stopped Ebron in the recreation yard and had an explicit conversation about a homicide:

> Funk said -- he said, "I need your help." Funk said, "I need your help." He said, "We're going to kill him tonight." He says, "Come over to the unit when they call the five-minute move to go to chow." And at that point Joe said, "All right. Bet."

4/20/09, 213.  Back on DB unit, Sherman said, he, Mosley, and Bacote continued to plan.  They decided that Bacote would enter Barnes's cell and keep him talking, to prevent him from leaving the unit for dinner.

43.     At the dinner hour, Ebron arrived on the unit.  Bacote entered Barnes's cell, and Mosley and Ebron put shirts on their heads (to prevent their identification on the security cameras posted in the common areas of the unit).  4/20/09, 215-18.  They followed Bacote into the cell, and Bacote came out.  Bacote and Sherman then sat on the staircase outside the cell as lookouts.  4/20/09, 219-20.

44.     The government introduced composite footage from four video cameras that showed events in the common areas of DB unit but did not portray what happened inside the cell. On the video, Bacote enters Barnes's cell at about 5:15 PM.  Mosley and Ebron enter the cell at 5:20, and Bacote emerges at almost the same time.  4/21/09, 526-27, 569, 573.  Bacote and Sherman then remain on the stairs.  4/21/09, 529.  Mosley and Ebron leave the cell at 5:30. Mosley heads upstairs in the direction of the showers, and Ebron leaves the unit.  4/20/09, 573.

45.     Sherman claimed at trial that he could see into the cell from his vantage point on the stairs, and saw Ebron holding Barnes in a headlock and Mosley's arm moving.  4/20/09, 220. At one point, the door opened and Sherman pushed it shut.  He said that, while he did this, he saw Mosley and Ebron lifting Barnes's body to the top bunk.  4/20/09, 222.  Later, Mosley told

17

him to remove a towel that had been hung over the cell window, and Sherman complied. 4/20/09, 223-24.

46.    About two hours later, the institution held an emergency lock-down.  4/20/09, 228.  Authorities had learned from an inmate informant that there was a dead body in one of the units.  4/20/09, 115, 4/23, 1023-25.  Correction Officer Mabel Credit responded to an alarm button set off by inmate Charles Giles.  Credit noticed blood on the lower bunk bed in Giles's cell and another inmate lying on the top bunk, not moving.  It was Barnes, apparently dead. 4/20/09, 81-85.  He was removed and pronounced dead later that evening.  4/22/09, 740, 780.

47.    The next day, the authorities conducted what they called "mass interviews"[8] of the whole institution.  When Sherman's turn came, he told the staff member that he knew what had happened but needed to get out of the unit immediately.  He was placed in administrative segregation (the "SHU" or "hole").  He then gave statements to prison investigators and the FBI, implicating Ebron, Mosley, and Bacote in the killing.  4/20/09, 234, 4/29/09, 1565.

48.    In return for Sherman's testimony, the government agreed (1) not to prosecute him for Barnes's murder, (2) to place him in witness protection, and (3) to send the parole board "a letter asking them could they review my case and it was up to them whether or not they wanted to grant it or deny it."  4/20/09, 236-37.  Sherman acknowledged that he was serving a sentence for robbery, but claimed that he had made an altruistic practice of "rob[bing] drug dealers" because of what the crack epidemic had done to his family.  4/20/09, 166.

---

[8] "Mass interviews are a process. The special investigative section will develop a questionnaire form based upon the incident that we're looking into. Then these are mass copied. There will be one page per inmate. The unit team and other staff in the institution then go to offices in each one of the pods and inmates are removed from their cell, under escort and restraints, to the interview room where they're asked. And these are timed interviews; so, nobody knows if anybody is talking or not talking. And then they're escorted back to their cell. And that process goes on and usually takes several days to complete a whole institution."  4/23/09, 1033, 4/28/09, 1563.

49.     The government presented other inmate witnesses, none of whom had direct knowledge of what had happened.  Johnny Bazile, Bacote's cellmate, associated with Charles Giles, Barnes's cellmate, because they were both from Louisiana.  Bazile testified that he learned from Bacote on the afternoon on May 7 that he should get Giles out of his cell and out to the yard after the count because "they were going to punish Keith Barnes."  No one ever told him what "punish" meant.  4/21/09, 325-29, 338, 374.  Bazile persuaded Giles to come outside with him.  They stayed outside until the authorities called the emergency lock-down and they heard rumors that an inmate was dead on Bazile's unit.  4/21/09, 344.  He testified that, once he was locked in the cell with Bacote, he asked if it was true.  According to Bazile (but in contradiction of the video), Bacote told him that he himself remained in the cell and held Barnes while Ebron and Mosley "punished" him.  4/21/09, 354.  Bazile testified in return for the prosecution's promise to move him to another prison and to recommend to the prosecutor in Bazile's case that he file a motion for reduction of sentence.  4/21/09, 358.

50.     Charles Giles, Barnes's cellmate, met Barnes when he arrived at the DB unit on the evening of May 6, 2005.  The next afternoon, Giles said, Barnes seemed upset and frightened after spending time out on the yard. 4/21/09, 391-98, 417.  Bazile told Giles to leave the unit, and Giles complied.  4/21/09, 422.  When Giles returned to his cell after the emergency lock-down, Barnes was on the top bunk, apparently asleep.  Giles moved a towel he noticed on the lower bunk, and found a "spot of blood" on the bedding.  4/21/09, 428-35.  He hit his alarm button and alerted Officer Credit.  4/21/09, 435.  Although Giles initially told the authorities he knew nothing about what had happened, he later agreed to testify in return for a promise to move him to another location and to recommend that his prosecutor seek a sentence reduction.  He did not know Ebron.  4/21/09, 438-39, 457.

19

51. Lamont Bailey, Bacote's half-brother, was a BOP inmate who also knew Mosley from DC. 4/28/09, 1695-97. Bailey also claimed that he knew Ebron from the time they were incarcerated at the DC Jail in 1997. He testified that he used to see Ebron at Muslim religious services and knew him as "Akh." 4/28/09, 1699-1701. He told the jury that he used to see Ebron and Rat Carpenter together there as well. 4/28/09, 1702-03.

52. Bailey was transferred to USP Beaumont from another institution about two months after Barnes's death, and soon concluded he was not safe in general population because other inmates seemed to be aware that he was a "snitch." He asked the authorities to place him in the SHU. 4/28/09, 1703-07. According to Bailey, he found himself in a holding cage next to Mosley and asked after his brother Bacote's involvement in the Barnes murder. Bailey claimed Mosley responded that Bacote had just stood outside the cell while he and Akh "put in the work." Bailey elaborated in response to leading by the prosecutor:

> Q. What did Mosley tell you?
> A. He said they went in there and put in the work. They said that he -- he stabbed him so many times that they had to take breaks. He say he punished the motherfucker.
> Q. Now, did he say he punished or did he say they punished?
> A. He said, "We punished the motherfucker."
> Q. "We punished." Did he tell you why he and Akh killed Keith Barnes?
> A. Say because he was a snitch; he was hot.

4/28/09, 1710-11.

53. Bailey acknowledged that, in return for testifying, he had received a promise that the government would protect him from DC inmates and send a letter to his prosecutor asking him to consider moving for a sentence reduction. 4/28/09, 1712. He also acknowledged that "Akh" was Muslim for "brother," that he called more than one person "Akh," and that Mosley never mentioned Ebron by name during the conversation. 4/28/09, 1700-01, 1728, 1733.

54.    Tommy Brown, M.D., a pathologist who did contract work for the county, conducted the autopsy and concluded that Barnes died of 106 stab wounds to the chest. 4/23/09, 849, 857, 861.  Barnes had defensive wounds on his forearms and hands, consistent with his trying to grab the knife. 4/23/09, 910-13.  According to Dr. Brown, the pattern of wounds was consistent with an attack in which Barnes was standing while someone restrained him from behind and someone else stabbed him from the front. 4/23/09, 896.  He conceded, however, that this opinion amounted to "conjecture, speculation," and that he was "just guessing" about how Barnes was held. 4/23/09, 897, 899.  The wounds could have been consistent with a single assailant sitting on top of Barnes to stab him. 8/23/09, 904, 910.

55.    Ebron's attorneys presented the testimony of Stephen Pustilnik, M.D., the chief medical examiner for Galveston County and a member of the pathology faculty at the University of Texas Medical Branch.  Dr. Pustilnik rejected Dr. Brown's conclusion that Barnes was standing during the attack, because the injuries contradicted that theory.  Dr. Pustilnik's expert opinion was that Barnes was stabbed on the bottom bunk with one assailant partially covering him and using his body weight to restrain him.  Dr. Pustilnik attached significance to these facts: (1) that the wounds were inflicted in a small area rather than all over the chest and abdomen, which would have been available to the stabber if a second assailant had restrained Barnes; (2) that only one assailant's DNA was under Barnes's fingernails; (3) that the first assailant had scratches on his eyebrows; (4) that Barnes had no scratches on his own neck and the second alleged assailant had no scratches on his arms; and (5) that there was little blood on the bed, suggesting that the blood pooled in the bottom of Barnes's body cavity as he lay on his back. 4/29/09, 1865-81.

56.     The prosecution introduced a palm print matching Ebron's, lifted from the bunk. 4/23/09, 946, 970, 986.   A DNA sample from a pair of pants found in a dryer in Ebron's unit (which was Unit AA) compared positively with Ebron's profile.  An apparent blood stain on the pants compared positively with Keith Barnes's profile. 4/20/09, 74, 4/23/09, 1036, 4/27/09, 1359, 1361.  Barnes had Mosley's DNA under his fingernails, but that testing excluded Ebron. 4/27/09, 1375-76.

57.     The court had ruled pretrial that the government could introduce evidence of Ebron's involvement in three infractions at USP Atlanta, where he celled with James Carpenter. 4/24/09, 1207.  Carpenter had also been involved in each of the infractions, and the court decided to allow the testimony on the theory that the assaults would "tie the whole motive back to Mr. Carpenter and the aversion to snitches, et cetera, but not just general aversions to snitches but knowing that this particular snitch is a snitch against Mr. Carpenter who is a friend of Ebron." 2/13/09, 127-28.  At trial, Tim Zuppinger, a food administrator at Atlanta, testified that a fight broke out in the cafeteria between Ebron and Carpenter on one hand and an inmate named Joseph Brown on the other.  According to Zuppinger, after officers broke up the fight, Carpenter announced in a loud voice, "That's how we handle snitches, bitch."  4/23/09, 1101-03.  A few weeks later, Corrections Officer Leander White placed Brown in a holding cell with Ebron and Carpenter while all three were waiting for hearings on the institutional infractions that arose from the cafeteria incident.  White testified that shortly afterwards, he noticed Brown on the floor and Carpenter and Ebron kicking and hitting him.  According to White, both Carpenter and Ebron told him that Brown was a "snitch."  4/23/09, 1137-44.  On a third occasion, according to Corrections Officer Steven Perry, he found Ebron and Carpenter hitting an inmate named

22

Michael Perry (no relation) while they were all in a recreation cage. Officers entered the enclosure and broke up the fight. 4/24/09, 1196-99.

58. A detective who had investigated a 1996 DC murder and prepared the case against James Carpenter and his co-defendants described Barnes's cooperation at their trial. 4/24/09, 1212.

59. Carpenter himself testified for the defense. He had been confined at USP Coleman since 2006 and, before that, at USP Atlanta, where he had shared a cell with Ebron. 4/28/09, 1739, 1743. He also knew Ebron when they were incarcerated in the DC Jail system. 4/28/09, 1743.

60. Barnes testified against Carpenter and his other co-defendants in 1998. Carpenter was convicted and received a sentence of 40 years to life. 4/28/09, 1740. In 2002, Barnes prepared a notarized affidavit, indicating that he had lied at the trial. Carpenter received it in 2003 and sent it to his attorney. He planned to use it in support of a petition for post-conviction relief in the DC Superior Court. 4/28/09, 1744-47. Ebron was Carpenter's cellmate when he received the affidavit, and Carpenter told him how he planned to use it. 4/28/09, 1747-48.

61. Carpenter explained the reasons for the three fights that had resulted in his and Ebron's institutional infractions in Atlanta. None of them involved "snitches." In the cafeteria incident, inmate Brown, Carpenter's cellmate, had lost a fight with Carpenter and a third cellmate (not Ebron). Brown attacked Carpenter in the cafeteria in retaliation, knowing that the fight would send Carpenter to the SHU. Ebron threw a tray at Brown to protect Carpenter. The incident had nothing to do with Keith Barnes. 4/28/09, 1752-54, 1756-57. In the holding cell incident, the guards locked the three up together as part of a "gladiator school" practice in which, as the guards knew, the three inmates did not have much choice but to fight each other. 4/28/09,

1769.  Again, the fight had nothing to do with Keith Barnes.  4/28/09, 1755.  In the third incident, inmate Perry had damaged a magazine, borrowed from Carpenter, which belonged to another inmate.  Carpenter and Ebron began fighting Perry because Perry had caused trouble for him with someone else.  Once again, the fight had nothing to do with Keith Barnes.  4/28/09, 1754.

62.    Joseph Ebron testified in his own defense.  4/29/09, 1960.  His attorneys introduced no evidence, other than his testimony, on most of the areas it covered.

63.    Ms. Scardino led Ebron through a three-page outline of his upbringing that stressed his criminal background and behavior.  4/29/09, 1961-64.  He grew up in a high-crime area.  4/29/09, 1961.  His father was a heroin addict, in and out of prison, and Ebron left home at thirteen to live on the streets with friends.  4/29/09. 1962.  He dropped out of school in the ninth grade.  4/29/09, 1963.  His stepmother, Denise Ebron, took care of him and his older sister Latina, and later his younger half-brother William, until he left home at thirteen.  Then he "basically did what I wanted to do," namely "get in trouble and run around with the wrong people."  4/29/09, 1964.  He used marijuana daily from thirteen to eighteen.  4/29/09, 1964-65.

64.    Counsel elicited Ebron's 1999 murder conviction (4/29/09, 1965-67), and his prison infractions, including one for bringing a handmade knife (or "shank") into USP Beaumont from USP Atlanta.  The government had not introduced this infraction in its direct case and had not sought to do so before trial.  Ebron denied that he knew Lamont Bailey in the DC jail.  4/29/09, 1967.  He described his history of incarceration after his conviction for the 1997 murder, first at a DC facility in Lorton, Virginia, then (after the Lorton facility closed and DC inmates were transferred to the BOP), at USP Atlanta.  The BOP transferred him to Beaumont on February 16, 2005.  4/29/09, 1969-74.

24

65.    Ebron converted to Islam in 2004.  Two Muslim cellmates in Atlanta taught him the basics.  He prayed five times daily, grew a beard "to show [my]self a believer," and studied the Koran regularly. 4/29/09, 1983-85.  In Beaumont, he "dealt" with both the Muslims and the DC inmates, but never joined either group completely.  4/29/09, 1987.

66.    While he celled with James Carpenter in Atlanta, Ebron learned of Keith Barnes. He knew that Barnes had "snitched" on Carpenter at his trial.  4/29/09, 1992-93.  He did not see Barnes when Barnes arrived at Beaumont on May 6, 2005, and did not hear his name until the afternoon of May 7, when Mosley, Sherman, and Bacote, with two other inmates named Joseph Jackson and Juvie, walked up to him on the recreation yard.  4/29/09, 1993-95.  Mosley walked with Ebron toward his building, and told him that a Muslim inmate had arrived from DC. Mosley believed the inmate's name was Keith Barnes, and wanted to know if James Carpenter had ever told him that Barnes was "hot."  Ebron responded that the last he heard, Carpenter and Barnes were "working it out" because Carpenter had received Barnes's affidavit.  4/29/09, 1998-99.  This answer did not satisfy Mosley, who demanded to know, "yes or no, is he hot?"  Ebron told him "yes."  Mosley said he was going to "put a knife in him."  Ebron, who had been at Beaumont longer than Mosley, tried to convince him that a stabbing would cause a "chain reaction" of repercussions with other groups.  4/29/09, 2000-03. By the end of the conversation, Ebron thought he had persuaded Mosely to "send him up top" to the SHU:

> A. He said he at least want to put the knuckles on him.
> Q. Want to put the knuckles on him?
> A. Yes. That mean beat him up and then send him up top.
> Q. Okay. And was that all right? I mean, nobody --
> A. No. I refused because, like I said, the guy was Muslim. So, I said, "No." And at that point Funk got mad at me and said that I'm protecting the hot dude. He said, "For that, get the dude -- get him gone." He told me to get him checked in, he said because he don't want to compromise with no snitches.

25

> Q. So, what happened then? I mean, where did you go after that -- is that the end of the conversation?
> A. No.
> Q. Okay. Well, then what happened after that?
> A. Once he told me to get rid of him since I was protecting him, I said, "Cool," that I'd do that, I'd check him in, get him to leave. He said that he wanted him out his unit. He said he want him out his unit today -- that day, May 7th.

4/29/09, 2003-04. Ebron promised to come to the unit after the institution-wide inmate count (for which Ebron needed to report back to his cell in his own unit). 4/29/09, 2004-06.

67.     When Ebron arrived at the DB unit at "chow time," he put his khaki shirt over his head "in the heat of the moment." He asked Sherman where Mosley was, then walked up to Mosley at a table in the common area. Then he asked Mosley where Barnes was. 4/29/09, 2007-08. Before taking Ebron to Barnes's cell, Mosley first wanted to show him some pictures he had mentioned. 4/29/09, 2010-11. Then Mosley told him, "Look, man, I don't want you to get on that Muslim shit. I'm going to make sure the dude get checked in with you. We're going to walk him up top." 4/29/09, 2011. Ebron agreed, telling Mosley to let him do the talking because Mosley had said previously he wanted to "put the knuckles on him" and Ebron wanted to prevent that. 4/29/09, 2011, 2018. Mosley put a shirt on his head and led Ebron to Barnes's cell, where he found Bacote. Mosley stood by the window and Barnes "backed up to the bunk." Ebron stood near the front of the cell, up against the wall. Bacote walked out shortly after Mosley and Ebron entered. 4/29/09, 2012-15.

68.     Ebron, in an effort to lead the conversation, asked Barnes if he was hot. Barnes began explaining that it was a misunderstanding that he was working out, but Mosley stepped in, drilling Barnes about his trial testimony against Carpenter and his other co-defendant. Mosley, increasingly agitated, would not let Barnes finish sentences, called him a snitch, and told him he

26

had to go up top.  Barnes turned to Ebron and protested that he had just talked to the Muslims, who had given him their protection.  4/29/09, 2019-20.

69.     Ebron asked Barnes to come with him to talk to the imam (the Muslim leader), but before Barnes could move, Mosley punched him on the side of the head and knocked him down on the bunk.  Mosley pulled out a knife, jumped on top of Barnes, and began stabbing him. Ebron, alarmed, yelled at Mosley to let Barnes go, but Mosley continued straddling Barnes and stabbing him.  Barnes tried to grab Mosley's hand, and Mosley kept smacking the hand away. When, at one point, Barnes managed to grab Mosley, begging him to "go ahead and let me leave," Mosley only promised to stab Barnes's heart out.  At other points, Barnes managed to bring the attack to a standstill.  Mosley yelled to Ebron, "Don't just stand there, get this hot motherfucker off me."  Ebron refused.  He asked Mosley to let him leave, but Mosley told him, "Don't open the door while I'm like this."  4/29/09, 2021-26.  Eventually, Barnes's arms collapsed.  Mosley took his knife in two hands and stabbed Barnes to death.  4/29/09, 2014.

70.     After the attack was over, Mosley took a towel and hung it over the window in the door.  He couldn't get the door to stay closed, so he called out to Sherman to close it.  Next he turned on Ebron:

> A. Then he hop up in my face and ask me why the fuck didn't I help him, why I didn't get that hot motherfucker off of him. I told him that I ain't – wasn't trying to be part of no murder.
> Q. And what did he say then?
> A. He say he ain't trying to hear that punk shit.
> Q. Did he ask you -- what was the next question he asked you?
> A. Well, after that he asked me was I DC or Muslim; and he stated that he didn't want to hear that Muslim shit.
> Q. So, what did you tell him?
> A. I had to say what he wanted me to say.
> Q. Why?
> A. Because he had the knife in his hand, wrapped around his hand, and he was going to kill me.
> Q. And did he -- what kind of look was on his face at that time?

27

A. That if I would have said Muslim, he would have killed me. So, I had to say DC.

4/29/09, 2028-29.

71.     Mosley told Ebron to help him put Barnes's body on the top bunk, and he complied.  They covered the body with a blanket.  Mosley washed his hands and his knife, and cleaned the floor and bed with a rag, which he then flushed down the toilet.  Mosley swore Ebron to secrecy on the Koran.  As they left, Mosley sent Ebron back to put a towel over the bottom bunk. Then Ebron returned to his unit.  4/29/09, 2030-37.  Aware that a lockdown was coming, he washed all his clothes.  4/29/09, 2037-38.  A short time later, Mosley and Bacote sent Sherman to fetch him.  Ebron promised again to say nothing, and, at Mosley's instigation, signed his name on the basketball recreation list for the time they had entered Barnes's cell.  4/29/09, 2042.

72.     Cross-examination pitted Ebron's credibility against that of other government witnesses.  He denied that a crusade against snitches led to the Atlanta assaults, and testified that Bailey lied about his alleged conversation with Mosley.  4/29/09,  2056-58, 2059, 2105.

73.     The only other evidence the defense presented, besides Dr. Pustilnik's testimony, was testimony from a BOP employee who photographed and identified a floor plan of Barnes's cell.  4/29/09, 1925-28.

74.     In rebuttal, Lieutenant Paul Wingate of the DC Police Department introduced letters Carpenter had written shortly after his arrest in 1996, showing his determination at that time to get revenge against Barnes.  4/30/09, 2132-50.  Barnes was seventeen when arrested and nineteen when convicted.  4/30/09, 2153-54.

75.     With no objection from the defense, the court instructed the jurors to consider only the two charges in the indictment, first-degree murder and conspiracy, without any lesser-

included offenses.  4/30/09, 2178, 2180.  In summation, the defense argued that Sherman had lied and that Ebron had told the truth.  Counsel argued that Ebron was not guilty of capital murder. 4/30/09,2206, 2235-37.  The government stood by Sherman's testimony, arguing that Ebron participated in a preconceived plan to kill Keith Barnes.  4/30/09, 2243-45.

76.     The jurors struggled to decide the credibility contest.  They deliberated from 3:56 PM until 5 PM on April 30 and all day on May 1, 2009.  At 3:34 PM on May 1, they announced that they were "hopelessly deadlocked, cannot reach a unanimous verdict."  4/30/09, 2254, 5/1/09, 2259.  The court told them to continue their deliberations, and discharged them at 5:12 PM for six days.  5/1/09, 2268.  At 10:14 on the day they reconvened, May 7, the court received another note indicating that "there is no way we can arrive at a unanimous decision."  5/7/09, 2273.  The court gave the circuit's pattern *Allen*[9] instruction and sent the jurors back for further deliberations, which continued until it excused them at 4:49 PM.  5/7/09, 2274-84.  On May 8, the court received a note from one juror complaining that the jury was hung and "I have been cursed at," and asking "how much more I will have to endure."  5/8/09, 2288.  After questioning each juror individually, the court excused the embattled juror and released the other jurors for the weekend, then replaced the dismissed juror with an alternate and instructed them to begin deliberations anew.   5/8/09, 2310, 2323, 2368, 5/11/09, 2373.   After five more hours of deliberations on May 11, the jurors found Ebron guilty, as charged, of first-degree murder and conspiracy.  5/11/09, 2374.

77.     At the eligibility phase that immediately followed, the prosecution proffered three statutory aggravating factors: that Ebron had been previously convicted of an offense carrying a sentence of life imprisonment or death, that the killing was heinous or cruel, and that it had involved substantial planning or premeditation.  5/11/09 (Eligibility Phase), 6.  Steve Durham,

_____

[9] *Allen v. United States*, 164 U.S. 492 (1896).

29

the Assistant United States Attorney who had prosecuted Ebron's 1997 murder case, introduced the presentence report and judgment that reflected his conviction and life sentence. 5/12/09, 35-36. The defense presented Charles Sherman, who described the extensive planning of Barnes's murder by the three inmates from DB unit (himself, Mosley, and Bacote), and indicated that Ebron did not participate in the planning that preceded his meeting with the three outside the unit. 5/12/09, 56-74. Nevertheless, Sherman maintained on cross-examination that Mosley told Ebron that he was going to kill Barnes, and that he saw Ebron restrain Barnes during the stabbing. 5/12/09, 84-86.

78.     The jurors found all three aggravating factors and found that Ebron was over eighteen years old. They were unconvinced, however, that he had the most culpable mental states, rejecting the government's allegations that he had intentionally killed or inflicted serious bodily injury on Barnes, and finding instead that he had "participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used." 5/13/09 (Eligibility), 154.

