## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 1:08-CR-36** |
| **v.** | : | **CIVIL NO.** _____1:14cv539 |
| | : | **THIS IS A CAPITAL CASE** |
| **JOSEPH EBRON, Defendant.** | : | |

### EXHIBIT 1 TO DEFENDANT JOSEPH EBRON'S
### UNOPPOSED MOTIONTO STAY AND HOLD
### § 2255 PROCEEDINGS IN ABEYANCE

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION - FELONY SECTION

2014 JUL 7 PM 12 03

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| Plaintiff, | * | |
| | * | Criminal No. 1997-FEL-7123 |
| v. | * | |
| | * | Hon. John M. Mott |
| JOSEPH EBRON, | * | Associate Judge |
| | * | |
| Defendant. | * | |

---

## PETITIONER'S MOTIONS TO AMEND AND FOR AN EVIDENTIARY HEARING AND CONSOLIDATED REPLY TO GOVERNMENT'S RESPONSES

---

**STEPHEN W. RIDDELL**
DC Bar # 357756
The Riddell Firm, PLLC
P.O. Box 42511
Washington, DC 20015
(202) 492-4034

**FEDERAL COMMUNITY DEFENDER OFFICE for the Eastern District of Pennsylvania**
Billy Nolas, DC Bar # 399275
Claudia Van Wyk
Suite 545 West - The Curtis Center
Independence Square West
Philadelphia, PA 19106
(215) 928-0520

July 3, 2014

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INDEX TO APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    Trial Counsel Deprived Mr. Ebron of the Effective Assistance of Counsel By
      Conducting a Constitutionally Deficient Investigation . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.   The Government's Failure to Disclose That Police Threatened One Star Witness
      With Prosecution for This Murder and Others and the Prosecutions of His Loved
      Ones, or That Their Other Star Witness Was Not Even On the Premises At the
      Time of the Shootings, Violated Mr. Ebron's Right to Due Process of Law . . . . . . . . . 17

      A.    Relevant Trial Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      B.    Suppressed Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      C.    Legal Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.  Appellate Counsel Was Ineffective for Failing to Investigate and Present
      Extra-Record Evidence During Mr. Ebron's Direct Appeal . . . . . . . . . . . . . . . . . . . . . 23

      A.    Counsel Failed to Investigate and Present a § 23-110 Motion During the
            Appeal, Despite His Client's Repeated Requests That He Do So. . . . . . . . . . . . 23

IV.   The Government's Procedural Objections Are Unsound Because Mr. Ebron
      Himself Repeatedly Demanded Relief During His Direct Appeal . . . . . . . . . . . . . . . . . 28

V.    Trial and Appellate Counsel Were Ineffective for Failing to Challenge the
      Government's Questioning and Argument On the Failure of Gregory Epps to
      Report the Substance of His Trial Testimony to the Police . . . . . . . . . . . . . . . . . . . . . . 29

A.    Trial Counsel Was Ineffective ................................ 29

B.    Appellate Counsel Was Ineffective ............................ 34

VI.    An Evidentiary Hearing is Appropriate .......................... 36

CONCLUSION .................................................... 38

## INDEX TO APPENDIX

1.  Arrest Warrant and Complaint Filed September 3, 1997 ..................... A000001

2.  District of Columbia Court of Appeals Case No. 99-CF-145 Docket dated
    January 19, 2006 ......................................................... A000005

3.  Anthony Stewart Appointment dated February 25, 1999 ...................... A000014

4.  Indictment filed January 20, 1998 ....................................... A000015

5.  Motion to Continue Trial Filed June 17, 1999 ............................ A000020

6.  Superior Court Jacket Entries ........................................... A000022

7.  Amended Judgment and Commitment Order Dated January 11, 1999 ........... A000025

8.  Notice of Appeal dated March 8, 1999 .................................... A000026

9.  Order consolidating appeals filed October 5, 1999 ....................... A000028

10. Direct Appeal Opinion filed December 24, 2008 ........................... A000029

11. Docket Entry dated October 18, 2004 for Denial of rehearing .............. A000054

12. Pro se 23-110s and correspondence ....................................... A000055

13. Petitioner's *pro se* 23-110 Motion dated January 12, 2009 .............. A000066

14. Movant's Response as to Why the Motion Should Not Be Barred Under
    Rule 9(b) filed January 21, 2009 ........................................ A000078

15. Orders pursuant to Defendant's *pro se* Motion for a Writ of Habeas Corpus ..... A000081

16. United States' Opposition to Defendant's Motion Pursuant to D.C. Code
    Section 23-110 dated March 30, 2009 ..................................... A000083

17. United States' Response to The Court's October 16, 2009 Order ............ A000093

18. Order Appointing Counsel dated December 1, 2009 ......................... A000099

19. Declaration of Gregory Quarles dated March 18, 2014 ..................... A000101

20. Declaration of Steven Goode dated May 30, 2014 .......................... A000102

21. Declaration of Latina Ebron dated February 2, 2014 ........................ A000103

22. Declaration of Stuart Fisk Johnson dated June 6, 2014 ...................... A000104

23. Appointment of Stuart Fisk Johnson dated October 5, 1999 .................. A000105

24. Consolidation Order dated October 5, 1999 .............................. A000107

25. Notes by Stuart Fisk Johnson (1) ..................................... A000108

26. Notes by Stuart Fisk Johnson (2) ..................................... A000129

27. Notes by Stuart Fisk Johnson (3) ..................................... A000151

28. Notes by Stuart Fisk Johnson (4) ..................................... A000209

29. Brief for Appellant dated May 18, 2001 ................................ A000226

30. Supreme Court of the United States letter denying Petition for Writ
    of Certiorari Denied dated October 12, 2004 ............................ A000280

31. Declaration of Bernard Pinkney dated June 29, 2014 ...................... A000281

32. Declaration of Bernard Pinkney dated June 28, 2014 ...................... A000282

## PROCEDURAL HISTORY

Joseph Ebron's District of Columbia conviction in this matter was used by the government to obtain a death sentence in a prosecution in the Eastern District of Texas under Docket No. 1:08-cr-00036.

In this matter, Mr. Ebron was arrested on September 2, 1997, for murder and other charges involving the death of Arthur Tate on May 24, 1997. A000001-4.[1] Trial counsel, Anthony Stewart, was appointed under the Criminal Justice Act on September 3. A000014. Co-defendant Steven Goode was represented by Claudia Crichlow, a staff attorney with the Public Defender Service. 10/13/98, at 1.

Mr. Ebron and Goode were indicted on January 20, 1998. A000015-19. On May 29, 1998, nine months after his appointment, Stewart was compelled to seek a continuance of the originally scheduled trial date because his investigation was incomplete. A000020. The investigation was still incomplete when trial began on October 13, 1998. Mr. Ebron and Goode stood trial before the Honorable Stephen J. Milliken and a jury from October 13 to October 22, 1998. The jurors deliberated for four days and twice announced deadlock before finally reaching a verdict on October 29, 1998. 10/22/98-10/28/98, A000022-24. They convicted both defendants as charged. A000022-24. On January 11, 1999, the court sentenced Mr. Ebron to an aggregate term of 61 years, eight months, to life. A000025.

Both Mr. Ebron and Goode appealed, and their appeals were consolidated under Docket Nos. 99-CF-145 (Ebron) and 99-CF-273 (Goode). A000028. On December 24, 2003, the Court of Appeals reversed Goode's conviction and ordered a new trial, but affirmed Mr. Ebron's conviction

---

[1] "A" refers to the Appendix submitted with this motion. Trial transcripts are cited by date and page number.

and sentence. A000029. Mr. Ebron petitioned for rehearing and rehearing en banc, which the Court of Appeals denied on June 10, 2004. A000013. The Supreme Court denied certiorari on October 12, 2004. A000280.

While his appeal was pending, Mr. Ebron wrote to this Court and to the Court of Appeals, requesting a petition for post-conviction relief pursuant to D.C. Code § 23-110, and also submitted a pro se § 23-110 petition. A000055, A000062-65. In his communications and petition, Mr. Ebron complained about trial counsel's investigation and contended that counsel had provided ineffective assistance. The Court referred the filings to appellate counsel, who never filed a § 23-110 petition.