79.     The final, selection, phase of trial began on the same day. In addition to the three statutory aggravating factors, the government proffered as non-statutory aggravation that (1) the motive for the killing was Barnes's past cooperation and testimony against his co-defendants, and (2) Ebron posed a continuing danger to others while incarcerated because he would likely commit violent acts in the future. 5/13/09 (Selection), 11-12. The government's presentation focused on showing Ebron's prior criminal convictions and infractions, and Keith Barnes's fears of retaliation during his time in the BOP.

80.     AUSA Darlene Soltys prosecuted Ebron and a co-defendant for murder in juvenile court in DC when he was fifteen years old. Ebron pled guilty to second-degree murder

30

and was committed to a residential facility.  5/13/09 (Selection), 41-50, 187.  The government introduced crime scene photos. 5/13/09 (Selection), 166-67.  A detective, Loren Leadmon, questioned Ebron without a parent and elicited a statement from him.  He told Leadmon that the shooting victim, Arthur Steve, may have stolen a stash of drugs from Ebron's friend, Carlie Swan.  Ebron handed Swan the gun he used to shoot Steve. 5/13/09 (Selection), 179-81, 189, 5/14/09, 214-20.

81.    Steve Durham, the AUSA who had testified at the eligibility phase, testified again about the trial of the adult murder case in 1998.  5/13/09 (Selection), 66.  A deputy marshal who was in the courtroom had told the court that he saw Ebron making a gesture to someone in the gallery, who then made a throat-slashing motion in the direction of the government's witness. The witness was already in witness protection and remained there for a period.  5/13/09 (Selection), 73-77.  Durham acknowledged that the surviving victim, Clarence Settle, had not identified Ebron as one of the shooters, and the alleged target of the shooting, Gregory Epps, testified that Ebron was not a shooter.  5/13/09 (Selection), 81-82.  The government introduced photographs of the homicide crime scene (5/13/09 (Selection) 93-114), and the testimony of the chief detective who investigated it, Timothy Doughty.  Doughty described the accounts of the government's two cooperating witnesses, Bernard Pinkney and Rose Brown.  According to them, Ebron and his friend, Steven Goode, had been hunting for Gregory Epps to retaliate for the shooting of a friend of theirs. They left from and returned to Pinkney's apartment, reporting that they had fired at Epps but accidentally killed a bystander.  5/13/09 (Selection), 126-31.  The court permitted Doughty to describe the witnesses' fears of retaliation and placement in the witness protection program.  5/13/09 (Selection), 137-38.  Doughty acknowledged that Rose Brown initially said the shooting involved three people, including a person named Stanley.  He

31

claimed that Stanley was only a "person of interest," not a suspect.  The police never found him.  5/13/09 (Selection), 149.

82.    Correction Officer Bennett Cobb searched Ebron's property when he first arrived at USP Beaumont, and found a shank, or homemade knife, with his correspondence.  5/14/49, 264-73.  Hearing Officer Larry Weston found Ebron guilty of an infraction, but imposed relatively lenient sanctions because it was the only time Ebron had possessed a weapon in the BOP and he accepted responsibility for it.  Ebron explained that he had not known he was packing for Beaumont, had not had the chance to get rid of the shank, and did not intend to smuggle it in.  5/14/09, 291-95.

83.    Peter Zeidenberg was the former AUSA who had prosecuted James Carpenter for murder and presented the testimony of Keith Barnes against him.  Zeidenberg made a deal with Barnes that he could plead guilty to second-degree murder and carrying a gun, and Zeidenberg in return would recommend a sentence to the judge at the end of the case.  Barnes was terrified of Carpenter, "an incredibility dangerous, vicious individual."  5/14/09, 311-12.  After Barnes testified and Carpenter was convicted, Zeidenberg was disappointed at the long sentence the court nevertheless imposed on Barnes: more than fifteen years to life.  Zeidenberg filed several motions seeking reduction of sentence.  The judge eventually modified the sentence to a parole-eligible term, but the board denied Barnes parole.  5/14/09, 314-15, 318, 320.  In 2003, Barnes was threatened at USP Coleman and requested placement in the SHU for protection, but did not receive it until an inmate calling him a snitch attacked and beat him.  5/14/09, 323-26.  From protective custody, he wrote to his congresswoman, the U.S. Attorney, and Zeidenberg asking for help getting out of the BOP.  Zeidenberg never learned of these letters because he had left the

U.S. Attorney's office.  5/14/09, 326-28.  He acknowledged that none of the letters, and nothing in Barnes's and Carpenter's DC case, had anything to do with Joseph Ebron.  5/14/09, 344-55.

84.    The defense presented five family witnesses for one and one-half hours of testimony.  5/14/09, 369, 444.

85.    Kathy Robinson, the sister of Joseph Ebron's stepmother, Denise Ebron, lived in DC during the years when Denise was caring for Joseph and his sister Latina.  She provided a few facts about Joseph's life:  Joseph Sr. was a heroin addict who rarely worked, but Denise worked full time.  As a child, Joseph was quiet, respectful to Robinson, and playful, and she saw no change in him as he got older.  He was always smiling.  Denise lived with the children and her husband in southeast DC, a high-crime area.  As an adolescent, Joseph was sent to a juvenile facility, but after his release he returned to "doing the same things."  He had a younger brother, William, who communicated with Joseph by letter after he received a prison sentence.  5/14/09, 369-79.

86.    Palamae Davis, a paternal aunt, lived in northeast DC about a half hour away from her nephew Joseph's family while he was growing up.  Her brother, Joseph Sr., was a heroin addict who had a twin.  Davis thought he had died of cancer.  She identified photos of her brother and nephew, Joseph Jr. and Sr., at family events.  She acknowledged that Denise was the family breadwinner.  Joseph was a "good kid" who was compassionate to his grandmother and father when they were sick.  Asked why (in Ms. Scardino's words) a "typical, happy little boy" like Joseph ended up in a juvenile facility for murder and was now facing equally serious charges, Davis thought that "the streets must have taken over."  She went on to suggest that Joseph may not have been such a typical, happy little boy. "[T]here's a lot of stuff he's been subjected to as a child," because "his [biological] mother was not there and his father was like he

33

was . . . he never did anything in front of him, but he knew." But Ms. Scardino did not ask her to explain. 5/14/09, 380-89.

87.    Alice Anderson, another paternal aunt, also provided a few facts. She knew that her brother Joseph Sr. was imprisoned at least twice, once for eighteen months and once for three years. He worked only sporadically. Joseph Jr.'s biological mother left him and his sister Latina. Joe Sr. tried to care for them, but "he couldn't when he got into situations." The family lived in a high-crime area with drugs and prostitution. Joseph Jr. corresponded with her from prison, at least in the early years. Ms. Scardino asked Anderson, like Davis, to explain why "this adorable-looking boy, normal-looking child" in childhood photographs, who "looks like he's happy and content," was now facing the death penalty. Anderson said that drug addiction and incarceration were rampant in her family and that the neighborhood was bad. Denise "worked all the time" but had a limited income, and Joseph's biological mother "never came back." 5/14/09, 389-408.

88.    William Ebron, Joseph's half-brother and Denise's son, was ten years younger than Joseph (and therefore was only five years old when Joseph was incarcerated at fifteen). He recalled that his brother used to walk him home from school and play with him. Joseph corresponded with William from prison and encouraged him not to go "down the wrong path." William was now twenty and had graduated from high school in Nevada, where he and Denise now lived. 5/14/09, 409-19.

89.    Joseph's stepmother, Denise Ebron, described her hard-working life and troubled marriage to Joseph Sr. Her life with Joseph Sr. was "chaotic." He was a heroin addict and went to prison three or four times for periods of around two years. Denise was the "sole supporter" of the family. She did not earn much, and worked overtime a good deal. Their neighborhood in

34

southeast DC had a lot of crime and gangs, drugs, shootings, and stolen cars. When Joseph Jr. stopped attending school, he began coming home with F's on his report cards, but the school did not tell her he was not attending. Her husband was "out there on drugs" and gave her no help. She got no help for Joseph from alternative programs, truant officers, police, probation officers, or social services, either. After Joseph Sr. died, Denise decided to get out of DC to save her youngest son, William. 5/14/09, 420-29

90.     Denise identified several family photos depicting her stepson and his siblings. Her stepdaughter, Latina, left home and went to live with her mother's family when she was 16. William, as he grew older, received support and encouragement to "do the right thing" from Joseph Jr., in phone calls and letters. Denise found it impossible to believe Joseph Jr. had committed the crime for which he now faced the death penalty. Asked by Ms. Scardino to explain how her stepson had come to this point, Denise blamed the environment, protesting that she had done the best she could to discipline him and that his addict father did not support her or provide a role model for his son. 5/14/09, 430-42.

91.     The balance of the defense presentation relied on experts. James Aiken, a retired prison warden from South Carolina who now worked as a consultant, reviewed records pertaining to the Barnes case and the two prior murder convictions. He viewed Ebron as a "high security inmate" who had "demonstrated disruptive behavior" and "will be in a high security setting for decades." 5/15/09, 498. He would be in a SHU or in the BOP's administrative maximum facility ("ADX"). In ADX, his routine "could be" 23 hours of lockdown with one hour of indoor recreation, "more than likely" living in a single cell. 5/15/09, 502. "More than likely he would be in a single cell until such time as he can convince people that he could have a relationship with a cellmate, which is a long time away," perhaps decades away. 5/15/09, 504,

35

541. Aiken noted that Ebron had not behaved aggressively to staff during any of his infractions, and stated that "staff could be protected" from him.  5/15/09, 514.

92.    On cross-examination, Aiken acknowledged that he had never worked for the BOP as a staff member or warden, and had visited ADX only two or three times.  He did not know that USP Beaumont had been reclassified from a high-security to a medium-security facility, and thought that an inmate could stay in the SHU there forever.  He had no information about the number of SHU-type cells at ADX or the likelihood an inmate confined there would be returned to a USP.  5/15/09, 519-45.

93.    Kristi Compton, a clinical psychologist, met with Joseph Ebron twice, administered tests, and asked him about his history.  She traveled to Las Vegas to meet Denise Ebron, and interviewed Alice Anderson and Palamae Davis by phone.  She met the family witnesses when they arrived in Beaumont to testify.  5/15/09, 546-49.

94.    Dr. Compton identified several risk factors for anti-social behavior in Ebron's background — poverty, parental addiction, lack of boundaries and resources.  5/15/09, 551.  Ms. Scardino asked her to give a "risk assessment for future danger."  Dr. Compton testified that the research would not support such an assessment for a prison inmate, although she suggested a "personal opinion" that he would be dangerous.  5/15/09, 553-54.

95.    Dr. Compton administered some personality testing and some cognitive testing "to assess if his brain is working like it should be working."  5/15/09, 555.  The personality testing showed that Ebron had anxiety and depression.  Although Dr. Compton said he did not report post-traumatic symptoms during the interview, the testing showed that he was "experiencing some post-traumatic stress type symptoms."  5/15/09, 555-57.  She learned about

one traumatic incident during Ebron's youth: he told her that a boxer befriended and then sexually abused him in his early teen years.  5/15/09, 568.

96.    Ebron's test scores for aggression were not elevated, meaning that he did not "have an ingrained and systematic pattern of negative behavior," but that his past conduct reflected "situational" aggression.  5/15/09, 557-59.  Dr. Compton also stressed Ebron's youth at the time of his prior homicides; until age 21 "our frontal lobes are not fully formed," and adolescents are prone to "poor judgment, impulsivity, and poor reasoning."  5/15/09, 560.

97.    Ebron's IQ was 89, a low average overall score.  Dr. Compton did not describe his scores on the subtests.  5/15/09, 563.

98.    Dr. Compton thought that Ebron could function in a "high security segregated type of facility."  The difference between him and his younger brother was that "the system failed" Joseph.  5/15/09, 565.

99.    The prosecutor vigorously cross-examined Dr. Compton about her reliance mostly on Ebron's reports about himself, with some additional information from his immediate family. He questioned her conclusions about post-traumatic symptoms, which she based on elevated testing scales rather than on specific incidents.  And he pressed her to say that Ebron's record met the criteria for antisocial personality disorder.  5/15/09, 579-615.

100.    Dr. Jerry Smith, a psychologist for the BOP at USP Beaumont, conducted evaluations of inmates in segregated housing on a thirty-day cycle designed to check for behavioral problems.  He had repeatedly evaluated Joseph Ebron during his time in the SHU following Barnes's killing, and found him smiling, pleasant, and cooperative.  He consistently received "low" ratings for threat to self or others.  5/15/09, 453-56.

101.    After the defense rested, the government called Greg Hershberger, a retired warden of ADX, in rebuttal.  Unlike Aiken, he had spent his career with the federal BOP.  5/15/09, 651.  According to Hershberger, Aiken had inaccurately testified that Ebron would not return to general population for "decades."  Hershberger testified that "even our most extreme placements for – say, in the control unit at the ADX . . . have limited time durations."  At the end of the placement period of four to six years, the inmate would return to general population.  Aiken, he said, had a "total misunderstanding" of BOP operations.  5/15/09, 656.  The control unit was reserved for "very egregious" behavior, while the regular ADX program permitted inmates to progress gradually to more "unrestrained" contact with other inmates and staff over the course of only three years.  5/15/09, 656-58.  Even control unit inmates were committed only for a specific period of no more than 100 months, after which they could return to the general ADX population or a mainline institution.  5/15/09, 660-63, 676.  Furthermore, ADX's limited capacity of only 500 beds limited the length of any one inmate's confinement there.  5/15/09, 666.

102.    Hershberger claimed that Ebron would stay at ADX for only about six years before he could return to general population in a mainline institution.  5/15/09, 664.

103.    Ray Coxe, a clinical psychologist, had reviewed Dr. Compton's report and testing, and observed her testimony, for the prosecution.  He criticized Dr. Compton for administering only 300 of 500 available items on one of the personality tests, the MMPI.  The full test would have yielded more reliable results.  Dr. Coxe speculated that Ebron's score on the scale for antisocial behavior might have been higher if she had administered the full test.  5/15/09, 704-07.  Dr. Coxe also interviewed Ebron, solely to assess his risk factors for future dangerousness and not to assess mental state or personality functioning.  He thought Ebron had

an antisocial personality disorder. And he focused on "risk factors" for future violence – multiple homicides and being a member of a gang. 5/15/09, 710-14.

104. Dr. Coxe did say on cross-examination that it was not unusual to administer the portion of the MMPI that Dr. Compton had given Ebron. 5/15/09, 719. Ebron's increasing age, lengthy sentence, and high school diploma lowered his risk of violence. 5/15/09, 716, 723. The conditions in which Ebron lived in his childhood and youth – in a high-crime area and among poor role models – had increased his risk of violent behavior before he got into trouble. 5/15/09, 724.

105. In summation, AUSA Batte argued that the government had proven that Barnes had been murdered for testifying against Carpenter. He proffered Ebron's 1997 adult murder conviction as an aggravating factor in its own right, and his 1994 juvenile murder conviction supported the non-statutory "future danger" factor. 5/18/09, 783. He argued that Ebron would certainly act violently in the future, on the basis of his prior convictions and infractions, some of which had involved retaliation against "snitches." 5/18/09, 778-81. In addition, Mr. Batte maintained that "[t]he doctors agree" that Ebron "has antisocial personality disorder," and that the best predictor of future violence is past behavior. He urged the jurors to "look at his resume." 5/15/09, 781. Then he reviewed the 35 non-statutory mitigating factors proffered by the defense, arguing that all except two either should receive little weight or were based only on Ebron's own word. 5/15/09 784-89. AUSA Craft, in his rebuttal summation, argued that a sentence of less than death would be "half justice" and that Ebron had shown no remorse. 5/15/09, 818, 819. He ridiculed Aiken's testimony as "balderdash." 5/15/09, 821.

106. Ms. Scardino asked the jurors to extend mercy because the doctors had all admitted they could not predict future violence, because a life sentence at ADX would constitute

39

harsh punishment, and because Ebron's family had given him "too little, too late" by coming to testify. 5/18/09, 792-801. Mr. Phillips urged the jurors to consider the neighborhood where Ebron grew up. 5/18/09, 807.

107. The jurors unanimously found both non-statutory aggravating factors. Of the thirty-five non-statutory mitigating factors that the defense submitted, twenty-five received no votes. The jurors unanimously accepted the factors that none of Ebron's co-defendants faced death and that his high-crime neighborhood affected his development. Ten accepted as mitigating that many of young Joseph's peers had similar family situations. 5/18/09, 833-38. Only a handful of other factors received a handful of votes.

108. The jurors unanimously determined that the aggravating factors (including the statutory factors found at the eligibility phase) outweighed the mitigating factors, and that Ebron should be sentenced to death. 5/18/09, 838.

## D. EVIDENCE THAT COULD HAVE BEEN PRESENTED AT TRIAL

109. As detailed above, the defense team conducted almost no investigation. An independent investigation could have produced extensive evidence that would have supported the defense at each phase of trial.

### 1. Evidence Available to Support the Defense at the Guilt-Innocence Phase

110. Because they had no other witnesses to call, Ms. Scardino and Mr. Phillips relied solely on Ebron himself to advance his defense. Ebron testified that he accompanied Mosley into Barnes's cell expecting to "run him up top," and was shocked when Mosley pulled out a knife and stabbed Barnes to death. With an adequate investigation, the defense could have learned that numerous available witnesses (including Lester Chew, Luther Fuller, Dwayne

Gladney, Lonnie Gooding, Edgar Hayes, Joseph Jackson, William Mercer, Damion Reeves, and Kelvin Smith) would support the defense, with or without Ebron's testimony.

111.    After the homicide, Mosley said that he and Ebron went to Barnes's cell to make it clear to him that he had to enter administrative segregation, because he had testified against another inmate.  Barnes resisted the message and Mosley got angry.  Mosley said that he began stabbing Barnes as Ebron argued and panicked at what Mosley was doing.

112.    On other occasions, Mosley said that the killing of Barnes "wasn't supposed to happen like that," that the visit to the cell was supposed to be a "check-in," and that Joseph Ebron was surprised by the stabbing.

113.    While they were both confined in the SHU on the same tier, Ebron frequently argued with Mosley, telling him, "this is your weight," and "you know that is you," and "it wasn't supposed to happen."  While he was at Beaumont, Ebron was a devout Muslim who was naïve about prison politics at Beaumont and often failed to appreciate what might create a dangerous situation.  Ebron made it clear that he did not agree with what Mosley had done to Barnes.  Mosley thought that Ebron was weak because he did not go along with what Mosley had done, and worried that Ebron might offer to testify against him.

114.    Sherman's testimony that DC inmates had an advance discussion about killing Barnes was false.  So was Bailey's testimony that he met Ebron when they attended Muslim services together at the DC jail.  During 1997-98, and again in 2004, when Ebron was confined at the DC jail, he was not a Muslim and did not attend Muslim services.

### 2.  Evidence Available to Rebut the Aggravating Factors

115.    The prosecution contended, and the jurors found, that the homicide had occurred after substantial planning and premeditation "to cause the death of a person."  *See* 18 U.S.C. §

41

3592(c)(9). A constitutionally adequate investigation could have uncovered persuasive evidence that counsel could have offered in rebuttal. As indicated above, multiple witnesses would have testified that Mosley did not plan to kill Barnes. Furthermore, multiple witnesses would have testified that Ebron remonstrated and argued with Mosley in the SHU after the homicide, telling him that it was not supposed to happen that way. All of this information would have rebutted the notion that Ebron participated in "substantial planning and premeditation" of a homicide.

116. The prosecution also contended as a non-statutory aggravating factor, and the jury found, that Ebron presented a continuing danger to the lives and safety of others while incarcerated. 5/18/09, 833. The prosecution relied in part on Ebron's institutional infractions to support this factor, 5/18/09, 783, but the trial defense team did not investigate the infractions and did not learn of potentially helpful rebuttal evidence. For example, the team could have learned from James Carpenter and Curtis Brothers — before trial, in time to use the information at the Rule 404(b) hearing — that Joe Brown began the cafeteria fight in retaliation for a fight in the SHU between himself and Rat Carpenter. It had nothing to do with "snitches."

117. Furthermore, the defense could have presented the testimony of a prison expert, such as Mark Bezy, with experience and information relevant to the BOP's capacity to ensure that an inmate like Ebron posed no danger to himself or others. Such an expert, informed about the operational procedures of the BOP and ADX, could have described the wide discretion and many tools available within the BOP to deal with inmates presenting both commonplace and extraordinary threats to the security of prison staff, other inmates, and the society at large. Finally, an expert such as Bezy could have testified in sur-rebuttal to the government's prison expert, Greg Hershberger. An informed expert could have established that Hershberger's testimony was misleading on several questions: the amount of time an inmate spends at ADX,

and the amount of time that Ebron would likely be housed there; the expectation that an inmate will leave ADX and return to general population if that inmate commits no infractions; and the capacity of ADX to house at-risk inmates for unlimited durations.

### 3.  Available Mitigating Evidence

118.    Joseph Ebron[10] grew up in southeast Washington, D.C.    An adequate investigation would have disclosed the true dimensions of his family history and background (readily available through witnesses who included Ethel Bennett, Annie Brown, Cykeithia Brown, Annette Caldwell, Valerie Clay, Denise Ebron, John Ebron, Kaniko Ebron, Anthony Fields, Alfonso Garces, Jacob Humphries, Vincent Jackson, Jeffrey Johnson, Rodney Johnson, Ronald Neal, Christopher Prince, Juan Scott, Jovan Smith, Willie Stokes, Bernita Ward, Ernestina Wiseman, Tonya Wiseman, and Toi Wiseman).

119.    Joseph Ebron's father, Joseph Sr., and his twin brother, John, were the youngest in a large family.  They had eight older sisters and brothers.  The family started out living a middle-class life.  Then, when the twins were about four years old, their father had a head injury while driving his cab and could no longer hold steady, well-paying jobs.  The family had to move into a bad neighborhood.  The twins, Joe and John, developed friendships in that neighborhood that led them into heroin use and then addiction, beginning at thirteen or fourteen years old.

120.    Joseph Jr.'s biological mother, Ernestina Wiseman, had a more unstable family background.  She was the youngest child in a large family born to a mother (Joseph Jr.'s grandmother) who abandoned her children several times.  When Ernestina and her siblings were small, their mother brought them down south to her husband's family in Mississippi and left them.  A few years later, she took some of the children, including Ernestina, back to Washington,

---

[10] This section uses first names when needed for clarity.

43

but after a while she left again to be with a new boyfriend, leaving the teenage Ernestina and her sister Valerie behind. Ernestina's family had many heavy drinkers. Her father eventually died of cirrhosis of the liver, and she herself began drinking in the sixth grade.

121. As young teens, both Valerie and Ernestina formed relationships with the two Ebron twins, Valerie with John and Ernestina with Joe. Not surprisingly, given her family background and his addiction, Ernestina and Joseph Sr. ("Big Joe") did not have a stable relationship. Ernestina and Big Joe had arguments, physical fights, and breakups. They did not often have a home of their own, frequently staying with the Ebron relatives.

122. Joseph ("Little Joe") was Ernestina's second child. During her pregnancy with him, Ernestina would drink at least a six-pack of twelve-ounce beers every weekday and more on weekends. She continued to "party," drinking and smoking marijuana, throughout her pregnancy. She sometimes urinated on her sister's couch and rug because she was too drunk to use the bathroom. Little Joe was born six weeks early and had to stay in the hospital until he had gained weight. She drank at the same rate during her pregnancies with her first child, Latina, and her third child, Keona. Both of those children were also born premature and small.

123. During the early years of their relationship, Big Joe and Ernestina sometimes lived at the Ebron family home. He would punch and kick her, and verbally abuse her. The beatings would occur about four times a week and at least once required treatment at the emergency room. The beatings began when Latina was a baby and continued after the birth of Little Joe. Big Joe did not care if the children were in the room when he hit Ernestina, and she would fight back in front of the children. They would often run out of the room crying.

124. Ernestina repeatedly left after Big Joe's beatings, sometimes taking the children and sometimes leaving them behind. At one point she stayed at her mother's one-bedroom

44

apartment with Latina and Little Joe and a half-dozen other Wiseman relatives. She left Big Joe for good after he broke her arm in an argument. She gave up on her children, too.

125. Latina and Little Joe cycled through the homes of various relatives, while Ernestina's mother, who felt guilty about having abandoned her own family as a younger woman, raised Keona as her own. Big Joe, deep into his addiction, could not care for Latina and Little Joe himself. They lived with his sister Ethel, with his other sisters, or with one of Ernestina's sisters.

126. Before Big Joe's final break with Ernestina, he had begun seeing another woman named Denise (or "Niecey"), whom he married after he and Ernestina broke up for good. Niecey assumed the care of Big Joe's children and provided some financial stability for them; she maintained steady employment for low wages, sometimes working overtime or at second jobs. But Big Joe's addiction and violence overshadowed the marriage and affected her relationship with her stepchildren. She and Big Joe fought over his heroin addiction, and sometimes she put him out of the house altogether. He would stay with his sister and hook up with another woman, causing further conflict.