On January 22, 2009, Mr. Ebron filed another pro se § 23-110 motion, accompanied by a completed, pre-printed form entitled "Movant's Response As To Why the Motion Should Not Be Barred Under Rule 9(b)." A000066, A00078. This Court ordered the government to respond to the motion and the Rule 9 response. A000081-82. After the government had filed both pleadings A00083, A000093, the Court granted Mr. Ebron's motion to appoint counsel, and directed counsel to address the government's arguments. A000099-100.[2]

This is Mr. Ebron's motion to amend his petition, his response to the government's arguments, and his motion for an evidentiary hearing. He has concurrently filed a motion to recall the mandate of the Court of Appeals, on the ground of appellate counsel's ineffective assistance for failing to investigate and litigate a § 23-110 petition during direct appeal. On July 3, 2014, undersigned counsel, Ms. Van Wyk, sought the consent of the government to Mr. Ebron's motion,

---

[2] During the appeal, Mr. Ebron filed one counseled and two pro se Motions to Modify Sentence pursuant to Rule 35 of the Rules of Criminal Procedure, all of which this Court denied. He filed a pro se petition for writ of habeas corpus in the United States District Court for the District of Columbia under Docket No. 08-1754. That petition was denied without prejudice on October 14, 2008.

2

but was advised by Leslie Ann Gerardo, Chief, Special Proceedings Unit, United States Attorney's Office, that the government will take no position until it has had an opportunity to study Mr. Ebron's pleading.

Mr. Ebron is now represented by assigned counsel, Stephen W. Riddell, and by the Federal Community Defender for the Eastern District of Pennsylvania, which also represents him in his post-conviction challenge to his conviction and death sentence in the federal district court for the Eastern District of Texas.  Post-conviction proceedings pursuant to 28 U.S.C. § 2255 are pending in that court.

## STATEMENT OF THE CASE

Although the government presented a number of witnesses who described the events surrounding the homicide, only two witnesses who were *not* present, and who received substantial consideration, claimed that Mr. Ebron was involved in the shooting.

In the early evening on May 24, 1997, Clarence Settle was standing outside the front door of his home at 1716 R Street SE talking to his cousin, Anthony Tate, when he heard what sounded like a firecracker. Someone suddenly stepped out from the corner of 17th Street and started shooting what looked like a rifle. 10/15/98, at 90-93. Settle could not see the shooter's face, but remembered that he was about his own height, 5'5". Settle received gunshot wounds to the ankle and thigh, and the impact knocked him inside his front door. When he looked outside, he saw that Tate had also been hit and was bleeding from the face. 10/15/98, at 97-98. Emergency personnel took him and Tate to the hospital. 10/15/98, at 101. Asked on cross-examination if he could tell whether Joseph Ebron was the shooter, Settle said no. 10/15/98, at 107-09. Tate died of shrapnel wounds of the head. 10/19/98, at 127.

Other witnesses saw the shooters, but none could identify them. Eugene Rodgers was sitting with some friends in his parked car, drinking, when they saw two armed men run past and begin firing shots across the street. When the shooting stopped, the men disappeared into the alley nearby. Rodgers did not identify either of the shooters. 10/19/98, at 7-13. Gregory Bean was having a barbecue in his back yard that evening. 10/19/98, at 30. He saw two armed men walk down the alley that cut behind both his building and the one next door. Bean heard gunshots, and saw the same men return and disappear into the building next door. He had seen the same men in the alley earlier that evening. 10/19/98, at 32-40. Later, while Bean was sitting in front of his house, a car

4

pulled up and "some gentlemen" got in. He did not identify any of the persons he had seen. 10/19/98, at 41-43. The police recovered shell casings from the immediate area that, as a ballistics expert testified, came from an AK-47 rifle and a .380 pistol, 10/18/98, at 138, 143, but they never recovered any gun. *Id.* at 139.

The government's case rested on the word of Bernard Pinkney and Rose Brown. Pinkney was living with Latina Ebron, Joseph Ebron's sister, at 1613 18th Street SE, in May 1997. He knew Joseph through Latina, and knew Steven Goode through Joseph. 10/15/98, at 110-16. Joseph visited his sister's (and Pinkney's) apartment three or four times a day. *Id.* at 117.

Pinkney testified that, for the two months preceding May 24, 1997, he heard Ebron and Goode say several times that they wanted to "get" or "catch" a neighborhood resident named Gregory Epps, or Little Greg, "while he was out there hustling on the strip." Pinkney knew Little Greg but claimed that he never had any problems with him, and did not know why Ebron and Goode were out to get him. *Id.* at 137-38.

According to Pinkney, Ebron and Goode were at his house on May 24, 1997, when a woman named Carolyn knocked on the door and spoke to Ebron in the hall. *Id.* at 121-22. Pinkney testified that Ebron came back into the apartment and announced, "He's out there, let's go." Pinkney said Ebron and Goode left and returned, wearing coats and carrying an AK-47 and a .32 caliber automatic pistol. He said a third man, Stanley Richardson, accompanied them. *Id.* at 123-26, 133. Pinkney claimed they asked him to unlock the back gate behind his building, but he said he had lost his key. Pinkney said he went to his downstairs neighbor, Rose Brown, who agreed to unlock the gate for

5

them with her own key. *Id.* at 130-33.[3] He said Ebron and Goode planned to go out the back door and "go around the next street." *Id.* at 134.

Pinkney testified that Ebron was carrying the .32 and Goode the AK-47, but that Stanley stayed behind on the back porch. *Id.* at 139-40. He claimed that less than five minutes later, he heard a lot of gunshots coming from around the corner. Pinkney said that Ebron and Goode, preceded by Stanley, soon came back into the apartment, still carrying their guns. He testified that they told him that they had hit someone, but they did not know if it was Epps. According to Pinkney, they were laughing about it. *Id.* at 143-45.

Pinkney claimed that at Ebron's request, he went to ask someone named Kevin Davis to give Ebron and Goode a ride. Pinkney said Davis drove him back to his house, and then Ebron and Goode got into the car and drove off with Davis, leaving Stanley behind with him. A few minutes later, however, they pulled into the back alley with Davis's car and another car. He said they retrieved the AK-47 (concealed in a gym bag) and left again. *Id.* at 146-54.

Pinkney testified that, the next day, Ebron and Goode asked him if his neighbor had seen them running down the back alley, and, when he told them yes, wondered if they should kill him. *Id.* at 156-57.

Pinkney was "nervous" that he might get locked up for his involvement in the incident. Detective Doughty began asking for him at his mother's house, and eventually tracked him down at his grandmother's house in Maryland in the summer of 1997. 10/16/98, at 165-66. Pinkney decided to talk because Detective Doughty "basically knew what happened," and "I'm in trouble just

---

[3] Pinkney acknowledged that he had told the investigating officer, Detective Doughty, that he himself opened the gate with his own key, but insisted that this was a mistake. 10/16/98, at 187, 226.

6

like him." 10/16/98, at 167. He claimed, in addition, that "it was the right thing to do at the time . . . it was a good start to get it in the past." *Id.* at 108. He denied that there was any animosity between himself and Joseph Ebron over his treatment of Latina Ebron; he had never punched her, although he had choked her once. *Id.* at 177, 198, 230.

Although he disclaimed any bias against Ebron and asserted altruistic motives for his cooperation, Pinkney acknowledged that, once he decided to cooperate, he received assistance through the witness protection program, including $5000 worth of housing assistance and $5950 worth of other incidentals. 10/16/98 at 210-212.[4]

Rose Brown was the government's other star witness. Brown lived in an apartment below Latina Ebron and Bernard Pinkney. 10/16/98, at 261-62. She said she knew both of them, and also knew Joseph Ebron and Steven Goode, who frequently visited there. *Id.* at 263-64. Detective Doughty learned from a fellow detective, who owned the building where Brown lived, that she had information. 10/20/98, at 19.

Brown claimed that, during the spring preceding the shooting, Ebron and Goode once asked her if she had seen Gregory Epps on the block. One of them, she said, added that "we're going to kill that motherfucker." *Id.* at 268.

Brown testified that on May 24, 1997, she was sitting on the porch when she saw Ebron, Goode, and a third person wearing "plats" (braids) walking into the house. She said they were wearing jackets and carrying a long gym bag. She said Pinkney soon came downstairs and told her to "get off the porch." *Id.* at 270-71. Brown testified that a few minutes later, she heard gunfire.