127. Big Joe's addiction was notorious in the family and in the neighborhood. Ebron's trial defense team could have learned about his addiction and its impact on their client from numerous available witnesses (including Ethel Bennett, Valerie Clay, Anthony Fields, Alfonso Garces, Jacob Humphries, Vincent Jackson, Ronald Neal, Damion Reeves, Juan Scott, Jovan Smith, Bernita Ward, Denise Wiseman, Ernestina Wiseman, and Tonya Wiseman).

128. Big Joe used to pass out on the ground in front of the home where he and Niecey lived with the children, or in Niecey's car with drug paraphernalia on the center console. Neighbors rarely saw him when he was not high, and never knew him to hold a job. When he

45

spoke, his eyes would nearly close and he would touch his nose frequently, as if he had "drips" from snorting drugs through his nose. He would do the "heroin nod," sometimes nodding off in the middle of a conversation. He spoke slowly with a graveley voice. His hands were swollen, and were frequently bandaged.

129. Big Joe would ask Niecey for money in front of the neighbors. He stole money from her to buy drugs, and sold the television and the VCR. Neighbors overheard them fighting about his addiction. She would call him a junkie and tell him he should get a job. Nevertheless, Niecey stayed with Big Joe for the rest of his life. She took care of his children and of him. She bought him drugs at drug houses to keep him happy, and kept alcohol pads and bandages for his injection sites.

130. At home, Big Joe and Niecey had arguments, over his addiction, irresponsibility, and infidelity, that could last for hours and end in violence. Big Joe fought with Niecey as if she were a man, but he was bigger and he always won. During the fights, Latina and Little Joe sometimes hid in the closet or under a blanket. They could hear everything that was happening.

131. As Little Joe got older, Big Joe would frequently ask his son, or his son's friends, for money or drugs. Big Joe never spent much time with Little Joe, and often did not even acknowledge him on the street.

132. Big Joe died of AIDS in 2001.

133. Those who knew Little Joe as a child and young boy remember his sweet nature. He smiled frequently, even when he did not seem sure what was going on. He was an obliging and loyal friend. Several factors, however, prevented him from achieving his potential in life. The defense team could have learned about these factors from readily available witnesses (including Ethel Bennett, Cykeithia Brown, James Carpenter, Valerie Clay, John Ebron, Jeffrey

Johnson, Rodney Johnson, Christopher Prince, Juan Scott, Willie Stokes, Bernita Ward, Tonya Wiseman, Toi Wiseman, Ronald Neal, Roy Middleton, and Damon Reeves).

134.    First, Little Joe was developmentally delayed.  He was late in toilet training, still wearing diapers at age four. As a small child, he announced that he had gone to the bathroom, but it turned out that he had urinated in a closet.  Even at age five or six, he wet the bed so often that none of his cousins would share the bed with him.   He spoke so indistinctly that his sister had to translate for him.  He was slow learning the rules of games.  He had trouble following social cues, and would smile to cover up for his inability to get the point of what was going on. He banged his head when frustrated and rocked himself to sleep.  He did risky things like trying to jump over things that were too tall to jump over.

135.    Even in adolescence, his friends knew him to be slow, one who could not master basketball or football, or think quickly.  He could not dribble the basketball and walk or run at the same time. In social situations, he would often miss what was going on, and people would take advantage of him.  Many of his friends noticed his tendency to smile at odd times.  He was reckless and impulsive, with a short attention span.  And he was a follower and people-pleaser. His friends found that he would readily go along with whatever they wanted to do.

136.    Second, the family chaos described above – abandonment by his mother, neglect by his addicted father, violence between his father and both his mother and his stepmother, and unstable living arrangements throughout his earliest years – left  Little Joe needy and vulnerable.

137.    Third, he was a small, timid child.  He was bullied within the family and on the street.  His older cousin, Anthony Fields, used to abuse Little Joe, wrestling him, slamming him to the ground, kneeing, kicking, and choking him, and practicing karate on him.  Sometimes Anthony would take his diabetic grandmother's syringes and inject Little Joe with water or soy

or hot sauce.  Little Joe would scream and cry but no one would stop Anthony.  Outside the family, it was common in that neighborhood for boys to pick fights.  Little Joe was terrified and would not fight back, which only made him a bigger target.  He would try to convince his cousins to fight for him.  When Big Joe found out, he whipped his son and called him names.  The family all laughed at Little Joe about his fears.

138.    In elementary school, Little Joe was a vulnerable target.  Boys were expected to fight to prove that they could defend themselves and weren't soft.  If they didn't have a "crew" to back them up, they could get jumped, meaning that a group would attack a single boy.  Joe was not a good fighter.  Boys would rip and tug his clothes, choke him, or punch him while their friends held him.  They made fun of his haircuts and his clothes.  On the way to school, other boys "jumped" him.  His quicker-witted friends ran away from danger, but he froze and was left behind with the attackers.

139.    Fourth, the neighborhood where young Joe grew up was extremely violent.  The trial defense team could have learned about the neighborhood from readily available witnesses (including Curtis Brothers, Charles Butler, John Ebron, Anthony Fields, Alfonso Garces, Jacob Humphries, Vincent Jackson, Jeffrey Johnson, Rodney Johnson, Ronald Neal, Roy Middleton, Christopher Prince, Damien Reeves, Yvonne Smallwood, Jovan Smith, Willie Stokes, Bernita Ward, and William White).

140.    Joe's trip to and from junior high school was perilous.  He always walked with a friend for safety because they had to cross other neighborhoods and housing developments to get there.  Joe frequently observed other boys ganging up on individual students, stomping their hands and kicking them in the mouth.  He saw boys with swollen eyes and broken noses.

141.    Like other neighborhood residents, though, he saw much more than schoolyard bullying.  Shootings, stabbings, and murders were common.  It was normal to hear gunshots or have a gun.  Once one car chased another past an elementary school, exchanging gunfire, while the children were arriving.  Another time, Joe was outside when the sound of a machine gun broke out.  A man was shot in the head in front of his two daughters.  As he died, his body jerked around, his blood pooled on the ground, and he urinated and defecated on himself.  Another man Joe knew was killed on the path that he routinely took to the corner store, leaving chunks of dried brain matter at the spot for days after the shooting.  A ten-year-old girl was shot after witnessing a shooting from her window.  The shooters saw her and shot at her.

142.    All these factors combined to make Joe a needy, vulnerable adolescent.  As Joe entered his teen years, home was not a comfortable place.  Niecey worked steadily but did not earn much, and sometimes supplied Big Joe's drug habit.  She did not have much to give the children in the way of material things.  Little Joe's shabby clothes stood out and attracted teasing.  Niecey was hard to please and yelled a lot.  She would come home from work and start yelling at Little Joe as she entered the door.  She yelled about school and homework, without asking if he had been to school or done his homework.

143.     At first, Joe rebelled by staying out all night.  He ran away from home with his friends, with his cousin, or on his own.  He slept at the homes of friends whose parents did not keep close watch, or in the hallways of buildings.  At one point, he slept in the laundry room of the apartment building where he had lived in elementary school.

144.    As he grew older, however, he was lured into more serious activity.  The house where his family lived when he was in his teens was right across the street from a place where a lot of drugs were sold.  People were standing outside hustling and selling drugs at all hours of the

49

day or night.  People would play craps behind the house, and there was a lot of traffic through the area at all times.

145.    Another busy area was on 18th Street, one block over from where Joe lived.  That block had so much activity that at one point the National Guard patrolled it, which only drove even more drug activity to Joe's area, which was called "the Hole."  There was no way for Joe not to see what was going on; all he had to do was look out his front window.

146.    People in the neighborhood paid attention to Joe.  Older guys from the area gave him clothes and shoes, but they were just using him.  He would do their errands and join their "beefs." The people he got to know on the street provided the loyalty and support he did not receive from his family, along with some hope of safety in a very dangerous world.

147.    Beginning in 1992, at age 13, Joe had seven arrests, two of which resulted in adjudications and terms of probation, for joyriding, attempted robbery, and drug charges.  When he was fifteen, he was arrested for the murder of Arthur Steve.  Although he pled guilty to having acted as an accomplice, the court did not decide where to commit him until February 27, 1995, a week before his sixteenth birthday.  In the interim, he was confined at the DC juvenile facility at Oak Hill.

148.    The trial defense team could have found readily available witnesses and evidence to describe conditions at Oak Hill (including testimony by Curtis Brothers and Jeffrey Johnson).  Oak Hill was a horrible place to live.  Even more than in the streets of Southeast DC, juveniles confined there had to know how to fight, or else had to have a "crew" behind them to fight for them.  A boy could not take a shower there unless he was willing and able to fight for the right.  If not, he would have to bathe at the sink with a washcloth because the stronger boys would not allow him in the shower area.  Thefts, robberies, and sexual assaults were common at Oak Hill.

One boy was hospitalized after another boy shoved a water hose and then a plunger up his rectum. The guards instigated fights and smuggled cigarettes and drugs into the facility. Education was almost non-existent. In that environment, Joe, without a crew behind him, was even more vulnerable than he had been on the street. He was attacked both physically and sexually.

149. Joe then spent two years at another juvenile facility in Colorado. 5/13/09, 4749. After his release in 1997, he was arrested for drug possession (for which he was acquitted) and then, on May 24, 1997, for the murder of Anthony Tate. He was convicted after trial and was incarcerated for that offense at the time of the events at USP Beaumont in 2005.

150. In prison, Joe found strength and refuge in the Muslim faith. The trial defense team could have found readily available witnesses to describe the importance of his religion (including Rat Carpenter, who was not asked about it, and Dwayne Gladney, who was not interviewed). Joe regularly attended Muslim services and classes. He spent a lot of time studying, sometimes out on the recreation yard with another inmate. He grew a Muslim beard and prayed frequently. During his months on the compound at USP Beaumont, Joe was spending more time with other Muslims than with inmates from DC.

151. As discussed, AUSA Batte vigorously cross-examined and sought to discredit the defense psychologist, Dr. Compton, because she based her conclusions primarily on information from Ebron himself. If the defense team had conducted an independent investigation, trial counsel could have developed a detailed social history for consideration by experts such as Dr. Compton, Paula Lundberg-Love, Ph.D., Julian Davies, M.D., and Harry Krop, Ph.D. These experts could have presented well-founded opinions that explained the effects of family dysfunction, childhood trauma, neighborhood violence, and brain dysfunction on Little Joe's

51

development and functioning, and could have provided a context for his adolescent juvenile adjudications and criminal convictions. Instead, the jurors decided Joseph Ebron's fate on the basis of a story told almost entirely by the prosecution.

## ARGUMENT

I. **TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE GUILT-INNOCENCE PHASE OF TRIAL.**

152.    The defense team never interviewed any inmate who had had direct contact with the murder or those who planned it, and conducted no interviews at all to prepare a defense to guilt until days before jury selection began.  They never learned that numerous witnesses could have supported Ebron's defense: that he went to Barnes's cell only to "check him in," and that Mosley acted on his own.  Counsel never requested discovery that could have yielded helpful information.  During trial, counsel failed to object to inflammatory and inadmissible testimony, was unprepared for the cross-examination of the key government witness, and failed to insure that the jurors could give effect to their reasonable doubts about his intent through instructions on lesser-included offenses.  Counsel stood silent when the government secured permission to hamper Ebron's trial participation through use of a stun belt.  These and other deficiencies in counsel's investigation, preparation, and presentation deprived Ebron of the effective assistance of counsel.  U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984).

A. **TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT READILY AVAILABLE EVIDENCE TO SUPPORT THE DEFENSE ON WHICH THEY RELIED AT TRIAL.**

1. **Counsel Failed to Interview and Present Numerous Witnesses Who Could Have Reported Marwin Mosley's Incriminating Admissions and Other Evidence That Would Have Supported the Defense.**

153.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

154.    Ebron's counsel failed to investigate and present helpful available evidence to support Ebron's defense.  Trial counsel failed to adequately review the discovery to determine which witnesses were relevant to their investigation.  In turn, neither trial counsel nor their

53

investigator interviewed any witness who had personal knowledge about Barnes's murder. This was deficient performance.

155.    Had they interviewed witnesses who had relevant information about Barnes's murder, there is a reasonable probability that the outcome of Ebron's trial would have been different.  A constitutionally adequate investigation would have uncovered several witnesses who support the defense theory that Ebron did not participate in the planning or killing of Barnes, and cast doubt on the testimony of the government's key witness, alleged co-conspirator Sherman.  If the jurors had heard from multiple witnesses who testified that Mosley initiated the stabbing without warning Ebron, there is a reasonable probability that the jurors would have reached a different verdict.  Accordingly, trial counsel's deficient investigation deprived Ebron of the effective assistance of counsel.

a)    Deficient Performance

156.    Trial counsel were not sufficiently familiar with the discovery provided to them. Because of their failure to familiarize themselves with the discovery, counsel failed to perform necessary investigations.  A June 9, 2012, Memorandum and Order by this Court illustrates trial counsel's deficient performance.

157.    This Court issued a Memorandum and Order, in response to a Motion for a New Trial Based on Newly Discovered Evidence, filed by appellate counsel after Ebron's trial was over, on the basis of an affidavit signed by inmate Quinton Jones.  An affidavit from trial counsel, Ms. Scardino, was also attached to the motion in which she stated she "had no record of Jones's name coming up before he contacted Ebron's investigator" after the trial was over.  Trial counsel, however, was wrong.  In fact, trial counsel received, over a year prior to trial, an April 11, 2008, letter from the government in discovery which stated:

> Enclosed is the following summary of evidence that could be considered exculpatory in this case: . . . Inmate 1 alleged that . . . four black males entered cell 305 . . . the fourth individual was Quintin Jones . . . Inmate 1 observed Jones flushing a bloody white t-shirt and shank down the toilet of a cell. He further stated Jones told him that all four of the inmates that went into the cell stabbed (Barnes) before he could get out of his bunk. He also claims that Jones threatened him, apparently to prevent Inmate from cooperating with law enforcement.

158. This Court noted that this information, at minimum, "should have alerted defense counsel that Jones potentially possessed knowledge of events surrounding the murder *and the need for further investigation of this inmate*."[11]

159. Despite the need for further investigation of Jones, the only investigation trial counsel performed was that its investigator, one month prior to trial, located Jones at United States Penitentiary, Atwater, but did not interview Jones and conducted no further investigation because "[t]his inmate was not on the Government's witness list."

160. Counsel was, or should have been, aware of many inmates who, like Jones, possessed knowledge of events surrounding the murder of Barnes. Counsel received discovery indicating that, at one time, the government suspected several other inmates of involvement in Barnes's murder. The very fact that none of them were charged and none of them became government witnesses should have suggested to competent counsel that they might have information favorable to the defense. Those considerations should have made them high-priority witnesses. Counsel, however, unreasonably failed to investigate or interview these witnesses. Instead, counsel and their investigator, Mr. Gradoni, focused almost exclusively on the inmates who were on the government's witness list. Repeatedly, Mr. Gradoni stopped work on inmate witnesses once he learned that they were not on the government witness list. As a result, no one

---

[11] This Court also noted that defense counsel was made aware at Ebron's trial that Jones was at a table with Mosley, Bacote and Sherman watching Barnes exit his cell and go into the shower area, and that "[w]hen a defendant becomes aware of evidence early in a trial, it is incumbent upon the defendant to seek a continuance or demonstrate efforts to obtain evidence before it will be considered newly discovered."

from the defense ever talked to numerous potentially helpful inmates.  Specifically, counsel

failed to investigate or interview the following witnesses that they knew, or should have known,

potentially possessed knowledge of the events surrounding the murder of Barnes:

- <u>William Mercer</u>:[12]   Trial counsel was provided with Sherman's transcribed pre-trial interview, in which Sherman stated that he witnessed Mercer pass Mosley a knife as part of the plan to kill Barnes.  Sherman described the knife.  In another interview provided to trial counsel, Sherman stated that Mercer and another inmate were supposed to supply the weapons for Barnes's murder, and that Mercer supplied the murder weapon to Mosley.  Trial counsel was also provided with a chain of custody log, which detailed that on May 9, 2005, four days after Barnes's murder, BOP officials seized a knife from Mercer's wheelchair.  Despite receiving information that directly implicated Mercer in Barnes's murder, counsel failed to investigate or interview Mercer.

- <u>Kelvin Smith</u>:  Trial counsel was provided with a report in discovery which stated that Kelvin Smith[13] was "[n]ot directly involved in assault [on Barnes] but believed to be the overseer to insure that it was completed and when it was completed."  Trial counsel was also provided with a transcribed pre-trial interview of Sherman, in which Sherman stated that Smith told Mosley and Sherman to kill Barnes.  Trial counsel's investigator located Smith at FDC, Houston, TX and noted that "Kelvin Smith has been succeeded [sic;subpoenaed] by the Bacote's defense team." Neither trial counsel, nor their investigator, performed any other investigation or interview of Smith.

- <u>Joseph Jackson</u>:  Trial counsel received, in discovery, several still frame photographs of Joseph Jackson, Ebron, and Mosley near Barnes's cell minutes before Barnes's murder.  Trial counsel also received in discovery a Memorandum from officials at USP Beaumont which lists Joseph Jackson as a potential suspect in Barnes's murder.  Trial counsel also received a report in discovery which lists Joseph Jackson, his register number 33186-007, and states that he is a "[p]ossible conspirator to [Barnes's] murder . . ."  Neither trial counsel, nor their investigator, investigated or interviewed Jackson.  Instead, both trial counsel and their investigator believed, despite receiving the above-noted discovery, that

---

[12] Counsel received, in discovery, a photograph of William Mercer, which noted his registration number and his alias as "Go Go."  Additionally, defense counsel was informed by their investigator that "Go Go" is William Mercer.

[13] The report notes that Kelvin Smith's alias is "Hollywood."

"Joseph Jackson" was named "James Jackson" and decided that there were too many "James Jacksons" to interview in the BOP.[14]

- Andrew Patrick:  Trial counsel received a photograph in discovery which was titled "United States Penitentiary Beaumont Texas Disruptive Group/Security Threat Group Photo Sheet."  Included in the photo were Andrew Patrick, Marwin Mosely, William Mercer, Joseph Ebron, and Joseph Jackson. Neither counsel, nor their investigator, attempted to investigate or interview Patrick.

161.    Had trial counsel interviewed these witnesses and undertaken a reasonable investigation, they also would have learned about Lonnie Gooding and Luther Fuller, two inmates who were housed in the Segregated Housing Unit with Ebron and Mosley after Barnes's murder.  Trial counsel did not, however, conduct a reasonable investigation.

162.    Instead, the only inmates interviewed by the trial defense team were Roy Wells, Edgar Hayes, Michael Surrell, and James Carpenter, none of whom lived in the unit where the homicide occurred and none of whom had any direct knowledge of Barnes's murder. Additionally, none of the inmates interviewed had the potential to support the defense account of the events surrounding Barnes's murder.  Counsel's failure to investigate and interview the above-noted witnesses who, like Jones, warranted "the need for further investigation," was deficient performance.

b)    Prejudice

163.    Trial counsel's deficient performance prejudiced Ebron.  Had trial counsel conducted a reasonable investigation, and interviewed the above-noted witnesses, there is a reasonable probability that Ebron would not have been convicted of first degree murder.  As described below, each of these inmates cast doubt on the testimony of the government's only

---

[14] Investigator Gradoni's memorandum regarding "James Jackson" was created on April 23, 2009.  Ebron's trial had already started.  Additionally, trial counsel, in an April 23, 2009, email to her secretary after trial had begun, listed "James Jackson" as a witness that she wanted available for trial.

57

alleged eyewitness, co-conspirator Sherman, and support the defense theory about the key issue in this case — whether Ebron agreed to or participated in Barnes's murder.

164. Ebron testified, and it was the defense theory, that he was not involved in a plot to murder Barnes, and went to Barnes's cell only to tell him that he had to leave the general population compound and enter the segregated housing unit. Ebron described how, over his protests, Mosley stabbed Barnes to death. Defense counsel presented no evidence to corroborate Ebron's testimony.

165. Ebron's testimony was in direct conflict with the testimony of unindicted coconspirator Sherman. Sherman testified that Ebron agreed to murder Barnes. 4/20/09, 221. He also testified that during the killing of Barnes, he observed Ebron put Barnes in a headlock while Mosley stabbed Barnes to death. *Id.* The government corroborated Sherman's testimony through inmate Lamont Bailey, who testified that after Barnes's murder, Mosley told him that he and Ebron went into Barnes's cell and murdered Barnes. 4/27/09, 1496-97.

166. In closing, the government seized on Bailey's testimony as a reason for the jury to accept Sherman's testimony over Ebron's: "Marwin Mosley spoke from the grave through Lamont Bailey and said 'We stabbed him so many times we had to take a break. We punished him.'" 4/30/09, 2197.

167. Had trial counsel conducted a reasonable investigation and interviewed the above-noted witnesses, they would have been able to argue powerfully to the jury that "Marwin Mosley spoke from the grave" through many inmates who corroborated Ebron's testimony. Those inmates are detailed below.

168. Mercer states that on the date of Barnes's murder, Mosley approached him and told him that he killed Barnes. Specifically, Mosley stated that although the plan was to send

Barnes to the segregated housing unit, Mosley decided to kill Barnes while he was in Barnes's cell. Mercer further states that Mosley told him that Ebron did not know that he was going to stab Barnes.

169. Mosley also detailed Barnes's murder to Andrew Patrick. Mosley stated that "he walked into the cell, [he and Barnes] had a few words, and then he got on top of Barnes and immediately began hitting Barnes with the shank." Mosley further stated that "[Ebron] looked shocked by what happened." Patrick also overheard Ebron and Mosley arguing about Barnes's murder. Patrick heard Ebron say to Mosley, "You're wrong slim. It wasn't supposed to happen."

170. Mosley also confided in Luther Fuller about Barnes's murder. Mosley told Fuller that after Ebron and he entered Barnes's cell, Barnes refused to go to the segregated housing unit. Mosley "had enough and started stabbing Barnes." Mosley stated that Ebron was panicked and wanted to leave the cell but could not open the cell door while Mosley was stabbing Barnes. Afterwards, Mosley thought Ebron was weak for refusing to participate in Barnes's murder. Fuller also overheard, after the murder, Ebron and Mosley argue about Barnes's murder, and Ebron made it clear that he did not agree with, or condone, Barnes's murder.

171. Joseph Jackson states that after Barnes's murder, he too overheard Ebron and Mosley arguing about Barnes's murder. Specifically, he heard Ebron say to Mosley, "I don't know why you did that. It wasn't supposed to go like that, you wrong man." Mosley did not deny Ebron's accusations.

172. Lonnie Gooding also overheard conversations between Ebron and Mosley after Barnes's murder. Gooding states that he heard Ebron say to Mosley, "this is you, you know this is you. This is your weight, there is no use in everyone going down, you know this is you."

173.    Other witnesses would have contradicted Sherman's testimony.  Kelvin Smith states that, contrary to Sherman's pre-trial statement and trial testimony, he never told anyone to kill Barnes.  Indeed, he maintains that Sherman's pre-trial statement was a lie and that no one mentioned anything to him about the killing of Barnes.

174.    Had trial counsel reasonably investigated, and interviewed the above-noted witnesses, they could have supported Ebron's defense that Mosley killed Barnes without Ebron's consent.  Defense counsel could have called these witnesses to corroborate Ebron's testimony, or it might have influenced their decision about whether Ebron should testify.  Whichever decision defense counsel made, there is a reasonable probability that the additional witnesses would have led the jury to find Ebron not guilty of first-degree murder.

175.    Furthermore, this deficiency is prejudicial in combination with counsel's constitutionally inadequate advocacy and advice concerning Ebron's right to testify.  *See* Claim I.G.1.  If counsel had performed properly on these fronts, either (1) Ebron could have testified free of impeachment with a damning prior murder conviction[15] and his testimony could have been supported with the accounts of other inmates who had personal knowledge, or (2) Ebron could have exercised his right not to testify and relied on other witnesses to present his defense. Either way, there is a reasonable probability of a different outcome.

176.    Counsel's omissions also prejudiced Ebron in the penalty phase of trial.  Had the jury heard from several inmates who supported the defense theory, it is reasonably likely that even if the jury did not acquit Ebron, they would have sentenced Ebron to life imprisonment. This is especially true when considered in conjunction with the prejudicial effect of the entirety of counsel's errors at the penalty-phase proceedings.  *See* Claim II.  Had counsel performed reasonably, there is a reasonable probability of a different result.

---

[15] *See* Claim I.G, *infra*.

**2. Counsel Rendered Ineffective Assistance By Failing to Request Relevant Discovery.**

177.   Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

178.   Counsel failed to request in discovery a host of evidence that, if properly investigated and developed, would have led them to find evidence admissible at both the guilt-innocence and selection phases.  But for counsel's failure to seek this evidence in discovery, there is a reasonable probability that the jury would have had a reasonable doubt as to Ebron's guilt.  Trial counsel's deficient discovery requests, in isolation and in combination with their other areas of deficient performance, thus deprived Ebron of his right to effective assistance of counsel.  U.S. Const. amend. VI.

a)   Trial Counsel Performed Deficiently in Failing to Seek Relevant Discovery.