---

[4] Pinkney and the United States Marshall on duty in the courtroom testified that, during Pinkney's testimony, Ebron made hand gestures near his face to two spectators who then made throat-slashing gestures to Pinkney. 10/16/98, at 256, 10/21/98, at 138-42.

She said she was alarmed because the sound came from behind the house where her children were, so she ran back there. She claimed her children were coming around the fence into the back yard.[5] She testified that Ebron, Goode, and "the guy with the plats" ran down the alley and into the building. Ebron was carrying a chrome-colored gun and Goode a long black gun. The third man had a black pistol. 10/16/98, at 274-81.

Brown testified that a little later, she was back on her porch when she saw Pinkney leave, then return in a car driven by someone else. She said Pinkney got out and the other three shortly came downstairs and got into the car. They were not carrying anything. *Id.* at 286-87. [6]

Brown testified that she did not initially go to the police because she was frightened. She claimed that one day after the shooting, Ebron asked her if the police had questioned her. She said that they had, but she had not told them anything. She claimed he asked her not to say anything because "he was trying to get himself together and he didn't want to go to jail." 10/16/98, at 290. Some months later, however, she contacted the police. She said it was "because it was on my conscience." 10/16/98, at 291. She chose Ebron's and Goode's photos from an array that Doughty showed her. Brown denied that she habitually bought drugs from Pinkney. *Id.* at 297. She acknowledged (in contrast to Pinkney's testimony that his visitors removed the AK-47 immediately after the shooting) that the next day she saw Pinkney handling guns in a closet, one of which looked

---

[5] The jury heard three conflicting accounts of the whereabouts of Brown's children. She said that they were at the barbecue in the next-door neighbor's back yard. 10/15/98, at 273. The next-door neighbor, Gregory Bean, denied that Brown's children were there. 10/18/98, at 50. Pinkney claimed that he was watching her children in his apartment. 10/15/98, at 131.

[6] Brown claimed for the first time at trial that shortly after the incident, Ebron called her upstairs to the apartment to ask her what was happening on the street. She said that "they were smoking blunts like nothing happened." 10/16/98, at 284-85. She had never mentioned this episode to Doughty or the grand jury. *Id.* at 294.

8

like one of those she had seen the night of the shooting. *Id.* at 302. She also acknowledged that, as a participant in the witness protection program, she had received a total of $77,000, including housing, medical, relocation, and travel expenses, from the government. *Id.* at 305. Over objection, she testified that she went into witness protection because she was afraid. Her children went to school "in the same area where they hung out and I had to walk past them every day when I took my kids to school." *Id.* at 316.

Steven Goode presented no evidence. 10/21/98, at 135.

Gregory Epps, who, according to the government, was Ebron's and Goode's intended target, testified as a defense witness for Ebron. He knew Ebron and Goode and had no problems with them. He regarded Ebron as a friend. Neither of the persons who shot at Epps on the night of May 24 was Joseph Ebron. 10/20/98, at 65, 69. From what Epps could see, Goode was not one of the shooters either. 10/20/98, at 70. Epps also knew Bernard Pinkney, but did not regard him as a friend. In fact, Pinkney had once tried to rob him. 10/20/98, at 65-67.

On cross-examination, the prosecutor elicited the fact that Epps had a pending murder case in which he planned to call Ebron as a defense witness. 10/20/98, at 72-73.

Joseph Ebron testified in his own defense. He said that Gregory Epps was a friend and that he did not shoot at Epps, or anyone, on May 24. He "could have been at a girl's house, a buddy's house," but he was not at the corner shooting at anyone. 10/20/98, at 100. He denied ever talking about "getting" Gregory Epps. *Id.* at 107.

Ebron's relationship with Pinkney was "all right" on May 24, but later they had problems, partly because Pinkney shook and injured Ebron's niece (Pinkney's and Latina Ebron's daughter). *Id.* at 101. Steven Goode often came with Ebron to visit his sister at her home, and knew about

9

Ebron's differences with Pinkney over his treatment of his sister and her children. Ebron eventually helped his sister move away from Pinkney, much to Pinkney's displeasure. *Id.* at 105-07. Ebron tried to convince his sister to complain to the police about Pinkney, but she never did. *Id.* at 110.

When the police questioned Ebron, he told them that he did not know anything and had nothing to do with the murder. 10/20/98, at 104.

Both before and during the course of trial, both trial counsel had several logistical discussions with the court and the prosecutor in anticipation that the prosecutor would arrange an opportunity for them to interview Latina Ebron, who was in the government's witness protection program. 10/14/98, at 53-54, 10/19/98, at 27-28, 73-79, 10/20/98, at 117-118. On the evening following Ebron's testimony, Goode's attorney indicated that she might call Latina as a witness after interviewing her the next day. 10/20/98, at 117. Ebron's counsel rested that same evening. The next day Goode's defense also rested without calling Latina. 10/21/98, at 128, 135.

In summation, the prosecutor argued that Ebron and Goode planned to kill Gregory Epps. 10/21/98, at 202. He reinforced that argument with a theory about Ebron's and Epps's philosophy:

> You know from the evidence, ladies and gentlemen, that and you can draw this from Mr. Epps's testimony from the testimony of Mr. Ebron and from the other witnesses, that Mr. Epps and Mr. Ebron do not settle their disputes in a courtroom. . . . Mr. Ebron, Mr. Epps distained the system, the police, the way the disputes are resolved in a courtroom like this. You know that Mr. Epps has his own pending first degree murder case here in this courthouse. You know that Joseph Ebron is a witness for Mr. Epps in his case. You know that. It's a distaining, disrespect of the system. Solve it outside of the courtroom. Take it back out onto the streets. Handle it man to man. Not in here. Not in the courtroom.

10/21/98, at 204-06. Joseph Ebron's and Steven Goode's attorneys argued that Pinkney and Brown had lied and that the government had not proven that Ebron and Goode were the shooters. 10/21/98, at 221-22, 242-48. The jury struggled for over four days with their decision before reaching a

10

verdict, following two reports that they were deadlocked, on October 29, 1998.  10/22/98-10/28/98,

A000022-24.

## ARGUMENT

### I. Trial Counsel Deprived Mr. Ebron of the Effective Assistance of Counsel By Conducting a Constitutionally Deficient Investigation.

While Mr. Ebron's appeal in this case was pending, he wrote to this Court and to the clerk, requesting a petition for post-convection relief pursuant to D.C. Code § 23-110, and also submitted a pro se § 23-110 petition. Within these pleadings, Mr. Ebron complained about trial counsel's investigation and his ineffectiveness, including trial counsel's failure to call his sister Latina Ebron as a defense witness. Mr. Ebron moves to amend his pleadings with the following:

Anthony Stewart, Mr. Ebron's trial counsel, provided Mr. Ebron with ineffective assistance of counsel as he failed to perform even the most cursory investigation of the government's case. Specifically, Mr. Stewart failed to investigate or interview two key witnesses: Gregory Quarles, an eyewitness to the crime, and Latina Ebron, the live-in girlfriend of the government's star witness, Mr. Pinkney.

To prove ineffective assistance of counsel, a defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced the defendant. *Young v. United States*, 56 A.3d 1184, 1189 (D.C. 2012) (citing *Strickland*, 466 U.S. at 687).

### A. Deficient Performance

The District of Columbia Court of Appeals has made clear that "counsel's arbitrary or ill-considered decision to forgo relevant pre-trial investigation is constitutionally deficient." *Kigozi v. United States*, 55 A.3d 643, 651 (D.C. 2012) (explaining that "counsel's investigation before trial is an essential component of effective representation and can be as important to the defendant as counsel's performance during trial"); *see also Cosio v. United States*, 927 A.2d 1106, 1127 (D.C.

2007) ("defense counsel has a basic obligation to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case . . .") (quotation omitted).

The District of Columbia Court of Appeals has repeatedly found trial counsel's representation deficient where counsel either failed to investigate the circumstances of the crime or failed to investigate avenues of impeachment regarding the government's key witnesses. *See Kigozi*, 55 A.3d at 654 (explaining that counsel was deficient where he/she knew that the key witness for the prosecution may have been under the influence of drugs yet failed to investigate its potential for impeaching the witness); *Cosio*, 927 A.2d at 1127 (finding trial counsel's performance deficient where trial counsel failed to ask defendant's coworkers about his interactions with the alleged assault victim for impeachment purposes); *Young*, 56 A.3d at 1199 (trial counsel's performance was deficient when he failed to conduct even a cursory investigation of the government's case in chief).