179.   After Ebron's case was severed from his codefendants,' trial counsel made boilerplate pretrial requests for all *Brady*,[16] Jencks[17] and *Giglio*[18] material.  None of the motions invoked the specifics of the case, though by the time the motions were filed, Ms. Scardino had been representing Ebron for more than two years.  The *Jencks* motion argued that the Court should give special consideration to *Jencks* issues in Ebron's case, given that "Coastal Corporation, at least one private investigation firm, the Commodities Futures Trading Commission, and possibly others all engaged in investigations and interviews of the applicable witnesses."  This material appears to have been copied and pasted from a motion in another

---

[16] *Brady v. Maryland*, 373 U.S. 83 (1963).

[17] The Jencks Act, 18 U.S.C. § 3500.

[18] *Giglio v. United States*, 405 U.S. 150 (1972).

matter — neither the Commodities Futures Trading Commission nor Coastal Corporation investigated Barnes's death.

180.    Meanwhile, trial counsel failed to request many of the basic documents that they needed to conduct an adequate investigation of Ebron's case.  Based on the statements of prison expert Mark Bezy, as well as investigation by counsel, those documents include, but are not limited to:

- **SIS Report**:  Typically, after a suspected homicide, the Bureau of Prisons ("BOP") "conducts an extensive review of the incident to determine the causes and to make thorough recommendations for preventing the recurrence of such incidents in the future."  The review begins at the prison itself with an investigation that leads to the  generation of a document—known as a Special Investigative Supervisor ("SIS") Report— that summarizes the incident, analyzes the circumstances that led to it and makes recommendations to prevent similar incidents in the future. Though a SIS Report is "required by national BOP policy," and likely would have contained a wealth of information about the circumstances surrounding Barnes's homicide, trial counsel never requested it.

- **After-Action Report**: The BOP review process following a prison homicide also includes an investigation initiated by the regional director. This investigation typically leads to the creation of an "After-Action Report," which examines the causes of the incident and makes additional recommendations for changes in prison policy.  Again, despite the likelihood of discovering relevant information in the report, trial counsel never requested it.

- **Mass Interview Forms**: Given the severity of the incident, the BOP should have interviewed, "at a minimum," all inmates on the unit where the homicide took place and all inmates from Washington, D.C.  Trial counsel knew that mass interviews were conducted in Ebron's case, because the government produced a small sampling of mass interview forms during discovery. Yet counsel never requested all of these forms, which presumably contain the statements of people who had the most relevant information related to the crime.     The government did not produce forms for potential witnesses who had relevant information about the homicide and who were identified in other discovery that defense counsel received, including William Mercer, Kelvin Smith, Joseph Jackson and Andrew Patrick.[19]   Counsel knew (or should have known)

---

[19] *See* Claim II.A.1, *infra.*

that these witnesses would have given interviews to the BOP investigators in the days after the homicide and should have requested their reports specifically.

- **SHU Records**: Inmates, including Luther Fuller, overheard Mosley make statements while housed in the SHU after the homicide that tended to inculpate himself and exculpate Ebron. Trial counsel would have known the existence of these witnesses — and may have even known the content of their possible testimony — if they had simply requested basic records relating to who was housed in the SHU during the time period immediately after the homicide, when Ebron and Mosley were both there.

Counsel made no discovery requests that identified any potential witness or issue in the case.

181. Counsel's deficient discovery requests were deeply intertwined with their deficient guilt-phase investigation. Because they did little investigation, they did not know, outside of generically described *Brady* material, what items were "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). Because they did not request adequate discovery, they did not develop leads that could be used in their investigation. As with their guilt-phase investigation, counsel's sparse discovery requests constituted deficient performance.

      b)    Counsel's Deficient Performance in Failing to Request Adequate Discovery Prejudiced Ebron.

182. Counsel's deficient performance prejudiced Ebron. Given that Ebron acknowledged being in Barnes's cell at the time of the homicide, any evidence that could have shed light on (1) his actions once inside the cell and (2) his intent in entering the cell in the first place was critically important. Counsel failed to develop evidence on those questions from available witnesses, including Mercer, Smith, Jackson, Patrick, and Fuller, because they did not request relevant discovery, including SHU records and mass interview forms. These witnesses would have supported Ebron's assertions that he never intended to hurt or kill Barnes and entered his cell only to encourage him to "check himself in" to the SHU.

63

183. But for counsel's failure to seek discovery, the jury would have heard this critical evidence regarding Ebron's actions and intent, and there is a reasonable probability it would have had a reasonable doubt as to his guilt, or would at least have imposed a life sentence. Alone and in combination with the other claims set forth in this petition, counsel's deficiency prejudiced Ebron at both phases of trial.

**B. TRIAL COUNSEL FAILED TO FAMILIARIZE THEMSELVES WITH, OR OBTAIN RECORDS RELATING TO, THE CRIMINAL HISTORY OF THE GOVERNMENT'S STAR WITNESS, CHARLES SHERMAN.**

184. Ebron incorporates all facts set forth elsewhere in this pleading in support of this clalim.

185. Charles Sherman was the government's star witness. He was an unindicted co-conspirator who testified that Mosley, Bacote, Ebron ,and he agreed to murder Barnes. 4/20/09, 221. He was the government's only witness who allegedly observed the killing. He testified that during the killing of Barnes, he observed Ebron put Barnes in a headlock while Mosley stabbed Barnes to death. *Id.*

186. Although Sherman's veracity and truthfulness were central to Ebron's defense and the government's case, trial counsel failed to familiarize themselves with the discovery provided or investigate or obtain even the most rudimentary of records relating to Sherman, including any records related to Sherman's criminal history. This was deficient performance.

187. Counsel's deficient performance prejudiced Ebron. Sherman lied numerous times throughout his testimony. Sherman's lies, however, went uncorrected. Sherman's lies would have been easily contradicted by records related to his prior criminal history. Had trial counsel familiarized themselves with Sherman's criminal history, and obtained relevant records, she

could have effectively impeached Sherman. In turn, there is a reasonable probability that the jury would have disbelieved Sherman, and found Ebron not guilty of first-degree murder.

### 1. Deficient Performance

188. Over a month before Sherman's testimony, on March 16, 2009, the government provided trial counsel with, *inter alia*, the following material related to Sherman's criminal history:

- March 14, 2001, Amended Judgment and Conviction for conspiracy, first-degree burglary while armed with intent to commit assault, first-degree burglary while armed with intent to commit robbery, threats to do bodily harm, assault with intent to commit robbery, robbery while armed, first-degree theft, kidnaping while armed, possession of a firearm during a crime of violence, and obstruction of justice (No. F3351-00);

- May 21, 2003, Judgment for possession of a firearm by a convicted felon (No. DKC 00-0423); and

- Excerpts of a Pre-Sentence Report, which notes that on July 14, 1998, Sherman was convicted of robbery with a deadly weapon (No. CT-98-1449A).

189. In addition, trial counsel received, in discovery, an October 29, 2002, Psychology Services Intake Screening Summary of Sherman at FCI Three Rivers, which contained relevant impeachment material related to Sherman's March 14, 2001, convictions.

190. Although trial counsel was provided with Sherman's criminal history, they failed to familiarize themselves with, or obtain relevant documents relating to, these convictions. First, trial counsel failed to familiarize themselves with, or obtain the certified conviction of, Sherman's 1998 conviction for robbery with a deadly weapon. Second, trial counsel failed to familiarize themselves with Sherman's March 14, 2001, convictions for first-degree burglary while armed with intent to commit assault and related charges, or to obtain the certified conviction or the transcript of those convictions.

191.    Trial counsel's failure to familiarize themselves with, or obtain records relating to, Sherman's convictions was evident at Ebron's trial.  When trial counsel cross-examined Sherman on his criminal history not related to his 2001 armed robbery conviction, the following exchange occurred:

> Ms. Scardino: Have you ever been convicted of a felony of moral turpitude other than the armed robbery that we discussed earlier?
>
> Sherman:    Yes ma'am.
>
> Ms. Scardino: And what would that be?
>
> Sherman:    One firearm possession.
>
> Ms. Scardino: I'm sorry.  Say that again.
>
> Sherman:    One firearm possession.
>
> Ms. Scardino: And when was that Mr. Sherman?
>
> Sherman:    I believe in 2000 - - or '99 or 2000.
>
> Ms. Scardino: And was that in Washington, DC?
>
> Sherman:    No ma'am.  It was in Maryland.
>
> Ms. Scardino: Maryland?
>
> Sherman:    Yes, ma'am.
>
> Ms. Scardino: Did you go to prison.
>
> Sherman:    Yes, ma'am - - no, I didn't go to prison.  I went to the county jail.
>
> Ms. Scardino: And how long did you stay incarcerated on those charges?
>
> Sherman:    I believe about eight months – seven, eight months.
>
> Ms. Scardino: And that was in 2000, and then the armed robbery was after that?

66

> Sherman:     No the firearms possession I believe was in like, '98; and the robbery was in 2000, yes ma'am.
>
> Ms. Scardino: So the armed robbery is what your in prison for now - -
>
> Sherman:     Yes ma'am.

4/20/09, 256-57.[20]

192.    Had counsel reviewed the discovery, she would have known that Sherman's conviction for possession of a firearm by a convicted felon occurred in 2003 in Washington, D.C., and his 1998 conviction in Maryland, for which he served eight months at the county jail, was for armed robbery.

193.    Trial counsel was also noticeably oblivious to the facts underlying Sherman's 2001 conviction for armed robbery and related charges.  Sherman testified on direct examination that he was currently serving a sentence of 26 to 78 years' imprisonment for an armed robbery. 4/20/09, 166.  Sherman testified that "[b]eing as though my family was all in trouble behind crack cocaine, I basically – I despised drug dealers because of what happened to my mom.  So, me and a couple buddies had devised a plan to start robbing drug dealers.  So, that's what I did; I robbed drug dealers." *Id.*

194.    This testimony was false.  Sherman's crimes stemmed from pure greed, not a misguided desire to avenge the wrong done to his family.  Both the discovery provided to counsel and the transcript relating to this conviction could have enabled counsel to powerfully impeach Sherman's false testimony.  Counsel, however, did not use the discovery provided or obtain relevant documents relating to Sherman's criminal history.  Her impeachment of Sherman on this issue was thus woefully incomplete.  In regard to that impeachment, the following exchange occurred:

---

[20] The robbery conviction that Sherman testifies about in this exchange is his March 14, 2001, armed robbery conviction in Washington, D.C., in which he received a sentence of 26 to 78 years' imprisonment.

Ms. Scardino: And that armed robbery, didn't you take – you had a gun to somebody's head and took them to a bank and told them to get all the money, didn't you?

Sherman:    Yes, ma'am.

Ms. Scardino: Dope dealers have bank accounts?

Sherman:    Yes, ma'am.

Ms. Scardino: They do. And that was a dope dealer that you robbed and took to a bank with a knife at - - or a gun at his back?

Sherman:    Yes ma'am.

4/20/09, 254-55.

195.    Had trial counsel reviewed the discovery provided to her, she would have known that the pre-sentence investigation report related to this robbery conviction described it as follows:

> [D]uring the instant offense, Mr. Sherman and two associates went to the home of an acquaintance and, at gun point, ransacked the residence and stole a TV and VCR. They then drove the victim to a bank and forced him to withdraw money from his account, which they took. **Mr. Sherman's version of the event differed significantly from the victim's. He claimed that the victim had willingly loaned him the money and then filed a false complaint with the police when the two of them disagreed over the payment schedule.**

196.    Furthermore, had trial counsel ordered the transcript of Sherman's trial relating to this robbery conviction, she would have learned that Sherman's testimony in that trial completely contradicted his testimony in Ebron's trial. Specifically, Sherman testified not that he had robbed a drug dealer, but that the victim was a friend of Sherman's whom he took to the bank so that he could borrow money from that friend. Sherman further testified that the reason that he was "in trouble" was because he did not repay the victim.

68

197.    At the very least, trial counsel could have used the March 14, 2001, Amended Judgment and Commitment/Probation Order, provided to her in discovery, to impeach Sherman with the fact that his 26-to-78-year sentence was not just for an armed robbery, but for conspiracy, first-degree burglary while armed with intent to commit assault, first-degree burglary while armed with intent to commit robbery, threats to do bodily harm, assault with intent to commit robbery, robbery while armed, first-degree theft, kidnaping while armed, possession of a firearm during a crime of violence, and obstruction of justice (no. F3351-00), some of which involve a dishonest act or false statement.

198.    Trial counsel's failure to familiarize themselves with and use the discovery provided, and to engage in the most basic of investigations of the government's key witness – reading discovery and obtaining information on his criminal history – constitutes deficient performance.

### 2.    Prejudice

199.    Ebron was prejudiced by trial counsel's deficient performance.  It was the defense theory that Sherman was a liar.  Because counsel was unprepared, Sherman's testimony on direct examination that he "robbed drug dealers" went unrebutted, and the jury was left with the false impression that Sherman was a loving son whose familial devotion led him astray.  Had trial counsel reviewed the discovery and obtained the relevant documents, she would have been able to forcefully impeach Sherman, showing the jury that Sherman was a liar and a thief who had obstructed justice in the past.  If the jury had been made aware that Sherman had lied to them on direct examination, there is a reasonable probability that they would have disregarded the entirety of his testimony.  In turn, there is a reasonable probability that Ebron would have been found not guilty of first-degree murder.

200.    Additionally, Sherman's false statement that "I robbed drug dealers," 4/20/09, 166, opened the door to his previous robbery conviction that would have otherwise been inadmissible under Fed. R. Evid. 609.  Specifically, on July 14, 1998, Sherman was convicted of robbery with a deadly weapon, in Prince George's County, Maryland.  Sherman testified about this 1998 robbery with a deadly weapon conviction during the trial for his March 14, 2001, convictions:

> Last year I had briefly paid a guy in Maryland to work on my car and I needed it to get back and forth to work.  And he worked on my car briefly and he didn't fix it right.  I in turn asked him for some of my money back or either fix the car.  He refused.  We got into an argument, me and the guy fought.  In the fight I took fifty dollars of my money from him.  Later on that evening, I was arrested.  The police arrested me and charged me with robbery because the guy said that in the fight I took the money from him.  And so it was no longer a first-degree assault, just fighting.  He says it was included in a robbery and I went to jail.  I had an attorney and she asked me did I do it.  And I told her yes, ma'am.  I told her why.

201.    Sherman's 1998 robbery with a deadly weapon conviction, and statement describing that conviction, could have been used to impeach Sherman's characterization of his prior criminal history that he only "robbed drug dealers."  However, trial counsel, despite being notified in discovery of this conviction, failed to obtain a certified copy of that conviction, or to even be aware of the conviction itself.  Trial counsel did not even attempt to impeach Sherman with this conviction, and was noticeably confused about Sherman's criminal history.  This area of impeachment, in conjunction with the above-noted impeachment material, would have shown that Sherman lied during direct examination.

202.    As the government made clear in its closing argument, the jury's decision rested on whether they believed Sherman or Ebron: "according to Joseph Ebron, somebody is lying. And you know, he's right about that.  Somebody is lying and you have to decide."  4/30/09, 2200.

203.    If the jury had been aware that Sherman had lied to them under oath, there is a reasonable probability that they would have disbelieved the entirety of his testimony and found Ebron not guilty of first-degree murder.

## C. TRIAL COUNSEL FAILED TO OBJECT TO IMPERMISSIBLE TESTIMONY OR EVIDENTIARY RULINGS.

204.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

205.    Trial counsel twice failed to make appropriate objections, first by failing to object to testimony whose only effect was to allow an impermissible inference of Ebron's propensity for wrongful behavior, and second by failing to object to the court's ruling that a government witness could not be cross-examined on a subject that might have shown motive to be untruthful. *See Ward v. Dretke*, 420 F.3d 479, 495–96 (5th Cir. 2005) (failure to object deficient, where it was unreasonable and could not be recast as a strategic decision); *Riddle v. Cockrell*, 288 F.3d 713, 717 (5th Cir. 2002) (failure to object deficient where there was no reasonable tactical basis for so failing).

206.    On the first day of trial, the government's final questions of its star witness, Charles Sherman, on direct examination were as follows:

> Government:   Now, in this case, you knew beforehand that Funk and Joe [Ebron] were going to do this murder, right?
>
> Sherman:      Yes, sir.
>
> Government:   Is there any reason you didn't go to any of the other inmates, the shot callers or anything like that, and tell them, "Y'all need to stop this"?
>
> Sherman:      No, because Joe and Funk have like pretty bad reputations. So, I didn't want to go and be trying to advocate for Keith and get something happen to me because they've got pretty tough reputations in the system.

71

4/20/09, 238.   Trial counsel remained silent instead of objecting and allowed a twenty-five-minute recess to elapse before beginning cross examination on another topic.  *Id.,* 238–39.

207.   This failure to object was deficient performance, which prejudiced Ebron because the government was allowed, without objection, to close direct examination of its star witness with the impermissible implication that Ebron had a propensity for wrongful or criminal activity. This improper suggestion about Ebron's character was then allowed to simmer in the minds of the jury for twenty-five minutes before trial counsel commenced cross examination on a different matter.  Had trial counsel objected, there is a reasonable probability that the court would have stricken the improper, irrelevant evidence of violent character from the record.  Instead, trial counsel allowed this impermissible inference to serve as the uncontested apex of the government's direct examination of its star witness.

208.   Trial counsel's second failure to object occurred the next day.  The government indicated that "one of the officers from Atlanta that testified at the 404(b) hearing and would be coming in to testify basically to the same thing here, it's my understanding that he is going to be terminated by the BOP for a rules violation there."   4/21/09, 483-84.   When trial counsel inquired as to who the officer was and why he was being terminated, the government identified the corrections officer as Steven Perry and indicated that "the actual violation is for violating security procedures, but what he apparently actually did was something akin to getting table dances from female inmates."  4/21/09, 484.  The government indicated that "he doesn't know that he's getting fired yet," *id.*, but that the government believed "he knows that the investigation has been ongoing."  *Id.,* 485.  When trial counsel requested, "Please let me cross-examine this," *id.*, the trial court indicated it did not see how it could come in for impeachment.  Then the following exchange occurred:

| Ms. Scardino: | Please?  No.  Okay.  All right.  So, I am—then the court is ordering me not to say anything to Mr. Perry about him being terminated at some future time or what he's being investigated for?  Is that right? |
| The Court: | Because I don't see how it has any bearing on—I think it's more prejudicial than probative.  While highly interesting, I don't really see that it's relevant. |
| Ms. Scardino: | Okay. |
| The Court: | Unless some way something happens to make it relevant. |
| Ms. Scardino: | Thank you, your Honor. |

*Id.,* 485–86.  Trial counsel thus indicated a *desire* to impeach Perry but failed to *object* to the court's ultimate ruling on that question.  Trial counsel also failed to argue why, as described below, the cross-examination would be relevant.

209.    Three days later, when the government called Perry, he testified about an alleged attack by Ebron on an inmate, Michael Perry, on November 10, 2003, in the prison recreational area.  4/24/09, 1196–97.  He testified that Ebron, along with Carpenter, "charged [Michael] Perry" and "began to hit him with closed fists."  *Id.,* 1197.  He testified that they refused his order to stand down and "continued to pound Inmate Perry in the face."  *Id.*

210.    Trial counsel performed deficiently by failing to object to the trial court's refusal to allow impeachment of a witness whose testimony alleged an incident of violence in Ebron's past.  Counsel could have made a valid argument for allowing her to impeach the witness.  If Perry knew he was under investigation for violating security procedures, and may have known that the investigation could end in his termination, then he would have had a motive to change or embellish his story.  He would have had a motive to tell a story that would gain him the

73

government's favor.  Trial counsel, though, never objected and never articulated these possibilities to the trial court.  Ebron was thus prejudiced by trial counsel's deficient performance.  Had trial counsel not unreasonably failed to object and the court permitted impeachment, there is a reasonable probability that trial counsel would have been able to place doubt in the minds of the jury, based on motive, as to the veracity of Perry's story of Ebron's alleged violence — and as a result there is a reasonable probability that the outcome of the trial would have been different.

211.    In short, there is a reasonable probability that if trial counsel (1) had objected to the last portion of Sherman's testimony, whose only effect was to allow an impermissible inference of Ebron's propensity for violence; and (2) had objected to the court's ruling that a government witness could not be cross-examined on a subject that might have proven motive to be untruthful, both the guilt-phase outcome and the penalty-phase outcome would have been different.  Both individually and cumulatively with other claims, these instances of deficient performance prejudiced Ebron at the guilt phase and the penalty phase.

**D. TRIAL COUNSEL FAILED TO CONDUCT A TIMELY INTERVIEW OF JAMES "RAT" CARPENTER, AND FAILED TO PREPARE AND PREVENT THE INTRODUCTION OF AN UNCHARGED PRISON INFRACTION.**

212.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

213.    No one from the defense team interviewed a crucial defense witness, James "Rat" Carpenter, whose importance should long have been clear to counsel, until the day before opening statements — after the pretrial hearing, after voir dire — and only nine days before trial counsel called him as a witness at trial.  This deficient performance prejudiced Ebron because had trial counsel learned what Carpenter had to say, he could have been called at the Rule 404(b)

evidentiary hearing. At that hearing, the trial court ruled that evidence of Ebron's and Carpenter's alleged history of physical altercations in prison would be admissible for the limited purpose of showing they were motivated to punish snitches. Carpenter eventually testified at trial that the physical altercations in prison were not motivated by an aversion to snitches but rather by unrelated reasons. Had Carpenter offered that testimony at the Rule 404(b) hearing and the court had ruled differently about the admissibility of the physical altercations, the jury would not have been exposed to certain evidence that Ebron had a history of physical violence within the prison system — evidence that may have colored their view of the death of Barnes to the detriment of Ebron — and thus there is a reasonable probability that the outcome of the guilt-innocence and penalty phases would have been different. *See Rompilla*, 545 U.S. at 383 (failure to investigate prior conviction is deficient performance); *Soffar v. Dretke*, 368 F.3d 441, 478–79 (5th Cir. 2004) (counsel ineffective for failing to conduct adequate pretrial investigation, with a clear negative impact on the verdict).

214. Trial counsel was appointed three years before trial, on April 26, 2006. A basic investigation of the case would have shown Carpenter's importance. For instance, early on, the government turned over to trial counsel, pursuant to discovery, a statement by Sherman from the day after Barnes was killed that pointed to a connection to Carpenter. Additionally, on July 2, 2008, over seven months prior to the Rule 404(b) hearing, the government sent trial counsel a "Notice of Relevant Evidence" informing her that it intended to use at trial evidence that Ebron and Carpenter together assaulted an inmate in the SHU at USP Atlanta on November 10, 2003; that they together assaulted another inmate there on May 22, 1993; and that Ebron threw a food tray at another inmate on May 2, 1993, after that inmate had entered an altercation with Carpenter (the last two years were apparent typos, the evidence at trial placing the year as 2003,

75

not 1993).  The government informed trial counsel of its position that, pursuant to Federal Rule of Evidence 404(b), this evidence was relevant against Ebron to establish identity, intent, and motive.  Trial counsel should have been aware of the importance of, and made efforts to contact and investigate, Carpenter soon after receiving this letter at the absolute latest.  But trial counsel did not investigate or interview Carpenter ahead of the Rule 404(b) hearing on February 13, 2009.

215.   Trial counsel's investigator did not interview Carpenter or even discuss Carpenter with Ebron until February 24, 2009.   The investigator did not make an effort to reach out to Carpenter until March 2009 and did not visit Carpenter or write his report to trial counsel until April 20, 2009, the day of opening statements in Ebron's trial.  Trial counsel's investigator reported that "Carpenter stated that none of the assaults [at USP-Atlanta] had anything to do with snitches."  Had trial counsel known this at the time of the Rule 404(b) hearing, she could have called Carpenter to provide this evidence to the trial court and thus given the court an opportunity to rule differently on the admissibility of evidence of these incidents.

216.   At the Rule 404(b) hearing, the government called Tim Zuppinger, a food administrator at USP-Atlanta at the time of the alleged altercation on May 2, 2003.  He testified that Carpenter and Ebron "got up and physically attacked" another inmate, Joseph Brown. 2/13/09, 75.  Zuppinger alleged that Ebron threw a tray at Brown, and that Carpenter "said something to the effect that 'That's how we take care of our snitches, bitch.'"  *Id.*  Trial counsel elicited Zuppinger's admission that he did not communicate the comment about the snitches to any correctional officer or put the comment in the report he wrote at the time.  *Id.,* 82–83.