Here, Mr. Stewart failed to reasonably investigate the circumstances of the crime *and* failed to investigate avenues of impeachment regarding the government's key witnesses. Mr. Stewart was notified, in pre-trial discovery, that the government's star witness, Pinkney, would testify that Mr. Ebron, co-defendant Goode, and "Little Stanley" (AKA Gregory Quarles)[7] were at Pinkney's apartment immediately preceding and immediately following the murder of Mr. Tate.[8] Despite the

---

[7]"Little Stanley" is the alias of Gregory Quarles. *See* Declaration of Steven Goode. A0 00102.

[8]Mr. Pinkney testified to the presence of "Little Stanley" in his apartment at Mr. Ebron's trial. 10/15/98, at 72, 82, 84, 86, 93, 139. Current counsel believes this information was contained in Mr. Pinkney's statements turned over to the defense. Current counsel attempted to obtain Mr. Stewart's trial file, but Mr. Stewart refused to speak with current counsel.

13

obvious – that Quarles could be a key witness in Mr. Ebron's defense – Mr. Stewart failed to interview Quarles. *See* Declaration of Gregory Quarles. A000101. The unreasonableness of Mr. Stewart's failure to interview Quarles is compounded by the fact that purported eyewitness testimony was the only evidence that connected Mr. Ebron to the crime. For that reason, it was crucial for Mr. Stewart to seek out and interview any eyewitnesses, like Quarles, who would have information about Mr. Tate's murder. Mr. Stewart's performance was deficient.

Second, Mr. Stewart failed to interview Latina Ebron, despite the fact that the government produced her at Mr. Ebron's trial to be interviewed by the defense for potential impeachment material. *See* Declaration of Latina Ebron. A000103. Instead, Mr. Stewart permitted Ms. Ebron to be interviewed by co-defendant Goode's lawyer, without Mr. Stewart present. Indeed, Mr. Stewart rested Mr. Ebron's defense without even waiting for the opportunity to interview Latina Ebron the next day. *Id.*; 10/21/98, at 128, 135; *see Kigozi*, 55 A.3d at 652 (stating "we have no doubt that any competent defense attorney would have appreciated the need to investigate [the credibility of the key witness for the prosecution.]") (citations and quotations omitted). Mr. Stewart's failure to interview Ms. Ebron, so that he could discover possible impeachment material, was deficient.

**B.   Prejudice**

Mr. Ebron was prejudiced by counsel's deficient representation. Prejudice is established from counsel's failure to investigate where a defendant can show "there is a reasonable probability that a competent attorney aware of [the evidence] would have introduced it" and secondly, "had the jury been confronted with this . . . evidence, there is a reasonable probability [of a different result.]" *Cosio*, 927 A.2d at 1132 (citations and quotations omitted). A reasonable probability is a probability sufficient to "undermine confidence" in the outcome. *Strickland*, 466 U.S. at 687. In *Kigozi, Young,*

14

and *Cosio*, the Court of Appeals had little doubt that a competent attorney would present evidence that would bolster the defense case or cast doubt on the government's theory. *Kigozi*, 55 A.3d at 654, *Young*, 56 A.3d at 1199, *Cosio*, 927 A.2d at 1134.

In Mr. Ebron's case, had Mr. Stewart interviewed Mr. Quarles or Ms. Ebron, he would have been able to present testimony that exculpated Mr. Ebron and impeached the government's two purported eyewitnesses. Had Mr. Stewart interviewed Mr. Quarles he would have learned the following:

- Mr. Quarles was present at Bernard Pinkney's apartment on the night of Anthony Tate's murder.

- Mr. Ebron was also at Bernard Pinkney's apartment.

- Mr. Ebron did not leave the apartment at the time of Mr. Tate's murder.

- Mr. Ebron was in Mr. Pinkney's apartment when Mr. Tate was killed.

Declaration of Gregory Quarles. A000101.

Reasonable defense counsel would have used this evidence. Mr. Quarles was an eyewitness who directly contradicted the government's theory and the government's two purported eyewitnesses who identified Mr. Ebron as a shooter. More importantly, Mr. Quarles explicitly exculpated Mr. Ebron for Mr. Tate's murder.

Had counsel interviewed Ms. Ebron, he would have discovered that she heard that co-defendant Goode and "Little Stanley" were the individuals who shot Mr. Tate.[9] Declaration of Latina

---

[9]As noted above, Ms. Ebron was interviewed during trial only by co-defendant Goode's counsel. Ms. Ebron states that after she told Mr. Goode's counsel that she heard that Mr. Goode and "Little Stanley" were the shooters, Mr. Goode's counsel told her that she would not be called to testify. Declaration of Latina Ebron. A000103.

15

Ebron. A000103. Competent counsel would have called Ms. Ebron to impeach the testimony of the government's key witness – Ms. Ebron's live-in boyfriend, Mr. Pinkney – and would have followed up on investigative leads suggested by her information. The government's case rested on the credibility of Mr. Pinkney. By discrediting Mr. Pinkney, and offering an alternative theory, defense counsel would have cast doubt on the government's case.

Had defense counsel presented the testimony of Mr. Quarles and Ms. Ebron, there is a reasonable probability of a different result. "[A] reasonable probability . . . does not require that counsel's conduct 'more likely than not' have altered the outcome." *Young*, 56 A.3d at 1200. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Kigozi*, 55 A.3d at 655.

The prejudice analysis in *Cosio* is on point with, and particularly instructive to, this case. In *Cosio*, the court found that the defendant was prejudiced by his counsel's failure to present impeachment evidence concerning the government's complaining witness, even though the witness's credibility might have stayed intact even after the impeachment. *Cosio*, 927 A.2d at 1134. The *Cosio* court explained that the case against the defendant was not weak, but it was not overwhelming: it rested almost entirely on the witness's credibility. *Id.* Thus, the introduction of impeachment evidence might have had a "pervasive effect . . . altering the entire evidentiary picture," and counsel's failure to discover and present such evidence prejudiced the defendant. *Id.*; *see also Young*, 56 A.3d at 1200 (finding that the defendant was prejudiced by counsel's failure to call a narcotics expert because such testimony would have called the government's key witness's testimony into question); *Kigozi*, 55 A.3d at 655 (explaining that the defendant suffered prejudice because had the eyewitness

testimony "been impeached it would have been a different trial, at least in the sense that very different questions would have been posed to the jury[,] [and] [h]ad the jury developed a reasonable doubt about [the eyewitness'] credibility, there would have been a different verdict.") (citations omitted).

Here, the testimony of Mr. Quarles and Ms. Ebron would have directly impeached the testimony of the government's two purported eyewitnesses. As in *Cosio* and *Kigozi*, had Mr. Pinkney been impeached by other witnesses, it would have been a different trial, and had the jury developed doubt about Mr. Pinkney's credibility, there is a reasonable probability of a different result.

More importantly, Mr. Quarles, who was identified by Mr. Pinkney as being present at Mr. Pinkney's apartment during Mr. Tate's murder, would have testified that Mr. Ebron did not leave Mr. Pinkney's apartment when Mr. Tate was murdered. Mr. Quarles's testimony not only impeached Mr. Pinkney but also directly exculpated Mr. Ebron. This testimony would have no doubt altered the entire evidentiary picture.

Even without the impeachment evidence that trial counsel failed to investigate and present, the jury harbored grave doubts about their decision, deliberating for four days and twice announcing deadlock before finally arriving at a verdict. There is more than a reasonable probability that, if they had been aware of evidence explicitly exculpating Mr. Ebron and throwing even further doubt on the government's well-compensated star witnesses, their verdict would have been an acquittal and not a conviction. Thus, Mr. Ebron was prejudiced by Mr. Stewart's failure to investigate, discover and present this evidence.[10]

---

[10]Mr. Quarles's declaration is corroborated by co-defendant Goode. Mr. Goode states that Mr. Quarles was present at Mr. Pinkney's apartment when Mr. Tate was killed, and that Mr. Ebron was not outside, or involved when Mr. Tate was killed. Declaration of Steven Goode. A000102.