217.   The government then called Leander White, a corrections officer at the Atlanta prison at the time of another alleged physical altercation on May 22, 2003.  *Id.,* 84, 95.  He

76

testified that just after he placed Joseph Brown — the same inmate connected with the alleged incident of May 2 — into a cage with Ebron and Carpenter, from a distance of "no more than 5 to 10 feet away from the cage area" he saw Brown on the floor while Carpenter and Ebron were "stomping on him with their feet . . . and attempting to punch him as well." *Id.,* 88, 89. White testified that when he asked Carpenter, "'Why are you jumping on this guy?'" he answered, "'That guy ain't nothing but a snitch.'" *Id.,* 93–94. He also testified that Ebron said, "'Well, we know he — this dude a snitch.'" *Id.,* 94. Like Zuppinger, White testified that he did not put any comments about snitches in his incident report at the time. *Id.,* 108.

218. Finally, the government called Steven Perry, who was a corrections officer at USP-Atlanta at the time of another alleged incident on November 10, 2003. He testified that on that date he saw Ebron and Carpenter beating inmate Michael Perry with their fists. *Id.,* 112. He saw that Carpenter had a weapon tied to his waist, and he commanded that they stop, but they refused. *Id.,* 112–13.

219. After oral argument, the trial court allowed evidence of the altercations and references to snitches to come in at the guilt phase of the trial:

> Okay, I think it's admissible under 404(b) to show motive but only if the government shows that Mr. Ebron know that this individual who was killed was the same Keith Barnes that had been the snitch against Mr. Carpenter. I mean, I take it there's going *to be evidence of that. Otherwise, it does seem just kind of like random fights. You've got to tie the whole motive back to Mr. Carpenter and the aversion to snitches, et cetera*, but not just general aversions to snitches but knowing that this particular snitch is a snitch against Mr. Carpenter who is a friend of Mr. Ebron and soul mate for many years. So, I mean, that's my ruling. I guess it depends on what evidence comes in at trial to show that.

*Id.,* 127–28 (emphasis added). But trial counsel failed to point out or argue that whereas Zuppinger's and White's testimony tied the motive for the beatings to Carpenter and the loathing of snitches, Perry's testimony only described a random fight and was silent on the question of

77

snitches and should be excluded accordingly.  This failure was deficient performance because it evinces a basic lack of preparation; the failure to object to Perry's testimony was a failure to give the trial court an opportunity to exclude, in advance, inflammatory testimony about a random fight completely unconnected to Barnes's death.

220.    All three witnesses' trial testimony was substantially similar to the testimony they gave at the evidentiary hearing, with a few differences.  (Zuppinger, 4/23/2009, 1100–21; White, 4/24/2009, 1133–91; Perry, 4/24/2009, 1195–1202.)   Again, Perry did not connect the incident he described with any antipathy towards snitches, and trial counsel did not give the trial court the opportunity to strike the evidence by objecting after the fact to its patent irrelevance.  Trial counsel had been aware since the evidentiary hearing, months earlier, that in order to be admissible, the testimony about these prison fights had to be connected with an abhorrence to snitches; the failure to object and argue for exclusion at trial demonstrates a severe lack of preparation.  It was deficient performance.

221.    When trial counsel called Carpenter as the first witness for the defense, counsel asked about the incident of May 22, 2003, involving Perry, and Carpenter explained, "I had let him see my porno magazine and he took some pictures out of it and then, you know, we got into a fight over it in the rec cage."  Carpenter also explained that the second incident involving Brown also had nothing to do with Barnes, and that neither did the incident involving Perry.  *Id.,* 1755, 1756.  He elaborated that the second incident involving Brown happened because they were "in a cell together" and "got to arguing and . . . fought."  *Id.,* 1756.  Carpenter thus testified that the altercations in Atlanta had nothing to do with snitches in general or Barnes in particular.  This evidence was available only at trial, and not at the Rule 404(b) hearing, because trial counsel failed to investigate Carpenter until after the 404(b) hearing and on the eve of trial.  At

78

the Rule 404(b) hearing, the trial court decided that the testimony of Zuppinger, White, and Perry would be admissible to the extent the incidents could be connected with snitching on Carpenter. Had trial counsel investigated Carpenter and discovered that the altercations had nothing to do with snitching, and had trial counsel in turn called on Carpenter to testify at the 404(b) hearing to that effect, there is a reasonable probability that the trial court would not have allowed evidence of the Atlanta altercations to come in at all.   Instead, the government's closing rebuttal emphasized, of Carpenter and Ebron, that "[t]hey beat up a snitch together in Atlanta." 04/30/2009, 2239.   Thus Ebron was prejudiced by trial counsel's deficient performance in investigating a key defense witness only well after such investigation could have made a positive difference for Ebron's defense at the Rule 404(b) hearing.[21]

222.   Furthermore, regardless of trial counsel's failure to conduct a timely interview of Carpenter, trial counsel's deficient failure to object to Perry's testimony for failing to create any connection to Carpenter and snitches, which the trial court had explicitly said was necessary for admissibility, prejudiced Ebron.   Had counsel been prepared and objected at the Rule 404(b) hearing, and had Perry's testimony consequently been excluded, there is a reasonable probability that the jury would not have been exposed to — or, if at trial, would have been instructed to ignore — gratuitous piling on of evidence of random fights that tended to support the idea that Ebron had a character for violence.   There is a reasonable probability that, but for the deficiency, alone and in combination with the other deficiencies set forth in this petition, the outcome of the guilt-innocence phase, or at least at the penalty phase, would have been different.

---

[21] Moreover, had trial counsel timely investigated  Carpenter, she would have had a better understanding before trial began of a key component of Ebron's defense — that Carpenter needed  Barnes alive for his § 23-110 action and accordingly did *not* want him to be killed.

**E. COUNSEL FAILED TO OBJECT TO THE QUASI-EXPERT SPECULATIVE TESTIMONY OF BOP OFFICIALS, WHICH INVADED THE JURY'S PROVINCE AND EMBRACED THE ULTIMATE ISSUE.**

223.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

224.    Trial counsel performed deficiently by repeatedly failing to object when Government witnesses Carl Powers, Eric Rayburn, and Derric Wilson provided inflammatory "background" testimony, responding to the prosecutor's leading questions in a speculative, quasi-expert manner and drawing on their prison experience to offer unfounded opinions about the ultimate factual issues in this case. *See Ward v. Dretke*, 420 F.3d 479, 495–96 (5th Cir. 2005) (failure to object deficient, where it was unreasonable and could not be recast as a strategic decision); *Riddle v. Cockrell*, 288 F.3d 713, 717 (5th Cir. 2002) (failure to object deficient where there was no reasonable tactical basis for so failing).  The nuances of prison culture and conduct could be considered an area fit for expert evidence (although in this case, none of the witnesses was formally so qualified).  That evidence, however, must conform to the rules for opinion testimony.  The government's witnesses, often in response to the prosecutor's firm leading, repeatedly exceeded those bounds and invaded the jury's province.

225.    Officer Carl Powers, when asked if, when an inmate sneaks into another unit, he is usually there just to socialize, initially testified, "Usually.  That, or just pick something up." 04/22/200, 724–25.  Then, when led by the prosecutor's question, "If they're not doing anything wrong, is there any reason for an inmate to risk getting a shot when they could visit with the same person out on the yard?" he responded, "No," and added that on a Saturday (the day Barnes died), there would have been even more time to socialize out on the yard.  *Id.,* 725–26.

80

226. His testimony then veered into speculation. Powers testified that there was no reason an inmate would have to sneak into another unit to check that inmate in, and specifically no reason why someone from another unit would have to sneak in to check Barnes in, because Barnes's unit already had thirty to forty DC inmates. *Id.,* 744. Besides, Barnes was "docile" and "small." *Id.* He further testified, in a quasi-expert manner, that inmates who have testified against other inmates are particularly "hot," and are usually checked in by members of their own "crew" who want "to send a message," not only to their own members but also to members of rival groups. *Id.,* 745–46. After many questions on this topic, the prosecution attempted to ask a further question and trial counsel finally objected — on the grounds of relevance — but was overruled. *Id.* Powers then explained, again in a quasi-expert manner, that there was no reason to give Barnes a secret beating — a quiet check-in in his cell — because that would defeat the purpose of sending a message; only inmates with clout earned private check-ins, and as an inmate who had arrived just that day, Barnes had no clout. *Id.,* 747–48. Besides, he said, inmates earn rank within the group by checking others in, and so they would want their identity to be public knowledge. *Id.,* 748.

227. Trial counsel similarly failed to object to the speculation of Eric Rayburn, a lieutenant at USP Beaumont at the time of Barnes's death. He testified that it was his opinion "that the number of stab wounds was — was a message to be sent." 04/23/2009, 1029. He further testified that "everything about" the video evidence suggested that what was happening was not a simple check-in:

> The fact that two inmates were outside the cell watching out for staff, that they were attempting to hide their identity wearing towels on their heads, the fact that they were waiting for the other staff to — other inmates to arrive. The whole thing was set up to be to my version of a hit.

81

*Id.,* 1051.  Rayburn thus offered his opinion that the incident was planned as a murder, without basing the opinion on any reason that would not equally apply to other, less serious, illicit activity.  He echoed Powers's testimony that if the inmates had meant simply to check Barnes in, they would not have tried to conceal their identities because they would have wanted other inmates to know what they had done, and that inmates who beat snitches gain status.  *Id.,* 1052.  He continued his quasi-expert discourse by observing that a check-in is generally done "[o]ut on the yard where the other inmates can see it and it can be stopped fairly quickly by staff," and that "typically the first inmate that becomes aware of it will be the one that has to run them off the yard."  *Id.,* 1053.

228.    Finally, trial counsel likewise failed to object to any of the speculative testimony of Derric Wilson, a special investigative agent.  Like Rayburn, he offered his opinion that the events on the video showed a murder rather than a check-in.  He said, "Normally that's going to be conducted in the view of everybody on the compound," because "individuals want to send a message to other people in the prison population, other inmates in the population, that this is what happens to rats or snitches or child molesters or people that fit the criteria that they disapprove of."  04/28/2009, 1589.  He continued:

> [T]his did not happen on the compound.  The individuals involved in this are observed on the video taking clothing upstairs, presumably to the laundry room, where they are left, for the individuals to change into after the assault occurs.
>
> Just before the individuals entered the cell, they covered their heads so they cannot be seen by the video cameras that are in the units.
>
> . . .
>
> And after they exit the cell, the body is found on the top bunk, presumably so the officers, when they make their rounds, won't find the body laying in the floor.  And this gives the perpetrators a chance to get out of the area, to change their clothes, to get rid of the weapons.  It gives them more leeway

82

> to take care of the things that need to be taken care of after the murder has been committed. This was not a typical beat-down. This didn't happen in a beat-down situation.

*Id.,* 1589–90.

229.     Trial counsel failed to object that any of these government witnesses was speculating or providing expert testimony without first having been qualified as an expert. This failure was deficient performance because the evidence these witnesses provided was highly inflammatory and damaging to Ebron:  taken together, this speculative evidence, which had the patina of expertise but not its foundation, inescapably implied that Ebron must have been planning to murder, rather than check in, Barnes. This opinion that there must have been a plan to murder — that there must have been premeditation — invaded the jury's province by opining on the ultimate issue of Ebron's mental state, an element of the crime charged.

230.     All of this testimony, which came in owing to counsel's failure to object, damaged Ebron's defense by presenting to the jury, uncontested, speculation disguised as certainty with respect to the ultimate issue of Ebron's intent and motive or lack thereof. These witnesses put on expert airs but were never qualified as experts and yet gave evidence that went beyond what the rules on expert evidence would allow. They invaded the jury's province by telling the jurors that they — people who know these things — knew that Ebron intentionally killed Barnes. Trial counsel's continual failure to object accordingly was deficient performance. Individually and cumulatively with other claims, these instances of deficient performance prejudiced Ebron at both the guilt phase and the penalty phase.

83

## F.  COUNSEL IMPROPERLY CROSS-EXAMINED COOPERATING WITNESSES, MINIMIZING THE EXTENT OF BENEFITS THEY HAD RECEIVED FOR THEIR TESTIMONY.

231.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

232.    Trial counsel performed deficiently by minimizing, on cross-examination, the benefits government witnesses Johnny Bazile, Charles Giles, and Lamont Bailey received in exchange for their testimony.  *See Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) (failure to question government witnesses about reward money counsel knew they expected to receive is deficient performance); *Steinkuehler v. Meschner*, 176 F.3d 441, 445 (8th Cir. 1999) (failure to cross-examine important witness adequately is deficient performance).

233.    Johnny Bazile, who was Bacote's cellmate at the time of Barnes's death, testified for the government that Bacote had informed him that Ebron and Mosley planned to "punish" Barnes, which he understood to mean that Barnes was going to be "stabbed."  04/21/2009, 326, 340, 345.  Bazile testified that in exchange for his cooperation he would be placed in a "safer environment" and hoped to see his sixty-five-year sentence cut in half, but that he understood that there was no guarantee.  *Id.,* 358–59.  On cross-examination, trial counsel minimized the importance of such benefits by implying that the government could not really protect him, suggesting the government did a poor job of protecting Barnes, who had been similarly situated; and also by intimating that the possible reduction in his sentence was trivial.  *Id.,* 361–62, 364.

234.    Charles Giles, who was Barnes's cellmate at the time of his death, testified for the government that he picked up a towel he noticed on the bottom bunk, saw a spot of blood, and called for help from a correctional officer without further disturbing the scene.  *Id.,* 435–36.  Giles testified that in exchange for his cooperation the government would protect him from all

DC inmates and would seek a time credit on his sentence. *Id.,* 440. On cross-examination, trial counsel minimized the significance of the benefits the government promised Giles instead of focusing on why those benefits might provide him a motive to say anything he could to help the government's case against Ebron. Counsel also emphasized that the contemplated reduction in sentence was in no way guaranteed. *Id.,* 468.

235. Lamont Bailey, an inmate at USP Beaumont at the time of Barnes's death, was the government's final witness. He testified that Mosley had told him that he and Ebron had "'put in the work'" on the killing of Barnes because he was a snitch. 04/28/2009, 1710. On redirect he testified that Mosley had told him, "'We stabbed him so many times that we had to take a break.'" *Id.,* 1734. He also testified that, like Giles, in return for his cooperation the government had promised him protection from all DC inmates and an effort to reduce his sentence. *Id.,* 1712–13. On cross-examination, trial counsel minimized the deal the government gave him by questioning whether either component was worth anything. As for protection from DC inmates, counsel insinuated that, owing to all the enemies he had accumulated from his history of informing, the government's offer of protection would not appreciably reduce his chances of being killed in prison. *Id.,* 1722–24. Counsel then questioned the value of the government's promise to seek a sentence reduction as well, stressing that there was no real guarantee of any reduction. *Id.,* 1724.

236. Counsel's aggressive and persistent diminishment of the significance of the benefits these government witnesses received for their cooperation was unreasonable. The benefits provided each witness a strong motive to testify in any way possible in order to please the government. Instead of emphasizing that motive, counsel sought to undermine it. By bolstering the testimony of adverse witnesses instead of impeaching it, counsel performed

85

deficiently.  The jurors deliberated for days before reaching a verdict and, even in the eligibility phase, continued to show doubt about Ebron's culpability level.   There is a reasonable probability that, had counsel effectively cross-examined these witnesses, the outcome would have been different.  Cumulatively with other claims, these instances of deficient performance prejudiced Ebron at both the guilt phase and the penalty phase.

**G.  COUNSEL RENDERED INFFECTIVE ASSISTANCE LEADING TO THE IMPROPER INTRODUCTION OF EBRON'S PRIOR MURDER CONVICTION.**

237.   Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

238.   Trial counsel made a series of errors that ultimately led to the improper introduction during the guilt phase of testimony that Ebron had been convicted of murder in 1999 in Washington, D.C.[22]   First, counsel made a constitutionally deficient effort to have evidence of Ebron's criminal history excluded.  Although the relevant standard requires the court to make an offense-specific assessment weighing the prejudicial effect against the probative value of each conviction, counsel's *pro forma* motion did not even specify which prior convictions it sought to exclude.  The motion also failed to cite to the relevant legal standard, *see* Fed. R. Evid. 609(a)(1), let alone explain why introduction of the murder conviction would be unfairly prejudicial to Ebron's defense.  Second, once the Court had denied counsel's *in limine* motion, counsel mistakenly assumed that the government would rely on Ebron's conviction as substantive evidence, regardless of whether he testified.  This led counsel to instruct Ebron — against his wishes — that he had to take the stand, creating an opening for the conviction to be admitted.   Finally, when Ebron testified, counsel introduced the conviction on direct examination, thereby waiving Ebron's right on appeal to contest the admission of his conviction

---

[22] Counsel also rendered ineffective assistance in failing to adequately investigate Ebron's prior conviction. *See* Claim II.A.2, *infra*.

as improper.  In all steps of the process that led to introduction of the conviction, trial counsel performed deficiently.

239.    This deficient performance prejudiced Ebron.  The introduction of the prior murder conviction improperly encouraged the jury to believe that he had a propensity to kill. But for the improper introduction of Ebron's prior murder conviction, made possible only by counsel's deficient performance, there is a reasonable probability that the jury would have acquitted him.  Counsel therefore failed to provide effective assistance to Ebron.

### 1.    Counsel's Failure to Identify the Governing Legal Standard Led to the Introduction of Ebron's Prior Murder Conviction.

240.    Before trial, counsel filed an omnibus motion *in limine* seeking an order barring the government, *inter alia*, from referring to Ebron's "prior convictions . . . in the presence of the jury prior to a ruling of this Court as to its admissibility."  The motion also made a somewhat duplicative, though equally sparse, request that the government not be allowed to reference Ebron's "prior criminal record" (including convictions, criminal charges and arrests) in the jury's presence without an *in limine* ruling.

241.    Admission of criminal records for impeachment purposes is governed by Federal Rule of Evidence 609, which, at the time of trial, provided:

> (a) **General rule.**    For the purpose of attacking the character for truthfulness of a witness,
>
> (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted *if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused*.

Fed. R. Evid. 609 (2009) (emphasis added).  Trial counsel's motion did not (1) cite the standard for admissibility, (2) identify which convictions Ebron's counsel wished to exclude or (3) explain why the unidentified convictions failed to satisfy the unidentified standard for admissibility.

242.    In response to the motion, the government stated that it intended to use Ebron's 1999 murder conviction as impeachment if he testified but did not object to Ebron's request for an *in limine* ruling on its admissibility.[23]  The Court held a hearing on the motion, but neither side presented any evidence or arguments regarding the admissibility of Ebron's record; the hearing focused entirely on other matters.  The Court granted Ebron's omnibus motion in part on grounds unrelated to the conviction and denied the "balance" of the motion without specifically addressing the admissibility of Ebron's criminal history.

243.    Trial counsel's failure to identify Rule 609 as the governing legal standard or to offer any analysis as to why Ebron's prior murder conviction should be excluded under that standard constituted deficient performance.  Given that counsel moved to exclude the conviction, there was no conceivable strategic reason not to support the motion with authority and reasoning.  Yet both in their written submission and during the motion hearing, counsel never explained to the Court the substantial prejudice that Ebron would suffer if the prior conviction were introduced or the comparatively minimal probative value of the conviction to his character for truthfulness.

244.    Counsel's deficient performance prejudiced Ebron.  Had counsel rendered professionally competent assistance with respect to the motion *in limine*, the Court would have excluded the conviction, and there is a reasonable probability that Ebron would have been acquitted.  Under Rule 609, a court must exclude evidence of an accused's prior conviction if the

---

[23] The government's response cites to Federal Rule of Evidence 609(f), a subsection that does not exist.

88

danger of its causing unfair prejudice to the defendant outweighs its probative value to the accused's truthfulness.  The rule embodies a "predisposition toward exclusion."  28 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure*, § 6132 (2d ed. 2012).  Where the past conviction and current charge are the same or similar, courts typically exclude the prior conviction because of the danger that the jury will believe that the defendant has a propensity to commit that offense.  *United States v. Sanders*, 964 F.2d 295, 297 (4th Cir. 1992).  This is especially true of violent crimes, such as Ebron's prior murder conviction, which "generally have limited probative value concerning the witness's character for truthfulness."  4 Weinstein's Federal Evidence § 609.05(3)(b).

245.    The erroneous admission of Ebron's conviction was prejudicial.  This was a close case: the jury deliberated for five days over Ebron's guilt, even though it was uncontested that Ebron was present in Barnes's cell at the time of the homicide.  The jury further demonstrated its ambivalence toward Ebron's intent and level of involvement in the homicide by finding, at the eligibility phase, that the government had not proved that Ebron either (1) intentionally killed Barnes or (2) intentionally inflicted serious bodily injury that resulted in  Barnes's death.

246.    The Fifth Circuit has explained that it can "hardly imagine anything more prejudicial" to a defendant than a jury's learning that he has committed a similar offense before. *Lyons v. McCotter*, 770 F.2d 529, 534 (5th Cir. 1985) (citation omitted).  Here, given the extremely prejudicial nature of the evidence and the closeness of the case, there is a reasonable probability that, but for the admission of Ebron's conviction, he would have been acquitted.

**2. Counsel Forced Ebron to Testify Against His Wishes, Apparently Believing That His Conviction Would Be Admitted Regardless of Whether He Testified.**

247. Ebron did not want to testify at trial.  But after the Court denied trial counsel's motion to exclude evidence of Ebron's criminal record, counsel erroneously believed that Ebron's criminal history would be admitted *regardless of* whether he testified.   Ms. Scardino wrote to members of the defense team in February 2009:

> Here is basically the Gov't's case:
>
> 1)  palm print of Ebron on upper bunk of Cell 305 ("the" cell);
>
> 2)  Security video showing the time and people going into cell; Ebron identified by other people and snitch as one who goes into cell at critical time;
>
> 3)  Charles Sherman's testimony;
>
> 4)  Ebron's criminal history (this IS his 3rd murder .... )

248. Since counsel believed that Ebron's criminal history would be a key part of the government's case whether or not he testified, they did not perceive any additional risk in his testifying and being impeached by his prior murder conviction.  Counsel thus advised Ebron that he had to testify and failed to explain to him that the choice whether to testify was his, not theirs. Furthermore, not having perceived the enhanced risk themselves, they did not explain it to Ebron before he testified.

249. Counsel's failure to appreciate the government's limited ability to introduce Ebron's conviction, as well as their strong-arming of their client into testifying, violated professional norms and constituted deficient performance.  Notwithstanding the Court's pretrial ruling, it should have been clear to a reasonably competent lawyer that Ebron's criminal record would not be admissible unless he testified.  Further, lawyers are required to consult with their

90

clients regarding the decision whether to testify in criminal cases and must abide by their clients' wishes. Tex. Disciplinary R. of Prof'l Conduct 1.02(a)(3). Failure to respect a client's decision regarding whether to take the stand constitutes deficient performance *per se*, even if counsel had a sound strategic basis for overriding the client's choice. *See United States v. Mullins*, 315 F.3d 449, 456 (5th Cir. 2002). Counsel thus performed deficiently in instructing Ebron that he had to testify and in failing to explain to him that, unless he testified, the jurors would not learn of his prior murder conviction at the guilt-innocence phase.

250. Ebron was prejudiced by counsel's error via introduction of his prior murder conviction. Even assuming, *arguendo*, that Ebron's conviction was properly admitted as impeachment, it could not have been admitted at all had he not testified. Few pieces of evidence are more prejudicial to an accused than evidence of a prior conviction for a similar offense. By contrast, much of the substance of Ebron's testimony could have been introduced through other witnesses.[24] There is a reasonable probability that, but for counsel's deficient performance in misunderstanding the Court's pretrial ruling and forcing Ebron to testify, the jury would have voted to acquit.

### 3. Counsel Waived Any Opportunity for Ebron to Contest the Admission of His Conviction on Appeal by Introducing the Conviction on Direct Examination.

251. Despite their failure to argue competently for the exclusion of Ebron's conviction and their insistence on his testifying, trial counsel could at least have preserved for appeal a challenge to the introduction of the conviction. Instead, counsel introduced the conviction on direct examination. By doing so, counsel waived Ebron's right to appeal the Court's ruling that the conviction was admissible. *See Ohler v. United States*, 529 U.S. 753, 760 (2000).

---

[24] Unfortunately, as discussed in Claim I.A.1, *supra*, counsel performed deficiently in failing to identify and/or locate these witnesses.

252.   Counsel's introduction of Ebron's conviction during direct examination constituted deficient performance.  Given that the conviction was inadmissible under Rule 609, *see* Claims II.G.1-2, *supra*, counsel sacrificed a meritorious appellate issue to introduce evidence through Ebron that was going to be introduced on cross-examination anyway.   Ebron thus received little to no benefit from counsel's decision, while at the same time incurring a substantial detriment.   Counsel's actions were unreasonable and fell below the standard of representation guaranteed by the Sixth Amendment.

253.   Counsel's deficient performance prejudiced Ebron in his appeal.  Admission of an accused's prior conviction for the same or similar offense as impeachment generally constitutes an abuse of discretion.  Particularly in light of the prejudice to the accused of admitting such evidence, there is a reasonable probability that, but for counsel's unprofessional errors, Ebron would have prevailed on appeal and received a new trial.