17

**II.**  **The Government's Failure to Disclose That Police Threatened One Star Witness With Prosecution for This and Other Murders and Prosecution of His Loved Ones, or That Their Other Star Witness Was Not Even On the Premises At the Time of the Shootings, Violated Mr. Ebron's Right to Due Process of Law.**

Mr. Ebron moves to amend his pro se pleadings by adding the following:

Detective Doughty and Bernard Pinkney both insisted at trial that, despite Pinkney's participation in the events surrounding the shootings, he did not face prosecution for murder. Pinkney has now acknowledged that the police did threaten him with prosecution for multiple murders, including this one; that they threatened to prosecute his loved ones; and that he told them that the government's other star witness, Rose Brown, was not even on the premises at the time of the shootings. The government's failure to reveal any of this exculpatory evidence to the defense before – or even during – trial violated Mr. Ebron's right to due process of law.

The Due Process Clause requires a prosecutor to disclose evidence to the accused that is favorable to the defense and that is material. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153-156 (1972). If the government suppresses favorable material evidence, it has committed a *Brady* violation. *Farley v. United States*, 694 A.2d 887, 889 (D.C. 1997).

**A.** **Relevant Trial Testimony**

Detective Doughty claimed at trial that Pinkney had only minimal potential exposure to prosecution for Mr. Tate's murder: "I didn't have any reason to believe that he was involved in the actual shooting. But after the fact things that he did could have potentially made him an accessory." 10/20/98, at 29. He acknowledged that he interviewed Pinkney for about three hours, and that he only videotaped the last 45 minutes of the interview. 10/20/98, at 30, 35.

18

Pinkney, too, denied that he thought he could be prosecuted for murder:

Q: So when the officers talked to you about criminal exposure, in your mind, the criminal exposure was you being charged with murder; isn't that right, sir?

A: Never.

10/15/98, at 206-07. Pinkney insisted that the officers never told him what he could be charged with and that he thought he might, at worst, face charges as an accessory. *Id.* at 206-08. Pinkney further insisted that he was testifying because he had started his life over, and that he had changed his life around. *Id.* at 241.

Rose Brown was the only other witness who implicated Mr. Ebron in the shooting. She testified that while she was sitting on the front porch of her apartment building, where Pinkney also lived, she "heard a bunch of gun fire go off." 10/16/98, at 274. She also testified that after the shots were fired she left the porch, ran through her apartment building, and went to the back of the apartment building where she saw Mr. Ebron, Goode, and another individual run into her building with firearms in their hands. *Id.* at 275, 279-283.

**B.   Suppressed Evidence**

Pinkney has now revealed exculpatory information that the government never disclosed to the defense at trial. This exculpatory information consists of threats to Pinkney, implied immunity agreements for Pinkney and his family, and statements from Pinkney himself that directly contradicted the testimony of the government's other key witness, Rose Brown. The undisclosed threats and implied agreements consist of the following:

- Detective Doughty and his partner threatened to charge Pinkney with the murder of Mr. Tate if Pinkney did not testify against Mr. Ebron and Goode.

19

- Detective Doughty and his partner threatened to charge Pinkney with other unrelated murders if Pinkney did not testify against Mr. Ebron and Goode.

- Detective Doughty and his partner threatened to prosecute Pinkney's loved ones, including his mother, his brother, the mother of his uncle's children, and the mother of his own children, if Pinkney did not testify against Mr. Ebron and Goode.

Declaration of Bernard Pinkney, June 28, 2014 A000282.

Pinkney also told Detective Doughty that Rose Brown was not at their apartment building, as she testified, when Mr. Tate was killed, but instead was down the street walking towards the building.[11] Pinkney told Doughty that after the fatal shots were fired, Ms. Brown did not, as she testified, come into their building. Declaration of Bernard Pinkney, June 29, 2014 A000281. This information was also suppressed.

## C.    Legal Analysis

The government's failure to disclose this exculpatory impeachment information violated Mr. Ebron's right to a fair trial. There are three components to a *Brady* violation: the evidence at issue must have been suppressed by the government, either willfully or inadvertently, it must be favorable to the accused, and prejudice must have ensued. *Miller v. United States*, 14 A.3d 1094, 1109 (D.C. 2011).

The threats and implied promises made by the police to Pinkney, in return for his testimony against Mr. Ebron and Goode, were suppressed. The government also suppressed Pinkney's statements to police that contradicted Brown's statements and trial testimony.

---

[11]In Pinkney's declaration, he refers to Rose Brown as "Sweetie." Sweetie is Rose Brown's alias. A000282.

20

This suppressed evidence was favorable to Mr. Ebron. Favorable evidence includes impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Here, evidence which established that the police threatened to charge Pinkney with the murder of Mr. Tate and other unrelated murders if he did not testify against Mr. Ebron and Goode would have certainly been an area of fruitful impeachment. *See Bagley*, 473 U.S. at 676 ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within th[e] general rule [of *Brady*.]" (citations and quotations omitted)); *Napue v. Illinois*, 360 U.S. 264 (1959) (holding that due process was violated where prosecutor failed to correct prosecution witness who falsely testified that he had been promised no consideration for his testimony).

Additionally, evidence which established that Ms. Brown was lying, namely that Pinkney gave a contradictory statement to police about her whereabouts at the time of Mr. Tate's murder, was also favorable to the defense. *See Bennett v. United States* 797 A.2d 1251, 1256 (D.C. 2002) (explaining that evidence which establishes that a government witness lied to police is favorable to the defense).

Finally, the suppressed exculpatory evidence prejudiced Mr. Ebron. The touchstone of the prejudice inquiry is "not whether the defendant would more likely than not have received a different verdict with the [suppressed evidence], but whether in its absence he received a fair trial . . . ." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). To prove prejudice, the defendant need only show that "the favorable evidence could reasonably be taken" to put the case in "a different light as to undermine confidence in the verdict." *Id.* at 435; *Banks v. Dretke*, 540 U.S. 668, 698 (2004). The materiality of suppressed evidence must be "considered collectively, not item-by item." *Kyles*, 519 U.S. at 436.

In *Bennett*, 797 A.2d 1251, the Court of Appeals found that suppressed evidence which would have undermined a key witness's credibility was material where the government's case rested entirely

21

"on the credibility of its three rather flawed witnesses." *Id.* at 1257.

Here, the government's case rested entirely on the credibility of two flawed witnesses, Pinkney and Brown. Moreover, the suppressed evidence at issue is the type of evidence that the Court of Appeals has found constitutes a *Brady* violation. *See United States v. Smith*, 77 F.3d 511 (D.C. Cir. 1996) (finding a *Brady* volation where government failed to disclose a deal to dismiss charges against key witness). The *Smith* court explained that when analyzing materiality under *Brady*, it "must assume that, had the Government disclosed the [suppressed] information . . . the witness would have still testified exactly as he did [at trial]." *Id.* at 516. Under this rubric, the *Smith* court found that, if the defense had evidence that the testifying witness had an agreement to dismiss charges against him in return for his testimony, where the witness testified that he was testifying to "get a fresh start[,]" the potential impact of such a cross-examination was sufficient to undermine the confidence in the verdict, and thus the prejudice prong was satisfied. *Id.*

Here, Pinkney insisted that he too was testifying to get a fresh start: "I [told the police] because I had already started my life over . . . I had changed my life around." *Id.* at 242. Had the government provided defense counsel with the suppressed evidence that Pinkney was in fact testifying because he was threatened with Mr. Tate's murder, with other unrelated murders, and under the threat that his loved ones would be prosecuted, the potential impact of such cross- examination would have been devastating to Pinkney's credibility. Competent counsel would not only have been able to establish Pinkney's bias and motives for testifying, but more importantly would have been able to establish that Pinkney lied on direct examination about those motives. If the jurors had been made aware that Pinkney had lied to them on direct examination about his motives for testifying, there is a reasonable probability that they would have rejected the entirety of his testimony. Thus, if the

22

government had disclosed the suppressed evidence to the defense, there is a reasonable probability of a different result.

Additionally, if the government had provided defense counsel with Pinkney's statement that Ms. Brown was not at their apartment building when shots were fired at Mr. Tate, and did not enter their apartment building after the shots were fired, as she testified, competent counsel could have pitted Pinkney against Brown and left the jury with a reasonable doubt as to whether either was testifying truthfully. Even if this evidence alone does not satisfy the materiality prong of *Brady*, the Court must consider the prosecution's suppression of evidence collectively, and not item by item. *Kyles*, 519 U.S. at 436. The suppressed evidence, considered collectively, undermines confidence in the verdict. Thus, this Court should grant Mr. Ebron a new trial.