### H. COUNSEL FAILED TO OBJECT TO JURY INSTRUCTIONS THAT DID NOT SUBMIT ANY LESSER-INCLUDED OFFENSE AND DID NOT EXPLAIN THAT AN ACCOMPLICE MAY HAVE A LESS CULPABLE MENTAL STATE THAN A PRINCIPAL.

254.   Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

255.   Trial counsel performed deficiently by failing to object to the absence of lesser-included-offense instructions, at the guilt phase, on second-degree murder and involuntary manslaughter.   Trial counsel was also deficient in failing to object to aiding-and-abetting instructions that failed to make clear that it was possible for the jury to find that the aider-and-abettor had a lesser degree of intent (i.e., no premeditation with respect to murder), and accordingly a lesser degree of culpability, than the principal actor. *See Rosemond v. United States*, 572 U.S. ___, 134 S. Ct. 1240, 1248 (2014) (jury instructions invalid where they fail to

make clear that guilty finding possible only where intent is proven to extend to the entire and specific crime charged); *Richards v. Quarterman*, 566 F.3d 553, 569, 571–72 (5th Cir. 2009) (counsel ineffective for failing to request instruction on lesser-included offense).  Furthermore, under the Eighth Amendment and the Due Process Clause, the death penalty cannot be imposed where the jury was not allowed to consider a lesser-included non-capital offense where the evidence supported a guilty verdict as to that lesser-included offense.  *Beck v. Alabama*, 447 U.S. 625, 627 (1980); *United States v. Snarr*, 704 F.3d 368, 390 (5th Cir. 2013) (lesser-included-offense instructions proper where evidence warrants them).

256.    A defendant is entitled to a lesser-included-offense instruction where "the elements of the lesser offense are a subset of the elements of the charged offense," *Schmuck v. United States*, 489 U.S. 705, 716 (1989), and where "the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit [her or] him of the greater."  *Keeble v. United States*, 412 U.S. 205, 208 (1973); *see also United States v. White*, 972 F.2d 590, 604 (5th Cir. 1992).

257.    Where the evidence supports it, second-degree murder is a lesser-included offense of first-degree murder.[25]    *United States v. Collins*, 690 F.2d 431, 436 (5th Cir. 1982). Involuntary manslaughter is also a lesser-included offense of murder, where evidence supports it.[26]  *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989).

---

[25] One difference between first- and second-degree murder is that first-degree murder involves premeditation.  *See* 18 U.S.C. § 1111(a).  Second-degree murder "is the unlawful killing of a human being with malice aforethought." *Id.*  Malice aforethought "encompasses three distinct mental states:  (1) intent to kill; (2) intent to do serious bodily injury; and (3) extreme recklessness and wanton disregard for human life ('depraved heart')."  *Lara v. United States Parole Comm'n*, 990 F.2d 839, 841 (5th Cir. 1993).

[26] Involuntary manslaughter "is an unlawful killing of a human being without malice."  *See* 18 U.S.C. § 1112(a). Involuntary manslaughter occurs "[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."  *Id.*  A conviction for involuntary manslaughter requires that the defendant "(1) act[ed] with gross negligence, meaning a wanton or reckless disregard for human life, and (2) [had] knowledge that his or her conduct

258.    In a series of emails to and from the government regarding jury instructions, trial counsel never proposed or insisted on the inclusion of an instruction on any lesser-included offenses.   In fact, the proposed instructions that trial counsel and the government jointly submitted by agreement to the trial court did not include any lesser-included-offense jury instruction.  Instead, the instructions gave the jurors only two choices:  conviction of first-degree murder or outright acquittal.  Trial counsel made no objection before the trial court instructed the jury.  04/30/2009 at 2165.

259.    The jury instructions, as given, thus failed to provide the jurors any way to implement in their verdict the defense that the evidence did not prove premeditation and that, if anything, Ebron was guilty of a lesser offense, such as second-degree murder or involuntary manslaughter.  In fact, trial counsel conceded in closing that the crime in question was murder. *See, e.g.*, *Id.,* 2212 & 2216.  The instructions on Count 1 required that the jurors find both malice *and* premeditation.  *Id.,* 2178–79.  Similarly, on Count 2, the conspiracy charge, the instructions contemplated only premeditated murder.  *Id.,* 2180.

260.    Trial counsel's theory of the case was that Ebron agreed to check Barnes in but was a mere bystander while Barnes was killed; such behavior could support a conviction of second-degree murder or involuntary manslaughter, depending on Ebron's mental state.  Thus it was deficient performance to fail to ensure that lesser-included-offense instructions be given that would have allowed the jury to find something less than premeditated first-degree murder.  Not only the federal criminal code, but the Constitution, guaranteed Ebron an instruction on one or more lesser-included offenses.  *Beck*, 447 U.S. at 627; *Snarr*, 704 F.3d at 390.  Counsel's failure to request their submission was deficient performance.

---

was a threat to the life of another or knowledge of such circumstances as could reasonably have enabled the defendant to foresee the peril to which his or her act might subject another." *United States v. Fesler*, 781 F.2d 384, 393 (5th Cir. 1986).

261.    Had the jurors been properly instructed, they could have found that the evidence supported one of these lesser offenses.   On direct examination, Ebron testified that his understanding had been that he and Mosley were going to Barnes's cell to check him in, but that instead Mosley suddenly killed Barnes.   04/29/2009, 2000–03, 2021–27.   Ebron did nothing either to assist the killing and little to stop it, and afterwards he helped Mosley move the body and cover the area where the homicide had occurred.   *Id.,* 2026, 2030–32.   Trial counsel argued in closing that there was no premeditation — that Ebron was merely present at the scene of the crime.   Counsel quoted from the "mere presence" portion of the aiding-and-abetting instruction, and told the jury, "You heard yesterday what happened in that cell.   Mere presence is something I talked to every one of you about, also, every single one of you."   04/30/2009, 2226.

262.    This absence of premeditation, in combination with the evidence presented at trial, could have supported a conviction of involuntary manslaughter rather than first-degree murder.   The jury could have found, given the evidence, that Ebron had gone into Barnes's cell with Mosley for the purposes of conversation and persuasion, or of physical threats or harm, but not of killing.   The jury could have further found, in light of the evidence, that Ebron's failure to stop Mosley or call for help, and his assistance of Mosley with the moving of Barnes's body, amounted to a grossly negligent and reckless disregard for human life that threatened to place that human life in peril.   *See* 18 U.S.C. § 1112(a); *Lara v. Parole*, 990 F.2d 839, 841 (5th Cir. 1993).   The jury thus could have found involuntary manslaughter instead of first-degree murder.

263.    Alternatively, the evidence presented could have supported a conviction of second- rather than first-degree murder, in light of the defense's theory of the case and evidence presented at trial.   Provided that same evidence — the absence of a plan to kill, failure to intervene physically on Barnes's behalf, assistance with moving the body — the jury could have

found not premeditation but instead malice aforethought.  *See* 18 U.S.C. § 1111(a); *Lara*, 990

F.2d at 841.  The jury thus could have found second-degree murder rather than premeditated

murder.

264.    Trial counsel also performed deficiently by failing to object to the court's

instruction on aiding and abetting, which failed to convey that the jury could find that the aider-

and-abettor could have a lower degree of intent, and thus a lesser level of culpability, than the

principal.  The instruction on aiding and abetting read in part:

> If another person is acting under the direction of the defendant or if the
> defendant joins another person and performs acts with the intent to
> commit *a crime*, then the law holds the defendant responsible for the acts
> and conduct of such other persons just as though the defendant had
> committed the acts or engaged in such conduct.

04/30/2009, 2182 (emphasis added).  The instruction then goes on to say:

> [Y]ou may not find the defendant guilty unless you find beyond a
> reasonable doubt that every element of the offense as defined in these
> instructions was committed by some person or persons and that the
> defendant voluntarily participated in its commission with the intent to
> violate *the law*.
>
> You may find the defendant guilty of either count of the indictment if you
> are convinced that the government has proved each of the following
> beyond a reasonable doubt:
>
> first, that the offense of *murder* and/or conspiracy to commit murder was
> committed by some person;
>
> second, that the defendant associated with *the criminal venture*;
>
> third, that the defendant purposefully participated in *the criminal venture*;
> and
>
> fourth, that the defendant sought by action to make *that venture*
> successful.

*Id.,* 2183–84 (emphasis added).  Thus the instruction conveys that Ebron could be found guilty of

first-degree murder if he acted "with the intent to commit *a* crime" and "with the intent to violate

96

*the* law." The instruction failed to convey that aiding and abetting applies only where the intent applies to the *specific* crime, not "*a* crime" or "*the* law" in general. *See Rosemond*, 134 S. Ct. at 1248 ("[A] person aids and abets a crime when . . . he intends to facilitate *that offense's* commission. An intent to advance some lesser or different offense is not . . . sufficient: Instead, *the intent must go to the specific and entire crime charged.* . . ." (emphasis supplied; internal citation omitted)). In *Rosemond*, the trial court's instructions were held to be misleading and erroneous because they failed to convey that, in order for the defendant to be found guilty of aiding and abetting a crime that involved a predicate crime plus firearm use, the defendant's intent must have included foreknowledge not just of the predicate crime but also of the firearm. 134 S. Ct. at 1251–52.

265.    Here, similarly, the instructions failed to account for the possibility that Ebron's intent did not extend to the entire, specific crime, and failed to make clear that a finding of premeditation was necessary for a guilty finding for first-degree murder; instead, the instructions contemplated intent only in connection with "a crime" or "venture" in general, and they furthermore failed to distinguish between first- and second-degree murder or a lesser form of homicide. Trial counsel's failure to object to this misleading error in the jury instructions was deficient performance.

266.    Individually and in combination, the failure to object to the absence of lesser-included-offense instructions and the failure to object to the flaws in the aiding-and-abetting instruction prejudiced Ebron because the evidence could have supported a conviction of a lesser offense but the instructions, as given, prevented the jury from delivering any lesser conviction. Even with their options limited to first-degree murder or acquittal, the jurors struggled for part or all of five days with their verdict. Had trial counsel proposed an instruction on second-degree

murder and involuntary manslaughter, or had they objected to their absence, lesser-included-offense instructions would have been given and, in turn, there is a reasonable probability that the jurors would have understood, and found, that Ebron had a lower level of intent and culpability in connection with the homicide. Likewise, had the instructions properly conveyed that in order to find him guilty on the aiding-and-abetting theory of liability, the jury would have had to find that his intent extended to the entire, specific crime, there is a reasonable probability that the jurors would have found that his intent did not extend to first-degree murder, even if they thought the principal actor (Mosley) guilty of first-degree murder.

267.    In sum, there is a reasonable probability that if trial counsel had made these objections, both the guilt-phase outcome and the penalty-phase outcome would have been different. Both individually and cumulatively with other claims, these instances of deficient performance prejudiced Ebron at the guilt phase and the penalty phase.

## I.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE GOVERNMENT'S REQUEST THAT EBRON BE FORCED TO WEAR A STUN BELT THROUGHOUT THE TRIAL.

268.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

269.    Before trial, the government moved that Ebron be required to wear a stun belt during trial. Although the government did not demonstrate a sound basis for imposing the restraint, trial counsel represented that they were unopposed to the motion, which the Court granted summarily. Trial counsel's failure to object to their client's being forced to defend himself and testify while wearing a device capable of sending a 50,000-volt shock through his body constituted ineffective assistance of counsel.

### 1.   Stun Belts Can Cause Substantial Physical and Psychological Damage.

270.   A stun belt is an electronic restraining device.  When activated, it sends a 50,000-volt, three-to-four-millampere shock through the body for eight seconds.  Activation may "cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal."  *People v. Mar*, 52 P.3d 95, 103 (Cal. 2002).  A shock from a stun belt can also cause an irregular heartbeat and seizures.  *Id.*

271.   But beyond the physical impact, a stun belt has a dramatic psychological influence on the person wearing it.  This is not an unintended consequence of the restraint, but an integral part of its appeal.  Stun-Tech, a stun-belt manufacturer, has touted the belt as having a "very psychological" effect on the wearer.  Philip H. Yoon, *The "Stunning" Truth: Stun Belts Debilitate, They Prejudice, and They May Even Kill*, 15 Cap. Def. J. 383, 386 (2003).  A Stun-Tech brochure brags:

> After all, if you were wearing a contraption around your waist that by the mere push of a button in someone else's hand could make you defecate or urinate yourself, what would that do to you from a psychological standpoint?

William F. Schulz, *Cruel & Unusual Punishment*, N.Y. Rev. Books, Apr. 24, 1997, at 51.

272.   A defendant wearing a stun belt is thus likely to suffer considerable anxiety about the possible activation of the device.  This psychological impact impedes a defendant's ability to participate in his own defense, consult with counsel and, if he so chooses, to testify.  To protect a defendant's Sixth Amendment and due-process rights, courts must subject requests that a defendant be subjected to a stun belt to "close judicial scrutiny" and make factual findings addressing whether (1) use of the belt is serving an "essential state interest," such as courtroom

safety, and (2) less restrictive means to serve that interest are available.  *United States v. Durham*, 287 F.3d 1297, 1307 (11th Cir. 2002).

### 2.    Counsel Performed Deficiently in Failing to Object to the Use of a Stun Belt.

273.    In moving to force Ebron to wear a stun belt at trial, the government proffered little in the way of specific evidence to show that use of the belt was "essential."   The government asserted, without citation to documentary evidence, that Ebron "has an extensive history of violence and has continued this pattern of violence, attempted violence, and threatened violence, even while incarcerated.  In addition EBRON is a known associate of the DC Blacks Prison 'crew,' a violent prison gang."  The government did not assert that Ebron had a history of escape, or that  he had ever behaved violently or caused danger during a court appearance.

274.    Trial counsel performed deficiently in failing to object to the government's motion.  Counsel did not point out Ebron's history of compliant conduct to prison authorities, such as the fact, elicited during the penalty phase, that he had not exhibited aggressive behavior in prison during the four years between the homicide of Barnes and trial.  Counsel did not ask the court to weigh this history against the severe burden that the stun belt would place on Ebron's ability to participate and testify in his own defense.  And counsel did not ask the court to consider less restrictive alternatives, such as removing the belt during Ebron's testimony if he chose to take the stand.  As a result, the court ruled summarily without applying the careful balancing test required by precedent.

275.    When the prosecution fails to demonstrate necessity for use of a stun belt, failure to oppose the government's request constitutes deficient performance.  Here, the government did not proffer any evidence in its bare-bones submission that would have justified use of the stun belt.  Counsel's failure to object constituted deficient performance.

100

### 3.      Wearing the Stun Belt Prejudiced Ebron.

276.    Had trial counsel objected to use of the stun belt, Ebron would not have been subjected to the restraint.  And given the heavy psychological impact of wearing a stun belt, trial counsel's failure to object to the government's motion prejudiced Ebron.  Ebron had to endure the entire trial while under constant threat of being zapped with a 50,000-volt current that could cause him debilitating pain and seizures.  He thus had to factor the possibility of being electrocuted into every action he took within the courtroom.  This anxiety impeded his ability to communicate with counsel and diminished his ability to participate actively in his own defense.

277.    It also weighed on his mind throughout his own testimony, thus abridging his ability to testify in his own defense.  Given counsel's constitutionally deficient guilt-phase investigation,[27] Ebron's credibility in testifying on his own behalf was likely a central factor in the jury's determination of guilt.  Forcing him to testify while in fear of being shocked to the point of soiling himself limited his ability to testify credibly.  But for counsel's constitutionally deficient failure to object to use of the stun belt — both in isolation and in combination with counsel's other areas of deficient performance — there is a reasonable probability that the jury would have found Ebron's testimony credible and would have acquitted him or would not have sentenced him to death.

### J. THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S GUILT-INNOCENCE PHASE DEFICIENCIES PREJUDICED THE DEFENSE AT BOTH PHASES OF TRIAL.

278.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

279.    Ebron's defense was that he did not join in any premeditated plan to murder Keith Barnes.  His attorneys advanced that defense on the basis of his unsupported word, opposed by

---

[27] *See* Claim I.A.1, *supra.*

that of Charles Sherman.  Even on that basis, the jurors deliberated for five days at the guilt-innocence phase, and later rejected the two most culpable mental state options at the eligibility phase.  There is a reasonable probability that if the jurors had heard from all the readily available witnesses, if counsel had effectively cross-examined Sherman and had otherwise performed effectively throughout the trial, and if the jurors had received instructions to consider lesser-included offenses instead of the all-or-nothing choice of convicting of capital murder or acquitting, they would have found Ebon not guilty of first-degree murder.  At the very least, there is a reasonable probability that, but for the effects of all these deficiencies combined, the jurors would not have sentenced Ebron to death.  Counsel therefore provided ineffective assistance at both phases of trial.

## II.    TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE.

280.    At the penalty phase, counsel's lack of investigation and preparation left them unprepared to rebut the government's case in aggravation or to present a reasonably supported case in mitigation.  These deficiencies deprived Joseph Ebron of the effective assistance of counsel.  U.S. Const. amend. VI; *see Rompilla*, 545 U.S. 374; *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000).

### A. TRIAL COUNSEL FAILED TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE GOVERNMENT'S CASE IN AGGRAVATION OR TO PRESENT EVIDENCE PROVIDING CONTEXT FOR THE AGGRAVATING FACTORS.

#### 1.    Trial Counsel Failed to Conduct an Adequate Investigation Designed to Rebut the "Substantial Planning and Premeditation" and "Heinous and Cruel" Statutory Aggravators.

281.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

102

282.    Trial counsel failed to interview witnesses who could have provided evidence that would have tended to refute the notions that Ebron engaged in substantial planning and premeditation of, and acted heinously and cruelly in connection with, the murder of Barnes.  This failure to investigate the statutory aggravators (substantial planning and premeditation, 18 U.S.C. § 3592(c)(9); heinous, cruel, or depraved manner of committing offense, 18 U.S.C. § 3592(c)(6)) was deficient performance.  Counsel's deficiency prejudiced Ebron's defense by depriving him of evidence that could have neutralized, or at least undercut, otherwise powerful evidence in aggravation.  U.S. Const. amend. VI; *see Rompilla*, 545 U.S. at 383 (failure to investigate prior conviction, a statutory aggravator, is deficient performance); *Summit v. Blackburn*, 795 F.2d 1237, 1245 (5th Cir. 1986) (counsel ineffective for failing to object to, or argue lack of corroboration for, aggravating factor); *see also Hooks v. Workman*, 689 F.3d 1148, 1203 (10th Cir. 2012) (counsel ineffective in capital sentencing for, among other things, failing to mitigate aggravation evidence).

283.    For many reasons, trial counsel should have ensured that a member of the defense team interviewed inmates who were at USP-Beaumont at or shortly after the time of Barnes's death.  Not only would the investigation have yielded evidence that would have supported the defense as to guilt, but it also would have rebutted the government's aggravating factors.

284.    For instance, had trial counsel interviewed Lonnie A. "Goody-Bey" Gooding, he could have testified that Mosley told him that Barnes's killing was not supposed to have happened as it had, and that Ebron repeatedly said to Mosley, within earshot of other inmates and guards, that the killing had been Mosley's doing.  Had counsel interviewed Luther Fuller, who was Mosley's cellmate for a few weeks a short time after Barnes's death, Fuller could have testified that Mosley told him that he and Ebron had gone to Barnes's cell to tell him that he had

to go into the SHU for his own protection, but that Barnes resisted and Mosley began stabbing him, at which point Ebron panicked and argued with Mosley. Fuller could have also testified that Mosley thought Ebron weak for failing to join him in punishing Barnes, and that Ebron made his disagreement with the murder plain to Mosley.  If trial counsel had interviewed Joseph Jackson, he could have testified that several times he heard Ebron say to Mosley that Mosley had been wrong to do what he had done, and that Barnes was not supposed to have been killed.  If trial counsel had interviewed Andrew "Twin" Patrick, he could have testified similarly and added that Mosley told him, while they were cellmates, that Ebron had looked shocked when Mosley had begun stabbing Barnes.  If trial counsel had interviewed Kelvin Smith, he could have offered testimony to deny Sherman's assertion that the two of them had discussed the killing of Barnes before it happened.  If trial counsel had interviewed William Mercer, he could have testified that on the day Barnes died, Mosley told him that he had stabbed Barnes because he had snitched on a friend of his, but that killing him was not the plan when he went into the cell along with Ebron, who had not known in advance that Mosley would stab him.

285.    This deficient performance prejudiced Ebron because had trial counsel presented this evidence, there is a reasonable probability that the jury would not have found that the government had proven these statutory aggravating factors beyond a reasonable doubt; in turn, there is a reasonable probability that, without these statutory aggravators, the jury would have voted to impose life without parole rather than death.  The witnesses trial counsel failed to interview would have provided evidence that Ebron did not help plan Barnes's murder and that Ebron was a mere bystander — he neither stabbed Barnes nor restrained him while he was stabbed, and so *his* behavior was not heinous or cruel, even if the murder itself was.

286.   On direct appeal, the Fifth Circuit held that the district court had abused its discretion in submitting substantial planning and premeditation as an aggravator to the jury because — even without the readily available evidence that counsel failed to uncover and present — the record showed that Ebron had not engaged in any planning whatsoever. *United States v. Ebron*, 683 F.3d 105, 152 (5th Cir. 2012).   The Fifth Circuit concluded, however, that this error was harmless because the jury would have imposed death even without the invalid aggravator, in part because the jury had found other aggravators — including that the murder was heinous, cruel, or depraved. *Id.,* 153.   But had trial counsel conducted an investigation and presented the evidence described above, there is a reasonable probability that the jury would not have found that the government had met its burden on the heinousness factor.   And if the jury had not even considered the premeditation factor, because it was invalid, and if the jury had not found that Ebron had acted heinously and cruelly in light of the evidence that trial counsel should have presented but did not present, there is a reasonable probability that the jury would not have imposed death.

### 2.   Counsel Failed to Conduct an Investigation to Rebut the "Prior Life Sentence" Aggravating Factor.

287.   Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

288.   Ebron was denied the effective assistance of counsel because trial counsel failed to conduct an adequate investigation into Ebron's prior murder convictions to rebut the "prior life sentence" and "future danger" aggravating circumstances.   It is incumbent upon trial counsel to investigate evidence that it knows the government will present in support of a death sentence. *See Rompilla*, 545 U.S. at 377.   Had trial counsel performed a reasonable investigation of Mr.

Ebron's prior murder convictions, there is a reasonable probability that the jury would have sentenced Ebron to life imprisonment.

a)      Deficient Performance

289.    On September 11, 2007, eighteen months before Ebron's trial began, the government informed trial counsel that it would present, as a statutory aggravating factor in support of a death sentence, Ebron's January 11, 1999, murder conviction.[28]  Trial counsel was also on notice that Ebron's murder conviction would be used to impeach him during the guilt phase, should he choose to testify, *see* Claim I.G, and that it would be relevant to the non-statutory aggravating factor "future dangerousness" in the selection phase of Ebron's penalty phase proceedings.  5/13/09, 67.  On December 9, 2008, the government provided trial counsel with discovery related to that murder conviction.  The discovery included an indictment, an autopsy report, a pre-sentence report and an arrest report.  It detailed that Ebron's prior murder conviction stemmed from an incident in which Ebron and co-defendant Steven Goode were found guilty of shooting Anthony Tate to death.

290.    Despite receiving notice of the government's intent to use Ebron's prior murder conviction in support of aggravating factors eighteen months before trial, neither trial counsel nor their investigator conducted any investigation into this conviction until only days before the penalty phase in Ebron's capital trial began.  Because the defense team waited until the last

---

[28] On March 4, 2009, trial counsel also received records relating to Ebron's 1994 juvenile murder adjudication. Neither trial counsel nor their investigator performed any investigation relating to Ebron's juvenile murder adjudication until the day before Ebron's penalty phase began.  On that date, the only investigation the defense team conducted was an electronic search for the attorney who represented Ebron at his juvenile proceeding.  The search turned up an address and a phone number for that attorney.  The investigator attempted a few calls to that number, and when he received an automated recording stating that the phone number was not accepting calls, he conducted no further investigation.

As expected, the government argued at the penalty phase that Ebron's juvenile murder adjudication should be considered when considering the non-statutory aggravating factor "future dangerousness."  5/18/2009 at 783. Because trial counsel conducted a deficient investigation, it could not respond to the government's argument.

106

possible days to conduct investigation into Ebron's prior murder conviction, it was unable to find any witnesses to the murder.

291.   At Ebron's capital trial, it was the defense theory that Gregory Quarles (also known as "Stanley") and Steven Goode killed Tate. *Id.,* 149.  The defense also attempted to rebut the "future danger" aggravating factor.  Yet, the defense team waited until May 4, 2009 — while the jury was deliberating Ebron's guilt — to conduct any investigation relating to Quarles. On that date, Investigator Gradoni searched electronically, not for a Gregory Quarles, but for "Stanley Gregory Qualls," and received no relevant match.  Mr. Gradoni performed no further investigation on Quarles.