**III.   Appellate Counsel Was Ineffective for Failing to Investigate and Present Extra-Record Evidence During Mr. Ebron's Direct Appeal.**

While Mr. Ebron's appeal in this case was pending, he wrote to this Court and to the clerk, requesting a petition for post-convection relief pursuant to D.C. Code § 23-110, and also submitted a pro se § 23-110 petition. Within these pleadings, Mr. Ebron complained about appellate counsel's investigation and his ineffectiveness, including appellate counsel's failure to contact his sister Latina Ebron or Bernard Pinkney. Mr. Ebron moves to amend his pleadings with the following:

Mr. Ebron's appellate counsel, Stuart Johnson, acknowledges that he did not have the services of an investigator and did not conduct any extra-record investigation. Declaration of Stuart Johnson A000104. Because the circumstances of this case called out for an investigation during appeal, Mr. Johnson provided ineffective assistance.

In the District of Columbia courts, appointed appellate counsel has a duty to consider whether a client's interest requires the filing of a post-conviction petition, pursuant to D.C. Code § 23-110, to raise reasonably known claims of ineffective assistance during direct appeal. *Hardy v. United States*, 988 A.2d 950, 959-60 (D.C. 2010). Counsel's duty includes:

> (1) investigating possible ineffective-assistance of counsel claims . . . triggered by . . . what is reasonably noticeable from the trial court's records, (2) researching and developing points thus uncovered, (3) advising appellant if counsel believes there is an adequate basis for advancing a claim of ineffective assistance of trial counsel, (4) requesting appointment of counsel for the § 23-110 motion, and (5) either filing or assisting appellant in preparing and filing the motion.

*McCrimmon v. United States*, 853 A.2d 154, 160 (D.C. 2004) (citing *Doe v. United States*, 583 A.2d 670, 674-75 (D.C. 1990) (internal quotation marks omitted)).

An appellate counsel's neglect may have serious consequences. The failure to raise trial counsel's ineffectiveness may constitute a procedural default of that claim if appellate counsel knew

24

or should have known, through reasonable investigation, of the grounds for advancing it. *See Shepard v. United States*, 533 A.2d 1278, 180-82 (D.C. 1987). A petitioner who later asserts a trial ineffectiveness claim then would have to show cause and prejudice – by establishing that appellate counsel was deficient for failing to litigate trial counsel's ineffectiveness, and by showing a reasonable probability that the petitioner would have been entitled to relief, such as a remand for a hearing, on the claim during the direct appeal process. *Id.* at 1282; *McCrimmon*, 853 A.2d at 161-62.

Mr. Ebron's appellate counsel did not fulfill the duty to investigate trial counsel's ineffectiveness. Counsel knew, from a review of the trial transcript:

- That Stanley (Gregory Quarles) was present in Pinkney's apartment at the time of the homicide, but neither party called him as a witness. 10/15/98, at 133, 139-40.

- That Latina Ebron, Joseph Ebron's sister and the paramour of the government's main witness, Bernard Pinkney, was in witness protection at the time of trial, and that trial counsel asked the government to produce her so that he could interview her. 10/14/98, at 52.

- That the government did not call Ms. Ebron as a witness.

- That trial counsel, because of his interest in Ms. Ebron's potentially exculpatory testimony, requested and obtained a sequestration order directing Pinkney not to discuss his testimony with her. 10/19/98, at 28, 78-79.

- That Joseph Ebron's counsel rested his defense without presenting Latina Ebron's testimony. 10/20/98, at 117.

- That, at the end of the day's testimony on October 20, 1998, counsel for Joseph Ebron's co-defendant, Steven Goode, expressed uncertainty about whether she would call Latina Ebron as a witness once the government had made her available for interview the following day.

10/20/98, at 117-18.

- That, on October 21, 1998, Mr. Goode's counsel rested his defense without presenting any evidence. 10/21/98, at 128.

Appellate counsel had documents that reflected Mr. Ebron's dissatisfaction with trial counsel's investigation:

- A pro se motion that Mr. Ebron filed with the trial court on May 26, 2000, indicated that trial counsel was ineffective because he did not investigate or call potential witnesses, including his sister Latina Ebron. A000063. Mr. Ebron claimed that trial counsel's investigator, Steven Roth, resigned from the case because "he can no longer continue on case because of [trial counsel's] lack of communication and investigation."

- A letter from Mr. Ebron to trial counsel asked him to "find my sister to get an affidavit." A000204.

- Appellate counsel's notes from his review of the appellate file indicated that Mr. Ebron "wants 23-110 for failure to call his witnesses and not investigating gov'ts. star witness [Pinkney] who had an arrest warr. in Md." A000132-33.

Additionally, appellate counsel learned directly from Mr. Ebron that his client wanted to challenge trial counsel's investigation:

- On January 5, 2000, Mr. Ebron asked counsel to "find my sister," advised him that she was no longer in witness protection, and gave the name of a cousin who might know where she was. A000160.

- In an interview conducted on March 28, 2000, Mr. Ebron told counsel that his sister had "valuable information." A000143.

26

- On September 6, 2000, Mr. Ebron wrote to counsel, "Far as my sister Latina Ebron we need a investigator to find her whereabouts because her knowledge is valuable to a good investigation." Counsel responded in a letter dated September 23, "How do I go about locating your sister, Tina?" A000171-72.

- While the petition for certiorari was pending, Mr. Ebron again mentioned Stanley, asked counsel to find his sister, and gave information about Pinkney's usual whereabouts "hustl[ing] on Central Ave. Near D.C. line." Counsel indicated under Stanley's name, "newly discovered evidence." A000157-59.

- In a jail visit that counsel paid to Mr. Ebron on September 6, 2004, Mr. Ebron told trial counsel that Stanley Quarles had never been questioned and that he wanted to file a § 23-110 motion to challenge trial counsel's ineffective assistance. A000210.

After this Court appointed counsel on this post-conviction motion pursuant to D.C. Code § 23-110, appellate counsel had a discussion with post-conviction counsel. Appellate counsel listed "witnesses not called," including Gregory ("Stanley") Quarles, who was "never Q'd," Bernard Pinkney, and Tina Ebron. A000109.

Thus, appellate counsel knew that Gregory Quarles was present in Pinkney's apartment during the shootings and could have helpful testimony. Appellate counsel also knew that trial counsel rested before the government provided an opportunity to interview Latina Ebron, and that Goode's trial counsel, after presumably interviewing her, did not present her testimony. Counsel therefore knew that, while Latina Ebron presumably could not help co-defendant Goode, it remained unclear whether she could have offered testimony helpful to Joseph.

In addition, appellate counsel knew that Mr. Ebron had requested a § 23-110 motion to

challenge trial counsel's ineffective assistance in failing to conduct an adequate investigation, and that his client had repeatedly asked him to interview Latina, Stanley, and Pinkney, among other witnesses, indicating that they had helpful information.

Appellate counsel therefore knew, or should have known, that he should conduct an independent investigation. Yet, as he has acknowledged, counsel made no inquiry at all into any facts outside the four corners of the transcript. Declaration of Stuart Johnson. A000104. And there is a reasonable probability that an investigation would have enabled appellate counsel to pursue a successful motion for post-conviction relief under § 23-110 on the grounds of trial counsel's ineffective assistance, *Brady*, and/or newly-discovered evidence. Appellate counsel therefore deprived Mr. Ebron of the effective assistance of counsel. *See Smith v. Robbins*, 528 U.S. 259 (2000); *McCrimmon*, 853 F.2d at 159-62 (appellate counsel's failure to file § 23-110 motion during direct appeal provided cause and prejudice to excuse default of claim that could have been raised).

Mr. Ebron has moved before the Superior Court to recall the mandate on the ground of appellate counsel's ineffectiveness. *See Head v. United States*, 626 A.2d 1382, 1384 (D.C. 1993). He is therefore prepared to establish, in that forum, the ineffective assistance of appellate counsel that overcomes any procedural bar to his trial ineffectiveness claim here.