292.   On that same date, Mr. Gradoni also ran an electronic search on the government's main cooperating witness, Bernard Pinkney, which turned up several potential addresses.  Mr. Gradoni, did not, however, attempt to visit these addresses nor did he conduct any further investigation on Pinkney.

293.   Counsel's failure to undertake any steps to investigate this murder until after the guilt phase proceedings were over was deficient performance.[29]

294.   Counsel's deficient investigation was highlighted during the penalty phase of Ebron's trial.  During the penalty phase, the government presented former Assistant United States Attorney Steve Durham to describe Ebron's prior murder conviction.  5/12/09, 30-43; 5/13/09, 66-90.  The government also called Detective Timothy Doughty, who testified, among other things, that Pinkney told the police that Ebron was willing to kill anyone who cooperated with the police. *Id.,* 138.  Defense counsel attempted to insinuate, without evidence, that it was

---

[29] During the guilt phase, trial counsel, during direct examination, questioned Ebron about this prior murder conviction.  4/29/09, 1966-1967.  Because counsel performed no investigation into Ebron's prior murder conviction at that time (they conducted only minimal investigation, after Ebron's guilt phase had ended), they were not able to explain or cast doubt on that murder conviction.

actually an individual named "Stanley" who, along with co-defendant Goode, murdered Tate. *Id.,* 149. Detective Doughty maintained, however, that there was not "one scintilla of evidence that anyone other than Joseph Ebron and Stephen Goode" committed the murder. *Id.,* 156. Because counsel performed deficiently and failed to conduct an adequate investigation, they were unable to present evidence to support their theory that Ebron was innocent of Tate's murder.

> b) Prejudice

295.    The failure of trial counsel to investigate, and uncover, readily available evidence that would have supported their theory and rebutted the government's "prior life sentence" and "future danger" aggravating factors prejudiced Ebron.[30] Had trial counsel conducted an adequate investigation, they would have found, and been able to present, compelling evidence that could have supported their chosen theory and undermined these aggravating factors. For example, had counsel interviewed Quarles, they would have learned, and been able to present, that Quarles was present at the scene of Tate's killing, and that Ebron was neither present at the scene of the crime nor one of the shooters. Had counsel interviewed Pinkney, they would have learned that the government threatened to charge Pinkney with the murder of Tate, and threatened to charge Pinkney's loved ones with unrelated crimes, if Pinkney did not testify against Ebron.

296.    Had trial counsel supported their theory with this readily available evidence, there is a reasonable probability that the jury would have harbored doubts about Ebron's participation in the killing of Tate, and would have sentenced him to life in prison. Moreover, had the jury believed that Pinkney testified against Ebron only because of undisclosed prosecutorial threats,

---

[30] Ebron's prior murder conviction was found as a statutory aggravator in the eligibility phase, and was used in support of Ebron's future dangerousness in the selection phase.

there is a reasonable probability that the jury would have doubted Pinkney's hearsay statements, and sentenced Ebron to life imprisonment.

### 3. Counsel Failed to Prepare and Present an Adequate Response to the "Future Danger" Aggravating Factor.

297.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

298.    Trial counsel failed to prepare and present an adequate defense to combat the "future danger" non-statutory aggravating factor.  Counsel's deficient performance prejudiced Ebron's defense at the penalty phase.

299.    On September 11, 2007, the government informed trial counsel of its intention to seek death against Ebron (Doc. 31).  On that date, the government notified counsel that it intended to prove Ebron's "future dangerousness" as one of the non-statutory aggravating factors to support a death sentence.  *Id.,* 2.  For over a year, counsel took no action to investigate this aggravating factor, and did not conduct any independent investigation of the prior convictions (including two homicides) that supported that aggravating factor.

300.    On September 23, 2008, counsel finally retained an expert in corrections but failed to inquire about his familiarity with the United States Bureau of Prisons, and failed to inquire into his proposed testimony or provide him with relevant documents until after the guilt phase of Ebron's trial was over.  Counsel also discussed Ebron's future danger with her trial psychologist, Kristi Compton, but counsel's ignorance of federal criminal procedure stymied Dr. Compton's ability to effectively consult with counsel.  Counsel's performance was deficient.

301.    On January 29, 2009, almost three years after trial counsel's appointment, she remained ignorant of criminal procedure in a federal death penalty case and was unsure of when Dr. Compton was to testify to rebut the government's "future danger" aggravating factor.  In an

109

email, trial counsel sent Dr. Crompton an email explaining that, when evaluating future danger, she "needs to focus on the fact that he is ACCUSED of committing murder in prison." Dr. Compton, noticeably confused, replied "[t]he only problem is that I will only be testifying if he is convicted? Right?" Months later, and only days before trial began, Dr. Compton informed trial counsel that the proposed future dangerousness presentation was a weak argument, and "statistically, if convicted he will meet the actuarial threshold for high risk."

302.   By May 5, 2009, while the jury was deliberating Ebron's guilt, counsel had no strategy on whether, or how, to rebut the future dangerousness aggravator. Counsel emailed her corrections expert, James Aiken, and asked, "What do you usually do?  At first, I assumed you would be able to testify about the ability of the United States prison system to deal with maximum security inmates."  Aiken, however, had no relevant experience with the Federal Bureau of Prisons.

303.   Trial counsel told Aiken that his purpose was "to knock down [the government expert] . . . who will say Ebron is a future danger to society."  The very next day, however, counsel learned that the government was not going to present an expert to opine on Ebron's future danger unless the defense raised that issue in its case.  Nonetheless, counsel's strategy of "knocking down" the government expert remained unchanged.

304.   On May 10, 2009, one day before the penalty phase began, trial counsel had still not provided Aiken with relevant records, including records related to Ebron's two prior homicide convictions.  Counsel also failed to request, or provide Aiken with, any records relied upon by the government's rebuttal corrections expert, Greg Hershberger.

305.   Aiken was forced to admit, during testimony, that he was ignorant of many facts relating to ADX, the BOP institution that, he testified, could adequately house Ebron.  5/15/09,

529.    In closing, the government was able to seize on counsel's deficient investigation and preparation of Aiken, and appropriately characterized Aiken as "a very nice man, completely not competent and qualified to testify about the Federal Bureau of Prisons." 5/18/09, 821.

306.    Counsel's failure to investigate Aiken's qualifications, provide him with materials in a timely manner, or request relevant records used by the government's expert was deficient performance.    Additionally, counsel's unreasonable failure to understand federal criminal procedure, which impeded her ability to make reasonable strategic decisions, was deficient performance.

307.    Ebron was prejudiced by counsel's deficient performance.    Had counsel performed a reasonable investigation before hiring a corrections expert, and provided such an expert with relevant documents, it is reasonably likely that at least one juror would have voted for life.    An expert retained after reasonable investigation could have testified, contrary to Hershberger's testimony, that the BOP has the ability to house Ebron safely, securely, and apart from other inmates if necessary, if he were to receive a life sentence.  Specifically, the BOP has the ability to house inmates, such as Ebron, for an unlimited duration in segregated housing units at ADX.  If BOP staff determines that an inmate, like Ebron, poses a threat to other inmates or the safety of the institution or the public, that inmate will remain at ADX until it is determined that the inmate is no longer a safety threat.  If the jury had known that Ebron would not be released to general population until, and unless, BOP staff determined that Ebron no longer posed a safety threat – and thus he would not pose a high risk of future danger – it is reasonably likely that at least one juror would have voted for life.  Counsel's deficient performance, alone and in combination with their other deficiencies at both phases of trial, prejudiced Ebron's penalty phase defense.

**B. COUNSEL FAILED TO CONDUCT A CONSTITUTIONALLY ADEQUATE BACKGROUND INVESTIGATION AND, AS A RESULT, PREPARED AND PRESENTED A CONSTITUTIONALLY INADEQUATE CASE IN MITIGATION THROUGH LAY WITNESSES AND EXPERTS.**

308. Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

309. Trial counsel had three years to develop a case in mitigation to persuade the jury to spare Ebron's life.  But it was not until May 8, 2009 — the fourth day of deliberations in the guilt-innocence phase and less than a week before the start of the selection phase — that any member of Ebron's defense team visited Washington, D.C., the city where Ebron grew up and had lived half of his life as of the time of trial.

310. Despite the benefit of a court-appointed mitigation specialist, a court-appointed mental-health expert, and a court-appointed investigator, counsel and their team conducted only a handful of interviews of Ebron's family members and made no attempt to contact friends or acquaintances who could share any insight into Ebron's formative years.  Counsel's token efforts to explore Ebron's family and community background fell far short of the mitigation investigation that a reasonably competent attorney would have conducted.  In light of the wealth of mitigating background information that was available at the time of trial, but for counsel's deficient performance, there is a reasonable probability that at least one juror would have voted for a sentence of life without parole.

### 1.    Counsel's Insufficient Background Investigation Constituted Deficient Performance.

311. Trial counsel recognized that evidence of Ebron's troubled childhood, together with evidence of any mental-health pathology, would form the core of the mitigation case if Ebron were found guilty.  But counsel made virtually no effort to develop evidence about

Ebron's family history, home life, or the neighborhoods in Washington, D.C., where he grew up. Particularly in light of counsel's acknowledgment of the importance of this evidence, their failure to pursue it constituted deficient performance.

312.    During the three years between counsel's appointment (April 26, 2006) and the beginning of the guilt phase of trial (April 20, 2009), the defense team's entire social-history investigation consisted of interviews of four of Ebron's family members, three of which were conducted by phone. All four of the relatives were interviewed between November 2008 and January 2009 by Dr. Compton, the psychologist, as part of her effort to assess Ebron's mental health.  Only Denise Ebron, Ebron's stepmother, was interviewed in person.  Neither counsel nor their investigator (Mr. Gradoni) nor their mitigation specialist (Ms. Schade) interviewed *any* members of Ebron's family during the entire pretrial period.  No member of the defense team interviewed a single friend, acquaintance or neighbor who could shed light on Ebron's upbringing.  No member of the defense team visited the Washington, D.C., neighborhoods where Ebron grew up.

313.    Recognizing the importance of social-history investigation to a successful mitigation case, trial counsel became anxious in early 2009 about the defense team's virtually nonexistent efforts to explore their client's background.  Ms. Scardino wrote to Ms. Schade and Mr. Gradoni on February 20, 2009 — 34 months after her appointment — that they needed to "work together to get witnesses ready for penalty phase . . . I am getting nervous."  Three weeks later, Ms. Scardino submitted a witness list that included just six people who knew Ebron before he was incarcerated, all of whom were relatives.  Three of the six — Ebron's birth mother, Ernestina Wiseman, and his siblings, William and Latina Ebron — had never been interviewed by the defense.  A copy of the list in Ms. Scardino's file has Ernestina's name crossed out, with

the notation "Deceased" handwritten next to it. Ernestina is, in fact, still alive, though counsel would not necessarily have known that at the time; their investigator did not even begin his attempts to locate Ernestina until March 17, 2009, five days after the witness list was filed.

314. Finally, on May 8, 2009, while the jury remained deadlocked for a fourth day over the question of guilt, Mr. Gradoni took the defense team's first and only trip to Washington, D.C. After making brief and unsuccessful attempts to speak to attorneys in Ebron's prior criminal matters, Mr. Gradoni dropped by Ernestina's house on Saturday, May 9, 2009. Mr. Gradoni asked Ernestina some general questions about her knowledge of Ebron, but never asked basic questions about abuse, neglect and trauma that Ebron suffered in his early childhood. Mr. Gradoni did not ask, for example, whether Ebron's father abused Ernestina (he did, "about four times a week") or whether Ernestina drank while pregnant with Ebron (she did, "a six pack every day after work"). Based on his cursory discussion with Ernestina, Mr. Gradoni concluded that she would not make a good mitigation witness.

315. During their conversation, Ernestina suggested that Mr. Gradoni speak with Ebron's sister, Latina Ebron, who was nearby. Ernestina called her daughter and asked her to come to her house to be interviewed by Mr. Gradoni; Latina agreed. During the subsequent interview in front of her mother, Latina informed Mr. Gradoni that a number of family members had drug and mental-health problems. Mr. Gradoni did not follow up on any of this information and instead concluded that Latina "couldn't provide any useful information about Joe's upbringing."

316. Next, having been asked to "canvass the neighborhoods where Ebron grew up" in an attempt to "verify the violent living conditions," Mr. Gradoni drove by Ebron's childhood home on P Street in Southeast Washington, D.C. Mr. Gradoni observed that the house did not

114

have any graffiti on it, then moved on to make quick observations about the addresses where the two prior homicides for which Ebron was convicted took place.  He did not knock on any doors or speak with any neighbors near any of the addresses; it is unclear if he ever got out of his car.  Mr. Gradoni did ask a Washington, D.C.-based private investigator for his opinion of the neighborhood.  The investigator responded that the area was "very, very violent" and suggested that the rate of violence could be demonstrated by crime statistics.  The defense team never asked for or obtained any such statistics.

317.    All told, including Mr. Gradoni's last-minute trip to Washington, the defense team's entire social-history investigation consisted of (1) three in-person interviews of family members, (2) three phone interviews of family members and (3) a firsthand observation that no one had recently spray-painted Ebron's childhood home.  Despite ample resources at their disposal and three years to prepare for trial, Mr. Ebron's defense team "failed to make even the most cursory inquiry into the existence of potentially mitigating evidence in [Ebron's] background."  *Adams v. Quarterman*, 324 F. App'x 340, 350 (5th Cir. 2009).  They thus rendered deficient performance at the penalty phase.

### 2.    Counsel's Deficient Background Investigation Prejudiced Ebron at the Penalty Phase.

318.    Had counsel conducted a reasonable social-history investigation, they would have discovered a plethora of mitigating evidence, discussed below, that could have been presented to the jury.  This history was readily available through witnesses who included Curtis Brothers, Ethel Bennett, Cykeithia Brown, Annette Caldwell, Valerie Clay, Denise Ebron, John Ebron, Kaniko Ebron, Anthony Fields, Alfonso Garces, Jacob Humphries, Vincent Jackson, Jeffrey Johnson, Rodney Johnson, Ronald Neal, Christopher Prince, Juan Scott, Jovan Smith, Willie Stokes, Bernita Ward, Ernestina Wiseman, Tonya Wiseman, and Toi Wiseman.  There is a

115

reasonable probability that this evidence, both in isolation and in combination with other mitigating evidence that counsel deficiently failed to develop, would have been sufficient to convince at least one juror to favor a sentence of life without parole.

319.   Counsel could have, but failed, to develop evidence that Ebron's father, Joseph "Big Joe" Ebron, Sr., physically abused both Ebron's mother, Ernestina Wiseman, and his stepmother, Denise "Niecey" Ebron.  The abuse was both frequent and vicious.  Ernestina states that, after she gave birth to her first child, Big Joe started beating her almost daily.  He "busted [her] lip."  He gave her a "big knot on [her] head."  He sent her to the hospital.  Big Joe had no compunction about beating Ernestina in front of the children — "[i]f he snapped, he snapped, and he was going to do whatever he wanted to do" to Ernestina.  Her sister, Valerie Clay, who was also available to testify at the time of trial, confirms the abuse that Ernestina suffered, including a broken arm.  Big Joe was similarly vicious toward Denise Ebron, Ebron's stepmother, whom Big Joe married after splitting up with Ernestina.  Big Joe hit Niecey.  Their fights resembled boxing matches, according to relatives, and when Big Joe "punch[ed] her in the face as if she was a man," Niecey stopped fighting back.  Ebron and his sister Latina witnessed the violence from an early age, and would run from the room or cower in closets when the fights broke out between their parents.

320.   Counsel also could have, but failed to, develop evidence of the neglect Ebron suffered throughout his childhood.  Ernestina drank throughout her pregnancy, and Ebron was developmentally delayed.  Ernestina and Big Joe never provided a stable home for their children.  Even when they were together, they moved often, and Ernestina left Big Joe frequently.  Throughout their early years, Latina and Ebron cycled through the homes of various relatives.  Later, after Big Joe married Niecey, his addiction overshadowed Ebron's childhood.  Big Joe

would pass out on the sidewalk in front of the home or inside Niecey's car. He frequently disappeared, or was incarcerated. He would steal money from his wife or sell the TV or VCR. He died of AIDS in 2001.

321. The violence Ebron saw at home mirrored the violence all around him in the Southeast Washington, D.C., neighborhoods where he grew up. Though Mr. Gradoni did not see any evidence of violence or gang activity during his drive-by investigation, numerous neighbors, friends and relatives, all of whom were available to testify at trial, could have explained to the jury the utter chaos that enveloped Southeast Washington, D.C., when Ebron lived there in the 1980s and 1990s.

322. Ebron's family first lived in the Stone Ridge Apartments off 37th Street and later moved to the house on P Street that Mr. Gradoni drove by. Both neighborhoods were drug-infested and plagued by violence. The area around Stone Ridge, and particularly 37th Street, was the site of frequent kidnappings, robberies and murders. Around 1989 — at the height of the crack cocaine epidemic, when Ebron was 10 years old — the neighborhood broke into what former neighbors describe as a "full-scale war." Gun shots rang out nightly, and murder was an almost daily occurrence. Ebron saw the results of the violence up close. When he was about 12, Ebron and friend Jeffrey Johnson were walking down 37th Street when they saw a large puddle of blood and large chunks of another material spewed all over the sidewalk and street. Johnson recognized the chunks as brain matter — it was not the first time he or his friends had walked past a murder scene. "When I saw these things with Joe, we were worried about what could happen to us," Johnson says. "We lived in a place where anything could happen to anyone at any time."

117

323.    When Ebron moved to P Street, he lived in a house instead of an apartment, but little else changed. The drugs and violence were so pervasive that the National Guard had to be called in to attempt to restore order. It didn't help — the Guard's presence in the neighborhood actually pushed the locus of drug trading closer to Ebron's home. The house across the street from Ebron's home was a center for gang and drug activity, while junkies regularly passed around crack pipes in the vacant lot beyond his home.

324.    Not surprisingly, the drug trade begat violence. "Living in our neighborhood was like living in a warzone," one neighbor said, while another found life on P Street similar to his experiences serving in combat during the Vietnam War. One time, men fired 90 rounds at a target, leaving cars and houses on the street chock full of bullet holes. Another time, a gunman interrupted a neighborhood basketball game by spraying bullets at a man standing outside of an apartment building. The man, who was shot in the head, urinated and defecated himself as he twitched on the ground and someone tried to wrap his head to stop the bleeding. Ebron, who was across the street at the time of the shooting, watched as the man struggled for life in front of his own children.

325.    Ebron did not just witness the violence; he experienced it. As a smaller and somewhat awkward child, he made an easy target for bullying. Ebron was "terrified" of the bigger boys who tried to intimidate him and tried not to fight them. But that only made him a bigger target. He once asked his cousin Tiffany to beat up a boy who had been bullying him. When his father found out that he had a girl do his fighting for him, Big Joe called him a "dag on punk" and whipped him with a belt until he cried. Sadly, this was not an atypical reaction to violence among children in Southeast DC. Adults encouraged children to fight each other and even fought children themselves.

326.    With chaos around him, by age 13, Ebron was running away from home with his cousin John.  The cousins would leave home for weeks at a time.  They slept in the hallway or laundry room of Stone Ridge, where Ebron previously lived, or anywhere else they could.  A former neighbor from his time living at Stone Ridge recognized Ebron when she saw him on the property and thought he "looked like a homeless person."  Ebron and his cousin survived on the streets by pumping gas or bagging groceries and running errands for the drug dealers whom they met while living on the street.

327.    Eventually, as Ebron turned to the streets, he landed in trouble with the law and ended up at Oak Hill Youth Center, the notorious juvenile detention facility in Laurel, Maryland.  At Oak Hill, the chaos that dominated Ebron's early life was amplified.  Inmates fought each other constantly.  Staff instigated and encouraged fighting.  Without friends for protection, according to those detained there, youngsters imprisoned at Oak Hill "wouldn't be able to survive."  Joseph was exposed and subjected to physical and sexual assaults.

328.    In the first 15 years of his life, Ebron's existence was defined by violence and drug use in his home and neighborhood.  He could not even walk to school without fear of being attacked.  He saw things — his father knocking his mother senseless, a man's brains splattered on a sidewalk — that no child should witness.  All of this information was available at the time of trial, and virtually none of it was collected or presented.[31]  Nor did counsel present the information to their mental health expert, Kristi Compton, or to other experts such as Paula Lundberg-Love, Harry Krop, and Julian Davies.  Armed with specific information about Ebron's background, any of these experts could have presented well-founded opinions on the effects of

---

[31] The jury was informed in generic terms that Ebron's father was a heroin addict, and his childhood neighborhood was a high-crime area.  But this cursory presentation hardly captured the full extent of Ebron's traumatic upbringing.

119

family dysfunction and violence, in utero alcohol exposure, childhood trauma, neighborhood violence, and brain dysfunction.

329. Had the jury been informed of the full extent of the trauma and neglect Ebron endured in his youth, along with expert testimony to explain the effects to the jury, there is a reasonable probability that at least one juror would have voted to spare Ebron's life. Alone and in combination with the other deficiencies set forth in this petition, counsel's failure to conduct a reasonable social-history investigation thus denied Ebron effective assistance of counsel at the penalty phase.

## C. COUNSEL'S DEFICIENCIES INDIVIDUALLY AND CUMULATIVELY PREJUDICED THE DEFENSE AT THE PENALTY PHASE.

330. Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

331. The jurors who sentenced Ebron to death found every aggravating factor the government alleged, and rejected almost every one of the 35 non-statutory mitigating factors the defense alleged. They never knew about evidence that supported Ebron's account of the homicide, cast doubt on his prior convictions, and established the BOP's ability to house him securely if he received a life sentence. And they heard only an outline of the truth about his background — that he grew up exposed to violence at home and on the street, suffered neglect from before birth, and experienced beatings and sexual assaults. They never heard from mental health experts armed with complete information about him. There is a reasonable probability that, but for counsel's failure conduct constitutionally adequate investigation, preparation, and presentation of a defense to guilt at the guilt-innocence phase and a case for life at the eligibility and selection phases, a jury informed of the undiscovered information would not have sentenced

Joseph Ebron to death.  All of counsel's deficient performance at all three phases of trial therefore deprived him of the effective assistance of counsel.

**III.    PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY BY THE INCLUSION OF A JUROR WHO LIED IN HIS QUESTIONNAIRE AND DURING VOIR DIRE ON GROUNDS WHICH, IF THAT JUROR HAD RESPONDED CORRECTLY, WOULD HAVE PROVIDED THE DEFENSE WITH A VALID CHALLENGE FOR CAUSE.**

332.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

333.    Juror Ronald Dunbar served as a juror on Ebron's case.[32]   On his juror questionnaire, and during voir dire, Dunbar failed to answer material questions honestly.  Had he done so, his answers would have provided a valid challenge for cause.  Thus a new trial or sentencing proceeding is warranted.  *See McDonough Power Equipment Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

334.    Specifically, Dunbar failed to answer the following three questions correctly:

- Have you or have any close friends/relatives been the victim of, or witness to, any kind of crime?

- Have you ever known anyone who was either the victim of a homicide or was closely related to the victim of a homicide?

- Have you or anyone in your family or a close friend or associate ever been arrested, charged or convicted of a crime and/or served any time in jail or prison?

335.    Dunbar answered that his only close friend or relative who was a victim of a crime was his renter, Robert, whose vehicle was burglarized.  He also answered that he did not know anyone who was the victim of a homicide.  Finally, Dunbar answered that the only person

---

[32] Dunbar was an alternate juror.  When Juror Brittany Johnson was dismissed, Dunbar took her place on the jury.

121

in his family who had been arrested, charged, or convicted of a crime was his son for not paying a ticket.

336.    Dunbar failed to disclose that his brother was convicted of several crimes, sentenced to prison, and while in prison was murdered.  On April 20, 2009, Dunbar alerted the Court that he had failed to disclose an incident during voir dire, and told the Court that his baby brother, Dale Dunbar, while incarcerated, fell out of his top bunk and died three days later. 4/20/09 at 7.  The Court then asked Dunbar if there was any suggestion of foul play, to which Dunbar replied, "they never knew[.]"  *Id.*  During a break in Ebron's trial, however, Dunbar told another juror that Dale Dunbar was killed in prison.  *Id.*

337.    Had Dunbar answered the jury questionnaire, or the Court's voir dire, honestly, his answers would have provided a valid challenge for cause.  The facts surrounding Dale Dunbar's death (a prison murder) and the facts surrounding the charges against Ebron (a prison murder) would have raised a material question concerning actual or implied bias.  This is especially true in the death-penalty context, where Dunbar was able to vote on Ebron's penalty – life or death.  Because Dunbar failed to give an honest answer to a material question that, if answered honestly, would have served as a valid basis for a challenge for cause, Ebron is entitled to a new trial or sentencing hearing.

338.    Trial counsel was ineffective for failing to question Dunbar on the circumstances surrounding Dale Dunbar's incarceration, or to realize that Dunbar lied several times on his juror questionnaire.    Counsel's deficiency prejudiced the defense because, but for counsel's deficiency, there would have been valid grounds to challenge Dunbar for cause.  Ebron is accordingly entitled to a new trial and sentencing hearing.