28

**IV.    The Government's Procedural Objections Are Unsound Because Mr. Ebron Himself Repeatedly Demanded Relief During His Direct Appeal.**

The government has submitted two responses to Mr. Ebron's pro se pleadings. A000083-84. It argues that his ineffective assistance claims are procedurally defaulted because (1) he knew or should have known of them during direct appeal, (2) he failed to raise them during direct appeal, and (3) the ineffective assistance of his appellate counsel cannot supply cause and prejudice for the default because Mr. Ebron did not move to recall the mandate of the Court of Appeals. In addition, the government maintains, Mr. Ebron cannot show prejudice because he has not established what uncalled witnesses would have testified if an adequate investigation had been conducted.

The government's procedural objections are unsound. Not only did Mr. Ebron know during his direct appeal that his trial counsel had conducted an inadequate investigation, but he demanded a § 23-110 motion on that ground, in writing, to this Court and the Court of Appeals, and repeatedly urged his appellate counsel, in meetings and letters, to investigate and file a petition challenging trial counsel's ineffective assistance. His repeated and timely assertion of his rights, and his extensive evidentiary proffer with this petition, undermine the government's arguments. Appellate counsel's failure to investigate Mr. Ebron's claims and file a § 23-110 motion establishes cause for the default, because the record shows that appellate counsel knew of the grounds for the motion and had a duty to investigate and file it. Mr. Ebron has concurrently moved to recall the mandate in the Court of Appeals on this ground. Finally, Mr. Ebron has proffered the signed declarations of prospective witnesses, and requests an evidentiary hearing, to establish that the ineffective assistance of his trial and appellate counsel prejudiced his defense.

Mr. Ebron has sufficiently pled, and can demonstrate, cause and prejudice.

29

**V.     Trial and Appellate Counsel Were Ineffective for Failing to Challenge the Government's Questioning and Argument On the Failure of Gregory Epps to Report the Substance of His Trial Testimony to the Police.**

While Mr. Ebron's appeal in this case was pending, he wrote to this Court and to the clerk, requesting a petition for post-convection relief pursuant to D.C. Code § 23-110, and also submitted a pro se § 23-110 petition.  Mr. Ebron moves to amend his pleadings with the following:

Joseph Ebron's trial counsel failed to object to the government's questioning of a key defense witness, Gregory Epps, about his failure to tell police that Ebron was not the shooter and not at the scene of the shooting. In summation, the government returned to this theme, attacking Epps's credibility because he had not reported the exculpatory information to the police, and arguing that both Epps and Mr. Ebron followed an antisocial philosophy of solving their problems out of court. Defense counsel again failed to make a proper objection. Trial counsel's inaction deprived Mr. Ebron of the effective assistance of counsel guaranteed by the Sixth Amendment, and appellate counsel's failure to challenge trial counsel's ineffectiveness on this ground deprived Mr. Ebron of effective assistance on appeal. *See Strickland*, 466 U.S. at 687; *Smith*, 528 U.S. 259.

**A.     Trial Counsel Was Ineffective.**

Epps testified for Mr. Ebron's defense at trial that he and Ebron were friends and that Ebron was not one of the men who shot at him the night Tate was killed. 10/20/98, at 69. On cross-examination, the prosecutor asked Epps whether he had alerted the authorities to this information when he heard that Ebron and Goode had been arrested for Tate's murder; defense counsel made no objection to this line of questioning and Epps stated that he had not. *Id.* at 95-96.

During summation, the government stated to the jury: "you can draw this from Mr. Epps' testimony[,] from the testimony of Mr. Ebron and from the other witnesses, that Mr. Epps and Mr.

30

Ebron do not settle their disputes in a courtroom." 10/21/98, at 204-05. Counsel for Goode objected

and was overruled. *Id.* Later, after noting Ebron's and Epps's "distaining [*sic*] disrespect of the

system," government counsel stated the following:

> And people who come into the courtroom, ladies and gentlemen, to tell what they know to get up there in public to tell what they know about Mr. Goode and about Mr. Ebron receive the same distain [*sic*]. They're snitches. You recall I asked Mr. Epps what's a snitch. A snitch is somebody who tells. Somebody who comes to court and tells. Somebody who is part of the system. They participate in the system and they tell. Snitches are not valued on the street and quite fact, in fact quite the opposite. They are distained [*sic*]. They are disrespected. You don't come to court and snitch. You handle it out there on the street.

10/21/98, at 206. Defense counsel raised no objection to these and similar comments. *Id.* at 205-20.

Government counsel later stated that "the point that I am making with Mr. Epps is that he doesn't go

to the police." *Id.* at 205.

The following day, the court, *sua sponte* and out of the jury's presence, addressed the issue

of a witness's failure to go to police. 10/22/98, at 278. The court referred to *Alexander v. United

States*, 718 A.2d 137 (D.C. 1998), which, while reversing a conviction on a Fifth-Amendment

violation, also noted the impropriety of cross-examining an exculpatory witness on his failure to

contact police. The court distinguished Ebron's case from *Alexander* because it did not involve alibi

testimony and did involve a substantial time between the homicide and the arrests. 10/22/98, at 280-

81. The court did not consider whether, under the circumstances, it would have been natural for Epps

to report what he knew to the police. Defense counsel did not object to the court's analysis or to the

prosecutor's cross-examination or argument. *Id.*

During Mr. Ebron's appeal, his appellate counsel did not raise a claim of trial counsel's

ineffectiveness for failure to object to the prosecutor's cross-examination and summation comments

related to Epps's testimony. *See generally* Brief for Appellant, A000226, *Ebron*, 838 A.2d 1140 (No. 99-CF 000145).

The prosecutor's cross-examination and argument were both unfair and impermissible at the time of Mr. Ebron's trial. The Court of Appeals recently explained *Alexander*'s reasoning:

> Our case law has embraced the view that, where the witness knows that the defendant is represented by counsel, "no inference [of fabricated testimony] can be drawn" from the alibi witness's failure to inform the authorities of the information in her possession, because the witness "might reasonably presume that it was sufficient for him to relate his knowledge to the attorney retained or appointed to represent [the] defendant.' *Alexander*, 718 A.2d at 143 (quoting *United States v. Young*, 150 U.S.App.D.C. 98, 102, 463 F.2d 934, 938 (1972)).

*Matthews v. United States*, 892 A.2d 1100, 1104 (D.C. 2006); *see also Young*, 463 F.2d at 938 (no permissible inference about witness who does not go to police when witness "might reasonably presume that it was sufficient for him to relate his knowledge to the attorney retained or appointed to represent defendant").

At the time of Mr. Ebron's trial, cross-examination of a defense witness about prior failure to alert law enforcement to exculpatory information was permissible "only where the circumstances are such that the witness' normal and natural course of conduct would have been to go to the authorities and furnish the exculpatory information." *Alexander*, 718 A.2d at 143 (internal quotation marks omitted); *see United States v. Huff*, 442 F.2d 885, 892 (D.C. Cir. 1971) (stating that "the very asking of the question" why a defense witness did not testify at a preliminary hearing may unfairly prejudice the jury); *cf. Warren v. United States*, 515 A.2d 208, 211 (D.C. 1986) (trial court did not

32

abuse its discretion in prohibiting impeachment by omission when prior testimony "did not concern material circumstances which it would have been natural for [the witness] to mention").[12]

The government's examination and argument about Epps's testimony were impermissible, and the trial court's contrary reasoning was unsound. Epps first learned that Ebron had been arrested in connection with the Tate killing when he was contacted by a defense investigator. 10/20/98 at 95. He promptly informed the investigator that Ebron was not one of the perpetrators, and rightly could have believed that notifying Ebron's investigator was sufficient to prevent Ebron from being wrongfully convicted of a crime he did not commit. *See Alexander*, 718 A.2d at 143. Finally, it would not have been in Epps's "normal and natural course of conduct" to do anything further because he only learned of Ebron's arrest after being contacted by the only person who investigated his impression of who had shot at him: defense counsel. 10/20/98, at 95, 99. Nor did Epps and Mr. Ebron have the kind of close relationship that would have supported the inference the government sought to draw. *See Matthews*, 892 A.2d at 1103-04. The government's summation compounded the damage. "No inference" can be drawn from a witness's failure to go to the police with exculpatory information, because the witness "might reasonably presume that it [is] sufficient for him to relate his knowledge" to defense counsel. *Alexander*, 718 A.2d at 143 (quotations and citations omitted).