122

**IV.** **THE GOVERNMENT DENIED EBRON'S RIGHTS TO DUE PROCESS OF LAW, TO CONFRONT HIS ACCUSERS, AND TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BY SUPPRESSING FAVORABLE MATERIAL EVIDENCE.**

339. Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

340. The Government violated due process under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny when it withheld from the defense at trial information tending to exculpate Ebron for the murder of Barnes.

**A. THE GOVERNMENT FAILED TO DISCLOSE REPORTS OF CONVERSATIONS AND ARGUMENTS BETWEEN MOSLEY AND EBRON IN WHICH EBRON WAS OVERHEARD TELLING MOSLEY THAT BARNES WAS NOT SUPPOSED TO BE KILLED.**

341. Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

342. At trial, it was undisputed that Ebron and Mosley entered Barnes's cell and that while they were there, Barnes was killed. The sole issue in the guilt-phase proceedings was whether Ebron intentionally participated in the planning or killing of Barnes. The evidence implicating Ebron rested on the testimony of the government's key witness, and only alleged eye-witness, alleged coconspirator Sherman. Sherman's testimony was the only direct evidence which supported the government's theory that Ebron agreed to, and participated in, the murder.

343. During the closing argument in the guilt phase, the government relied predominantly on Sherman's testimony to establish Ebron's guilt. 4/30/09, 2196-99. It then cited another witness, Lamont Bailey, as corroboration for Sherman's testimony. The prosecutor argued: "Marwin Mosley spoke from the grave through Lamont Bailey and said 'We stabbed him so many times we had to take a break. We punished him.'" *Id.,* 2197. The government

contrasted Sherman's testimony with Ebron's testimony, which it described as uncorroborated and self-serving.  *Id.,* 2200-02.  More importantly, it characterized Ebron as a liar.  *Id.*

344.    Ebron testified that he, accompanied by Mosley, went to Barnes's cell to inform Barnes that he had to leave general population and enter the segregated housing unit ("SHU"). 4/29/09 at 2003-04.  He further testified that it was not until Barnes refused to go to the SHU that Mosley decided to kill him.  *Id.,* 2020-21.  Upon information and belief, the government had, or should have been aware of, evidence that corroborated Ebron's testimony.

345.    Several witnesses have stated that after Barnes's murder, Ebron and Mosley had several public conversations in which they discussed that Ebron did not know that Mosley was going to kill Barnes.  Some of those witnesses have stated that prison guards at USP Beaumont overheard these conversations:

- Lonnie Gooding has stated that Ebron told Mosley repeatedly in the SHU, "This is you, you know this is you."  Gooding also states that "[t]here were guards present and everyone could hear the conversation between Funk and Joe."

- Luther Fuller has stated that Ebron told Mosley publicly in the SHU that "he didn't agree with what [Mosley] did to Barnes."

- Andrew Patrick heard Ebron arguing with Mosley across the space between the cell about how "[i]t wasn't supposed to happen."  He also overheard heated discussions between Ebron and Mosley in the yard.

- Joe Jackson also heard Mosley and Ebron argue about how "it wasn't supposed to go like that" in the cell range and the recreation cages.

346.    The guards who were present during these discussions among inmates facing homicide charges would have been practicing sound correctional policy to record them. Nevertheless, the Government failed to disclose any such information to Ebron's defense, despite defense counsel's June 5, 2008, Motion Pursuant to *Brady v. Maryland* for Production of Exculpatory Evidence (Doc. 12).

124

347.    The suppressed evidence was favorable.  Had it been disclosed it would have corroborated Ebron's testimony and directly supported Ebron's defense.  It was also material. Suppressed evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

348.    Evidence that would have corroborated Ebron's version of events — that he did not plan or participate in the killing of Barnes — would have had a profound impact on this case, and undermines the confidence in the verdict.  Defense counsel could have argued to the jury that Marwin Mosley also "spoke from the grave" through Lonnie Gooding, Luther Fuller, Andrew Patrick, Joe Jackson, and presumably prison guards at USP Beaumont.  Had the jury heard that Mosley and Ebron had arguments regarding Ebron's displeasure with Mosley's killing of Barnes, there is a reasonable probability that the jury would have believed Ebron's testimony and found him not guilty of first-degree murder, or at minimum would have imposed a life sentence.

## B. THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY FORMS AND INTERVIEWS IN THE POSSESSION OF THE BUREAU OF PRISONS AND OTHER RELATED INVESTIGATIVE AGENCIES.

349.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

350.    Upon information and belief, the government suppressed several BOP interviews and reports related to Barnes's murder.  These interviews and reports are likely exculpatory in nature, and had they been disclosed there is a reasonably probability of a different result.

### 1. Mass Interview Forms

351.    Special Investigative Supervisor Eric Rayburn testified that after Barnes's murder, BOP staff conducted mass interviews of the entire institution.  4/23/09, 1032.  Supervisor Rayburn described the mass interview process:

> The special investigative section will develop a questionnaire form based upon the incident that we're looking into.  Then these are mass copied.  There will be one page per inmate.  The unit team and other staff in the institution then go to offices in each one of the pods and inmates are removed from their cell, under escort and restraints, to the interview room where they're asked.  And these are timed interviews; so, nobody knows if anybody is talking or not talking.  And then they're escorted back to their cell.  And that process goes on and usually takes several days to complete a whole institution.

*Id.,* 1033.

352.    Although the authorities interviewed the entire institution, defense counsel received only about sixteen mass interview forms.[33]  As shown above and in Claim I.A, many inmates have provided exculpatory information related to Ebron's involvement in Barnes's killing.  These same inmates, and others, likely provided BOP investigators with exculpatory information during their mass interviews.  The government did not disclose these mass interview forms to defense counsel.

### 2. SIS Report

353.    After a homicide at a BOP prison, the BOP conducts an extensive review of the incident.  The review and investigation begins at the local level (the prison), and the investigation results in a document referred to as the "SIS report."  This report is an investigative summary of the incident, and is required by national BOP policy.  Defense counsel was never

---

[33] Mark Bezy, the former CEO (Warden) at Federal Correctional Complex, Terre Haute, Indiana, has reviewed records and provided opinions on several matters at issue in this case.  Mr. Bezy explains that all of these interviews are recorded, and are referred to as "Mass Interviews."

provided with the SIS report relating to Barnes's murder.  Given the reports of inmates who heard Ebron's and Mosley's arguments, the SIS report should have reflected similar information.

### 3. After Action Report

354.    In discovery, trial counsel was provided with a May 11, 2005, letter from Harley Lippin, the Director of the BOP, to the Deputy Attorney General which states, *inter alia*, "[a]n after action review is currently being conducted.  The after action team will follow-up their review with a written report and recommendations."  An "after-action report" is conducted by a team of individuals from outside the institution to provide greater objectivity for review.  The "after action team" looks into causal factors for the incident and makes recommendations for institutional corrective measures.

355.    Current counsel's investigation produced numerous pieces of exculpatory information.  The investigation and corresponding report created by the "after action team" should also have contained exculpatory information.   Had it been disclosed to defense counsel, along with the other suppressed material, there is a reasonable probability that the jury would not have found Ebron guilty of first-degree murder, or would have imposed a life sentence.

**V.     THE GOVERNMENT DENIED EBRON'S RIGHT TO DUE PROCESS OF LAW, TO CONFRONT HIS ACCUSERS, AND TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BY PRESENTING, OR FAILING TO CORRECT, FALSE TESTIMONY OF ITS KEY WITNESS, CHARLES SHERMAN[34]**

356.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

357.    Charles Sherman was an un-indicted coconspirator and the government's only alleged eyewitness to Barnes's murder.  He testified that Ebron agreed to, and participated in, Barnes' murder.  4/20/09, 221.  Sherman's testimony was in direct conflict with the testimony of Ebron.  4/29/09, 2032.  The jurors had to decide whom to believe, Ebron or Sherman.  If the jury disbelieved Sherman, it would have been forced to find Ebron not guilty of first-degree murder. To bolster Sherman's credibility, the government presented, or failed to correct, testimony relating to his criminal history that it knew, or should have known, was false.  Because Sherman's credibility was essential to securing a first-degree murder conviction against Ebron, his false testimony may have had an effect on the outcome of Ebron's trial.  Thus, a new trial is warranted under *Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny.  *Napue*, 360 U.S. at 272 (explaining that when the  government knowingly uses false testimony to secure a conviction, a new trial is warranted if that testimony "may have had an effect on the outcome of the trial.").

---

[34] On June 18, 2013, the government wrote appellate counsel, Donna Coltharp and Jimmy Phillips, a letter which states: "when asked to describe his prior conviction during Ebron's trial, Mr. Sherman stated that he 'robbed drug dealers' and indicated that the victim in that offense had been a drug dealer.  This description is inconsistent with his testimony from the D.C. trial and with his version of events in the presentence report . . ." The government's letter further states,  "At the time, we did not have the transcript and did not search for it because we did not believe that it could be relevant."  However, the government did have in its possession, and had reviewed, the presentence report which contradicted Sherman's trial testimony.  On June 6, 2008, defense counsel for codefendant Bacote, Mr. Cunningham, specifically requested Sherman's presentence report because it contained possible *Brady* information. 6/6/08, 28.  AUSA Batte responded that he had the presentence report and did not "have any problem tendering the presentence report to the court for [its] inspection."  *Id.,* 29.  AUSA Batte continued that the presentence report "would be *Giglio* material [only if it is] impeachment evidence that they could use at trial."  *Id.,* 30.  Although the prosecutor had Sherman's presentence report, which contradicted Sherman's trial testimony, he failed to correct Sherman's testimony or disclose the presentence report to defense counsel.  This is a clear violation of *Giglio* and its progeny.

128

## A.  SHERMAN'S FALSE TESTIMONY

358.    Sherman testified on direct examination that he was currently serving a sentence of 26 to 78 years' imprisonment for an "armed robbery."  4/20/09, 166.[35]  Sherman testified that "[b]eing as though my family was all in trouble behind crack cocaine, I basically – I despised drug dealers because of what happened to my mom.  So, me and a couple buddies had devised a plan to start robbing drug dealers.  So, that's what I did; I robbed drug dealers."  *Id.*

359.    This testimony was false.  Sherman's "armed robbery" conviction had nothing to do with robbing drug dealers.  Instead, it involved deceit, threats, violence, and false reports against an innocent victim.  The pre-sentence investigation report related to Sherman's robbery conviction describes it as follows:

> during the instant offense, Mr. Sherman and two associates went to the home of an acquaintance and, at gun point, ransacked the residence and stole a TV and VCR.  They then drove the victim to a bank and forced him to withdraw money from his account, which they took.  **Mr. Sherman's version of the event differed significantly from the victim's.  He claimed that the victim had willingly loaned him the money and then filed a false complaint with the police when the two of them disagreed over the payment schedule.**

360.    Sherman's testimony at his "robbery" trial also completely contradicts his testimony at Ebron's trial.  Specifically, at his own trial, Sherman testified, not that he had robbed a drug dealer, but that the victim was a friend of Sherman's whom he took to the bank so that he could borrow money from that friend.  Sherman further testified that the reason that he was "in trouble" was that he did not repay the victim.

---

[35] Sherman's 26-to-78 year sentence stemmed not only from armed robbery, but from convictions for conspiracy, first-degree burglary while armed with intent to commit assault, first-degree burglary while armed with intent to commit robbery, threats to do bodily harm, assault with intent to commit robbery, robbery while armed, first-degree theft, kidnaping while armed, possession of a firearm during a crime of violence, and obstruction of justice (No. F3351-00).

361.    Indeed, four years after Ebron's trial, the government, in a June 8, 2013, letter, informed Ebron's appellate counsel that Sherman's testimony that he "robbed drug dealers" and that the victim in the above-noted offense was a drug dealer was inconsistent with Sherman's "testimony from the D.C. trial and his version of events in the pre-sentence report. . . ."

## B. THE GOVERNMENT KNEW, OR SHOULD HAVE KNOWN, THAT SHERMAN'S TESTIMONY WAS FALSE.

362.    When Sherman testified in Ebron's case, the government was in possession of Sherman's pre-sentence report, which contradicted his trial testimony.  On June 6, 2008, defense counsel for co-defendant Bacote, Cunningham, in a hearing before this Court, specifically requested Sherman's pre-sentence report because it contained possible *Brady* information. 6/6/08, 28.  The government responded that it had the pre-sentence report in its possession and did not "have any problem tendering the pre-sentence report to the court for [its] inspection." *Id.,* 29.  The government continued that the pre-sentence report "would be *Giglio* material [only if it is] impeachment evidence that they could use at trial." *Id.,* 30.[36]

363.    As described above, Sherman's description of his "armed robbery conviction" in his pre-sentence report contradicted Sherman's testimony at Ebron's trial.  The government had this pre-sentence report in its possession and thus knew, or should have known, that Sherman's testimony regarding this conviction was false.

## C. SHERMAN'S FALSE TESTIMONY WAS MATERIAL.

364.    A conviction obtained by the knowing use of perjured testimony must be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).  The Fifth Circuit has found false testimony material where there was a material discrepancy between the testimony of the

---

[36] The government provided defense counsel with excerpts of Sherman's pre-sentence report.  None of those excerpts contained any information relating to the underlying facts of the crime or Sherman's version of the crime.

130

government witness and the defense witness, and the credibility of the witnesses was key to the jury's determination of guilt or innocence. *United States v. Barham*, 595 F.2d 231, 242-43 (5th Cir. 1979).

365. Here, Sherman's credibility was crucial to securing a first-degree murder conviction against Ebron. Sherman was the only witness who testified that Ebron conspired to kill Barnes. 4/20/09, 221. He was also the government's only witness who allegedly observed Barnes's murder. Sherman testified that he watched Ebron put Barnes in a headlock while Mosley stabbed Barnes to death. *Id.*

366. Sherman's testimony was at diametric odds with Ebron's testimony. Ebron testified that he did not conspire to kill Barnes, and that he went to Barnes's cell only to tell him that he had to leave general population. 4/29/09 at 2001-03. Ebron denied placing Barnes in a headlock or participating in Barnes's murder. *Id.,* 2032.

367. In their deliberations, the jurors had to choose which witness they believed, Ebron or Sherman. Indeed, the government argued in closing that the jurors' decision rested on whether they believed Sherman or Ebron: "according to Jospeh Ebron, somebody is lying. And you know, he's right about that. Somebody is lying and you have to decide." 4/30/09, 2200.

368. The government did not disclose that Sherman lied on direct examination. Thus, the jury was left with the belief, based on Sherman's false testimony, that although he was serving 26 to 78 years' imprisonment for an armed robbery, he was merely a Robin Hood-like figure who "robbed drug dealers" because he observed what drugs did to his mother. 4/20/09 at 166.

369. Sherman's false testimony created the false impression that he was not an unsavory character, who had lied, stolen, and obstructed justice in the past, but instead was a

131

person who believed in justice, whether vigilante or judicial. The jury's false impression of Sherman led them to credit Sherman's testimony over Ebron's and therefore had an effect on Ebron's trial. This Court should accordingly vacate Ebron's conviction and sentence.

**VI.    THE GOVERNMENT DENIED EBRON THE RIGHT TO DUE PROCESS OF LAW, TO CONFRONT HIS ACCUSERS, AND TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BY PRESENTING FALSE TESTIMONY OF ITS CORRECTIONS EXPERT, GREG HERSHBERGER.**

370.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

371.    Greg Hershberger was the government's corrections expert. The government called him in rebuttal, during the selection phase, to establish that Ebron would return to general population at a mainline institution where he would have direct interaction with other inmates, and that he would pose a continuing risk of future danger. Hershberger's testimony directly conflicted with the testimony of the defense corrections expert, James Aiken, who testified that it would be "decades" before Ebron was moved to a general-population high-security setting. 5/15/09, 500.

372.    Risk of future dangerousness was one of the non-statutory aggravating factors that the government argued warranted a death sentence in Ebron's case. The jury unanimously found this aggravating factor based, in part, on Hershberger's testimony about Ebron's anticipated return to general population. Relevant portions of Hershberger's testimony were, however, misleading, if not false. Because the jury's decision to sentence Ebron to death rested, in part, on Hershberger's false or misleading testimony, and may have had an impact on their decision to sentence Ebron to death, a new sentencing hearing is warranted under *Napue v. Illinois*, 360 U.S. 264 (1959).

132

## A. HERSHBERGER'S FALSE TESTIMONY

373.    Hershberger's testimony was false, or misleading, in three main areas: (1) the amount of time that an inmate typically spends at ADX, and the amount of time that Ebron would likely be housed there; (2) the expectation that an inmate will leave ADX and return to general population if that inmate commits no infractions while housed at ADX; and (3) the capacity of ADX to house at-risk inmates for unlimited durations.

374.    First, Hershberger testified that after Ebron completed his term at the control unit at ADX, "there is an expectation that in three years, assuming good behavior and everything goes well, that [he] will be returned to a regular institution." 5/15/09, 660. This testimony was misleading. An individual with Ebron's risk status would likely be placed, after completion of his term at the control unit, in the general ADX program for much longer than three years. Inmates, like Ebron, who exhibit good behavior while at ADX but still pose a threat to the safety of other inmates, the public, the staff, or the security of the institution, remain housed at ADX for indefinite periods of time.

375.    Hershberger also testified that "unless [Ebron] misbehaves at [ADX]" there was no way that he could be kept out of the general population at a United States Penitentiary. *Id.,* 671. This testimony was false. ADX's policy/practice is that if an inmate poses a threat to other inmates, he will not be returned to a mainline institution even if he commits no infractions while at ADX. In fact, before an inmate is released to the general population at a United States Penitentiary, a panel reviews the inmate's release and considers a variety of factors, of which that inmate's behavior is just one. Contrary to Hershberger's testimony, there is no requirement or rule that if an inmate is well behaved at ADX, he will be returned to the general population at a United States Penitentiary.

133

376.  Hershberger also testified that there are a limited number of beds at ADX, and implied that therefore Ebron would have to progress through ADX and be returned to a mainline institution, to make room for other inmates.  *Id.,* 666-70.  This testimony was misleading. ADX's own population projections are such that it will never be at maximum capacity.  The BOP ensures that inmates housed at ADX will remain at ADX unless and until a review board determines that inmate is ready to be returned to a mainline institution.

377.  Finally, Hershberger testified that while he was testifying as a consultant for the United States, "I'm retired and I really don't have a business or consulting business, but on occasion I'm called on by [prosecutors] due to my past experience.  And as you know, I help out in that regard."  *Id.* at 653.  Hershberger, however, was a paid expert.  This was not disclosed to the jury.

378.  The government knew, or should have known, that the above-noted testimony was false or misleading.  Yet, it not only failed to correct Hershberger's testimony, but in many instances elicited the false testimony.

### B.  HERSHBERGER'S FALSE TESTIMONY WAS MATERIAL.

379.  If there is "any reasonable likelihood" that Hershberger's "false testimony could have affected the judgment of the jury," a new sentencing hearing is warranted.  *Agurs*, 427 U.S. at 103.  Here, there is no doubt that Hershberger's false testimony could have affected the judgment of the jury.  The government, in its closing argument, implored the jury to sentence Ebron to death based on the false testimony of Hershberger: "you heard that without a doubt, that man [Ebron] is going to go back into general population someday. . . . When he goes back on the yard, he's going to be a hero.  He killed a snitch and got away with it."  5/18/09, 822.  "It will be

a free murder, ladies and gentlemen, because he will be right back on the general compound. . . ."  *Id.*

380.    The government also argued that Hershberger's testimony supported the future danger aggravating factor: "What is it to prevent him from doing this (indicating), should it strike his fancy once he's back on the compound, to a prison guard?"  *Id.,* 823.  "Does a leopard change his spots?  . . . What do you think this man [Ebron] will do if given the chance to be back in general population, where he most assuredly will be."  *Id.,* 823-24.

381.    The government continued, "You heard from the former warden, Mr. Hershberger: In the policies that the Bureau of Prisons must follow, this man will cycle back onto the prison yard."  *Id.,* 824.  The government also bolstered Hershberger's testimony with the false implication that unlike Aiken, Hershberger had testified for free:  "I think you can set Mr. Aiken's testimony aside.  He was a paid advocate."  *Id.*

382.    Had the jury been made aware that the government's closing argument, and Hershberger's testimony, were misleading at best, and that Ebron would not "cycle back onto the prison yard" unless he was no longer deemed a safety threat, there is a reasonable likelihood that the jury would have not found the future danger aggravating factor.  If the jury believed that Ebron would not pose a future danger in the custody of the BOP, there is a reasonable likelihood that they would have sentenced him to life.  Thus a new sentencing hearing is warranted.

## VII.    PETITIONER WAS DENIED A FAIR TRIBUNAL IN VIOLATION OF HIS FIFTH AND SIXTH AMENDMENT RIGHTS TO DUE PROCESS

383.    Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

384.    A "fair tribunal is a basic requirement of due process."  *Caperton v. A.T. Massey Coal Co. Inc.*, 556 U.S. 868, 876 (2009).   Here, Ebron was denied this basic right, because at

some points he was afforded no tribunal at all, when the trial judge fell asleep during the proceedings. This impermissibly prejudiced the defense by affecting the conduct of the trial and signaling to the jury that Ebron's case, and the decision whether to sentence him to death, was unimportant. Because Ebron was denied his due process right to a fair tribunal, a new trial is warranted.

## VIII.   THE CUMULATIVE EFFECT OF THE CONSTITUTIONAL ERRORS THAT PERMEATED THE TRIAL REQUIRES RELIEF.

385.   Ebron incorporates all facts set forth elsewhere in this pleading in support of this claim.

386.   Each of the constitutional errors described above merits relief. Furthermore, regardless of the prejudice each error caused to Ebron's defense individually, their cumulative impact was devastating. At the guilt-innocence phase, the jury that deliberated for five days might have rendered a different verdict if Ebron had not only received effective assistance of counsel following a reasonable pretrial investigation, but had the benefit of twelve impartial jurors, full disclosure of exculpatory information, and a fair trial  At a minimum, the jurors might have spared Ebron's life if not for these errors, and if not for counsel's deficient preparation and presentation at the eligibility and selection phases. In light of the record as a whole, the cumulative effect of the errors more likely than not caused a suspect verdict. *See Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (citing *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985)). There is a reasonable probability that, together, they affected the outcome of Ebron's guilt-innocence and penalty trials, and they had a substantial and injurious effect on the result. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *Brecht v. Abrahamson*, 507 U.S. 619 (1993). This Court should therefore grant Ebron relief from his convictions and/or his sentence.

## **PRAYER FOR RELIEF**

WHEREFORE, Ebron prays that this Court:

387. Permit him to file this motion and then stay the proceedings and hold the motion in abeyance, as requested by separate unopposed motion filed on this date;

388. Upon resumption of proceedings, allow Ebron reasonable time to file any appropriate amendments, an appendix with documents supporting his motion, and a memorandum of law in support of his motion;

389. Permit the government to file an answer and allow Ebron reasonable time to file a reply, to amend the motion, if warranted, and to file such legal memoranda and briefs as may be necessary to respond or reply to any defenses raised and/or motions filed by the government;

390. Order such discovery as Ebron may specifically request by separate motion;

391. Conduct an evidentiary hearing after the completion of discovery, as Ebron will request by separate motion;

392. Permit further amendment to and briefing of the motion if the fact-development procedures so warrant, and allow reasonable time for briefing the merits of grounds asserted in the motion and any amendments thereto, after discovery is complete and an evidentiary hearing is conducted;

393. Vacate Ebron's conviction and death sentence and order a new trial of the guilt-innocence and penalty phases; and

394. Grant such additional relief as may be necessary and to which Ebron may be entitled.

Respectfully Submitted,

/s/ Claudia Van Wyk
**Claudia Van Wyk**
**Billy H. Nolas**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EASTERN DISTRICT
OF PENNSYLVANIA
Suite 545W- The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
Phone: 215-928-0520
Fax: 215-928-0826
claudia_vanwyk@fd.org
billy_nolas@fd.org

*Counsel for Joseph Ebron*

/s/ Eric M. Albritton
**Eric M. Albritton**
Texas Bar No. 00790215
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
Phone: (903) 757-8449
Fax: (903) 758-7397
ema@emafirm.com

*Counsel for Joseph Ebron*

October 27, 2014

138

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of October 2014, I electronically filed the foregoing

Motion to Vacate, Seat Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 using the

Court's CM/ECF system.  Electronic notice will be provided to the following individuals:

**Joseph R. Batte**
Assistant United States Attorney
United States Attorney's Office
  for the Eastern District of Texas
350 Magnolia St.
Suite 150
Beaumont, TX 77701

**John A. Craft**
Assistant United States Attorney
United States Attorney's Office
  for the Eastern District of Texas
350 Magnolia St.
Suite 150
Beaumont, TX 7770

/s/ Claudia Van Wyk
Claudia Van Wyk