The trial court's representation of the law in its colloquy with counsel during deliberations was confusing and inaccurate. The judge indicated that questioning witnesses about their failure to go to police with an alibi is appropriate as long as the questioning addresses their credibility – an

---

[12] Whether the testimony is permissible is partly dependent on "the existence of a close relationship between the witness and the defendant." *Matthews v. United States*, 892 A.2d 1100, 1103-04 (D.C. 2006) (discussing and applying earlier precedent, and finding relationship between grandmother and grandson sufficient); *see Cain v. United States*, 532 A.2d 1001, 1006 (D.C. 1987) (relationship between father and son sufficient).

33

overbroad characterization of controlling precedent. *Cain* explicitly stated that it was "clear" that "in certain contexts" a prosecutor is "precluded" from comments or questions relating to exculpatory witnesses' delay in coming forward. 532 A.2d at 1006; *see also Morris*, 622 A.2d at 1125, n.19 (quoting the same language). The proper standard at the time of Ebron's trial was *Alexander*'s statement that a witness cannot be questioned about failure to go to police with exculpatory information unless it would be in the witness's "normal and natural course of conduct" to do so. 718 A.2d at 143. The court made no mention of this language and did not address the appropriate factors.

The court also mischaracterized the facts of Ebron's case and the law of alibi defenses. The court stated that the case was "not in the alibi area" and "not like the *Alexander* case." 10/22/98, at 280. In fact, however, Epps's testimony was squarely within the alibi realm because he stated that neither Ebron nor Goode was at the scene of the crime. 10/20/98, at 69; *see Gethers v. United States*, 556 A.2d 201, 203 (D.C. 1989) (defendant has alibi "if he or she was not at the exact scene of the crime"). In any case, *Alexander* and related cases have not limited the controlling rationale to alibi. Furthermore, contrary to the court's belief that the duration of time between the crime and the point when the witness learned of the defendant's arrest was "a critically distinguishing factor," nothing in the cases that address witness silence places any importance on the amount of time it took the witness to come forward. 10/22/98, at 281. *Contra Young*, 463 F.2d at 937-38; *Cain*, 532 A.2d at 1005-06; *Morris*, 622 A.2d at 1125; *Alexander*, 718 A.2d at 143-44; *see also Matthews*, 892 A.2d 1102-1105 (discussing and applying foundational requirements for impeachment by silence and emphasizing close relationships, not distance in time).

Defense counsel's failure to object to improperly elicited testimony can constitute deficient representation. *See Mack v. United States*, 570 A.2d 777, 783-85 (D.C. 1990). Trial counsel's

34

failure to object to the prosecutor's unfair questioning and argument was unreasonable. The prosecutor's inference had no logical support, given that Epps did not even learn of Mr. Ebron's arrest until the defense investigator approached him. Counsel could have no reasonable tactical ground for letting the prosecutor draw the unfair inference that Epps should have taken his information to the police.

Given the closeness of the case, counsel's deficiency was prejudicial. The only witnesses who linked Mr. Ebron to the shootings were paid for their cooperation and involved in the surrounding events. Epps was the ostensible target of the shooting and the only defense witness except Mr. Ebron himself. His testimony was crucial. The jury agonized over their decision for more than four days, and reported two deadlocks. There is at least a reasonable probability that, but for the prosecutor's damaging examination and argument, the jurors would have voted to acquit. Alone and in combination with the deficient investigation described above, counsel's deficient performance prejudiced the defense.

## B.    Appellate Counsel Was Ineffective.

As the Court of Appeals has held:

> In order for appellant's claim of ineffective assistance of appellate counsel to succeed, appellant must demonstrate (1) that the "performance of counsel fell below an objective standard of reasonableness" and (2) that appellant suffered "prejudice, *i.e.,* it must be established that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Long v. United States*, 83 A.3d 369, 378 (D.C. 2013). Mr. Ebron's case satisfies that test.

Appellate counsel knew, from his review of the transcript, that the trial court had raised the question whether the prosecutor's examination of Epps and subsequent argument about his failure to go to police had violated *Alexander*. A review of *Alexander* itself would have disclosed that the

35

court was right to take note of the problem and should have granted relief. Appellate counsel could have raised a plain-error claim on direct appeal, *see Bryant v. United States*, ___ A.3d ___, 2014 WL 2769351 (D.C. June 19, 2014) , and could have filed a § 23-110 petition that included a claim that trial counsel was ineffective for not objecting. And, because the prosecutor's improper examination and argument were highly prejudicial, appellate counsel could have had no valid strategic reason for not raising such a challenge. *See Long*, 83 A.3d at 378 (court "cannot conceive of any reasonable 'professional judgment' which would lead an attorney to disregard an issue which, at the time of appeal, would likely have resulted in the vacating of appellant's [] sentence"). For the same reasons that trial counsel's inaction was prejudicial, there is a reasonable probability that, if appellate counsel had challenged the inadmissible testimony and argument on direct appeal and/or challenged trial counsel's deficient performance through a § 23-110 motion, Mr. Ebron would have obtained a new trial on appeal or in post-conviction. Alone and in combination with appellate counsel's ineffective failure to investigate and present a § 23-110 challenge to trial counsel's deficient investigation, appellate counsel's unreasonable failure to challenge the improper evidence and argument prejudiced Mr. Ebron on appeal.

## VI.    An Evidentiary Hearing is Appropriate.

There exists a presumption in favor of holding an evidentiary hearing on a § 23-110 motion. *Hardy*, 988 A.2d at 961. Only if a petitioner raises claims that are vague and conclusory, palpably incredible, or frivolous should the court deny the motion without a hearing. *Id.* at 961 (citing *Jones v. United States*, 918 A.2d 389, 403 (D.C. 2007)).

In *Hardy*, the Court found that the petitioner had enumerated trial counsel's performance deficiencies and had never received a decision on the merits of that claim. The court was not "'satisfied that under no circumstances could [Mr. Hardy] establish facts warranting relief.'" 988 A.2d 967 (citing *Jones*, 918 A.2d at 403). The Court therefore remanded the case for an evidentiary hearing. *Id.*; *accord Long v. United States*, 910 A.2d 298 (D.C. 2006), amended 2014 WL 260326 (evidentiary hearing warranted on claim that trial counsel ineffective for failing to present alibi witness and other witnesses who would have testified that co-defendant admitted to shooting and killing victim).

Mr. Ebron has proffered affidavits detailing the witnesses' proposed testimony, along with appellate counsel's notes and other supporting documents. *See Ransom v. United States*, 947 A.2d 1127, 1130-31 (D.C. 2008) (upholding denial of hearing because petitioner did not proffer affidavits or other proffer). His proffer is specific and the proffered facts demonstrate that relief is appropriate. This Court should not assume that both trial and appellate counsel's failure to investigate, or to challenge the prosecutor's improper examination and argument, had any strategic basis, or that their deficiencies were not prejudicial, without holding a hearing. Because Mr. Ebron has raised colorable claims, *see Steward v. United States*, 927 A.2d 1081, 1088-90 (D.C. 2007), the presumption in favor

of a hearing applies. *See Ginyard v. United States*, 816 A.2d 21 (D.C. 2003). This Court should accordingly grant Mr. Ebron an evidentiary hearing on his claims.

## CONCLUSION

For the reasons above, an evidentiary hearing should be granted, and Mr. Ebron's conviction should be reversed and a new trial ordered.

Respectfully submitted,

**STEPHEN W. RIDDELL**
DC Bar # 357756
The Riddell Firm, PLLC
P.O. Box 42511
Washington, DC 20015
(202) 492-4034

**FEDERAL COMMUNITY
DEFENDER OFFICE for the
Eastern District of Pennsylvania**
Billy Nolas, DC Bar # 399275
Claudia Van Wyk
Suite 545 West - The Curtis Center
Independence Square West
Philadelphia, PA 19106
(215) 928-0520

July 3, 2014

## CERTIFICATE OF SERVICE

I, Claudia Van Wyk, hereby certify that on this date, I caused the foregoing to be served

on the following person by Federal Express:

Leslie Ann Gerardo
Chief, Special Proceedings Division
United States Attorney's Office
District of Columbia
555 4th Street NW, 5th Floor
Washington, DC.  20530

Dated: July 3, 2014

Claudia Van Wyk