**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CIVIL NO. 1:14-CV-00539** |
| **v.** | : | **(CRIMINAL NO. 1:08-CR-36)** |
| | : | |
| **JOSEPH EBRON, Defendant.** | : | |

<u>**APPENDIX TO DEFENDANT JOSEPH EBRON'S AMENDED MOTION
TO VACATE, SET ASIDE OR CORRECT SENTENCE
PURSUANT TO 28 U.S.C. § 2255**</u>

EXHIBITS 26, 27 & 49 FILED UNDER SEAL
MOTION FILED TO PLACE EXHIBITS UNDER SEAL

**Alex Kursman**
**Jennifer Chiccarino**
FEDERAL COMMUNITY DEFENDER OFFICE FOR THE EASTERN DISTRICT OF
PENNSYLVANIA
Suite 545W- The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
Phone: 215-928-0520
Fax: 215-928-0826

*Counsel for Joseph Ebron*

May 28, 2025

# INDEX TO APPENDIX

**Exhibit 1** – Letter from J.J. Gradoni to Katherine Scardino (8/27/07)..............A001

**Exhibit 2** – J.J. Gradoni Investigative Report re: Defendant Interview (4/6/09)....................................................................................................A003

**Exhibit 3** – Email from J.J. Gradoni to Katherine Scardino (3/5/09)................A015

**Exhibit 4** – Email from Katherine Scardino re: Review of Mass Interviews (2/20/09).............................................................................................A016

**Exhibit 5** – J.J. Gradoni Investigative Report re: Interview of Edgar Lee Hayes (4/7/09)....................................................................................................A017

**Exhibit 6** – J.J. Gradoni Investigative Report re: Interview of Michael Surrell (4/7/09)....................................................................................................A020

**Exhibit 7** – J.J. Gradoni Investigative Report re: Interview of Roy Wells, Jr. (4/7/09)....................................................................................................A023

**Exhibit 8** – J.J. Gradoni Investigative Report re: Interview of Bryant Valentine (4/7/09)....................................................................................................A026

**Exhibit 9** – J.J. Gradoni Investigative Report re: Interview of Ronnie Hudnall (4/7/09)....................................................................................................A027

**Exhibit 10** – J.J. Gradoni Investigative Report re: Interview of Howard Ahart (4/7/09)....................................................................................................A028

**Exhibit 11** – J.J. Gradoni Investigative Report re: Interview of Quenton Jones (4/7/09)....................................................................................................A029

**Exhibit 12** – J.J. Gradoni Investigative Report re: Interview of Antoine White (4/7/09)....................................................................................................A030

**Exhibit 13** – J.J. Gradoni Investigative Report re: Interview of Sheldon Marbley (4/7/09)....................................................................................................A031

**Exhibit 14** – J.J. Gradoni Investigative Report re: Interview of Charles Giles (4/16/09)........................................................................................................A032

**Exhibit 15** – J.J. Gradoni Investigative Report re: Interview of Frederick Graham (4/7/09).........................................................................................................A033

**Exhibit 16** – J.J. Gradoni Investigative Report re: Interview of Lamont Bailey (4/16/09)........................................................................................................A035

**Exhibit 17** – Email exchange between Joseph Batte and Katherine Scardino (4/16/09)........................................................................................................A036

**Exhibit 18** – Email exchange between Joseph Batte and Katherine Scardino (4/16/09)........................................................................................................A037

**Exhibit 19** – J.J. Gradoni Investigative Report re: Interview of James Carpenter (4/20/09)........................................................................................................A039

**Exhibit 20** – Government's Response to Defendant's Motion for Notice of Extraneous Offenses and Government's Notice Under F.R.E. 404(B) and 609(F)(1/9/09)...............................................................................................A048

**Exhibit 21** – Declaration of William Mercer (3/20/14) .....................................A051

**Exhibit 22** – Declaration of Luther Fuller (4/30/14)..........................................A052

**Exhibit 23** – Declaration of Joseph Jackson (4/14/14) ......................................A055

**Exhibit 24** – Declaration of Andrew Patrick (4/12/14).......................................A058

**Exhibit 25** – Declaration of Lonnie Gooding (6/18/14) .....................................A062

**Exhibit 26** – FILED UNDER SEAL.................................................................A064

**Exhibit 27** – FILED UNDER SEAL.................................................................A081

**Exhibit 28** – Discovery Letter from Joseph Batte to David Cunningham, Katherine Scardino and Patrick Black (6/9/08). ..................................................A091

**Exhibit 29** – Federal Bureau of Investigation 302 – Transcript of Videotaped Interview of Charles Sherman (6/20/08) ...........................................................A094

**Exhibit 30** – U.S. Department of Justice Memorandum re: Interview of Charles Sherman (5/10/03)...........................................................................................A150

**Exhibit 31** – Investigative Interview Notes re: Interview of Charles Sherman (5/9/05)...................................................................................................................A152

**Exhibit 32** – Chain of Custody Log for Suspect: Mercer William (5/9/05) ......A158

**Exhibit 33** – United States Penitentiary Beaumont Texas, Disruptive Group/Security Threat Group Photo Sheet............................................................A159

**Exhibit 34** – Photographs of alleged coconspirators .........................................A160

**Exhibit 35** – J.J. Gradoni Investigative Report re: Interview with Kelvin Smith (2/28/09)...................................................................................................................A161

**Exhibit 36** – USP Beaumont D-B Unit May 7, 2005: Still Frame from CCTV Camera System .....................................................................................................A162

**Exhibit 37** – USP Beaumont D-B Unit May 7, 2005: Still Frame from CCTV Camera Security System .......................................................................................A163

**Exhibit 38** – U.S. Department of Justice Memorandum re: Homicide D-B Unit Phone Monitoring May 5-6, 2007 (5/11/05)........................................................A164

**Exhibit 39** – J.J. Gradoni Investigative Report re: Interview of James Jackson (4/23/09)...................................................................................................................A165

**Exhibit 40** – Email from Katherine Scardino re: Witnesses Subpoenas (4/16/09)...................................................................................................................A167

**Exhibit 41** – Declaration of Kelvin Smith (3/25/14) ........................................A168

**Exhibit 42** – Letter from Joseph Batte to Katherine Scardino listing disclosed Jencks/Giglio material...........................................................................................A170

**Exhibit 43** – Amended Judgment and Commitment/Probation Order, *District of Columbia v. Charles Sherman*, Case No. F-3351-00 (3/14/01)..........................A175

**Exhibit 44** – Judgment in a Criminal Case, *United States of America v. Charles C. Sherman*, Case No. DKC 00-0423 (5/21/03)......................................................A178

**Exhibit 45** – Excerpts of a Presentence Report for Charles Sherman ..............A185

**Exhibit 46** – Psychology Services Intake Screening Summary of Charles Sherman, FCI/FPC Three Rivers (10/19/02) .......................................................................A189

**Exhibit 47** – Testimony of Charles Sherman, *United States of America v. Charles C. Sherman,* Case No. F-3351-00 (12/18/00)......................................................A192

**Exhibit 48** – Email from Katherine Scardino re: Deadline for Defense Witness List (2/26/09).............................................................................................................A273

**Exhibit 49** – FILED UNDER SEAL..................................................................A274

**Exhibit 50** – Declaration of Randal "Kyle" Tubbleville (9/12/14)....................A297

**Exhibit 51** – Declaration of Vickie Foreman (3/31/15) .....................................A298

**Exhibit 52** – Record from the Texas Department of Criminal Justice listing all offender deaths in July 2006 ...............................................................................A299

**Exhibit 53** – Letter from the Texas Department of Criminal Justice re: Death of Dale Dunbar (5/6/15) .........................................................................................A306

**Exhibit 54** – U.S. Department of Justice Memorandum re: Homicide on May 7, 2005 (5/11/05).........................................................................................A308

**Exhibit 55** – Letter from U.S. Department of Justice to Donna Coltharp and Jimmy Phillips, Jr. re: Charles Sherman's testimony ......................................................A310

# Exhibit 1

# Gradoni & Associates

Professional Investigative Services

*State License A5741*

August 27, 2007

Katherine Scardino
3730 Kirby Drive #1120
Houston, Texas 77098

RE:    USA vs. Joseph Obron

Dear Katherine:

Please find attached my CV per your request.

As you know, our firm has been involved in representing clients charged with Capital Murder in over 75 cases in Harris County, Galveston County, Brazoria County, Fort Bend County, and at the Federal level.

Our hourly rate for investigative work on cases of this nature is S60.00 per hour. We also have incidental fees for mileage, computerized searches, and word processing.

Since we are just starting to gear up on this case, I do not possess a great deal of knowledge about what occurred, other than an inmate was killed, allegedly, for providing information about one of the Defendants' fall partners.

In a case of this nature we normally provide the following investigative activities:

- Interviews with Defendant.
- Interviews with inmates who may possess knowledge about the incident and/or the players (it should be noted that it may be necessary to travel to other prisons to interview inmates who have been transferred from the Beaumont facility).
- Interview Guards and prison personnel.
- Conduct background investigations regarding both potential defense witnesses and government witnesses.
- Interview government witnesses.
- Develop information for mitigation.
- Travel to the decedent's home area to conduct background investigation.

14520 Wunderlich, Suite 120    •    Houston, Texas 77069    •    (281) 440-0800    •    Fax (281) 440-0208

*www.gradoni.com*

A001

-       Follow leads developed in the course of our investigation.

It is hard to put a dollar figure on how much the investigation would cost but since it is a death case and we will leave no stone unturned, I would estimate the cost of the investigation could range as low as $10,000 to high as $25,000.

Should you need any further information please advise. I'm looking forward to working with you on this matter.

Sincerely,

GRADONI & ASSOCIATES

J.J. Gradoni

JJG/mvh
Encl.

A002

# Exhibit 2

| | |
|---|---|
| **CLIENT:** | **Katherine Scardino** |
| **CASE DESCRIPTION:** | **USA vs. Joseph Ebron** |
| **OUR FILE #:** | **07-04-0252** |
| **REPORT DATE:** | **April 6, 2009** |
| **REPORT TOPIC:** | **Defendant Interview** |

## INVESTIGATIVE ACTIVITY

### I.    Interview

Investigator J.J. Gradoni interviewed Defendant, Joseph Ebron, at Beaumont USP on February 24, 2009, for the first time.  Katherine Scardino was present during the initial stages of the interview.  After Scardino left, Investigator spent additional time with Ebron, collecting background information.

During the initial stage of the meeting, Katherine explained that the Judge ruled that the three assaults in Atlanta USP involving Carpenter would only be admissible if the Government can prove that Ebron knew that Barnes was the snitch in Carpenter's murder case.

Carpenter is currently housed at USP Coleman, Florida.

Ebron stated that he was a Muslim and suggested that Investigator talk to the Eimam Mohammad at Beaumont USP who could verify his affiliation.

Ebron stated when he was admitted to Beaumont USP he told the prison officials that he was not in the D.C. group but was rather a Muslim.  Ebron stated he did not run with the D.C. group but he was from D.C.

It was also discussed that there was a towel over the window of Barnes' cell which certainly would prohibit Sherman from seeing what occurred inside the cell during the stabbing.

Scardino explained to Ebron that he had spoken to Sherman's Attorney and no formal deal is in place yet for Sherman to testify.

A003

**PAGE #:** 2

It was discussed that Barne's cellie, Giles, was told to leave the cell before the hit occurred. It was not discussed who in fact told Giles to leave. When Giles got back to the cell around 7:30 p.m., he called for the Guard, stating that he saw blood on his sheets but made no mention of finding the body on the top bunk.

Katherine pointed out that there was no one else on the video entering Barnes' cell after the Defendants are caught on tape, leaving.

The tape indicates that Ebron and Mosley were in Barnes' cell between 9 and 10 minutes. Ebron stated he had no idea if Barnes was involved in Carpenter's case. Ebron stated the reason he got involved with Barnes is because Barnes was a fellow Muslim. The purpose for Mosley and Ebron to visit the cell was to take Barnes up top and check him in because he was a snitch and he couldn't be on the compound.

Ebron stated that Sherman also was a Muslim but he really didn't know him very well.

Ebron stated that Sherman went up and took the towel from the window after they had left his cell. Ebron believes that some of Sherman's friends told him that he would be on the video taking the towel and therefore should step up and give a statement in order to get the best deal that he could.

Ebron stated that Mosley had been connected to Carpenter in D.C. Ebron stated that Mosley had been involved in other stabbings on the street and also may have been involved in some in the prison system.

Ebron stated that the reason he had a shirt over his head, hiding his face, was because being in the Unit was an out of bounds infraction for him, since he lived in another Unit. Ebron stated he did not have a towel on his head but rather his brown uniform shirt. Ebron stated that Mosley, on the other hand, had a towel on his head. Ebron stated that he had no idea that Mosley was planning to stab Barnes. Mosley had asked him to help check Barnes in, and take him up top. Mosley asked Barnes "Walk up top with me".

Ebron stated that he should have snapped that Mosley was dressed to kill. He had a towel over his head and sweat pants on. Ebron then stated that he was mistaken. Mosley actually was wearing sweat shorts and tennis shoes. Ebron also made another comment that didn't make much sense, stating he wore the shirt over his head to check someone in, so they wouldn't recognize him later.

**CONFIDENTIAL REPORT**

A004

**PAGE #:** 3

Investigator asked Ebron if he had spoken to Mohammad, asking permission to assist in taking Barnes, a fellow Muslim, up top. Ebron stated that he did not ask for permission but went along with Mosley to assist his Muslim brother, Barnes. Ebron stated it was normal procedure for the inmate to produce his paperwork when he arrived at the prison to prove he was not a snitch; if he was, the inmate could check himself into protective custody.

Investigator asked Ebron if he would detail what occurred when he and Mosley walked into Barnes' cell. Ebron stated that Barnes was standing in front of the bunk. He was asked "Did you testify against someone?" Barnes responded "Yes". Ebron stated he told Barnes he needed to get off the compound. Barnes replied "Can't the Muslims help me?" Ebron stated Barnes was told he'd have to go to the hole. Barnes was resisting, saying "I've just been in the hole". Ebron stated without any notice Mosley pulled out a knife and pushed Barnes onto the bottom bunk. Barnes' head was facing the door. Barnes started to fight back. Mosley got on top of Barnes and was pushing his hands away as he was stabbing him in the chest. Ebron stated most of the strikes were at Barnes' heart. Ebron cannot imagine that Mosley had stabbed Barnes 106 times.

Ebron stated he stood in the corner of the cell on the other side of the locker. Investigator asked Ebron why he didn't stop Mosley. Ebron stated that when Mosley was initially stabbing Barnes he made the comment "You've hit him enough. Stop it". Ebron stated that Mosley just kept on stabbing. Ebron stated that Mosley was a lot bigger than him and also had a knife. He was not about to get involved in trying to help Barnes and be stabbed himself. Ebron drew a diagram of where he was standing in relationship to Mosley and Barnes. When the stabbing was over Mosley told him to wipe blood away from the bottom of the bunk. Ebron surmises that is how his palm print got there. Mosley then wrapped Barnes in a blanket and put Barnes in the top bunk all by himself.

Ebron interjected that while Mosley was stabbing Barnes, Barnes said "I'll go up top", as he continued to try to hold Mosley's hand, to prevent Mosley from striking him with the knife.

Investigator asked Ebron if he could recount the chain of events that occurred just prior to the stabbing. Ebron stated that he was approached by Sherman who said they were trying to find out Barnes' real name, since Barnes had told everybody his Muslim name. The head of the D.C. Crew (Tone) was approached by Sherman, Bacote, and Mosley. Mosley knew Carpenter and recognized Barnes as Carpenter's snitch. Sherman, Bacote, and Mosley asked Tone for permission to kill Barnes. Tone allegedly responded to their request by saying "Why kill him? Beat

**CONFIDENTIAL REPORT**

A005

**PAGE #:** 4

him up, check him in and send him up top". The trio told Tone that they were going to kill him because he snitched. Ebron stated he believes that they sat around the rest of the day, plotting to kill Barnes. Ebron stated he got word that Mosley "Wanted to holler at him". Mosley told Ebron that they were trying to verify Barnes' identity to see if he was actually a snitch. Ebron told Mosley he didn't know Barnes' name.

Ebron was also aware that Barnes had gone to some Muslims that day for orientation. Ebron again re-iterated that the only reason he went to help check Barnes in was because Barnes was a fellow Muslim and Ebron was just trying to help out.

Ebron stated that before the 3:00 p.m. count is when he initially talked to Mosley. It was decided that they would bring Barnes down to the kitchen after they ate and walk him to the gate to check him in with the Lieutenant. Ebron stated that he arrived at the Unit around 5:00 p.m., but no one came out to meet him, so he decided to go inside. Nobody was sitting at the table. Ebron stated he saw Becoti and Sherman and asked them where is funk? (Mosley). Ebron then went down to Mosley's cell which was at the back of the Unit. Ebron talked to Mosley in Mosley's cell. Ebron stated that after they left the cell they went into the general area. Ebron stated they were not trying to hide from the camera, sitting at tables in the general area. Ebron stated everyone knew they were on the cameras in that position.

Ebron stated that Bacote had gone to the cell to pray with Barnes. Bacote made a hand gesture that it was time to check Barnes in and take him up top. Mosley had gone back to his cell and came out with a towel on his head. Ebron stated that he pulled a shirt over his head and crept under the stairs. Ebron stated that he had his shirt over his head the whole time he was in the Unit because he was off limits and did not to get identified on the cameras.

Ebron stated that after Barnes was dead he wiped the bed with a rag and then flushed the rag down the toilet. Mosley washed his hands and also cleaned the knife before they walked out of the cell. Ebron stated he went back to his Unit, when thirty minutes later, Bacote, Sherman, and Mobley came over to see him, telling him he needed to keep his mouth shut about what occurred. Ebron stated he then went over and signed in to give the impression he was playing basketball at the time the murder was committed.

Ebron stated that he had never noticed any blood on his clothes. Ebron threw his clothes in the laundry as a result of just plain instinct. Ebron claims he was not trying to hide any evidence.

<u>**CONFIDENTIAL REPORT**</u>

A006

**PAGE #:** 5

Ebron denied ever holding Barnes while Mosley was stabbing him. Ebron stated if he was holding Barnes while he was being stabbed, he would think he would have blood all over his clothes.

Ebron stated that once he was picked up by the Prison Investigators, he never gave a statement of any kind.

Ebron stated that Sherman initially hid the knife and then gave it to Juvi (Sheldon Mobley). Ebron doesn't think Mobley ever gave a statement to the Investigators.

Ebron stated that he believed it was Sherman's cellie that told him he would be caught on camera pulling down the towel and suggested that Sherman save his ass by talking to the Investigators. Ebron stated it was Bacote who told Barnes' cellie, Giles, to leave.

Ebron stated it was Mosley's intent to kill Barnes from the start, but he did not snap on that until it was too late.

Investigator asked Ebron why someone serving a life sentence like Mosley would expose himself, knowing he'd be on camera, killing another inmate. Ebron stated that the first reason he thought Mosely did that was to make a name for himself by killing a snitch. Ebron also thought that Mosley didn't think if he got caught he'd get the death sentence, but just another life sentence.

Ebron described Bacote as the real instigator to the stabbing. Ebron stated that Bacote, Mosley and Sherman sat for hours, planning on killing Barnes. Ebron denied his involvement in any of the planning stages. Ebron stated he did not get involved until 3:00 p.m. when he was approached by Mosely.

Investigator reviewed some names with Ebron to see if he was familiar with them. The first name was Clinton Jones. Ebron stated that Jones was part of the D.C. Crew.

Ebron stated he did not know Roy Wells, Jr., Howard Ahart, or B. Valentine.

Ebron stated that the reason everybody talked about taking showers, because after a serious incident, the Unit is locked down. No showers are allowed. The Unit can be locked down for days.

<u>**CONFIDENTIAL REPORT**</u>

A007

**PAGE #:** 6

Investigator asked Ebron if he could describe his relationship to Carpenter. Ebron stated that the Government did not know, but he has been in jail with Carpenter since they were juveniles. Carpenter did time with Ebron in Juvenile Custody in D.C. The pair were also incarcerated together on unrelated cases in State Jail.

Ebron and Carpenter were reunited when both were sent for different cases to USP Atlanta.

Ebron stated that he was a member of the Minnesota Avenue Crew in D.C. which was basically a gang.

Ebron stated he was in State Jail located in Pounds, Virginia, called The Red Onion. He was shipped from Red Onion to Atlanta USP, staying there from April 2001 until February 2005. Ebron then arrived at USP Beaumont in February 2005.

Ebron stated that after he was arrested with Barnes' murder he spent 20 months in the hole at Beaumont USP. He was then transferred to Super Max for nine months (12/06 to 8/07). Ebron was then transferred back to Beaumont USP.

Ebron stated he likes Super Max. He had his own cell, a TV, and exercise facilities three hours a day. Ebron stated that the conditions for Terrorists and Uni-Bombers, etc. are much more severe.

Investigator asked Ebron if he had ever spoken to Carpenter about his case and the Co-Defendant who snitched against him. Ebron stated that Carpenter did talk about his case, stating that he had no remorse for the person he killed. Ebron stated that Carpenter never talked about Barnes or identify the name of the snitch. Ebron stated that Carpenter talked about Prosecutorial Misconduct and Constitutional errors in his case but there was never a discussion about the snitch involved.

Investigator asked Ebron if he would describe the three incidents he was involved with Carpenter in assaulting other inmates.

Ebron stated that two of the incidents were with the same inmate, Joseph Brown. On 5/22/03, Brown got into a verbal altercation with Carpenter and tried to hit Carpenter in the neck, by throwing a food tray at Carpenter in the food line. Both he and Carpenter kicked Brown while he was on the floor. Both he and Carpenter were put into the hole.

**CONFIDENTIAL REPORT**

A008

**PAGE #:** 7

The second incident with Brown occurred on 2/6/04. They were going to a Hearing and all three were together in a cage. Brown started mouthing off and tried to come out of his cuffs. Both Carpenter and Ebron punched Brown during this incident.

The third incident occurred on 11/10/03 with inmate Michael Perry. An incident broke out while they were in the rec cage. The argument involved Perry cutting a photograph of Beonce out of one of their magazines. When they asked Perry to pay for the damage to the magazine, he became aggressive, so both Carpenter and Ebron started punching on him.

Ebron admitted that one of the incidents Carpenter had a knife, but never took it out or try to use it.

Investigator then asked Ebron if he would detail what occurred in his 1999 murder conviction that put him in the Federal Penitentiary.

Ebron stated that he was not involved in the murder. His Co-Defendant, Steven Goode and Stanley Gregory Quarrles, were the actual ones involved in the shooting. Ebron's sister, Latina Ebron, was living with Bernard Pinkney. His sister lived in a house where everyone congregated to smoke "dope" and "hang out". The shooting happened on Memorial Day. His sister was not at the house. Ebron stated that Gregory Epps killed his best friend, Arthur Ward. Goode and Quarrles got an AK47 and went over to the house to kill him. The shots went wild and an innocent bystander on the porch was shot and killed. Pinkney told the Police that Ebron was involved because he didn't like Ebron. Pinkney also identified Steven Goode as the other shooter.

Ebron stated that Pinkney beat his sister and smoked "weed" when kids were present. Pinkney was upset because Ebron's sister had left him and was living with Ebron. Pinkney always had an AK47 and a .380 at the house while the kids were around.

Ebron stated there was another witness named Rose Brown who was Pinkney's Uncle's baby's mamma. Brown lived downstairs where the shooting occurred. Brown testified that all three were involved in the shooting; Ebron, Goode, and Gregory.

Both Pinkney and Brown received about $70,000 in Crime Stoppers money and were put in some sort of witness protection program. Ebron stated that when his

**CONFIDENTIAL REPORT**

A009

**PAGE #:** 8

sister learned that Pinkney was going to get some money, she left him before trial and went to live with Pinkney, who booted her out after the trial was over.

The decedent was Anthony Tate, a 44 year old bystander who had nothing to do with any of the players.

Ebron stated that both Goode and Quarrles were 5'9' tall and did not match his physical description.

Ebron stated that Goode's case was overturned and he was convicted again at the second trial.

Investigator ended the interview at this time.

End of Interview…

Investigator found Joseph Ebron to be relaxed and fairly straight forward, but it is hard to believe that Ebron did not know that Barnes was the individual that was involved in Carpenter's case.

Follow-up Interview, March 18, 2008

Investigator started out the interview by obtaining all of Ebron's clothing sizes, so that Katherine could purchase clothes for Ebron to wear during the trial.

Investigator reviewed the names of the inmate witnesses who the Government has advised will be testifying against Ebron. Ebron stated he did not know Lamont Bailey or Johnny Brazil and surmised they might have lived in the same Unit as Barnes.

Ebron stated that if he testified, he would take full responsibility for his first Homicide conviction as a juvenile because he did in fact take part in the murder.

Ebron re-iterated the same information he did during the first interview about his second murder case which placed him in the Federal system. Ebron stated that Goode's case had been reversed but he was convicted in the re-trial. Goode was the actual shooter.

Ebron stated that during the first trial in which he was convicted with Goode, he made a motion with his hand when Pinkney was testifying, to signify that he was

**CONFIDENTIAL REPORT**

A010

**PAGE #:** 9

going to cut Pinkney's throat. This action was observed by the Judge, Jury, and Prosecutor.

Ebron stated that Quarrles, he heard, was doing a 7 ½ year sentence at Coleman USP.  Ebron stated that Quarrles was never questioned regarding his involvement in the Homicide.

Ebron stated that all of the fights he got into with Carpenter (3 incidents with fellow inmates) were all about "jail bullshit".  None of the fights had anything to do with the inmates being snitches.

Ebron stated that one of the Government witnesses, Tim Zuttinger, is probably going to say that he saw Carpenter with a knife during the Micahel Perry inmate incident and now it appeared that there is some sort of documentation that the incident with Perry was over him being a snitch.  Ebron stated this documentation regarding the Perry incident occurred a long time after the incident and was never brought up during the Disciplinary Hearing.  Ebron believed that Steve Perry is now living in the Houston area.

Ebron stated that Carpenter had a Murder conviction which placed him in the Washington, D.C. jail.  Carpenter's Co-Defendant was "Pretty Mike" (Ebron did not know his real name).  Pretty Mike was a very close associate of Mosley.  Mosley was also a close associate of Carpenter.  Mosley's brother (Ebron did not know his name) was also acquitted with Carpenter in a 1997 murder case.

Ebron stated that Mosley was in the D.C. jail in 1996, along with Carpenter. Ebron was in the D.C. jail in 1997, but he was kept separately from Carpenter because Carpenter was in the hole.

Ebron stated he first met Mosley when he was in the D.C. jail in 2004 because he had been Bench Warranted back to D.C. on a Writ to testify in Goode's second trial by the Prosecutor.  Ebron believed that it was November of 2004 when this occurred.  Ebron stated he refused to testify.

Ebron stated that Mosley had stabbed another inmate at the D.C. jail and almost killed him.  The inmate's name was Walter and he was from Philly.  Mosley was there for in a hold most of the time also, when Ebron was at the D.C. jail in November 2004.  The next time Ebron saw Mosley was when he arrived at Beaumont USP.

<u>**CONFIDENTIAL REPORT**</u>

A011

**PAGE #:** 10

Ebron stated that while at Beaumont USP he "hung out" with both the D.C. Crew and the Muslims.  Ebron explained that his main allegiance was with Muslims, but it was also "cool" to "hang out" with the D.C. Crew because they have a pact that's okay.

Ebron stated in the Federal system a lot of the Crews have pacts with one another, such as D.C., New York, Maryland, and Virginia.  The pacts deal with everybody backing each other up.

Investigator reviewed some of the names on the Government Witness list. Ebron stated that Willie Jefferson was the Cop who questioned him about the 1994 Homicide in D.C.

Ebron did not know Frederick Graham.

Ebron stated that the one of the photographs depicts him with GoGo.  GoGo is William Mercer from D.C.  GoGo has one leg and is pushed around the compound in a wheelchair.  Sherman claims that GoGo is the individual who provided Mosley with the shank to kill Barnes.

Investigator then covered the three letters secured from Ebron's cell that are going to be introduced into evidence.  The three letters are detailed in a separate fields report, but the most damaging letter comes from Ebron's cousin, Anthony Fields, who makes a comment about Carpenter's other snitch and Co-Defendant, Theo.  Theo also testified at Carpenter's trial, until the trial to turn on Carpenter. Fields' letter stated that they haven't been able to show no love to this individual. Ebron stated that was "code talk" for putting a knife in him.  Ebron does not know if the prison system understands the code.

There is also a letter from Steve Crocket, one of Ebron's friends, who  said the dude MP (Michael Perry) is out, asking if the love needed to be spread to him. Perry is an individual who had gotten into a fight with Carpenter and Ebron.

Investigator explained to Ebron that the references to stabbing people, especially Carpenter's other snitch, and an individual that he and Carpenter had problems with, would be devastating if it came out in trial.

Investigator made the statement to Ebron "You are communicating and writing about stabbing Carpenter's other snitch, but you maintain that you did not know that Barnes was a snitch in Carpenter's case".  Ebron remained consistent with his story and stated that he didn't.   Investigator explained to Ebron if the

**CONFIDENTIAL REPORT**

A012

**PAGE #:** 11

Government understood the code language, there would be no way we could sell a Jury on the fact that Ebron did not know Barnes' relationship to Carpenter. This is the only time during the two sessions that Ebron appeared to be a little bit lost, shaking his head "yes", without making any comment.

Ebron went on to say that Mosley was in the hole in the D.C. jail with "Pretty Mike" and that's how he learned about Barnes snitching on Carpenter. Ebron pointed out that Sherman was saying that he, Bacote and Mosley were trying to figure out if the new guy at the compound was Keith Barnes. Ebron surmises that Mosley had never seen Barnes but certainly knew him by name.

Ebron re-iterated that he did not get involved with Mosley, Bacote and Sherman until after the dinner count that day around 3:00 p.m. During his conversation with Mosley, Mosley asked Ebron if he could verify Barnes' name, since Ebron had just come from Atlanta. Ebron stated he told Mosley he didn't know his name, but believes Mosley had already figured out it was Barnes.

Ebron stated that it was well established that Sherman, Bacote and Mosley went to the head of the D.C. Crew to get permission to kill Barnes. Sherman, after Barnes' murder, he tried to give the knife to Damons but Damons couldn't take the knife because he was wearing shorts, so he gave the knife to Juvi (Sheldon Mosley).

Ebron stated that to his knowledge Sherman had no connection whatsoever to Carpenter.

Ebron suggested that Investigator talk to Mike Surrell, a fellow Muslim, who has been at Beaumont USP for quite a while and knows the system. Surrell can also verify that Ebron is heavily connected with the Muslim faith.

Ebron also suggested that Investigator talk to Mohammad, the head Muslim, who could provide additional background information about Ebron. Investigator explained to Ebron that he was going to interview both individuals after they were finished with his interview.

Ebron also made the comment that while Mosley was stabbing Barnes, he was yelling "Your bitch ass wanting to tell; you're going away now".

Investigator asked Ebron why he wanted Katherine to obtain video tapes of Marshall Arts fighting in the case. Ebron stated that the combatants punch, kick, and choke each other. A video tape, which would show one of the combatants being knocked to the ground by a punch and then choked into unconsciousness in three

**CONFIDENTIAL REPORT**

A013

**PAGE #:** 12

minutes by his opponent who was sitting on top of him.  This would show the Jury how Mosley could have controlled Barnes without Ebron's help.

Investigator ended the interview by telling Ebron that it's important that he makes a good impression at the Defense table, both during Jury selection and the trial.  Investigator explained that Ebron needed to be dressed well, make good eye contact with the Jurors, and communicate with Katherine and Jimmy by passing notes.  Ebron looked at Investigator like a light had gone on his head.  Ebron made the comment that he wished his original Attorney in his D.C. murder trial had told him that.  Ebron explained that during the entire trial he and Goode made snide comments and were very disrespectful.  At one point, the Prosecutor commented that they were disrespecting the family of the victim.

Ebron stated he understood now why this was not positive feed back for the Jury, who was deciding his case.

Investigator ended the interview on that note.

End of Follow-up Interview…

The information developed during the interview about Ebron's letters was important regarding a "heads up" factor.  Investigator believes that if this information gets to the Jury, the Government will be able to substantiate that Ebron knew that Barnes was Carpenter's snitch and would therefore be able to introduce a motive for the killing, along with allowing the Government to introduce the three inmate altercations involving Barnes and Carpenter.

The fact that the letters refer in code to stabbing people isn't very helpful, either.

End of report.

_____            _____
**President/Manager, Texas License A05741**            **Date**
G:\Cases\2007 Case Files\04\0252Reports\Defendant Interview doc

**CONFIDENTIAL REPORT**

A014

# Exhibit 3

Subj:      **Ebron**
Date:      3/5/2009 6:39:41 A.M. Central Standard Time
From:      jj@gradoni.com
To:        kascar@aol.com

I will be out of town Thurs 3/5/09 to Thurs 3/12/09.  I will be available bt email.

I sent you all the inmate info for your review.  most of these guys have been bench warranted by Bourque.  Some are close so I can interview them.
Some are released or out of State.  I won't get any info from them until I interview them which will take place after the witness filing deadline.

Gave you the info in cvase you want to list as witnesses to CYA.

I am taking the girls on spring break but took Ebron file with me to review.

J.J. Gradoni
President
Gradoni & Associates
2611 FM 1960 West, Suite C-100
Houston, Texas 77068
(281) 440-0800
Fax: (281) 440-0208

A015

# Exhibit 4

## Rachel Davis

| | |
|---|---|
| **From:** | <kascar@aol.com> |
| **To:** | <shellischade@sbcglobal.net>; <kleecompton@aol.com>; <jj@gradoni.com> |
| **Cc:** | <jimmy@jpjlaw.com>; <rachel@kscardino.net> |
| **Sent:** | Friday, February 20, 2009 1:19 PM |
| **Subject:** | U S V. EBRON |

Guys - I am filing a motion to get Ebron moved to Houston.  It won't do much good, but I am battling with the FDC.  Yesterday I met with Judge Crone and with the AUSA.  I was told that the FDC is not willing to change their attorney visitation schedules but would allow us "telephone access" during trial. I said in my motion that since the FDC routinely tape recorded all inmate telephone conversations, that this "concession" was not feasible.  At least we have made a record.

Kristi - I sat down this morning and read thoroughly your initial report.  It is very good.  There are a lot of issues to testify about.  Do you know the Gov't mental health expert .. Ray Coxe?

Shelli and JJ - you guys are going to have to work together to get these witnesses ready for the punishment phase.  JJ I do want you to interview this guy Quentin Jones in the FDC - and I am hoping that he is still in Beaumont.  He may not be.  Here are the ones I noted from my review yesterday of their "Mass Interview" of inmates after the killing:

    Howard Ahart (35070-060) Interviewed 5/8/05 at 11:45 am.  Saw lots of inmates "taking showers"
     B. Valentine (19512-086) Interviewed 5/20/05 at 6:40 am.  "He stared at victim's picture for a moment"....(?)
    ** Quentin Jones (03822-000) Interviewed 5/10/05 at 8:25 am.  "He would not look at picture".
     R. Wells, Jr. (40052-080) Interviewed 5/9/05 at 5:31 pm.  "word on the yard 2 or 3 hours before was there was a dead man.  We weretold to get showers."

****One issue that Jimmy has raised that I believe is a very valid one - is:  did the deceased have rigor mortis at the time his body was discovered?  The only evidence of the time of the death is the video - but the video only shows people going into cell.  It was hours later that the guy's body was discovered.  The amount of rigor mortis may be important (or it may just be a smoke screen - but either way, it may be important to the defense).  So, we are trying to find the EMS people and I want JJ to interview them.  I am about to dive into all the discovery documents to see what I can find about this.  If I can find the name of the EMS people, I will let you (JJ) know...

I am getting nervous = as all of you know that I always do about this time before a capital case - I want to hear from JJ and Shelli that you guys have the witness issue under control and I don't have to worry about it....??? Family knows when trial starts and they will all be there?

ks

Looking for work? Get job alerts, employment information, career advice and job-seeking tools at AOL Find a Job.

A016
2/20/2009

# Exhibit 5

| | |
|---|---|
| **CLIENT:** | Katherine Scardino |
| **CASE DESCRIPTION:** | USA vs. Joseph Ebron |
| **OUR FILE #:** | 07-04-0252 |
| **REPORT DATE:** | April 7, 2009 |
| **REPORT TOPIC:** | Edgar Lee Hayes |
| **RELATIONSHIP TO CASE:** | Background Information |

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

The Defendant advised that Edgar Hayes was the leader of the Midland Group at USP Beaumont.  The Defendant requested that Investigator interview Hayes regarding the incident.

### II.    Federal Inmate Locator

Edgar Lee Hayes is a 55 year old black male serving a life sentence at USP Beaumont.  Hayes possesses Inmate Register #34618-118.

### III.    Interview

Investigator J.J. Gradoni interviewed Edgar Hayes, the Iman of the Muslim group at the USP Beaumont on March 18, 2009.

Hayes is a short, muscular, black male who walked into the interview room with what Investigator would describe "with presence".  Hayes immediately let Investigator know that he had interviewed both Surrell and Wells previously that day.

Hayes seemed agitated that he had been called to be interviewed.  Hayes immediately tried to take charge of the interview by wanting to know how long Investigator knew Investigator wanted to talk to Hayes.  Hayes already knew that Investigator was working on Ebron's defense.  Investigator explained to Hayes that

A017

**PAGE #: 2**

it had been approximately a month prior to the interview that Investigator had decided that talking to Hayes might be beneficial to Ebron's defense.

Hayes responded by asking "Why didn't you write me a letter, instead?" Investigator explained to Hayes that Ebron was facing the death penalty and that Investigator did not interview witnesses by mail, but rather chose to look people in the eye when gathering information.

Investigator went on to explain to Hayes that it was not the Defense's position to try to put Hayes in the middle of the case, but rather to use Hayes as a sounding board regarding what occurred at the prison, amongst the Muslim culture. Hayes appeared quite agitated with that statement.

Investigator then explained to Hayes that Ebron has made some statements that Investigator did not feel comfortable with and therefore wanted to talk to Hayes to ascertain if the statements were accurate. Hayes seemed to loosen up a little bit.

Investigator explained that Ebron had made the comment that he had gone to Barnes' cell because Barnes was a fellow Muslim and he wanted to assist in checking him in and taking him up top. Hayes responded immediately by saying "Nothing happens in this prison with a Muslim unless I OK it". Hayes stated that he never instructed Ebron to take Barnes up top. Hayes stated on the day of Barnes' death, at approximately 12:30 p.m., he found out that there was a plan in place to kill Barnes because he was a snitch. A member of the D.C. Crew gave him the "heads up" about what was going to happen. Hayes stated that he immediately sent two of his people up to Barnes' cell to check him in and take him up top because Barnes was in danger.

Hayes stated when his people got to the cell, the door was closed and they did not enter because they feared something had already happened.

Hayes stated he was very upset with Ebron about what occurred and stated that it was his position that whoever was involved needed to do every day in prison that they received because of the murder.

Hayes made the comment "It was very sad what Ebron and the other Co-Defendant did to Barnes and what they put Barnes' family through as the result of his violent death".

**CONFIDENTIAL REPORT**

A018

**PAGE #: 3**

Hayes went on to say that if the Defense introduced the information that Ebron was in Barnes' cell as a fellow Muslim, that the Administration very well knew the procedures. Hayes felt that the Administration would call him to the stand and he would, of course, tell the truth, that Ebron was not sent there by him.

Hayes also stated that D.C. Crew already knew Barnes was coming. They knew who Barnes was and who he had snitched on. Hayes also made the comment that it was common knowledge that Ebron and Barnes were in the same street gang in D.C. and that Ebron certainly knew Barnes and his association with Carpenter.

Hayes stated that if the Defense called him to the stand, he would "bury Ebron".

Investigator thanked Hayes for his frankness and advised him that he certainly would not be asked to testify by the Defense.

Before he left the room, Hayes also made the comment that Investigator should tell Surrell if he testified he should definitely tell the truth.

End of Interview…

Edgar Lee Hayes is obviously a person in control over a large number of the inmates. The information provided by Hayes certainly pokes a number of holes in Ebron's story.

End of Report.

President/Manager, Texas License A05741            4/7/09
                                                    Date
G:\Cases\2007 Case Files\04\0252\Reports\Edgar Lee Hayes.doc

**CONFIDENTIAL REPORT**

A019

# Exhibit 6

| | |
|---|---|
| **CLIENT:** | Katherine Scardino |
| **CASE DESCRIPTION:** | USA vs. Joseph Ebron |
| **OUR FILE #:** | 07-04-0252 |
| **REPORT DATE:** | April 7, 2009 |
| **REPORT TOPIC:** | Michael Surrell |
| **RELATIONSHIP TO CASE:** | Bacote Witness |

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Investigators determined that Michael Surrell is a listed witness for Bicote's defense. Surrell possesses Inmate Register #29493-177.

### II.    Federal Inmate Locator

Michael Surrell is a 36 year old black male with a suggested release date of August 1, 2011. Surrell is currently incarcerated at USC Beaumont.

### III.    Interview

Inmate Michael Surrell was interviewed by Investigator J.J. Gradoni at Beaumont USP on March 18, 2009. Surrell stated that he is from Dallas, Texas and was serving a "dope" sentence with an expected release date in 2011. Surrell stated that he entered the Federal System in September 2003. Prior to being incarcerated at Beaumont, he was incarcerated at Segoville. During the course of the conversation, Surrell made the comment that he also has a plea bargain for a Capital Murder. Surrell went on to say he was "running a dope house". An individual was murdered at the house. Although, in Surrell's opinion, the Police knew he was not responsible for the murder he was charged.

Surrell stated that he has been interviewed by David Cunningham. He has also talked on the phone to Gerald Bourque's office, asking that he be taken off of their witness list.

A020

**PAGE #: 2**

Surrell is currently housed in the Special Housing Unit because he refuses to provide information regarding illegal conduct by Guards.

Surrell stated that he is also an active Muslim.

Surrell stated he is somewhat frustrated because he is due to be transferred from Beaumont, but he won't because Bourque has a hold on him to testify on behalf of Bacote.

Surrell stated that he was the Prison Barber until he got cross wise with the Administration. Surrell stated that he lived in the same Unit as Ebron. Ebron was also involved in the formal Islamic culture at the prison. Surrell stated that during the time he lived in the Unit with Ebron, they "hung out" together. Surrell stated he could certainly testify that Joe is never aggressive, nor did he ever cause any problems with fellow inmates. Ebron, in his opinion, was laid back and soft spoken. Sorrell commented he had never seen Ebron mad.

Surrell stated that Ebron never talked about James Carpenter, nor anyone named "Rat".

Surrell also knew Giles, Barnes' cell mate. Surrell stated he used to cut Giles' hair and was also aware that Giles had been in the hospital directly after Barnes' death. Giles never said anything to Surrell about Barnes' death or his potential testimony regarding the case.

Investigator asked Surrell if he could describe the interaction of the Islamic group at the prison.

Surrell stated that the Mohammad was the lead figure. The head of security was called the Sharif, who handles all of the problems amongst the Islamic people.

Surrell stated that individuals associated with the Muslim group superseded being in any other territorial cars, like the Detroit Car, New York Car, etc.

Surrell stated that any new arrival at the prison would need to show his paperwork to the other inmates. The paperwork would contain the Federal Judgment, his PSI, Docket Sheet, etc. Surrell stated that an inmate could review the paperwork and immediately determine if the newcomer had been debriefed or had testified against any other inmate. Surrell stated that snitches were at the mercy of the yard and needed to ask for Protective Custody.

**CONFIDENTIAL REPORT**

A021

PAGE #: 3

Surrell stated that asking for Protective Custody was called "go up top", which meant an inmate will be processed for Protective Custody.

Surrell stated that Muslim inmates were not violent and they did not generally become violent unless they were actually defending themselves from being physically attacked.

Surrell stated he did not know anything about Barnes' arrival at the prison, nor did he know anything about any plan to kill him. Surrell stated that he was a devout Muslim and would not lie for anyone's benefit because of his beliefs. Surrell stated he would be more than happy to testify about Ebron's demeanor and gentle characteristics at trial.

Surrell also went on to say that he is bi-polar and as long as he takes his medicine he does real well. Surrell has seven children in the Dallas area, mothered by seven different women. Surrell stated when he gets out of prison he intends to get a Cosmetology degree and continue with is life.

End of Interview...

Michael Surrell was intelligent and straight forward and claims to know nothing about anyone's involvement in Barnes' death. Surrell probably has nothing of value that would be beneficial to Ebron's defense.

End of Report.

_____                    _____
President/Manager, Texas License A05741                Date
G:\Cases\2007 Case Files\04\0252Reports\Michael Surrell.doc

**CONFIDENTIAL REPORT**

A022

# Exhibit 7

CLIENT:                          Katherine Scardino

CASE DESCRIPTION:                USA vs. Joseph Ebron

OUR FILE #:                      07-04-0252

REPORT DATE:                     April 7, 2009

REPORT TOPIC:                    R. Wells, Jr.

RELATIONSHIP TO CASE:            Potential Government Witness


## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

R. Wells, Jr., Inmate #40052-080, was interviewed on 5/9/05, making the statement "word on the yard, 2 or 3 hours before was there was a dead man.  We were told to get showered".

### II.    Federal Inmate Locator

Rory Lee Wells is a 54 year old white male incarcerated at Beaumont USC. Wells' projected release date is 9/8/2041.

### III.    Interview

Investigator J.J. Gradoni interviewed inmate Roy Lee Wells at Beaumont USP on March 18, 2009.

Wells is currently housed in the Special Housing Unit.

Wells stated that he was very upset about what was written on his Mass Interview Statement associated to his comments.  Wells stated that he told the FBI Agent that he had never made the comment as it was quoted.  Wells stated what had occurred is that there was word on the yard that there was a dead guy in a bunk and that all the inmates should get showered and get ice, anticipating the lock down that would be coming.

A023

**PAGE #: 2**

Wells stated that he was doing a 60 year sentence for a RICO conviction. Wells stated that he was currently the head of a Car called the Texas Independents.

Wells stated that he has been incarcerated for 21 years in the Federal System, 11 of those years at Beaumont USP.

Wells went on to say that there were probably 30 Cars or groups of prisoners at USP Beaumont.

Wells described the D.C. Car as a real wild card that did whatever they wanted. The D.C. Car was not influenced by what any other groups wanted.

Wells stated it was readily accepted in the USP System that if an individual testified against someone from D.C., that they would be killed. In the case of Barnes, Wells stated that even if the Muslim group asked them to back off, they wouldn't because if anyone testified against one of them, they would be killed.

Wells went on to say that the inmates that will be testifying on behalf of the Government against Ebron are SOS (meaning stab on sight). Wells stated that it was a likely-hood that any of the Government's inmate witnesses would be reassigned to probably a medium level security prison. The Cars in these prisons are not as violent as the ones in the USP. Wells stated that if anyone of these individuals ever got sent back to a USP, even if it was 10 years from now, they would be killed for testifying against Ebron.

Wells stated that the only one of the four inmates he knew was Giles. Wells was aware that Giles was asked to leave his cell, so that the murder could occur.

Wells went on to say that due to the sophisticated Internet system available, inmates could find out almost immediately if an incoming new arrival inmate had ever been an snitch. Wells pointed out that recently a list of the pedophiles at USP Beaumont had been circulated amongst the prisoners. Wells stated that the list could only come from the Guards. Once the list was circulated, at least 25 of the people on the list asked for Protective Custody, knowing that they were exposed to being stabbed.

Wells went on to say that everyone knew Barnes was "hot". It was his assumption that the D.C. Car knew that Barnes was there, even before he hit the yard and he was recognized immediately.

**CONFIDENTIAL REPORT**

A024

**PAGE #:** 3

Investigator asked why the D.C. Car didn't follow the normal protocol and ask to look at Barnes paperwork. Wells stated that it wasn't necessary because they knew who he was.

Wells stated that when he first arrived at the prison, the Guards would walk by the cells and see inmates doing heroin and marijuana, and would never do anything about it. Wells stated that during those periods or time, they would tell the Guards they were taking a pedophile to the bathroom to beat him up and the Guard's only comment would be "Don't kill 'em".

Wells stated that there was still "dope" at the prison but not in the large quantities it had been in the past. Heroin and marijuana were the narcotics of choice now. Wells stated that all of the contraband was brought in by the Guards. A female Guard had recently been arrested for bringing in "dope" because she had entered into some sort of relationship with one of the male inmates.

End of Interview...

Wells is an old, crusty, white male who will definitely not be testifying for the Government.

Wells does add credibility to the fact that everyone on the D.C. Car knew who Barnes was and nothing was going to stop them from killing him because he snitched.

End of Report.

_____  4/7/09
President/Manager, Texas License A05741    Date
G:\Cases\2007 Case Files\04\0252\Reports\R. Wells, Jr..doc

**CONFIDENTIAL REPORT**

A025

# Exhibit 8

Case 1:14-cv-00539-MAC-CLS    Document 49    Filed 05/28/25    Page 38 of 324 PageID #: 475

CLIENT:                          Katherine Scardino

CASE DESCRIPTION:                USA vs. Joseph Ebron

OUR FILE #:                      07-04-0252

REPORT DATE:                     April 7, 2009

REPORT TOPIC:                    B. Valentine

RELATIONSHIP TO CASE:            Potential Government Witness

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Inmate B. Valentine, Inmate #19512086, was interviewed on 5/20/05 by Investigators regarding Borne's death.  The Investigator noted that Valentine "stared at victim's pictures for a moment".

### II.    Federal Inmate Locator

The Federal Inmate Locator System indicated that Bryant Terrell Valentine is a 41 year old black male housed at the Florence FDI in Florence, Colorado 81226.  Valentine's projected release date is 5/15/2010.

FDI Florence is located at 5880 Hwy 67 South, Florence, Colorado 18226.

Phone:       (719) 784-9100
Fax:         (719) 784-9504

### III.    Government Witness List

This inmate is not on the Government's witness list and no further activity was performed.

End of Report.

_____               ___4/7/09_____
President/Manager, Texas License A05741         Date
G:\Cases\2007 Case Files\04\0252\Reports\B. Valentine.doc

A026

# Exhibit 9

| | |
|---|---|
| **CLIENT:** | **Katherine Scardino** |
| **CASE DESCRIPTION:** | **USA vs. Joseph Ebron** |
| **OUR FILE #:** | **07-04-0252** |
| **REPORT DATE:** | **April 7, 2009** |
| **REPORT TOPIC:** | **Ronnie Hudnall** |
| **RELATIONSHIP TO CASE:** | **Government Witness** |

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Katherine Scardino provided Investigators with an email to Joe Batte, the Government Prosecutor, stating that she wanted her Investigators to interview Ronnie Hudnall. There was no information regarding Hudnall's association with the case. Hudnall was not identified as a Guard, nor an inmate.

### II.    Federal Inmate Locator System

The only Ronald Hudnall found in the system was a 52 year old white male, Registered #09060-097 who was released 9/10/99.

### III.    Government Witness List

This individual was not on the Government's witness list and no further activity was performed.

End of Report.

_____

President/Manager, Texas License A05741
G:\Cases\2007 Case Files\04\0252Reports\Ronnie Hudnall doc

_____4/7/09_____
Date

A027

# Exhibit 10

| | |
|---|---|
| **CLIENT:** | Katherine Scardino |
| **CASE DESCRIPTION:** | USA vs. Joseph Ebron |
| **OUR FILE #:** | 07-04-0252 |
| **REPORT DATE:** | April 7, 2009 |
| **REPORT TOPIC:** | Howard Ahart |
| **RELATIONSHIP TO CASE:** | Potential Government Witness |

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Howard Ahart, Inmate #35070-060, on 5/8/05 made a general statement that he saw lots of inmates taking showers.

### II.    Federal Inmate Locator System

The Federal Inmate Locator System indicated that Howard Glen Ahart is a 46 year old black male who had been released 6/20/05.

### III.    Government Witness List

This inmate was not on the Government's witness list and no further activity was performed.

End of Report.

_____
President/Manager, Texas License A05741
G:\Cases\2007 Case Files\04\0252\Reports\Howard Ahart.doc

4/7/05
Date

A028

# Exhibit 11

| | |
|---|---|
| **CLIENT:** | **Katherine Scardino** |
| **CASE DESCRIPTION:** | **USA vs. Joseph Ebron** |
| **OUR FILE #:** | **07-04-0252** |
| **REPORT DATE:** | **April 7, 2009** |
| **REPORT TOPIC:** | **Quenton Jones** |
| **RELATIONSHIP TO CASE:** | **Potential Government Witness** |

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Quenton Jones, Inmate #03822-000, was interviewed on 5/10/05 regarding Borne's death. The interviewer made a note that Jones would not look at the pictures.

### II.    Federal Inmate Locator

Quenton L. Jones is a 35 year old black male incarcerated at Atwater USC. Jone's projected release date is 6/28/05.

Atwater USC is located at 1 Federal Way, Atwater, California 95301, phone (209) 386-0257, fax (209) 386-4635.

### III.    Government Witness List

This inmate was not on the Government's witness list and no further activity was performed.

End of Report.

_____
President/Manager, Texas License A05741
G:\Cases\2007 Case Files\04\0252\Reports\Quenton Jones.doc

_____4/7/09_____
Date

A029

# Exhibit 12

**CLIENT:**                              Katherine Scardino

**CASE DESCRIPTION:**           USA vs. Joseph Ebron

**OUR FILE #:**                        07-04-0252

**REPORT DATE:**                   April 7, 2009

**REPORT TOPIC:**                  Antoine White

**RELATIONSHIP TO CASE:**     Bacote Witness


## INVESTIGATIVE ACTIVITY

**I.      Preliminary Information**

Investigators determined that Antoine White is listed as Bacote's defense witness. Investigators did not have a Register number for White.

**II.     Federal Inmate Locator**

Antoine T. White possesses Register #11995-026. White is a 34 year old black male who was released on 10/22/07.

**III.    Government Witness List**

This inmate was not on the Government's witness list and no further activity was performed.

End of Report.


President/Manager, Texas License A05741                    Date    4/7/09
G:\Cases\2007 Case Files\04\0252Reports\Antoine White doc


A030

# Exhibit 13

CLIENT:                        Katherine Scardino

CASE DESCRIPTION:              USA vs. Joseph Ebron

OUR FILE #:                    07-04-0252

REPORT DATE:                   April 7, 2009

REPORT TOPIC:                  Sheldon Marbley

RELATIONSHIP TO CASE:          Bacote Witness

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Investigators determined that Sheldon Marbley is a listed defense witness for Bacote. Marbley's Register number is #87086-007.

### II.   Federal Inmate Locator

Sheldon Marbley is a 29 year old black male who was released January 2, 2007.

### III.  Government Witness List

This inmate was not on the Government's witness list, so no further activity was performed.

End of Report.

President/Manager, Texas License A05741
G:\Cases\2007 Case Files\04\0252Reports\Sheldon Marbley.doc

4/7/09
Date

A031

# Exhibit 14

| | |
|---|---|
| **CLIENT:** | **Katherine Scardino** |
| **CASE DESCRIPTION:** | **USA vs. Joseph Ebron** |
| **OUR FILE #:** | **07-04-0252** |
| **REPORT DATE:** | **April 16, 2009** |
| **REPORT TOPIC:** | **Charles Giles** |
| **RELATIONSHIP TO CASE:** | **Government Witness/Decedent's Cellmate** |
| **ATTACHMENT:** | **J. Batte email** |

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Charles Giles was Keith Barnes' cell mate at the time of Barnes' death.

Gailes was the individual who had found the victim's body hours after he had been killed.

The offense report notes included that Charles Giles possesses Register #11388-035.

### II.    Federal Inmate Locator

Charles Edward Giles is a 60 year old black male, serving a life term. Giles was currently incarcerated at Houston FDC located at 1200 Texas Ave., Houston, Texas 77002, (713) 221-5400, fax (713) 229-4200 on March 31, 2009.

### III.    Interview

Investigator was given permission to interview Charles Giles at FDC Houston by Unit Coordinator, Kim Gwara.  When Investigator arrived at FDC Houston to conduct the interview he was informed that Giles had been transferred.

Investigator later learned that Giles was being housed at USP Beaumont for the trial.  Giles sent word through the US Attorney that he did not want to be interviewed by Investigator.

End of Report.

_____                    _____

**President/Manager, Texas License A05741**                    **Date**

G:\Cases\2007 Case Files\04\0252Reports\Charles Giles doc

A032

# Exhibit 15

CLIENT:                        Katherine Scardino

CASE DESCRIPTION:              USA vs. Joseph Ebron

OUR FILE #:                    07-04-0252

REPORT DATE:                   April 7, 2009

REPORT TOPIC:                  Frederick Graham

RELATIONSHIP TO CASE:          Government Witness

ATTACHMENT:                    J. Batte email

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Frederick Graham was listed as one of the Government's witnesses.  Graham possesses Register #27970-044.

### II.   Federal Inmate Locator

Frederick Graham was housed at FDC Houston on April 1, 2009.  Graham is a 28 year old black male with an expected release date of 4/30/09.

### III.  Interview

Investigator was given permission by Unit Coordinator, Kim Gwara, to interview Frederick Graham at FDC Houston.  When Investigator arrived to conduct the interview he was notified that Graham had been transferred.

Investigator later learned that Graham, who is incarcerated at USP Beaumont for the trial, had declined to be interviewed through the US Attorney.

End of Report.

_____          _4/7/09_____
President/Manager, Texas License A05741    Date
G:\Cases\2007 Case Files\04\0252\Reports\Frederick Graham.doc

A033

**JJ Gradoni**

Gov't Inmate Witnesses

**From:** Batte, Joe (USATXE) [Joe.Batte@usdoj.gov]
**Sent:** Wednesday, April 15, 2009 2:30 PM
**To:** kascar@aol.com
**Cc:** Craft, John A. (USATXE); jimmy@jpjlaw.com
**Subject:** Gov't Inmate Witnesses

Katherine,

I spoke to inmates Bazille, Giles and Graham this morning. I explained to them that you had requested a member of the defense team be allowed to interview them before trial. I told each of them that they had three options in that regard: ( 1) they could talk to you freely; (2). They could talk to you with a member of the prosecution team present; or (3 ) they could refuse to talk to you prior to trial. Each of them chose option 3. I had them each handwrite statements to that effect.

Also, I received Dr. Postilnik's CV by fax this afternoon. Please don't forget you promised to send me a written summary of his expected testimony and opinions this afternoon.

Thanks,

Joe

4/16/2009

A034

# Exhibit 16

| | |
|---|---|
| **CLIENT:** | Katherine Scardino |
| **CASE DESCRIPTION:** | USA vs. Joseph Ebron |
| **OUR FILE #:** | 07-04-0252 |
| **REPORT DATE:** | April 16, 2009 |
| **REPORT TOPIC:** | Lamont Bailey |
| **RELATIONSHIP TO CASE:** | Bacote Witness |

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Lamont Bailey is listed as one of Bacote's defense witnesses.    Bailey possesses Register #22688-007.

### II.    Federal Inmate Locator

Lamont Bailey is a 33 year old black male with a release date of 3/12/12. On March 1, 2009, Bailey was incarcerated at the Federal Transfer Center in Oklahoma City located at 7410 S. Macarthur Blvd., Oklahoma City, Oklahoma 73169, (405) 682-4075, fax (405) 680-4043.

It is Investigator's experience that people moving through Oklahoma City may physically not be present but are still listed in the system at that location.

The second time Investigator ran Bailey's register number in preparation for an interview with him, Investigator found that the number was no longer in the Federal Inmate Locator System.

Investigators subsequently learned that Bailey was incarcerated at the FDC Houston, obtaining permission to visit and interview Bailey from Kim Gwara, Unit Coordinator.

When Investigator arrived at the FDC Houston to interview Bailey he was informed that Bailey had been moved.

AUSA Batte informed the Client that he could not provide Bailey's location but he was not in the area and would not be available until the actual day the trial started (April 25, 2009).    Bailey was not interviewed.

End of Report.

A035

# Exhibit 17

## Rachel Davis

| | |
|---|---|
| **From:** | <kascar@aol.com> |
| **To:** | <rachel@kscardino.net> |
| **Sent:** | Friday, April 17, 2009 9:52 AM |
| **Subject:** | Fwd: EBRON |

PLEASE SAVE THIS IN EBRON DIRECTORY.

-----Original Message-----
From: Batte, Joe (USATXE) <Joe.Batte@usdoj.gov>
To: KASCAR@aol.com
Sent: Thu, 16 Apr 2009 5:40 pm
Subject: RE: EBRON

Katherine,

If I'm understanding your question...yes there are witnesses who were on our original witness who we will not be calling, and if they are not from Bmt they will not be travelling here for the trial.
I am also becoming concerned about still not having anything yet on Dr. Postilnik's opinion and expected testimony. (and Mr. Craft is becoming increasingly impatient).
Thanks

Joe

**From:** KASCAR@aol.com [ mailto:KASCAR@aol.com]
**Sent:** Thursday, April 16, 2009 3:32 PM
**To:** Batte, Joe (USATXE)
**Cc:** jimmy@jpjlaw.com
**Subject:** EBRON

Joe:  Are there any witnesses you have designated that would not be available to us during the Guilt phase?

katherine

---

Great deals on Dell's most popular laptops - Starting at $479

---

Join ChristianMingle.com® FREE! Meet Christian Singles in your area. Start now!

# Exhibit 18

## Jimmy Phillips Jr.

**From:**    kascar@aol.com
**Sent:**    Thursday, April 16, 2009 10:14 PM
**To:**      Joe.Batte@usdoj.gov
**Cc:**      jimmy@jpjlaw.com
**Subject:** Re. EBRON - Misc. issues

Joe:   Re. Dr. Pustilnik:  I filed my notice and what he would be testifying to on Pacer this afternoon.  I do apologize, but I just could not make up stuff and needed to confirm with Dr. P. before I filed anything.  Maybe I should have emailed to you directly the notice, but we put it on Pacer immediately after getting Dr. Pustilnik's ok on it.   I don't think there is anything that is surprising on that notice, as I said there would not be.  Tell John to chill out. He will have time to do his "oppositional" research.... And, again, call Dr. P. if you have any questions.

With regard to the witnesses who are on **both** our lists, but who we would like to have available to testify are:
Mabel Credit
Douglas Byrd
B. McBride
Nylen
Eric Rayburn

Will you have these people available or will we need to issue our own subpoena??

Since you are the "pro" in these capital cases, I am not understanding exactly what will happen in the "eligibility" phase.  You will prove up that he is over 18 years old and put on evidence of prior convictions?  adult and juvie?  When do our experts testify?  I am feeling a bit off-center about this part of the process.  Very different...:

Call me on my cell tomorrow if you have any questions/comments....(713/703-3341) or email.

katherine

-----Original Message-----
Fro m: Batte, Joe (USATXE) <Joe.Batte@usdoj.gov>
To: KASCAR@aol.com
Sent: Thu, 16 Apr 2009 5:40 pm
Subject: RE: EBRON

Katherine,

4/17/2009

A037

If I'm understanding your question...yes there are witnesses who were on our original witness who we will not be calling, and if they are not from Bmt they will not be travelling here for the trial.
I am also becoming concerned about still not having anything yet on Dr. Postilnik's opinion and expected testimony.  (and Mr. Craft is becoming increasingly impatient).
Thanks

Joe

**From:** KASCAR@aol.com [mailto:KASCAR@aol.com]
**Sent:** Thursday, April 16, 2009 3:32 PM
**To :** Batte, Joe (USATXE)
**Cc:** jimmy@jpjlaw.com
**Subject:** EBRON

Joe:  Are there any witnesses you have designated that would not be available to us during the Guilt phase?

katherine



Great deals on Dell's most popular laptops - Starting at $479



Great deals on Dell's most popular laptops - Starting at $479

4/17/2009

A038

# Exhibit 19

| | |
|---|---|
| **CLIENT:** | **Katherine Scardino** |
| **CASE DESCRIPTION:** | **USA vs. Joseph Ebron** |
| **OUR FILE #:** | **07-04-0252** |
| **REPORT DATE:** | **April 20, 2009** |
| **REPORT TOPIC:** | **James Carpenter** |
| **RELATIONSHIP TO CASE:** | **Keith Barnes' Co-Defendant/Associate** |
| **ATTACHMENT:** | **5/21/05 Washington Post article** |

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Keith Barnes was a Co-Defendant with James Carpenter in a killing that occurred in Washington, D.C.  Barnes cooperated with the investigation which resulted in Carpenter's conviction.  Barnes also was convicted in the same case.

The Judge recently ruled that the Government must prove that Ebron had knowledge of Barnes' cooperation in Carpenter's case.

Carpenter is currently believed to be incarcerated at the Federal Penitentiary in Coleman in Florida.  James Howard Carpenter was born 7/28/78.

### II.    Interview with Ebron regarding his knowledge of Barnes as an informant in the Carpenter case

On February 24, 2009, Investigator J.J. Gradoni interviewed Joseph Ebron at the Federal Prison in Beaumont.  Ebron stated that it was not known by the Government, but he had been associated with Carpenter since he was a juvenile. Ebron "did time" with Carpenter in Juvenile Custody and also in State Jail in D.C. before ever becoming a fellow Federal inmate prisoner in Atlanta with Carpenter.

Ebron stated that Carpenter was his "cellie" in Federal Prison on two different occasions.  Investigator queried Ebron regarding any comments Carpenter made about his conviction and his involvement as a "snitch".  Ebron claimed that Carpenter never spoke about the informant in this case.  Carpenter made comments that he had no remorse about the guy he killed and complained

A039

**PAGE #:** 2

about Prosecutor misconduct and Constitutional errors.   Ebron claimed that Carpenter never spoke about his Co-Defendant testifying against him.

Ebron also stated that Mosley, the Co-Defendant who committed suicide, did have a relationship with Carpenter and was aware that Carpenter's Co-Defendant (Barnes) had testified for the State.

Ebron did not know if anyone from the Government ever interviewed Carpenter to determine if Carpenter ever discussed Barnes' status as an informant in his case, with Ebron.

### III.    Federal Inmate Locator

James Carpenter is a 30 year old black male serving a life term at Coleman II USP.  Carpenter's Register number is #08594-007.

Coleman II is located at 846 NE 54th, Terrace, Florida 33521 (phone, 352-689-7000; fax 352-689-7012).

### IV.    Attempt to set up Interview

On March 11, 2009, Investigator J.J. Gradoni spoke with the Receptionist at the prison.  Investigator provided Carpenter's name and inmate number and was advised that Dale Grafton was the Unit Team Leader.  Grafton would have to be contacted in regards to getting permission to come to the prison to conduct an interview with Carpenter.  Investigator was told that Grafton was not available at that time.  Investigator was also advised that he could not leave a message; that he would have to call and speak to Grafton in person.

Investigator called the prison in an effort to make contact with Grafton on March 13, 2009 and March 20, 2009.  On both occasions, Investigator was told that Grafton was not available; a message could not be left, and requested that Investigator call back to speak to Grafton.

Investigator called the prison in an effort to make contact with Grafton on March 23, 2009, March 24, 2009, March 26, 2009, and March 27, 2009.  Each time the phone rang each time without ever being answered.

Investigator decided to draft a letter to both the Warden and Grafton, requesting contact for an interview.

Faxed letters requesting contact regarding the interview were sent on April 1, 2009.  No response was received.

**CONFIDENTIAL REPORT**

A040

**PAGE #:** 3

On Wednesday, April 1, 2009, Investigator finally made contact with the Switchboard Operator, who looked up Coleman's inmate number and stated that he was in Unit H.  Investigator was then directed to Amy Ruiz, the Unit Secretary. Investigator explained the reason for the phone call and the urgency to meet with and interview inmate Carpenter.

Ruiz stated that the Unit Leader at this time was now named Fisel and Dale Grafton was no longer in charge of the Unit.

Ruiz requested that Investigator fax a letter, outlining the reason for the visit, along with a photo copy of his Texas driver's license and Texas Investigative license.  Ruiz stated that someone from the Unit would get back in touch with Investigator in order to facilitate the visit.  Ruiz provided her direct phone line for Investigator, (352) 689-7183.  Ruiz also provided Investigator with the fax number, (352) 689-7189.

On Thursday, April 2, 2009, Investigator was not contacted by anyone in the Unit.

On Friday, Investigator left a message for Amy Ruiz, asking if someone called, but a call was never received.

On Monday, April 6, 2009, Investigator left two messages for Ruiz regarding setting up the visit.  No return calls were received.

On Tuesday, April 7, 2009, Investigator made contact with Counselor Cutino, H Unit Coleman USP.  Cutino stated that he didn't think there would be any problem with Investigator visiting and requested that Investigator fill out a form that Cutino was going to fax to Investigator's office.  Cutino provided her direct line, (352) 689-7182.

Investigator completed the necessary paperwork and faxed it back to Cutino.  Cutino left a message at the offices of Gradoni & Associates on 4/7/09, stating that he had submitted the paperwork for approval and he would call back the following morning, 4/8/09, to advise as to whether it had been approved.

Investigator never received a call back from Cutino and began calling the prison starting Thursday, 4/9/09, through Tuesday, 4/14/09.

On 4/13/09, Investigator spoke with Cutino who advised that he was approved for the visit and could come to the prison on any of the seven weekdays. Investigator explained to Cutino once he had made travel arrangements he would notify Cutino when he would be visiting.  Cutino advised that Investigator could visit even on Saturday or Sunday.

<u>**CONFIDENTIAL REPORT**</u>

A041

**PAGE #:** 4

## V.    Interview

On Sunday, April 19, 2009, Investigator J.J. Gradoni traveled to Orlando, Florida and interviewed James Carpenter at the Coleman USP #2.

During Investigator's visit he learned that the Florida complex was the largest Federal penal complex in the nation, having two USPs, one medium facility, one low facility, and a camp.

Carpenter is not in any sort of Administrative Custody but is in the general population.  Carpenter is very short, 5'6" tall, and a little over weight.

Carpenter advised that he had been expecting Investigator's visit and would do anything he could to help Joseph Ebron.

Carpenter did say that next week was the final deadline for his Appeal and he was hoping that he did not have to go to Beaumont to testify, but if it was necessary to help his buddy, he would.

Carpenter said his nickname, "Rat", was given to him when he was very young.  Carpenter stated he was very fat, so everyone called him "Fat Rat".  Carpenter also made the comment that he sucked his thumb.  The nickname stuck with the "Fat" part of it being dropped off.

Carpenter explained that his entire relationship with Ebron was as the result of them being in custody together.  Carpenter stated that Ebron was from the southeast part of D.C., while he was from the southwest of D.C.  Carpenter stated that they never ran together on the streets because of their geographical locations.

Carpenter first met Ebron when they were locked up together at the Oak Hill Juvenile Facility.

Carpenter then met Ebron again when they were locked up in the State Prison in Lawton, Virginia.

Finally, the pair wound up being cell mates in the Federal Prison at Atlanta.

Investigator read all of the details to Carpenter obtained through Discovery regarding Sherman, Bailey, Mosley, Giles, Bazile, and Graham.

Investigator also identified each individual's nickname for Carpenter.

**<u>CONFIDENTIAL REPORT</u>**

A042

**PAGE #:** 5

Carpenter stated he did not know anyone on the list.  Carpenter thought the name, Lamont Bailey, was familiar, asking how old Bailey was because at one point there was an individual who had testified against him in one of his murder trials, an inmate informant named, he thought, Lamont Bailey.

Carpenter stated he did not know any of the key players.  He did not know Bacote.  He did not know Sherman and especially he did not know Mosley, known as "Funk".

Investigator read a portion of Ebron's interview, stating the Ebron believed that Mosley was a close of associate of "Pretty Mike" who was a Co-Defendant of Carpenter's in a prison murder case which eventually ended in an acquittal for Carpenter.

Carpenter stated that the individual's correct nickname was "Pretty Mike" who Carpenter identified as Michael Wonson.  Carpenter stated that was his most recent murder trial involving the death of an inmate.  In November 1999 an inmate was stabbed to death in his bunk.  The State alleged that Tyrell Hagar had asked Carpenter and Wonson to kill the victim because the victim was snitching against him (Hagar).

Carpenter stated that the inmate was stabbed to death in his bunk.  As a result of snitch testimony by Roy Bright, all three of the individuals Carpenter, Wonson, and Hagar were charged.  Bright testified that he saw the Defendants leave the cell.  Carpenter stated that his Defense Attorney established during the cross that Bright had a cut that day and also was found with money.  Bright was also in a special detail which would allow him to hide knives.  All three Defendants were acquitted.  Carpenter stated he thought there was a witness in the case with the State named Lamont Bailey who had been incarcerated on a UUMV charge but couldn't remember.  Carpenter stated that Bailey was "an older dude" but that's all he could remember.  He could not remember what Bailey may have testified about.

Carpenter stated the actual trial would have been in State Superior Court in front of Judge Wendt.

Barnes was also involved in a January 1997 murder case in which he was found not guilty also.  Carpenter stated he had no Co-Defendant in that case as was stated to Investigator by Ebron.

Carpenter mentioned that the FBI had come to see him about a year ago regarding Ebron's case.  He said the first words out of their mouths were "We think you know some guys in Beaumont and if you do we may be able to give you

<u>**CONFIDENTIAL REPORT**</u>

A043

**PAGE #:** 6

some help on your case".  Carpenter stated he responded "I'm not talking to you at all.  My  Appeal is pending" and left.  Carpenter stated he didn't spend longer than three minutes with the Agents and there was no conversation whatsoever.

Investigator again tried to swing the conversation back to Mosley.  Investigator read the portion of Ebron's interview that outlined Mosley's incarceration in the D.C. jail at the time Carpenter was there.  Carpenter stated that he believed Mosley was also from southeast Washington, D.C. and was therefore known to Ebron, but Carpenter did not know Mosley, nor did he know Mosley by his street name, "Funk".

Carpenter could not even think of a reason why Bacote, Sherman, and Mosley would want to kill Barnes.  At this point in the interview is when Carpenter informed Investigator that Barnes had given an Affidavit a few years ago when he was incarcerated at USP Coleman that he lied at Carpenter's trial.  Carpenter stated that staff personnel from USP Coleman were involved in notarizing Barnes' signature.

Carpenter stated that in no way did he want Barnes dead because he needed Barnes to verify the authenticity of the Affidavit.

Investigator asked Carpenter if he could outline what occurred in his original murder conviction.  Carpenter stated that it was alleged that he, Theo Mitchell, and Barnes went to rob an individual.  The individual wound up shot and killed in the robbery/murder.  Barnes testified in his trial that he was outside, and after he heard the shot he ran in, hearing Carpenter make the comment that he didn't know the gun was loaded.  Carpenter then stated there was another Co-Defendant named Jimmy Pearsall.  Pearsall, Carpenter and Mitchell were all tried together.  Pearsall and Carpenter received life sentences.  Mitchell was acquitted.  Mitchell testified on his own behalf, stating that he was present during the shooting but he never knew that Carpenter was going to kill the victim.

Carpenter stated that it was his understanding that Mitchell was living in the free world.  Carpenter stated that he needed Mitchell very badly to help with his Appeal.

Carpenter spoke with great ease in legal terms, indicating that he had been definitely involved in researching items for his Appeal.  It was obvious that Carpenter did not want to talk in any detail about his original murder conviction involving Barnes.

Investigator asked Carpenter if he was upset with Mitchell regarding Mitchell's testimony.  Carpenter stated he wasn't upset with Mitchell at all because Mitchell was basically trying to save himself.  Investigator asked

**CONFIDENTIAL REPORT**

A044

**PAGE #:** 7

Carpenter why Barne got such a stiff sentence after he cooperated.  Carpenter went through a dialogue about how unfair the system was in D.C., etc., and how the Judge put the heavy year load on Barnes even though he had cooperated.

Carpenter reiterated that his Appeal deadline was coming this week. Carpenter stated that his Attorney, Frances D'Antuono, probably has a copy of the Affidavit or the original.  Attorney D'Antuono can be contacted at (202) 544-6332.

Carpenter also stated that his sister, Crystal Carpenter, who lives in Oxon Hill, Maryland, also has a copy of the Affidavit or the original.  Carpenter stated that his sister's cell phone number was (202) 264-0212.

Carpenter stated that he would call his sister as soon as the interview was over and tell her that Investigator was trying to obtain a copy of the Affidavit.

Investigator asked Carpenter if he would give Investigator a hand written permission note asking that the holder of the Affidavit give a copy to Investigators. Carpenter responded "No", stating that anyone who was asking for the Affidavit would know whoever was asking was friendly with Carpenter.  Investigator could tell by Carpenter's body language that the thought of giving such a hand written document signed by him was not something he really wanted to do.

Investigator asked Carpenter if Barnes' Affidavit could be challenged because he gave it under duress.  Carpenter stated that would be an expected argument from the Government but there were people at the prison who notarized the Affidavit that were part of the prison staff that might testify otherwise.

Carpenter stated that he had no problem coming to Beaumont to testify for Ebron but felt that since he had been charged in the murder of an inmate in a bunk under similar circumstances, might dilute his credibility.  Investigator explained to Carpenter that was an issue the Attorneys would have to deal with, but since he had been acquitted Investigator didn't think it was a problem.  Carpenter then began to ramble about legal issues, thinking that the testimony would come in under his bad acts.  Again Investigator's comment to that would be for the Attorneys to handle.

Carpenter stated that on May 14, 2005 and May 21, 2005, there was an article in the Washington Post, which Investigator can find under www.WashingtonPost.com, where Barnes' family accused Carpenter of sending a message to Beaumont inmates to kill their son.  Investigator found it quite interesting that Carpenter could supply the dates the articles ran without any hesitation.

**CONFIDENTIAL REPORT**

A045

**PAGE #:** 8

Investigator asked Carpenter if he had ever talked about his case to Ebron. Carpenter admitted to talking to Ebron about his case, the prosecutorial misconduct, and some of the facts/situations he wanted to pursue for his Appeal. Carpenter stated that he certainly remembered talking to Ebron about how important Barnes was to him because of the Affidavit. Carpenter explained that Ebron knew that Carpenter needed Barnes alive in order to enhance his Appeal. (The Government could try to dispute this statement if they could prove that Ebron left Atlanta for Beaumont before the Affidavit was ever signed).

Carpenter also stated that Tyrone Sanders, a fellow inmate, had told Carpenter that Barnes told Sanders that he lied during Carpenter's trial regarding Carpenter's involvement in the murder. Evidently, Sanders and Barnes were housed in the same Block.

Investigator then directed Carpenter's attention to the three incidents in which he and Ebron were involved in assaulting other inmates.

Carpenter stated that none of the assaults had anything to do with snitches. Two of the incidents involved inmate Brown. Carpenter stated that they were in the chow line when Brown snuck up behind him and was about to stab him in the back. Ebron ran across the room and hit Brown with a food tray to prevent the stabbing. A fight then ensued. Carpenter stated that Brown was upset with him because they had a fight in the cell and Brown got the short end during the scuffle. Carpenter stated that Ebron had saved his life but none of the Guards knew it. The Guards did not find Brown's knife.

The second incident with Brown occurred because the Guards put all three of them together and the animosity that everyone had for each other just spilled over.

As far as the incident with Perry was concerned, Carpenter stated that it was just more jailhouse "bull shit". Perry was an individual who was older and taking advantage of the younger prisoners in business matters. Perry was basically a "bully". Neither Ebron nor Carpenter liked Perry and that's where they initiated the altercation.

Investigator asked Carpenter why everyone was so intent and incensed about killing snitches. Carpenter responded by saying that Beaumont had a reputation that was "over the line" that snitches could not live in the compound. It was an absolute rule. Carpenter stated that other USPs were not that tough on snitches. Carpenter stated that there were snitches who had been at Beaumont that are now at Coleman who were not been put in protective custody. Carpenter quipped that some of them might get beat up now and then but no one is killing them. Carpenter reiterated that the environment at Beaumont is "no snitches on

**CONFIDENTIAL REPORT**

A046

**PAGE #:** 9

the compound.  Carpenter stated that the environment of the USPs is dictated by those people incarcerated there.

Investigator showed Carpenter the letters taken from Ebron's cell that were placed in evidence by the Government.  Ebron verified that Investigator's translation of the code was correct but he had no idea about the cause and origination of the letters.

<u>Washington Post</u>

Carpenter stated that he hasn't received any kites from Ebron.  Investigator searched for the two News articles identified by Carpenter regarding Barnes in the Washington Post.

Investigator ended the interview with Carpenter on this point.  Carpenter pledged his support for Ebron and would be willing to testify that he needed Barnes alive because of the Affidavit and that Ebron was aware of that.

End of Interview…

James Carpenter is more intelligent than Investigator expected, on legal issues.  Carpenter was not wanting to talk very much about his own case and, surprisingly, didn't know any of the players in Beaumont, including Mosley.

Carpenter has been involved in three killings, two of which he was acquitted.  His background may not make him the best of all witnesses, but his demeanor and presentation, I believe, are acceptable.

Investigator did not feel that the system was very user friendly but was able to locate one of the articles which was dated May 21, 2005.  The article did not mention Carpenter by name and appeared to be written about Barnes regarding an assault that occurred while he was at Coleman.  A copy of the article is attached.

End of Report.

_____          _____
**President/Manager, Texas License A05741**          **Date**
G:\Cases\2007 Case Files\04\0252\Reports\James Carpenter.doc

**<u>CONFIDENTIAL REPORT</u>**

A047

# Exhibit 20



IN THE UNITED STATES OF AMERICA

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| VS. | * | CRIMINAL NO. 1:08-CR-36 |
| | * | (Judge Marcia Crone) |
| JOSEPH EBRON | * | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR NOTICE OF EXTRANEOUS OFFENSES AND GOVERNMENT'S NOTICE UNDER F.R.E. 404(B) AND 609(F)

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the United States of America, by and through the office of the United States Attorney for the Eastern District of Texas, and files this the Government's Response to the Defendant's Request for Notice of Extraneous Offenses and by way of response would show the Court the following to-wit:

I.

The Government intends to offer the following two instances of misconduct that may fall under F.R.E. 404(b):

1. On November 10, 2003, Defendant while an inmate at USP-Atlanta, participated in the assault of inmate S. Perry. Inmate James Carpenter also assaulted inmate Perry with a shank while Defendant was observed striking him with his fists at the same time. Defendant was found guilty of this disciplinary infraction by BOP staff.

2. On May 22, 2003, Defendant while an inmate at USP-Atlanta, participated in the



1

A048



assault of inmate J. Brown. Defendant and James Carpenter were observed kicking Brown with their feet while he lay on the floor in a fetal position. Defendant was found guilty of this disciplinary infraction by BOP staff.

3. On May 2, 2003, Defendant while an inmate at USP-Atlanta, threw a food tray at inmate J. Brown after Brown had been in a fight with inmate James Carpenter. Defendant was found guilty of this disciplinary infraction by BOP staff.

## II.

In the event Defendant elects to testify in his own defense, the government intends to offer the following conviction as impeachment evidence under F.R.E 609(f):

1. First Degree Murder While Armed
2. Conspiracy
3. Assault with Intent to Kill While Armed
4. Possession of a Firearm During a Crime of Violence  (two counts)

Defendant was sentenced on January 11, 1999, under Case No. F7123-97B-H in the Superior Court of the District of Columbia.

## III.

The Government has previously provided counsel for Defendant with evidence of the offenses listed above in discovery in this case.

WHEREFORE, PREMISES CONSIDERED, the Government respectfully requests that this Court enter an Order to GRANT the Defendant's Motion.

2

A049

Respectfully submitted,

REBECCA A. GREGORY
UNITED STATES ATTORNEY

/s/
Joseph R. Batte
Assistant U. S. Attorney
Lead Attorney
Texas Bar #01918070
350 Magnolia, Suite 150
Beaumont, Texas  77701
(409) 839-2538
(409) 839-2550 fax
Email: joe.batte@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above Response has been forwarded to defense counsel, MS. Katherine Scardino 3730 Kirby Dr., Ste. 1120, Houston, Texas, 77098 and Mr. Jimmy Phillips, P.O. Drawer 29, Angleton, Texas, 77516 via electronic transmission on this the 9th day of January, 2009.

/s/
Joseph R. Batte
Assistant U.S. Attorney

3

A050

# Exhibit 21

Page 1 of 1

**Declaration of** William Mercer

**Pursuant to 28 U.S.C. §1746**

I was at Beaumont on the day of Keith Barnes Murder. That afternoon I was on the basketball court. At some point, Marwin Mosley came up to me. He told me that he stabbed Keith Barnes, and that I needed to get water because they were going to lock us down. He said Keith Barnes snitched on his man. He told me that the plan was to check him in, but he decided to kill Barnes while he was in the cell. He said Joe did not know he (Mosley) was going to stab him. (Barnes).

No defense attorney talked to me. Had they interviewed me, I would have told them what I know. I would have also testified on Joe Ebron's behalf.

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on 3-20-14

Name William Mercer

# Exhibit 22

**Declaration of Luther Fuller**
**Pursuant to 28 U.S.C. § 1746**

1. My name is Luther Fuller. I am an inmate of the United States Bureau of Prisons, currently incarcerated at USP Coleman II.

2. In late May, 2005, I was transferred from USP Atlanta to USP Beaumont. Before I even got to Beaumont, I was hearing all kinds of wild stories from the inmate grapevine about a murder that just happened there involving inmates from DC. For example, I heard guys saying that the ones who did the murder hid the body in a bag. I heard that the guy who got killed, Keith Barnes, was a snitch who once testified against someone named Rat Carpenter.

3. When I got to Beaumont, the corrections officers would not let me go into general population right away because my paperwork still hadn't arrived there from Atlanta and they couldn't feel sure I wouldn't have any problems out there. I figured out later that they must have been nervous about letting anyone get into general population (or the compound) without knowing their record, because of what had just happened to Barnes. Since they couldn't let me out there, they had to put me in segregated housing, also called the SHU. My cellmate in the SHU was Marwin Mosley, who was also known as Funk. I knew him from back home in Washington, D.C.

4. I celled with Funk for about 2 weeks, until my paperwork arrived and they released me onto the compound. Funk knew he was in serious trouble. He was already doing a long sentence, and he knew he was facing the death penalty for killing Barnes. He had been in the

4·30-14

A052

2 OF 3

BOP for a lot of years by then and he knew it was risky to talk about his business to anyone. But he told me what happened anyway.

5. Funk said that when Barnes arrived at Beaumont the other DC inmates figured out right away out that he was the guy who testified against Rat. (The rule for DC inmates in the BOP is that if you've cooperated or testified against another inmate you cannot be out on the compound. You have to go in the SHU or the other DCs will make sure you go.) Funk said that Barnes would not go in the SHU when he got to Beaumont. He wanted to be on the compound. Funk and Joe Ebron went to Barnes's cell to make it clear to him that he had to and it didn't matter what the muslim leader told him. It was up to DC, not the muslims, and DC said he had to go into the SHU.

6. Funk said when they got to Barnes's cell, Barnes wouldn't go along. He was digging in his heels and giving them an argument. Funk finally had enough and started stabbing Barnes. He said that Joe was arguing and panicked at what Funk was doing and wanted to leave, but he couldn't very well just open the cell door while Funk was at it. So Joe just stood there.

7. By the time I got to the SHU and began celling with Funk, he was in conflict with Joe. Funk thought Joe was weak because he didn't go along when he had to punish Barnes for refusing to go into the SHU. Funk thought because of that, Joe might offer to testify against him. When they were arguing, Joe made it clear that he didn't agree with what Funk did to Barnes. L.F.

8. After a couple of weeks, my paperwork finally arrived from Atlanta and they let me out on the compound. A few months later, though, I was in a knife fight and both the other guy and I were cut. I was put back in the SHU. By this time, Funk had another cellmate and I shared a cell with Joe Ebron. Joe knew that I was Funk's cellmate the first time I was in the hole, and

4·30-14

A053

3 oF 3

he never talked to me about what happened with Keith Barnes. But we got to know each other a lot better than we did before we celled together. Joe was a very humble and soft-spoken guy. I am a muslim, but compared to me, Joe took his religious obligations much more seriously. He had just converted to Islam a little while before that and he was always studying and praying. He was very serious about following the laws of Islam, like the law against shedding muslim blood.

9. Sometimes I played basketball with Joe. A lot times he would get brain lock. He would have the ball, and someone would yell to him to pass it, but Joe would freeze. He wouldn't know where to go or what to do. We would tell him, "you're lunching," meaning that his mind was somewhere else. L.F.

10. No one from Joe's defense ever came to talk to me at the time of his trial or before his trial, If Joe's lawyers had asked me to testify at his trial to everything I have said here, I would have done it.

L.F.

I declare, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on _4-30-14_

Signed _____

A054

# Exhibit 23

Page 1 of 3

**Declaration of** _Joseph Jackson_

**Pursuant to 28 U.S.C. §1746**

1. My name is Joseph Jackson. Sometimes people call me "Rock". In 2005, I was incarcerated at USP Beaumont. I was housed in the DB unit.

2. I got to know Joe Ebron at Beaumont because we both attended Muslim services there. Joe was a very humble Muslim. He attended Muslim services every day. He wore a Muslim beard. He kept Muslim papers with him to study.

3. Joe had a short attention span. Sometimes he would ask people to work out with him. Then, in the middle of the workout, he would get up and walk away. Joe was also forgetful. We would play basketball and in the middle of the game, he would forget which position he was supposed to be playing. He would say that he would meet you

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on _4, 14, 14,_

Name _Joseph E. Jackson_

A055

Page 2 of 3

someplace and then you'd have to go find him because he forgot. Sometimes in the middle of a conversation, he would space out even if the conversation was about him.

4. I remember the day that a new guy got killed on the DB Unit. Right after it happened, I was placed in the SHU. Marwin "Funk" Moseley was one of my cell mates in the SHU. Joe Ebron was also in the SHU and his cell was right across from ours. More than once, ~~I heard~~ I heard Joe and Funk arguing. Joe would say, "I don't know why you did that. It wasn't supposed to go like that. You wrong, man." Funk would tell Joe to "fall back" and to "get off the door." Joe and Funk would argue in the rec cages, too.

5. No one from Joe's defense team ever came to talk to me about Joe's case. If someone from

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on 4/14/14

Name Joseph E. Jackson

A056

Page 3 of 3

Joe's defense had come to talk to me, I would have told them everything I have said here. If they had asked me to be a witness in Joe's defense at his trial, I would have done it.

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on 4/14/14

Name Joseph E. Jackson

A057

# Exhibit 24

**Page 1 of 4**

**Declaration of** Andrew Patrick

**Pursuant to 28 U.S.C. §1746**

1. My name is Andrew Patrick. People call me by my nickname, "Twin". In 2005, I was at USP Beaumont on the Delta Bravo Unit. There were other inmates on the DB Unit from DC, including Marvin "Funk" Moseley, Michael "Rags" Bacote, and Charles "Lil C" Sherman. I am also from DC.

2. I knew Joseph Ebron. Joe was in the Alpha Alpha Unit. Joe was also from DC and he was a Muslim. I am also a Muslim, although I was not practicing in 2005. In 2005, Joe was a very devout Muslim. Every time the chapel was open, Joe was there attending Muslim services and classes.

3. Sometimes I would see Joe on the compound

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on 4-12-14

Name _Andrew Patrick_

A058

**Page 2 of 4**

and he always seemed a little off and/or burned out. His attention span was ~~a little~~ very short. For example, one time the DC inmates had a Homie Day, where all the DC inmates got together to hang out, share food, and participate in activities out on the compound. I was playing a game of spades with Joe and two other guys. We were having fun and in the middle of the game, Joe stood up and walked away, ~~No~~ like he suddenly forgot that he was playing cards.

4. I remember the day that Keith Barnes got killed. Some of the DC inmates were talking about Barnes on the compound, but I never saw Joe around during any conversation I was part of. That afternoon, I got called to work in the kitchen before the 4 o'clock count. I got off work while chow was still going on and came back

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on __4-12-14__

Name _____

**Page 3 of 4**

to the DB unit. While I was on the track walking toward DB, I saw Joe coming down the stairs from DB. He was moving really fast like he was running scared.

5. In the following days, I got sent to the SHU, along with several other DC inmates from the DB unit. I got put in a cell with Funk, Rags, and Dehaven "Strong" Phillips. Joe was on the same range, across from our cell. Sometimes, Funk would get on the door, talking to Joe across the hall. At least twice, I heard Joe say, "You're wrong, slim. It wasn't supposed to happen." More than once, they had heated discussions in the rec cages on the yard.

6. While I was celling with Funk in the SHU, he told me what happened with Keith Barnes. Funk walked into the cell, they had a few words, and then

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on __4-12-14__

Name _____

Page 4 of 4

he got on top of Barnes and immediately began hitting Barnes with the shank. Funk told me that Joe look shocked by what happened.

7. Until now, no one from Joe's defense has ever tried to talk to me about Joe or what happened at USP Beaumont. If anyone from Joe's defense team had interviewed me, I would have told them everything I have said here. If Joe's defense had asked me to testify on his behalf, I would have done it.

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on 4-12-14

Name _____

A061

# Exhibit 25

Page 1 of 2

### Declaration of Lonnie A. Gooding

**Pursuant to 28 U.S.C. §1746**

My name is Lonnie A. Gooding. I also go by the name Goody-Bey. I am currently incarcerated at USP Canaan. In May of 2005 I was at Beaumont, (USP).

I remember when Keith Barnes was killed. Not longer after that I was placed in the SHU for an unrelated incident. I was in a cell next to Funk (Marwin Mosely) and Rags (Bacote). I was talking to Funk through the vent. He was stressed out about being in the SHU. He was saying he did not want to be in the SHU. He said "it wasn't supposed to happen like that", referring to the killing of Barnes. Joe Ebron was

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on 6-18-14

Name Lonnie A. Gooding-Bey

A062

Page 2 of 2

also in the SHU. Joe and Funk were talking back and forth. Joe kept telling Funk, "This is you, You know this is you" and "This is your weight, There is no use in everyone going down, you know this is you". There were guards present and everyone could hear the conversations between Funk and Joe.

Joe was very serious about his religious beliefs. He studied and prayed a lot. He was into his deen, meaning he was a devout Muslim. Joe was quiet and kept to himself.

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on 6-18-14

Name Lonnie A. Gooding-Bey

A063

# Exhibit 26

# A064-A080
# FILED UNDER SEAL

# Exhibit 27

# A081-A090
# FILED UNDER SEAL

# Exhibit 28

*P- 17084*

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Texas*          JUN 1 6 2008

---

350 Magnolia Ave., Suite 150                                409/839-2538
Beaumont, Texas 77701-2237                                  Fax 409/839-2550
                                                            409/839-2557

June 9, 2008

Mr. David Cunningham
Attorney at Law
485 Milam
Beaumont, TX 77701

Ms. Katherine Scardino
Attorney at Law
3730 Kirby Drive
Houston, TX 77098

Mr. G. Patrick Black
Federal Public Defender
200 East Ferguson, Suite 407
Tyler, Texas 75702

RE: *USA v. Michael Bacote, et al.* No. 1:07-CR-142

Dear Mr. Cunningham/Ms. Scardino/Mr. Black:

Enclosed is the following summary of evidence that could be considered exculpatory in this case:

An inmate (hereinafter "Inmate #1") who was housed in Unit DB on the date of the murder relayed information to an FBI Special Agent, that while being consistent with other evidence the government believes to be credible, contradicted some of the government's evidence in some respects;

Inmate #1 alleged that the murder took place around 9:30 am when four black males entered cell 305. (You may re-call that surveillance cameras captured your client going into cell 305 that evening). Further, this inmate alleges that the fourth individual was inmate Quentin Jones, who is from the District of Columbia. Shortly thereafter, this inmate claims that he approached cell 305 and saw an inmate (presumably Keith Barnes) lying on the top bunk bed. Inmate #1 claims to have knocked on the cell door, but that Barnes did not respond, and he thus assumed that he was asleep in the bunk. Immediately thereafter, Inmate #1 was approached by another inmate named "Andrew" or "Drew", who called him over and informed him that he was "just knocking on a dead man's door."

Inmate #1 subsequently observed Jones flushing a bloody white t-shirt and a shank down the toilet of a cell. He further stated that Jones told him that all four of the inmates that went into the cell stabbed (Barnes) before he could get out of his bunk. He also claims that Jones threatened him, apparently to prevent Inmate from cooperating with law enforcement.

Quentin Jones was interviewed by an FBI agent at USP-Atwater, Ca., on 10-24-96. Jones refused to answer any questions without counsel.

Based on follow-up investigation, it is the government's belief that Inmate #1's account of the events is not credible. I have not forwarded you the name of this inmate, due to considerations for his own safety should

A091

it be known that he gave information to the government, for obvious reasons. If you feel it necessary to obtain his identification, please contact me so we can discuss this issue.

Additionally, inmate Sheldon Marbley, also a DC inmate housed at Beaumont USP at the time of the offense, was interviewed on 8-26-06 at the Federal Transfer Facility in Oklahoma City. Marbley denied any knowledge of the events, but did say that he knew Charles Sherman, that Sherman "had a 66-year sentence to do and would say anything."

Finally, another inmate (hereinafter "Inmate #2") reported that as he was getting ready to go to breakfast th day of the murder he noticed "three inmates that did not belong in the unit come in" and that all three went into the murder victims cell. He says that these inmates were all from DC. According to Inmate #2, he left the unit and was on the yard for about 10 minutes when all inmates were ordered back to their cells for lockdown. On his way back to his cell he "saw the victim in the top bunk of his cell covered up."

As mentioned, if you wish for further information about Inmate #2, please contact me.

Sincerely,

JOSEPH R. BATTE
Assistant U.S. Attorney

A092

# KATHERINE SCARDINO
### ATTORNEY AT LAW

RIVER OAKS TOWER
3730 KIRBY DRIVE, SUITE 1120
HOUSTON, TEXAS 77098
(713) 520-5223
FAX: (713) 520-5455

## FACSIMILE TRANSMITTAL COVER SHEET

DATE: 6-16-08

TO: Jimmy          FAX:

RE: EBRON

MESSAGE:

FROM: Katherine Scardino

TOTAL NUMBER OF PAGES (INCLUDING COVER):

Please call me at (713) 520-5223 if you do not receive all of the copies. Our Fax number is (713) 520-5455.

CONFIDENTIALITY NOTICE: Unless otherwise indicated or obvious from the nature of this communication, the information contained in the communication is Attorney-Client Privileged and Confidential, intended for the use of the intended recipient named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, or distribution, as well as the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please notify us by telephone to arrange for the return of these documents.

A093

# Exhibit 29

J&G: 00023

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/20/2008

Attached and made a part hereto is a transcript of a videotaped interview conducted of CHARLES SHERMAN at the United States Bureau of Prisons (US BOP), United States Penitentiary (USP), Beaumont, Texas, on 05/11/2005. Referenced transcript was transcribed by SST Lucy Restivo, Federal Bureau of Investigation (FBI), Beaumont, Texas.

Investigation on    06/20/2008    at  Beaumont, Texas

File #  281D-HO-64610                    Date dictated

by    SA Tracy Masington

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned to your agency,

A094

J&G: 00024

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

TM    -    SA Tracy Masington

LT    -    Lt. Patrick Townsend

CS    -    Charles Sherman

[Beginning of recording]

TM    -    Ok, this is an interview of Charles Sherman, also known as, Lil C. Present at this interview are Special Agent Tracy Masington with the FBI, Lt. Townsend with the Federal Bureau of Prisons. It is May the the 11, 2005, approx. 5:22pm.

TM    -    OK, Uh, Charles, Uh I would like to to reiterate that you have consented to this videotaped interview , you aware that the videotape is there.

CS    -    Yes ma'am.

TM    -    and you consent to being filmed today.

CS    -    Yes ma'am.

TM    -    OK. I also want to reaffirm that I've read you your rights and we went through that form read you your constitutional rights where you agreed to uh to give a statement. You signed that form. Correct?

CS    -    Yes ma'am.

TM    -    and you consent to be interviewed today?

CS    -    yes man

Page 1 of 55

A095

J&G:  00025

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

TM  -  Ok. um, if you would um and again I want to reaffirm to you it is voluntary.  OK, so when you say we're done, we're done.

CS  -  Yes ma'am.

TM  -  Ok.  Um If we could, just back up to to the beginning and lets start from the beginning, just tell us everything that happened.

CS  -  Humum, on Friday, morning a guy named Barnes

TM  -  Ok.

CS  -  Kevin Barnes, came to the compound and all the homies was guys from DC was running around looking for what what his real name was.  And they thought that his name was Kevin Barnes.  But by him being a Muslim they didn't know that was his real name because he had been telling them his Muslim name.

TM  -  Do you know this Muslim name?

CS  -  No ma'am.

TM  -  Ok

CS  -  No ma'am.  He had said his Muslim name but he wasn't giving people his real name.

TM  -  Ok

CS  -  Um Well anyway, um, I got the names and that scared me.

TM  -  That's alright take your time.

Page 2 of 55

A096

J&G: 00026

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

LT    -    Just take your time ok?

CS    -    The guy, Funk and Rags knew this guy's real name but they weren't sure until he was able to confirm it by telling them his his real name.  So what they did was they waited all day Friday and introduced him to all the homies on the compound and we gave him a care package and stuff like that.  Then on a care packages is like soap, shampoo, flip flops, toothpaste, deodorant and stuff you need when you get into the prison.

TM    -    Ok

CS    -    Until you get your property

TM    -    Umm

CS    -    Uh we gave him a care package and then after the care package he went up to the unit and he stayed in the unit all day.  Then on Saturday morning, I believe, um a Muslim guy by the name of Amir asked me and Rags could we get the new guy, Kevin Barnes and bring him to orientation that afternoon;  so we said yeah we'll bring him to orientation which is a meeting with the Muslims out on the rec yard and they have a orientation with all the new Muslims that come on the compound.  And once again it just to see where you stand at between your gang and the and the Muslim nation.  Do you, if a riot or a fight kicks off between the Muslims are you going to roll with the Muslims or you going to roll with the people from your city.

Page 3 of 55

A097

J&G: 00027

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

TM    -    Ok.

CS    -    See that's what the orientations is mostly about. Well anyway, they we went and got Kevin Barnes, brought him to the orientation . It was like four other Muslims there, I don't remember they names. Uh it was me, Rags, Kevin Barnes and Amir and four other Muslims that Amir had brought, and we was sitting on the rec yard at the uh the little table outside.

TM    -    Ok, about what time was that Saturday?

CS    -    This was probably at about, this was probably at about 12:30?.

TM    -    Ok

CS    -    1 o'clock.

LT    -    What what tables were you at?

CS    -    That uh, right when you walk out on the rec yard the table that sit towards your right then like 3 brown circle tables

LT    -    The one on the uh food service side of the yard, or one on the rec side of the yard?

CS    -    On the rec side of the yard on the on the grass section; um at that point we had the orientation um and then Rags was trying to make a way for him to maneuver Kevin Barnes into giving up his real name. So the way that he figured out a way to maneuver him giving up his real name was to ask him-- tell him that he was going to be on call-

Page 4 of 55

A098

J&G: 00028

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

out. He told Kevin Barnes, he said you going to be on call-out over the next couple of days and I'm going to be looking for you name on the call out sheet in case you gotta go to A and O or if you gotta go dental or the library or see psychology. So he said what's your real name again? And then Kevin Barnes said 'Kevin Barnes'.

TM    -    Did you witness that

CS    -    Yes ma'am.

TM    -    conversation?

Cs    -    Yes ma'am.

TM    -    Ok

CS    -    So at that point, Rags had Kevin Barnes' real name now. So when the orientation was over we left and went back to the unit. And that's where we met up with Funk. Now

LT    -    Hold for a second. Now the other day when you talked to me what did ya'll do before ya'll went to the unit?

CS    -    Went and told we went and told Tone and and went told a bunch of the homies that that was his real name.

LT    -    Where were they at?

CS    -    Um Tone and about maybe seven or eight of DC dudes was

LT    -    Go ahead and name who you know who they are. Name their names

A099

J&G:  00029

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

CS    -    Tone, Fats, Mustafa, Omar, Juvie, and Smoke.  They was all... they was all on the food service side of the rec yard sitting at the table.

TM    -    Ummm

CS    -    Well when we left orientation they all went back.  Uh, me and Rags went back to uh the table  where all the DC guys was sitting at and Funk came outside.  So Rags told the homies at the table said his name is Kevin Barnes.  So then Funk said let me speak to you by yourself Tone and he pulled Tone aside.  And he told Tone  Funk said 'man you know you gonna die tonight'. and Tone Tone said who the dude that just got off the bus?  And then Funk said 'yeah'. And he said 'why is he gotta die'?  He said 'cause hes's a he's a rat'.  And then Tone told Funk he said  'man, why don't ya'll just beat him up and run him up top'?  Run him up top means beat him up and sit him in the hole and make him transfer to another prison

LT    -    What is what is Tone's status with the DC inmates?

CS    -    He's the shot caller for for all of us.

LT    -    And shot caller is what?

CS    -    Uh, he he basically what he says governs the car.  What he says goes; so if he says that um we ought to jump on somebody  we are to jump on 'im and if he says to let somebody  make it then we are to let him make it and in this instance Tone had said let

Page 6 of 55

A100

J&G:   00030

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

'im make it.  But Rags was the mastermind behind  this whole thing.

TM   -   Ok, let me let me interrupt you for just a second.  This conversation between Tone and ummm

LT   -   Funk

TM   -   Funk

CS   -   Yes ma'am

TM   -   were you present

CS   -   Yes ma'am

TM   -   For that conversation?

CS   -   Yes ma'am.

TM   -   You heard him say he's going to die?

CS   -   Yes ma'am, yes ma'am

TM   -   Ok

CS   -   And Tone kept saying 'don't kill the dude, just be beat him up and run him up top and sit him in the hole'.  He said  'man I ain't got nothing to do with no murder.  So Rags kept telling the man, he he snitched on some good dudes and got some good dudes some life sentences.  So Tone said  'man well ya'll do what 'what ya'll going to do, but he said I ain't got nothing to do with it'.  He said,  'I'm telling ya'll what my stand is is to

Page 7 of 55

A101

J&G: 00031

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

beat him up and send him in a hole.  So Rags and Funk went back to the homies and they was asking em what is the dude's name, what's the dude's name and he said the dude's name is Kevin Barnes and uh then Rags said man we'll deal with it later on we going to deal with it later on. So after that point we said we'll see all ya'll later.  And we left and went back to the block and when we got back to the block

LT   -   To the unit?

CS   -   To the unit

TM   -   To the unit.  Ok.

CS   -   Yes ma'am.

LT   -   What unit what unit you went to

CS   -   DB

TM   -   Ok

CS   -   Unit DB

TM   -   Are all you guys in the same unit?

CS   -   Yes ma'am

TM   -   Ok

LT   -   No not everybody.  No.

CS   -   No.

Page 8 of 55

A102

J&G: 00032

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

TM - Ok

LT - Ok.

CS - Me, Funk, Rags is in the same block

TM - Ok

CS - And Kevin Barnes

TM - Ok

CS - Tone, Mustafa,

LT - That's ok, you don't have to tell them that. Go ahead

TM - Ok

CS - They're in other blocks

TM - Ok

CS - So we went back to the block and sat down at the table. Now Rags, the one with the dreds,

TM - Umm

CS - Is the one-- the whole time he's hyping this up. He steady telling Funk over and over and over again how you can kill this dude. He steady hyping it up, hype hyping it up. Funk is already got a life sentence. I don't........ it don't really matter to him. But Rags is trying to give him the the best possible scenario that he can do it and get away with it.

A103

J&G: 00033

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

So they sitting at the table at 1:30 the like one like from what

TM - in the afternoon?

CS - yes ma'am. like at the 2:30 move we left back out the block and went on the rec yard. that's when we seen Joe.

LT - Now when you were at the table while Rags was hyping all this up. Were you sitting at the table?

CS - Yes sir.

LT - Ok. So while you're hearing everything that they're saying

CS - Yes sir. While we're sitting at the table, Rags is saying 'ok, this what Rags is saying, ok take the dude in the in the in the in the in the mop closet room ok this what he's tellin Funk this. Funk is telling no I'm going to do it do it in the cell. Rags is telling him nah, better yet, do it up in the laundry room where the cameras can't see. You do it up in the laundry and uh the cameras can't see, or in the tv room upstairs where the cameras don't point towards the tv room. Funk continue to say 'No, I'm going to deal with it in his cell'. So then

LT - How come Funk wanted to deal with it in the cell, not somewhere else?

CS - Because Funk felt that if he did it in the tv room somebody would see it, if he did it in the laundry room, somebody would see it. So either way somebody would see it. If he

Page 10 of 55

A104

J&G:  00034

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

did it in the in the in the cell, nobody would see it and I guess he figured that he would get away with it by by it being in the cell.

TM    -    Ok.

CS    -    So then me being the person that I am, I opened up my mouth and I'm asking him why does why does why does the dude gotta die?

TM    -    You're asking who?

CS    -    I'm asking Funk why does the dude gotta die

TM    -    Umm

CS    -    So Funk turns around and tells me, you know what the fuck you mean why does the dude gotta die?  You know he told on some good dudes and I don't wanna hear no more soft ass shit come out come out your mouth like that again.  So I left it alone. You know I ain't gonna keep putting my two cents in.  So at the 2:30 move they say come with me and I'll walk with Funk and Rags and we went down out the block and went out front like out in the middle of the rec yard.  They was looking for Joe.  Joe is the other guy who killed the dude Kevin Barnes.

TM    -    Ok.

CS    -    Ok, so when they found Joe they told Joe uh right at dinner time come over come over to the block right after dinner. Or right during dinner time come over to the block and

A105

J&G:   00035

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

sneak up in the block; we gonna do it right at dinner time when everybody leaves ya'll

...........

TM   -   Who's telling that?

CS   -   Uh Funk and Rags is telling Joe this.

TM   -   And you were present for that conversation

CS   -   Yes ma'am.  Yes ma'am.

TM   -   Ok.

CS   -   So Joe says ok, so Rags tells Funk put your, I mean Funk tells Joe put your shirt on top of your head on your way coming in,  so the camera can't pick  you up coming in the block and leaving out of the block.  They won't know who it is, cause you have a shirt over your head.  So he says ok.  So he leaves-- we go back in the block-- we sit back at the table.  So while we sitting at the table the whole time for the next two hours, all Rags is doing is trying to hype Funk up to get in trouble.  This supposed to be his home boy, but he is steady hyping Funk up telling Funk man when listen all ya'lls gotta do is put him in a 'L'. A "L" is like a choke hold.......

TM   -   Ok

CS   -   It's called, like when somebody comes up behind you and puts your neck in a choke hold

A106

J&G: 00036

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

TM - A head lock

CS - In a head lock.

TM - Ok.

CS - And Rags keep telling Funk if you get Joe to put him in a in a "L" then then you can stop his breathing. And if you stop his breathing, then you can just stab him up that way. And then.. and now Funk is telling Rags-- man we ain't gotta do that. I know how to push a knife; I done pushed a knife before I'm just going in the room and just start gutting him. And

TM - Were you present for that conversation

CS - I'm sitting at the table

TM - Ok.

CS - Sitting at the table, all three of us is sitting at the table in front of my cell.

TM - Ok

CS - As so I'm just sitting there

LT - This is back up in in DB?

CS - In DB, yes sir. Now I can't do no more talking. Because they done already told me they don't want to hear no more soft shit come out of my mouth no more.

TM - ummm

A107

J&G:  00037

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

CS    -    And I don't want to I don't want to make them think that I'm like getting kinda soft on them or anything like that. Because these the wrong types of dudes for them to get that impression of you. If they have that impression of you you can be the next victim. So it's best just to keep your mouth shut. So, I just sat there at the table and just listened to 'em. So Funk Rags says at dinnertime bring me your clothes he says bring me bring me all your clothes. I'm going to take them upstairs by the laundry room and I'm going to hold them up there. I'm going to sit them on the laundry floor. He says after you go in the room, he says when you come out of the room go straight upstairs and pick up all your clothes; take off all your clothes. The clothes that you did the murder in and and put on these new clothes and get in the shower. I'm going take all the new clothes , I mean I'm going to take all your old clothes that you did the murder in and dispose of them.

TM    -    Ok who is saying that?

CS    -    Rags is saying saying to Funk.

TM    -    To Funk? Ok.

CS    -    Yes ma'am. So so Funk goes in a room and gets a stack of clothes that he is going get in the shower with. Takes them upstairs and puts them at the front. Matter of fact you know he didn't, he hands them to me and tells me to put them at the corner of the

Page 14 of 55

A108

J&G:   00038

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

shower.

TM   -   Ok

CS   -   So I take all the clothes up and sit them at the corner of the shower.

TM   -   Ok

CS   -   Then Rags tells Funk remember to put your t-shirt on your head at the when they call for chow at dinnertime.  So he says 'alright'.  So they all split up then, and the the plan was... that Rags had told Funk to make sure that Joe, when Joe goes in the room, that the whole plan was that Rags, by the guy being a Muslim, Rags gots has a little Koran. Rags said I'm going to go in an room and talk to the dude about the Koran. The Koran is the Muslim Bible.

TM   -   Umm

CS   -   He's going to go into the room and talk to the guy about the Koran. Like pretend he's talking to him about the Koran.  While he's talking to him he says Joe is going to put him in a in a "L", in a headlock.  At that point then he's going to take the Koran, he's going to leave out, and let Funk go in and kill the dude.

TM   -   Ok

CS   -   Ok, so that's the plan.  So they split up with it and Funk goes to his room, Rags go to his room, and I go to my room.  So at chow time, when they call for when they when

Page 15 of 55

A109

J&G: 00039

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

they pop the doors to let us out for chow time.

LT    -    UI. Is this after this is after the 4:00 count

CS    -    This is after the 4:00 count, yes sir.

LT    -    Ok.

CS    -    After the 4:00 count, they let us back out and then we sit in the block and wait for them to call chow.

TM    -    Uuum

CS    -    I went and got my laundry bag and my my soap power because I was going to wash my clothes and then go play some play basketball. So I take my clothes; Funk tells me to come the end of the steps and stand at the end of the steps. So I said 'alright'. So I take my bag and my laundry detergent and I sit at the end I stand at the end of the steps. When they call for chow, the doors open up and I see Joe walking in. So the officer is standing right at the door, but Joe's got a t-shirt on his head.

TM    -    Ok.

CS    -    And Joe walks in past the officer and walks past the doors and Rags walks up in the room with Kevin Barnes.

TM    -    Ummm

CS    -    So Rags goes in the room with Kevin Barnes and then Joe

A110

J&G: 00040

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

LT - What's he what's he doing in the room? This time

CS - He's he's in the room with the Koran open; I'm standing up looking towards like the door. They got

TM - You saw them go in there?

CS - Yes ma'am. It's like a window

LT - Where were you at?

CS - I'm standing on the end of the steps. And my cell is directly in front of me.

LT - Ok

TM - Ok

CS - And you can just you can kinda like stand there and look directly into the window.

TM - Ok.

CS - It's got like a long window.

TM - Long skinny window. Ok.

CS - Yes ma'am. Rags' got the Koran open and he's talking to him 'you know hey, you this that and the other'

TM - Could you see Barnes at that point or ?

CS - Yeah, I see Barnes standing there looking at the Koran.

TM - Ok

A111

J&G:  00041

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

LT  -  Where is Barnes and Rags at?  How are they positioned in the cell when you're looking in the window?

CS  -  Uh.  Rags is-- Barnes is facing me.  Rags is to the side of me.  Rags is standing here and Barnes is standing here facing this way.  And Rags is standing like with his his butt towards the sink-- where the sink is.  Then Joe and Funk walks in.  When Joe and Funk walk in uh it was kinda like blocking me so I couldn't see in there no more.

TM  -  So all three of them were in there (UI) at once ?

CS  -  All three of them in there.  Yes ma'am.  So I see Joe cause their bodies is kinda is kinda crowded in there now.  I see Joe walk behind Kevin, Kevin Barnes.  He's behind him now.  Rags walks out of the room.  When Rags walks out of the room, uh Joe puts the dude in the headlock.

TM  -  Did you could you see that?

CS  -  Yes ma'am.  I could look directly into the window.

TM  -  Ok

CS  -  So when he does, I see I see Funk stick 'em.  So when he does, I turn around and sit my soap power and my laundry bag there and uh, because I had never seen a stabbing before.  So I took off and walked... the cameras'll show you I walked all the way upstairs on the other end of the corner where the storeman is.  And I lit a cigarette and

Page 18 of 55

A112

J&G: 00042

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

stood up there tried to get away from the cell.  Well Rags rode up there like about two minutes later and was like 'get the fuck down here.'  He was like get down here now.  So I walked back down the steps I come back down the steps I walk back over to the corner and he said 'sit down' right here.

LT  -  Was this where.  Where was this at?

CS  -  At the end of the steps.  At the very end of the steps.  So I sit at the end of the steps so now Rags is telling me um um you need to sit right here this is how you put in work.  So now I'm sitting here smoking a c...

LT  -  What do you mean by put in work?

CS  -  He means this is how how you how you kill somebody.  This is how you know you this is how you get stripes for the car.  Like in other words  you get points for killing a rat.  You get like your status in the system.  People look up to you because you killed a rat in the system.  They call it like points, stripes or whatever.

TM  -  Ok.

CS  -  So Rags is talking to me, so at that point Funk and the dude Joe is walking out.  Now

LT  -  How long did they stay in there?  You remember?

CS  -  About 10 minutes.

LT  -  About 10 minutes?

A113

J&G:  00043

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

CS    -    Yes.  in between about 10 and 11 minutes.

LT    -    Did you.  How many times did.. I mean was you in front of that cell the whole time?

CS    -    Yeah, I stood up I stood up like three or four times,  and then sat back down and then stood up.

LT    -    Did you ever leave?

CS    -    That one time when I went upstairs.  I went up to the other side of the tier and talked to Bobo.  I went up there and lit a cigarette. And that's when Rags called me down and made me stand in front of the cell.  Ok.  Um.  When I looked up the last time

LT    -    Why do you think he wanted you down there?

CS    -    Because he's he's he's trying to get me to see that his is how you take care of business. This this is what he wanted me to see ... is that this is how you take care of business. Not being scared, not being a soft, not being soft or nothing you know what I mean this is.. he's trying.. trying to make me .. he's trying to make grow to be a a harder inmate...to be a be a tougher dude... you know what I mean?  Because I'm like the youngest out of out of the DC dudes...I'm like the youngest.  So, a lot of times they call they self showing me things... kinda make me .. I'm like the littlest too....so they kinda show me stuff and tell me stuff and make me be tougher about how I look at things and how I deal with things.  So at that point I see Joe and Rags, I mean Joe and Funk

Page 20 of 55

A114

J&G:  00044

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

pushing the dude up on the top bunk. So

TM    -    Ok, you could see that?

CS    -    Yes ma'am,

TM    -    Ok.

CS    -    Through the window.

TM    -    Umm

CS    -    So I sit back down again.  Then they walk out of the cell and Joe takes off walking towards the door,  and Funk walks up the stairs and goes all the way up the stairs towards the shower.  Then Rags follows.  When Rags follows up, Rags says 'come up here' so when I come up the stairs Rags.. Funk is taking off all his clothes an giving them to Rags. Then he goes and gets in the shower.  So at that point I sit my clothes down and my soap powder and I tell Rags and them I'm going to leave out of the block and go to chow.  So I I go downstairs and I leave out of the block and I go to chow. When I go to chow after that I meet Funk and Rags over in the ping pong room at like 6:30 after dinner.  Joe done went on the basketball court cause he had a basketball game...he went to play basketball.....he went straight to his basketball game......Funk and Rags is in the ping pong room with me....well Joe left the towel up, he put a towel up over the door, when they went in there to do it.  So when we was leaving the ping

Page 21 of 55

A115

J&G: 00045

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

pong room Funk told me, 'man take the towel down off the door'....so I was like why I gotta take the towel down off the door? and he was like 'just do what the fuck I tell you..take the towel down off the door'..so at that point I ain't fixin to second guess him at all.

TM - Uumm

CS - you know what I mean...I ain't gonna

TM - ummmm ...... yeah

CS - I'm going to do exactly what you tell me to do.

TM - Yea.....

CS - So I walked in and took the towel down off the door and folded it up and I sat it in the corner of the laundry room....sat it up in the corner by the laundry room and then we went on back in the block and they sat down at the table and and started telling people to to get food together because they was fixin to be a lockdown. Then when I walked upstairs, uh a guy Bill um had walked past me and and said uh 'ya'll be safe, ya'll be safe' and uh I said 'what you say that for?' he said 'ya'll be safe'....so when I went back downstairs, I told Funk I said "Man, Bill said for ya'll to be safe..told me ya'll be safe, ya'll be safe'. So Funk was like 'what he tell you that for?' And I said 'I don't know man'.... and he was like 'did you tell anybody..or did you say anything to anybody?'...I

Page 22 of 55

A116

J&G: 00046

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

said 'Man, I swear to God, I ain't I ain't told a soul.' So he says, he runs upstairs, and goes to Bill, and and me and Rags follow him...we go upstairs to the top of the stairs and he tells Bill 'what did you say--be safe for to my little homie? What did you say 'be safe' for to my little homie? What did you mean by that? Did somebody tell you something?' And Bill was like 'Hey man, you know I don't know what you getting crazy about. I did, Nobody done told me nothing. I just heard that something's supposed to be going down in the block. And, you know, cause it was all over the compound. All the homies had knew that they was going kill this dude but

TM - Beforehand. Ummm

CS - but they had told they had told all the homies, they told everybody. So and then you don't know who they talked to you know I mean they talked to passed (UI) so everybody knew. They didn't know that nobody was going to actually die, but they knew that something's was going down in the block tonight and you better get your food together because we was going on a lockdown....you know get your smokes and stuff together.

TM - yeah

CS - And that was all.

TM - Ok

Page 23 of 55

A117

J&G:   00047

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

LT    -    What happened?  What made you decide to do this?

CS    -    Me personally? Because Funk and them was going to kill me.

LT    -    Well why do you think that?

CS    -    Because uh at one point at before the night was over I went in my room. And I was sitting in the room crying.  And Rags walked in and I was trying to wipe my face so they wouldn't see me crying and Rags and Funk walked in and Funk was like uh, 'Man, what the fuck you crying over? I know you ain't crying over that bitch-ass rat.'  He was like 'You know what, Rags let me speak to you real quick.'  He was like 'let me holler at you real quick'  and he took Rags out of the room.  And he took Rags up somewhere else and he start..he was on the tier he was talking to Rags and he was pointing like that to Rags and he was pointing down there at the room at me.  I guess implicating that I'm showing signs of softness that I might crack or break any minute.  So he.. might as well take care of me too in the process, you know because I shouldn't uh been crying.  I shouldn't have let them see me crying.  And uh, so I knew right then and there that if they didn't get... if they didn't get Funk and them in a few days, if they had gotta away with it, they would have killed me next.  I would have been next just because I made the mistake and I was crying in the room and I shouldn't have.

TM    -    Ok, umm I mean why..... do you know any more specific reason as just that this guy

A118

J&G: 00048

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

was a rat. I mean do you know of any other I guess if there is a specific person or you know... person he ratted on or whatever that

CS   -   One of Funk's home boys

TM   -   Did you know who that was?

CS   -   uhun (no) The guy's name was Rat.

TM   -   Ok that he ratted on.

CS   -   who's who's uh

TM   -   Ok

CS   -   Yes ma'am....

TM   -   ok

CS   -   he got... Funk had a home boy named Rat.

TM   -   Ok

CS   -   And he had killed a dude in DC jail

LT   -   you know where ...you know where Rat is?

CS   -   uhnh (no).

LT   -   They never told you where Rat was at?

CS   -   Uhun, I I think they might have said it and I don't remember hearing where they where they put him at.  But he killed somebody at DC jail and the dude Kevin Barnes testified

Page 25 of 55

A119

J&G:  00049

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

on it.

TM    -    ok.  Testified on Rat.  Ok.

CS    -    So yes ma'am.  So um I kept... I asked them at least two or three times you know.. why don't we just beat the dude up and run him up top and uh he had got so defensive about  it

TM    -    Who He, who? Rags? Ok.

CS    -    uh,... Rags had got so defensive about it and he kept kept pumpin' Funk up to do it.  And he got so defensive about it, that I shut up and  stop saying that, because I was starting to show signs of being 'soft'

TM    -    Ok.

CS    -    And I didn't want to do that.  I shouldn't have been able to do that.  I'm surprised they didn't get me that night.  I think... I think  it just so happens that Funk might couldn't 've got  to another knife... um cause the knife that he had GoGo gave him that knife.

TM    -    OK, yea, that was one of my questions.  Is where these things that they're stabbing him with, where'd they come from?  Do you know?

CS    -    Um one of them came from uh, you know the grey hole puncher?

TM    -    Ummm

CS    -    The hole puncher?  Well GoGo had stole that out of the .... because he's in a

A120

J&G: 00050

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

wheelchair, he can put stuff on him, and he can just go right through the metal detector

TM    -    Ok

CS    -    ..and the police don't have to shake him down or nothing because he is already in a wheelchair and it's going to go off in a metal detector anyway.

TM    -    Ok

CS    -    So he put one of them grey things from the school building in on him

TM    -    A hole puncher

CS    -    And took it out and uh they all took our fingernail files to unscrew it and then they took and they made like 6 poles out of it, they got like 6 shanks out of it.

TM    -    ok

CS    -    And GoGo gave..GoGo's the one who who did it down down in Smoke's building ........ they gave after he made the knives up and sharpen them up..that

LT    -    Where does where does GoGo live at?

CS    -    Um, somewhere down (UI)

LT    -    Where does he work at?

CS    -    Oh, where does Go..in the kitchen. He pass out napkins.

LT    -    OK;

TM    -    Uummm. Ok.

Page 27 of 55

A121

J&G: 00051

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

CS  -  And uh, Go...that day at about...matter fact when we went out on that move to see Joe?

TM  -  Ummm

CS  -  On the 2:30 move?  GoGo was out there. And GoGo had passed uh Joe, I mean Funk the knife.  Gave Funk the knife...

TM  -  Ok

CS  -  and uh, Joe said he had already gotten his from Smoke, Smoke had already given him a knife....

TM  -  Ok, so Smoke had already given Joe something?  And, ok

CS  -  And GoGo gave Funk the knife.

TM  -  Ok

LT  -  Now they told you this, or you heard them say that?

CS  -  I seen..I seen GoGo when he passed it to him.

LT  -  You saw GoGo pass Funk the knife?

CS  -  Yeah.  I didn't see when Smoke gave Joe the knife.

LT  -  What did the knife to GoGo look like?  What did it look like?

CS  -  It was long and it had it was uh, uh...Wood put a handle on it for GoGo, it had glue at the end of it and it was made out of grey shoestring.  The shoestring made a handle on

Page 28 of 55

A122

J&G: 00052

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

it.

TM - Ok

CS - And uh...it was, it was, real long it was about that long and had a grey grey shoestring on it with some some glue on it.  Cause Wood puts on a... Hollywood is another homie of ours, he puts all the handles on the knives.

TM - Ok

CS - So GoGo had took it to Hollywood and he put a handle on it for him.  And then he took it back down his block.

LT - And you saw this happen?

CS - Yeah.

TM - Where are they.. do you know what they did with them, after this?  the knives, do you know?

CS - The grey one uh Lt. Townsend's got it.

TM - OK

CS - The one that I know I seen Funk with he's got it.

TM - Ok

LT - How how did they dispose of that?

CS - Uummm Once it was over with, when Funk went back up the steps, Funk took all of

Page 29 of 55

A123

J&G:  00053

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

his clothes off and handed the knife to Rags.

TM    -    Uh ok

CS    -    When he handed the knife to Rags, we left out of the block and I was going to go to chow. And on my way going to chow, Rags caught up with me and we seen the homie Boo. And Rags told Boo I got this strap on me that uh Funk just used and need to get it off me. And Boo had on some shorts. He was 'like man I can't, uh, I can't put it on me and get it in my house cause I think the officer down there is one of the ones that be shaking people down a lot. And I don't think I can get it past him.' So he was like -- well then just walk down to your building. So they walked, we all walked down to like one house and we seen Juvie out there. And Juvie is another uh, DC guy. And that's his nickname, Juvie. And uh, when Juvie came out, Rags told Juvie 'I need you to take this and try to get it in your block.' And so Juvie took it in and he took it straight over to they block.

TM    -    Ok alright

LT    -    What happened to Joe's knife?

CS    -    Uh, he took it with him. So I don't know.

LT    -    You don't know what happened to it?

CS    -    Unhn. He left out of the block with it. He came in with it and left out of the block with

Page 30 of 55

A124

J&G: 00054

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

it. So I don't know what he did with it, or who he gave it to afterwards.

TM - Ok

LT - When this got ready to happen, when uh, when Rags was in there rocking Barnes asleep with the Koran, how did they know when it was time to come down and to do what they had to do?

CS - Uh, Rags just told them at about two minutes after I'm in the room ya'll just come in and follow right behind me.

LT - Was there a sign that he gave or

CS - Uhun, he just he just came in he just said two minutes after I'm in the room ya'll just bail right in behind me. So they just let they let Rags go in they let him get a chance to open the Koran up and talk to him about the Koran for a minute and after about two minutes then they just bailed in and when they walked in the guy didn't wasn't even expecting it. And, and, uh the dude Joe put a towel up over the door. And I don't know why he didn't suspect something then when he seen the towel going up over the door, over the window.

LT - Barnes' cellie. How did they keep from him from showing up?

CS - Rags' cellie his name is uh, Rags cellie's name is uh Wodie. Rags told Wodie what what they was going to do.

Page 31 of 55

A125

J&G: 00055

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

LT    -    When was this?

CS    -    Some time during that day.

LT    -    Were you there when they said he said something to him?

CS    -    Yea. I I..This was about like at about 11:30 this was right before lunch. Rags told Wodie that after chow keep your cellie I mean not your cellie. Rags told Wodie that after chow keep Pops out of the block. Take Pops and take him on the rec yard and keep him out on the rec yard. And he said alright. And so Wodie went downstairs and told Pops 'Man you just need to stay out the block. Something's gonna go down. I can't really tell you but something's gonna go down. You need to stay out th' block

LT    -    When when did when did he go tell Pops?

CS    -    I don't know exactly when he went and told 'em

LT    -    You never saw him go tell him?

CS    -    Nawh. Unhn. I don't know exactly when

LT    -    But you know that .... he he supposed to go do that

CS    -    Yeah. Yeah. And that's that's why Pops never came back in the block.

LT    -    Ok

TM    -    Pops is?

LT    -    Giles

A126

J&G: 00056

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

TM  -  Barnes' cellmate.

LT  -  cellmate

TM  -  OK. Alright. Well this guy Rat, uh, who knows him?   I mean who here is associated with him.  You say

CS  -  Funk.

TM  -  Ok.

CS  -  That's Funk's homeboy.

TM  -  Rags, OK, But does Rags know him?

CS  -  Nope.

TM  -  Ok

CS  -  Not that I know of.. cause Rags never mentioned that he know him.

TM  -  Ok ok.

CS  -  Rags just .. just kept uh uh, what do you call it? Uh, uh, encouraging.

TM  -  Ok, he was egging him on?

CS  -  Yeah, he kept encouraging for him to do this.

LT  -  Why would Rags... what is  what stake does Rags have in this?

TM  -  That's what I'm asking.

CS  -  Nothing that I know of.. just wanted to wanted to see something go down.  He wanted

A127

J&G: 00057

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

to see Funk put in some work.

TM    -    And what about Joe?

CS    -    Uh, apparently Joe is is home boys with Rat too.

TM    -    Ok

CS    -    Apparently him and Funk is tight with Rat.

TM    -    Alright

CS    -    They know Rat from up DC jail.

TM    -    Ok

LT    -    What do you know about the relationship ... the the three of them?

CS    -    Nothing really.

LT    -    How they.... in the past you don't know how they all hooked up?

CS    -    Uh uh, Funk told me that him and Rat was smashing dudes on the street together.

That's all I know.

LT    -    Ok. But you don't know nothing about Joe's relationship with Rat?

CS    -    Nope. He ain't never mentioned.... I never even, since I've been on this compound, I. never even said more than two words to Joe. I never

LT    -    How long how long you been at USP Beaumont?

CS    -    Uh, almost two months.

A128

J&G:   00058

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

LT    -    Two months.  Where did you come from before you came here?

CS    -    Three Rivers.

LT    -    Why did you come from Three Rivers to USP Beaumont?

CS    -    Um I went on a writ to another institution.  Uh to go back to court.  Then I ended up not going to court.. never seeing anybody.  And when I came back, they just redesignated me from Oklahoma City to Beaumont.

LT    -    Did they say why?

CS    -    They said my points had went out.  Because uh I had caught about five or six uh 300 series uh shots down at Three Rivers and I had already had a management UI in my jacket.  So I guess by having those shots they just said well he belongs in the USP and put me on to the penitentiary.

TM    -    Ok

LT    -    Did you know any of these guys before hand?....... from the street?  Cause you ran the streets in DC, didn't you?

CS    --    Yeah

LT    -    Did you know any of these guys on the street?

CS    -    I heard of Funk.

LT    -    You heard of him?

A129

J&G: 00059

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

TM - You heard of him?

LT - But you never saw him on the street?

CS - I've seen him before.

LT - How did you as.. in what capacity?

CS - I I ran past him. I've ran past him and seen him on drug strips. And seen 'em... and I and I heard about 'em. Heard about 'em. He's got

LT - What what did you hear about him?

CS - He got vicious name on the street.

LT - Such as?

CS - Vicious vicious for killin dudes.

LT - For what? Drugs?

CS - Uh no, for they they do a lot of robbing do a lot of robbin and lot of robbin and killing dudes.

LT - Ok. But you just ran across him. What about Joe? Did you ever run across Joe on the street?

CS - Nuhu. No sir.

LT - Rags?

CS - No sir.

A130

J&G: 00060

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

LT - Never saw him anywhere else in the system except USP Beaumont?

CS - Nuhu. Nuhu.

CS - I I mean I just gave Beaumont a chance. I I should have known... that I shouldn't have stayed here anyway. My foster dad kept telling me to go in the hole you know that I didn't belong in no penitentiary, I shouldn't have stayed here anyway. They got a guy here named Debo that I was at Levenworth with that had tried to rape me while I was at Levenworth. And I'm sure you know about it, it's in my SIS file and everything. When I got here, I coulda just went right back to the hole and told the authorities that the guy Debo was on the compound and then got a transfer. But since he wasn't bothering me, and Tone told me he would keep him away from me and not allow the dude try to hurt me, I said I'm gonna go on and give Beaumont a shot to see what that dude and this is this is what I end up getting myself into. A damn murder, when I should've just went in the hole like my dad said and work with the region to try to get me transferred back to another medium. Cause I had no business in no US penitentiary. Period.

LT - Sherman, back earlier that afternoon when you know they were plotting everything.... how to do it. And you knew what was fixing to happen, why didn't you go tell somebody?

A131

J&G: 00061

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

CS    -    Because mostly I had to stay within they sight. I couldn't never leave they sight.

LT    -    Why?

CS    -    I because I didn't I didn't never want I ..... Rags had already gotten mad at me for making comments about just beating the dude up when I was supposed they was looking at me like I was supposed to be making comments like 'kill the dude'. You know what I mean? I wasn't, I'm like just beat the dude up. So it was like after I made them comments they was they was watching to see my reactions and stuff. And I did never once at no point in time for them dudes to ever for any reason at all suspect that I had left they sight for any reason and had went and told the police or drop the dime or try to drop a kite or anything so I tried to stay with them and stay within they sight at all times. During the time that they plotted it I didn't want to leave they sight. After they they plotted it and the murder happened even afterwards I didn't want to leave they sight I wanted to stay within they sight at all times So that whenever it did go down none of them would never be able to say that that Lil C was out of our sight and that he could have did it and then now I have somebody trying to kill me in the system. You see what I mean? So I tried stay within they sight. Uh as much as I possibly could

LT    -    Now Sherman, they call you 'little C'? Right?

CS    -    Yes sir.

Page 38 of 55

A132

J&G:  00062

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

LT  -  When ya'll left out of the block, and you went out, you and Rags left out of the block and then later on that evening he came in your room and found you in there crying-- what happened between those time periods.  What was going on there?  Anything?

CS  -  Nah I went in my room.  Man I couldn't  I couldn't take it man I was just havin problems

LT  -  Did you uh .... no I'm talking about after ya'll went out, did ya'll go anywhere else?

CS  -  Nah. We went we went down into the rec yard and stayed down there and played ping pong for a hour and then came back to the block.

LT  -  Anything happen up there while ya'll was up in the rec yard.

CS  -  Uhun. They laughed and joked about it like it wasn't even nothing man.

LT  -  Do you remember what you told me before?

CS  -  Uh uh. That UI

LT  -  ....about about what what went on in the rec up in up in the rec yard at the ping pong table there?

CS  -  It may have slipped my mind man

LT  -  What was going on up there that would that would be suspicious activities?  I ain't trying to coach you to tell you what to say.  I want you ... I want it to come out of your mouth. You told me on the first initial interview, uh I think it was you and Rags and

A133

J&G: 00063

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

Funk and some of the other homies were out there at the ping pong table. What did they do up there?

CS  -  Um. They all they all went and talked to Funk. They went and talked to Funk.

LT  -  Besides that?

CS  -  Um. I'm trying to think of what else what else did any of us do.

LT  -  You told me something that was pretty significant.

CS  -  Man, I uh

LT  -  What did they do?

CS  -  I done forgot man.

LT  -  Now think. It's it's it's important.

CS  -  Um.

LT  -  They did something up there, not to anyone particular. They didn't assault anyone or anything like that. That's not what I'm asking. OK. They did something that you told me that first time I interviewed you. What did they do?

CS  -  Oh uh, they they did ask me did I see anything. Did I remember

LT  -  Not ask you. What did they do? Now think for a minute Sherman. When you were up there you were all sitting up there. They did something that that is is is significant with all this.

A134

J&G: 00064

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

CS    -    Man I'm trying to think Lt. Umm

LT    -    Think for a minute, just stop and think about what all went on up there in the rec up at up at the ping pong table up there.

CS    -    I remember I remember an officer tried to speak to me and I stepped off away from them.

LT    -    Ok

CS    -    Um.

End Side 1

Side 2

LT    -    Not what you did specifically, what did they do?

CS    -    Oh, oh. They ummm ok I remember now. They asked the rec officer what time it was.

LT    -    Is that the only person they asked?

CS    -    Uhun. They asked three other officers. Officer Byrd, and they asked three other officers what time it was. Umm, they asked him one time in the rec yard and then when we was leaving the rec yard going back to the where the cell house, three more officers on the way going back they asked them what time it was and they stopped and asked them what time it was and then looked at they name tag. That was for the purpose of

A135

J&G: 00065

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

for an alibi so that if anybody said that they was in the block committing a murder or doing something wrong they could say they had an officer who witnessed that they was asking for the times at a certain time.  I I'm I'm sorry

LT - ......I'm not trying to coach you.  I want you to I want you to UI ..... on your own.

CS - I told you.... I don't even know who UI

LT - I remember I remember everything you said.  I wrote it down.  OK

CS - Yes sir.

TM - Yeah, ok. ok.

LT - Because I mean that right there plays a part in it all.

TM - Yeah yeah that's an important detail. Yeah. Ok.

LT - Anything else you'd like to ask him?

TM - UI.  You gave a lot of information here I can't think of something right now.  Uh, but let me ask you if uh I if I need to come back here to speak with you again, are you alright with that?

CS - That's where I need to, that where I'm having a problem with.  Ummm.  This is what I need to know from you.  Do you know how much longer you all would need to see me or get a hold of me before they can finally get me out of here?  I'm trying to get them to get me out of here but they can't get me out of here because they don't know how long

J&G:  00066

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

you all are going to need to be seeing me.  And that hole drives me crazy.  I mean I ...

TM  -  I understand

CS  -  I mean I literally I literally freaks out up in there.  I got a few books and I'm trying to keep cool, but I'm honestly I tries to stay out of trouble so I don't go to the hole.  You know I tries to mind my business and not go to the hole.  Because I ain't like most inmates, I can't lay back there and just read books and just be back there in that hole like that.  It freaks me out.  If if you can work with them to get me on another compound if I can't be on a compound they can get me on a compound where I can be an orderly in the in the SEG, where I can at least be out of my cell.  But I'm going to have a serious problem with coming and and speaking with you all being back there in that hole.  I'm being honest with you.

TM  -  Alright alright.

CS  -  Because I need to get out of there.  I don't have no problem with ya'll seeing me.  Once they get me to a compound somewhere ya'll can come to see me and fly me as many times as ya'll need to as long as I'm on a compound.  But I can't I can't tolerate ma'am being back there in that hole like that.  It hurts me real bad back there man.  I'm going crazy back there by myself looking at the walls, I start freaking out.  That's why I take my medication to keep me from from harming myself.

Page 43 of 55

A137

J&G: 00067

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

TM - OK. Well we'll see. I wish I could give you, you know, a real definite answer. Right now I can't I can't. I'm trying to do this stuff as quick as I can. Ok. I mean I understand what you're telling me, and I'll make it known we need to address your you know some issues with you. Ok.

CS - I don't have tell 'em... I don't have no problem cooperating with them

TM - Alright

CS - If they can just get me on a compound. I just can't sit back there in that cell.

TM - Ok.

CS - And then they expect for me to sit back there in that hole but then come out and be cooperatin with them. I told the Lt. I don't mean to renig on my word or anything, but but screw cooperating, or or going on the stand and testifying on some guys that's going to be trying to kill me any where in the system. I'm a marked man now anyway in the system.

LT - UI

CS - They got my name Charlie Sherman in the system and DCs going to kill me now. I'm a dead man. Wherever on site they going punish me. Especially with Tone and them behind behind this especially with Tone and them giving his approval now. That Lil C ratted on Funk and them. Little Charles ratted on them; I'm dead on sight now.

Page 44 of 55

A138

J&G:  00068

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

LT    -    What do you think Tone's going to do to you?

CS    -    Tone's going to put the word out to have me smashed.  Basically, because no he don't approve of them killing no rat and he did give the the approval to beat him up, but he damned sure with an iron fist don't approve of what I'm doing.  With without no questions asked.  I turned on Funk and Rags?  And told on them .  His name is Charles Sherman anywhere in the system ya'll see him, he's on sight.  I'm a dead man now.

TM    -    Ok.  Well, I this is I I know you have that issue.  I knew that before coming and talking to you.  OK and this is something else that we all have to address.

CS    -    Cause they everywhere ma'am.

TM    -    I know that.

CS    -    I fucked up with the wrong car.

TM    -    Well

CS    - ·    They everywhere.

LT    -    You gonna be alright Charles.

TM    -    Look.  You know.  We we know you have this concern.  And you are legitimate to have this concern.  Alright, and we are aware of it and we are talking about some options for you.  OK.  Umm, you know I don't wanna just leave you,  I don't want to leave you sitting back there in that hole and you know and I don't wanna leave you

A139

J&G:  00069

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

hangin out there, um but we are going do some talking about what we can do. But right now I can't make you any promises or anything like that. I wish I could. Charles I don't want to sit here and promise you something I can't deliver. I'm not going to do that.

CS - Sure. I respect that.

TM - Alright

CS - Yes Ma'am. I respect that.

TM - OK

CS - If, as soon as you can give him the word to get me out of here,

TM - But, I'll I'll tell you this is like the number one case on the list right now. OK?

CS - Yes Mam.

TM - So you're you're it.

CS - OK

TM - Ok. Yeah. Alright.

CS - Priority.

LT - Is there anything else, we sit there and we talk about today or since we've talked the first time Sunday, when we talked the first time Sunday and I know we talked again Monday.

A140

J&G: 00070

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

CS     -     Ummm

LT     -     Alright then this morning.  Is there anything that you forgotten or you think that might would be important?

CS     -     Ummm. I don't know if you might can get my my my cellie to talk.  I don't know if you can get him to talk, but he knows everything that happened.

TM     -     But did you talk to him

CS     -     He watched he watched everything happen.  And I told him play by play as it was going along.

LT     -     Who who was your cellie?

CS     -     His name is Trey; he's in 325.

LT     -     Do you know Trey's real name is?

CS     -     Uhh..Graham.

LT     -     Trey Graham?

CS     -     uh uh, something Graham.

LT     -     Ok

CS     -     His last name is Graham.  And du du before it happened

LT     -     Is he is he a DC?

CS     -     Nah.  He's from uh St. Louis.  He's a crypt.  He might not be will, he go home in three

A141

J&G: 00071

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

months, so he might be willing to say anything. Because he's kinda scared at at the DCs. But before the incident happened, I went in the room and I told him everything that was going down right when it happened he didn't even go to chow. So you can look on the cameras and you can look down towards my cell; I stay in 325 and you can see on the cameras right at chow time when Funk and them walk in the room then Rags done walked in, you can see Trey standing right there; he's looking directly at the door. He's watching the whole thing go down and then after it was over with I told him and he kept telling me over and over he was like why did you pull the towel down? He was like man they gonna charge you with murder. And I was like man I had no choice. It's either that or fuckin Funk kill me. I'm going do what I'm told. He told me to take the towel down I'm take the towel down. And he kept telling me over and over he was like you made a mistake man they going to charge you with murder. And you're going down. Because you took that towel down off the door. And I said I I ain't got no choice. It's either be charged with murder or or and and have to deal that, or deal with Funk doing something to me. When he told me to take that towel down off the door I had no choice in the matter. It was either do what he told me or they was fixing to do something to me. So I rather just go on and take the towel down and be charged with murder then end up losing my life right there on the spot. And I they left me with no

A142

J&G: 00072

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

choice. So yeah I am on the camera taking the towel down because I was scared and I I ain't going to lie. I'd rather get charged with murder any day than to have somebody take my life. Then to have them kill me. So

LT  -  Was there very many people up in the unit?

CS  -  No.

LT  -  Did the unit know what was fixing to happen?

CS  -  Yeah

LT  -  Did Hollywood know what was fixing to happen?

CS  -  Yeah. Holly Hollywood said to kill him.

LT  -  Hollywood? How do you know this?

CS  -  Because we went in the room. Hollywood you you you'll see that we went into Funk's room and Hollywood walked up in the room with us and uh

LT  -  Were you in the room?

CS  -  Yeah. It was me it was me. Rags wasn't even in there it was just me Funk and Hollywood. And uh, Hollywood said what's ya'll going to do? And uh, Funk said man we're going to kill him. After dinner and and Hollywood said uh, uh well ya'll know what to do to take care of business. He a rat, fuck him, I don't got no love for no rats.

LT  -  So, and what is Hollywood status in the DC car?

A143

J&G: 00073

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

CS   -   He's second in command; shot caller.

LT   -   OK, and so he he approved with what ya'll with what they were going to do?

CS   -   He told him to take of business. Ya'll know what to do. I don't I don't got no love for no rats.

LT   -   Even even what with Tone being the being the being the leader, the spokesman for the car

CS   -   But, he didn't know that Tone didn't disapproved of it; he didn't know that cause he wasn't at the meeting when we was outside. So he don't he don't know, he just assuming that if we told Tone and that Tone would also be in cahoots with him and Tone wasn't. Tone said beat him up and run him up top, but I ain't nothing to do with no murder.

LT   -   So what do you think now? Since Tone didn't approve of it and you know Hollywood and them talked; cause the yard the yard has come up today.

CS   -   Everybody's back out on the yard?

LT   -   They're on the yard.

CS   -   Man.

LT   -   So what do you think?

CS   -   I I bet Wood ain't going to probably tell Tone that. He's not going to tell Tone that he

Page 50 of 55

A144

J&G: 00074

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

gave him that approval. Cause Tone was going probably be like 'man, you let good dudes go down for some bullshit that you could have stopped. You could have stopped because all you had to do is just tell Funk and they would have listened to you.' Everybody listens to Wood. All you had to do is just tell Funk 'man, nah ya'll ain't killing nobody. Ya'll going to beat the dude up and run him up top and that's it. Ya'll ain't killing nobody

LT - And they and they would've done it.

CS - And they would've done it. Because that've been Tone's word and now Wood's word. And then they wouldn't want to have no problems with them two coming down on you. You know if you did opposite; then Funk would have just been mad if they had beat him and ran him up top. But Wood said man go on and take care of business. I ain't got no love for no rat.

LT - Being that Barnes is Muslim, how is this going to affect the relationship with the Muslims and the DC out there?

CS - I'm just taking it. I ain't out there. I I might just opinions, I assumed they was going to be beefin. Because Amir Amir knew something was gonna go on.

LT - Dude, so the Muslims did not know anything about this prior to it happening?

CS - No, they they they had suspicions that somebody was going to do something to Kevin

Page 51 of 55

A145

J&G:  00075

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

Barnes.  Because throughout the entire day, Amir and three other Muslims kept coming up on the block and hollering for Kevin Barnes and they kept hollering for him and telling anybody go get him.  And then Rags kept telling him at chow time Rags told him 'Man, I think he went to chow.' And then Amir said nah, hell nah, he didn't go to chow.  We been to chow hall.  He ain't in the chow hall; ya'll ya'll got him in the block somewhere.  Where the fuck is he at?  And and Rags said 'man, I don't know where he is at.  And Amir and like three Muslims came up in the block and they was looking for him.  Walking around, they knew something was up, they knew something wasn't right.  They knew something wasn't right.

LT    -    But, so the Muslims the Muslim group didn't know nothing about what was fixing to come down.

CS    -    No.  Un unless unless the homies, unless you know the homies told ran they mouth and told other people.  But everybody in the DC car knew that it was going to go down.  Because

LT    -    Did anybody outside the DC car knew?

CS    -    Just my cellie that I know of.  My cellie and uh Butch Butch and and Bill.  The ones that I told you about this morning.  They stood and watched it.  When when when they went up in the cell Butch stood out there on the tier watching it.  And watched when they

J&G:   00076

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

came about.

LT    -    Where was he standing out on the tier.

CS    -    By his by the by the table by his cell.

LT    -    Which side is that?  Looking at the cell, which tier is that?

CS    -    Umm

LT    -    The the one above it or the one across.

CS    -    The one across.  At the bottom.  Like going towards my closet room back there come out some the first table right there.  That first table, you be at like 323 or 324, cause I'm in 325.  So 324 you be at like 323 cause that UI

LT    -    Where, who does Butch associate with?

CS    -    Uh I don't know where Butch is from.  That's the bald headed guy that brings the wine, makes the wine.

LT    -    What about Bill?

CS    -    Can't tell you who Bill runs with either.  I don't know right off-hand.  Who neither one but both of them seen the incident.  And the and uh what's his name was looking for whoever might have seen it cause he was fixin to take care of them too.

LT    -    Did the whole block know what was fixing to happen?

CS    -    Yeah.  Nobody actually knew who or what was going to happen, but everybody in the

Page 53 of 55

A147

J&G: 00077

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

block knew that something was fixin to go down. It was all over the block. Everybody was running to the ice machine and getting ice and going to the store man packin up on Buglers and Snickers and stuff because everybody knew it was going down.

LT    -    Somthin' was fixing to happen.

CS    -    Yeah. Everybody knew it .

LT    -    Did they know who?

CS    -    They knew it was somebody out of DC.

LT    -    Somebody out of DC was fixing to get hit.

CS    -    Yeah.

LT    -    Alright. Anything else?

TM    -    Well that's, nothing I can think of right now. You did a pretty good job. Pretty good job uh recounting the the story. I appreciate you sitting down with me today um Charles. And I I will, the concerns you have, we're gonna discuss those. Ok.

CS    -    I know that.

TM    -    Ok

LT    -    UI go ahead and turn this off

TM    -    Yeah

CS    -    Just don't forget about me

A148

J&G:  00078

281D-HO-64610
Cassette Recording
05/11/2005
5:22 pm - approx
SA Tracy Masington/lr

TM    -    I ain't gonna forget about you, don't worry UI

LT    -    Turn this off right quick.

End of interview

A149

# Exhibit 30



**U.S. Department of Justice**

*Federal Bureau of Prisons*

---

*United States Penitentiary, Beaumont*          Beaumont, Texas 77720

May 10, 2005

MEMORANDUM FOR FILE

FROM:          Derric S. Wilson, SIA

SUBJECT:       Interview of Inmate Charles Sherman, Reg. No. 04719-007

Inmate Charles Sherman, Reg. No. 04719-07, was interviewed by Derric S. Wilson, SIA, with Patrick Townsend, SIS Lieutenant present, on May 9, 2005, in the Health Services Department. The interview began at 12:15 p.m., and ended at 1:05 p.m. Inmate Sherman was reminded he was advised of his Rights via Attachment K-1 on May 8, 2004.

Inmate Sherman agreed to speak to me without a lawyer present. Inmate Sherman was asked who supplied the weapons used in the homicide of inmate Keith Barnes, Reg. No. 13197-007. According to inmate Sherman, inmates "Smoke and Go Go" were to supply the weapons. He stated Smoke gave one weapon to Joe. Inmate Sherman described this weapon as four and one quarter inch in length, gray steel, handle made of black shoe string with a black lanyard. He stated glue was present at the base of the handle. Inmate Sherman drew a picture of the weapon. (See attached.) Reportedly, the weapon was supplied by Smoke (inmate Mahdi, Nadir, Reg. No. 56528-066) who gave it to Joe (Ebron, Joseph, Reg. No. 08655-007). He stated after the assault, Joe took the weapon with him.

Inmate Sherman stated Go Go supplied a weapon to Funk (Mosley, Marwin, Reg. No. 01210-748) for use in the assault on inmate Barnes. Inmate Sherman described this weapon as six inches in length, square, chrome, handle made of black shoe string with a black lanyard. Inmate Sherman drew a picture of the weapon. (See attached.) Reportedly, Funk used the weapon to assault inmate Barnes then gave the weapon to Rags (Bacote, Michael, Reg. No. C5835-007) who gave it to Boo (Unknown) who gave it to Juvee (Marbley, Sheldon, Reg. No. 07086-007). Inmate Marbley is assigned to Unit BB. A search of Unit BB revealed three weapons. The weapons were shown to inmate Sherman and he identified one of the weapons as the weapon used by inmate Mosley. The weapon was placed into evidence.

According to inmate Sherman, Rags took a miniature Koran into inmate Barns cell to allegedly ask him a question about the Koran. He said Rags did not have weapon. He stated about an hour after the assault, funk told him to take the towel down off the door which he did.

Inmate Sherman was asked to explain what he saw regarding the assault on inmate Barnes. He said during the assault, Joe put Barnes in a choke hold from behind. He stated he saw this when Rags walked out of the cell. He stated he also saw Funk, who was in front of Barnes, strike Barnes with is right hand. He said the door was pushed closed and he sat down on the stairs. Inmate Sherman stated he later left the stairs and went upstairs to the store man "Slink and BoBo" and got

SHERMAN-Statements

GD0002
A150

a light for his cigarette. He stated Rags called him back downstairs stating, "Hey C, Hey C, you don't need to be up there talking to them." He stated he then went back downstairs and sat down. After they left the cell, Joe left the unit and Funk went upstairs to the shower. Rags brought him clean clothes and took his dirty clothes.

GD0C03
A151

# Exhibit 31

Investigative Interview Notes

Date: 5-9-05      Began: 12:15 Pm      Ended: 1:05 Pm
Name: SHERMAN, CHARLES      File: 04719-007      EOS: UNIT DB
Interviewer: D. WILSON      Witness: P. TOWNSEND      Case File Number: _____
Location: MEDICAL      Form QB?: Yes      Union Rep: N/A

"Smoke & JoJo" were supposed to supply the weapons. Smoke gave one knife to "Joe", described as (see drawing)

"JoJo" supplied a knife to Junk described as (see drawing).

After the assault, Joe took his knife w/ him.

Junk passed his knife off to Rage in the Laundry Room, Rage gave it "Juvie" who was outside. Juvie took it back to his unit.

Positively identified weapon found in Unit BB dryer vent.

Observed Rage take a miniature Kara to Bruno cell

Smoke - DC F/m, lives in Bldg. 1.
Juvie - DC F/m lives in Bldg. 1.

FOI EXEMPT - LIMINTED OFFICIAL USE ONLY      Page ____ Of ____

and went upstairs to the store man, "Slink & BoBo" and got a light on my cigarette. Rage called me back downstairs so I went back downstairs & sat down. Rage stated when he called, "Hey C, Hey C you dont need to be up there talking to them." After they left the cell, Joe left the unit & Junk went upstairs to the shower. Rage brought him clean clothes & took his dirty clothes.

Page ____ Of _____

GD0004
A152



CHROME
←SQUARE

WEAPON SUPPLIED BY "GO GO".
USED BY FUNK. FUNK GAVE WEAPON
RAGS AND RAGS TO BOO & BOO GAVE TO TO
GAVE → JUVIE.

FOUND IN UNIT BB DRYER VENT.

C.S.

GD0005
A153

4¼"

BLACK
SHOE STRING

GLUE

GRAY
STEEL

WEAPON SUPPLIED BY SMOKE
USED BY JOE. JOE TOOK
WEAPON WITH HIM.

C. S.

GD0006
A154

Investigative Interview Notes Continued

Inmate: SHERMAN, CHARLES          Reg. No.: 04719-007

Raga did not have a knife.

After the assault - about an hour later Funk told me to take the towel down off the door & he did.

During the assault Joe put Barns in a choke hold from behind - Saw this when Raga walked out of the cell - Saw Funk, who was in front of Barns with his right hand. the door was pushed closed & he sat down on the stairs. Later, left the stairs and went to upstairs to the store man, "think 9 to 6" and got a light on my cigarette. Raga called me back down stairs so I went back downstairs & sat down. Raga stated when he called, "Hey C, Hey C you don't need to be up there talking to them." After they left the cell, Joe left the unit & Funk went upstairs to the shower. Raga brought him clean clothes & took his dirty clothes.

Page____ Of_____

GD0007
A155



FUNKEY

JOE

RAGS

ROCK

WOOP

GD0008
A156



JUVIE          SMOKEY          GO-GO

GD0009
A157

# Exhibit 32

P.S. 1380.05
CH-8- July 10, 1999
Attachment G

ECN # P05139-B

**CHAIN OF CUSTODY LOG**
(Enclose with/attach to evidence)

CASE ID NUMBER: BMP05-139   SUSPECT (If known) MERCER, William, 15996-016

DESCRIPTION OF ITEM: 7½ inch flat metal, sharpened to a point with a handle of boot laces and tape

DATE/TIME ITEM FOUND: 5-9-05 , 2:45p

LOCATION: right rear pipe, near wheel on wheelchair

SIGNATURE OF PERSON RECOVERING EVIDENCE: J. Handley

PRINTED NAME: J. Handley

EVIDENCE PLACED IN OVERNIGHT DROP-BOX BY: (printed name) _____
Date & Time: _____
Witness: (printed name) _____

EVIDENCE RECOVERED FROM OVERNIGHT DROP BOX BY: (printed name) _____
Date & Time: _____
Witness: (printed name) _____

EVIDENCE PLACED IN SAFE FROM DROP BOX BY: (printed name) _____
Date & Time: _____
Witness: (printed name) _____

EVIDENCE PLACED DIRECTLY IN EVIDENCE SAFE BY: (printed name) Eric Rayburn
Date & Time: 5/9/05   3:50pm
Witness: (printed name) J. McIntosh

DISPOSITION:

☐ Hold as evidence  ☐ Return to owner  ☐ Lab Analysis  ☐ Return to finder
☐ Destroy immediately  ☐ FBI Agent  ☐ Other

REMARKS (condition of evidence) _____

**CHAIN OF CUSTODY**

| EVIDENCE RELEASED BY: | DATE/TIME | Destination | EVIDENCE RELEASED TO: |
|---|---|---|---|
| J. HANDLEY | 5-9-05/2:4p | SIS | D. WILSON |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

COPY

GD0185
A158

# Exhibit 33

# UNITED STATES PENITENTIARY BEAUMONT TEXAS
## DISRUPTIVE GROUP/ SECURITY THREAT GROUP PHOTO SHEET
FORM PREPARED BY: R. CALHOUN, SIS ADMINISTRATIVE TECHNICIAN, USP BEAUMONT SIS OFFICE



**APRIL 17, 2005   USP BEAUMONT   DC CREWS**

| | | | | |
|---|---|---|---|---|
| 1. | Jones, Dewayne | Reg. No. 04266-007 | | DC Crew (A) |
| 2. | Mosley, Marwin | Reg. No. 01210-748 | aka: "Funky" | DC Crew (A) |
| 3. | Mercer, William | Reg. No. 15996-016 | aka: "Butch/Go-Go" | DC Crew (A) |
| 4. | Ebron, Joseph | Reg. No. 08655-007 | | DC Crew (A) |
| 5. | Jackson, Joseph | Reg. No. 33186-007 | aka: "Rock" | DC Crew (A) |

# Exhibit 34

J&G: 00223



I/M Mosley, Marwin Reg. No. 01210-748
from Washington, DC, (Stanton Road)
Cell 326    Aka: "Funky"
Assailant observed going in cell ID unit
    agrees (Holmes & Alexander) based
on video footage. Observed in the shower
after the assault.



I/m Ebron, Joseph Reg. No. 08655-007 from
Washington, DC (P Street SE).  Aka: "Joe".
Assigned to A-A Unit Cell-203.
Assailant observed going into cell based on
video footage.  Observed with shirt covering
head while walking through the dayroom.



I/M Bacote, Michael Reg. No. 05835-007
from Maryland (lived in DC, D Street)
Cell 419    Aka: "Bow Wow", "Raggs".
Served as "look out" and assisted in destroying
evidence.  Possibly removed weapon from boot
prior to assault.  Observed going in the cell.



I/M Sherman, Charles Reg. No. 04719-007
from Washington, DC (202 SE)
Cell 325    Aka: "Lil C" "True Thug"
Served as "look out" observed sitting on
stairs with Bacote.  Assisted in destroying
evidence.  Brought clean clothes up stairs to
shower area.



I/M Jackson, Joseph Reg. No. 33186-007
from Washington, DC (Cedar Street SE)
Cell 326    Aka: "Rocket" "Rock" "Jojo"
Possible conspirator to murder as determined
based on video footage.



I/m Smith, Kevin Reg. No. 01420-000
from Washington, DC (4th Street NE)
"Brickyard Mafia" Cell 313 Aka: "Hollywood"
Not directly involved in assault but believed to
be the overseer to insure it was completed and
when it was completed. Very well respected
by DC inmates, 2nd or 3rd to Antone White.

A160

# Exhibit 35

CLIENT:                     Katherine Scardino

CASE DESCRIPTION:     USA vs. Joseph Ebron

OUR FILE #:            07-04-0252

REPORT DATE:         February 28, 2009

REPORT TOPIC:        Kelvin Smith

RELATIONSHIP TO CASE:    Bacote Witness

ATTACHMENTS:

## INVESTIGATIVE ACTIVITY

### I.    Preliminary Information

Investigators determined that Kelvin Smith has been succeeded by the Bacote's defense team.  Smith possesses Register #01420-000/

### III. Federal    Inmate Locator

Kelvin Smith is a 43 year old black male serving a life term, currently incarcerated at the Federal Detention Center in Houston located at 1200 Texas Ave., Houston, Texas 77002, (713) 221-5400, fax (713) 229-4200.

End of Report.

_____      _____

**President/Manager, Texas License A05741**       **Date**
G:\Cases\2007 Case Files\04\0252Reports\Kelvin Smith.doc

A161

# Exhibit 36



USP Beaumont D-B Unit May 7, 2005
Still frame from CCTV Camera System camera #266 at approximately 5:17 p.m.

(1)  Inmate Ebron, Joseph
(2)  Inmate Mosley, Marwin
(3)  Inmate Jackson, Joseph

Government's
Exhibit
#13C
1:08-CR-36

A162

# Exhibit 37



**USP Beaumont D-B Unit May 7, 2005**
Still frame from CCTV Camera System camera #266 at approximately 5:17 p.m.

(1) Inmate Ebron, Joseph
(2) Inmate Mosley, Marwin
(3) Inmate Jackson, Joseph

A163

# Exhibit 38



**U.S. Department of Justice**

*Federal Bureau of Prisons*

---

*United States Penitentiary, Beaumont*          Beaumont, Texas 77720

5-11-2005

MEMORANDUM FOR D. Wilson
                              SIA

FROM:              M.Gardner

SUBJECT:        Homicide D-B Unit Phone Monitoring May 6-7, 2005

A request for Intruder Monitoring was made for the below listed Inmates for any possible involvement in the Barnes, Kieth Reg. No. 13197-007 Homicide. All Inmate account information has been reviewed and a Report Master Cross Reference has been completed to obtain any possible information from the FCC Beaumont Complex and and all other BOP Facilities

Bacote, Michael 05835-077    No phone calls.

Dawkins, James 18244-057    Two calls placed to the extension 864-621-5712 and 864-505-2446, No related information.

Ebron, Joseph 08655-077 No phone calls.

Holmes, Jabob 30437-007 No phone calls.

Jackson, Joseph 33186-007 No phone calls.

Mahdi, Nadir 56528-066 No phone calls.

Marbley, Sheldon 07086-007 No phone calls.

Mercer, William 15996-016 One phone call placed to the extension 202-359-9913 , No related information.

Mosley, Marwin 01210-748 No phone calls.

Sherman, Charles 04719-007 No phone calls.

Smith, Kelvin 01420-000   Two phone calls placed to the extensions 202-359-0900 and 202-584-0091. No related information.

GD00164

# Exhibit 39

| | |
|---|---|
| **CLIENT:** | **Katherine Scardino** |
| **CASE DESCRIPTION:** | **USA vs. Joseph Ebron** |
| **OUR FILE #:** | **07-04-0252** |
| **REPORT DATE:** | **April 23, 2009** |
| **REPORT TOPIC:** | **James Jackson** |
| **RELATIONSHIP TO CASE:** | **Potential Defense Witness** |
| **ATTACHMENTS:** | **Federal Inmate Locater List (7 pages)** |

## INVESTIGATIVE ACTIVITY

### I.   Preliminary Information

The Client advised that James Jackson participated in the conversation with the Defendant, Joseph Ebron, and Marvin Mosley prior to Keith Barnes' death.

After Ebron left Mosley's cell, the pair continued to talk.

The Defendant believes that Jackson is currently incarcerated at USP Florence, Colorado.

### II.   Federal Inmate Locator

Investigators reviewed the Federal Inmate Locator System for inmate James Jackson, finding there were 131 inmates, both black and white, in the system.  19 were still in custody, but none were in custody in the State of Colorado.

There was one inmate, James E. Jackson, Register #30910-034, listed as in transit.

Investigators would need more information in order to identify this individual.

End of Report.

_____          _____
**President/Manager, Texas License A05741**          **Date**
G:\Cases\2007 Case Files\04\0252\Reports\James Jackson.doc

A165

CLIENT:                           Katherine Scardino

CASE DESCRIPTION:                 USA vs. Joseph Ebron

OUR FILE #:                       07-04-0252

REPORT DATE:                      April 16, 2009

REPORT TOPIC:                     Johnny Bazile

RELATIONSHIP TO CASE:             Bacote Witness

ATTACHMENT:                       J. Batte email

## INVESTIGATIVE ACTIVITY

### I.   Preliminary Information

Investigators determined that Johnny Bazile is a listed witness for Bacote's defense.  Bazile possesses Registered #08439-062.

### II.   Federal Inmate Locator

Johnny Bazile is a 35 year old black male with a projected release date of July 2, 2066.  Bazile was incarcerated at the Federal Detention Center located at 1200 Texas Ave., Houston, Texas 77002, (713) 221-5400, fax (713) 229-4200 on March 31, 2009.

### III.   Interview

Investigator was given permission to interview Johnny Bazile at FDC Houston by Unit Coordinator, Kim Gwara.  When Investigator arrived at FDC Houston to conduct the interview he was informed that Bazile had been transferred.

Investigator later found out that Bazile was now housed at UPS Beaumont for the trial.

Bazile refused to be interviewed by Investigator, sending word through the US Attorney.

End of Report.

_____        _____
**President/Manager, Texas License A05741**          **Date**
G:\Cases\2007 Case Files\04\0252Reports\Johnny Bazile doc

A166

# Exhibit 40

## Jimmy Phillips Jr.

**From:** kascar@aol.com

**Sent:** Thursday, April 16, 2009 10:45 PM

**To:** Susanr1961@aol.com; jj@gradoni com

**Cc:** jimmy@jpjlaw.com

**Subject:** EBRON - WITNESS SUBPOENAES

Here are the witnesses that we want to be available for us during the Guilt part of the trial which we anticipate will begin mid week of April 27...

James Jackson (inmate at prison Florence Colo - not the Supermax, but one next to it) (No subpoena now - JJ will go to Florida to interview him)

Dr. A. Villasaw        BOP Beaumont

Patrick Townsend        ""

Samuel Flores        ""

Enoch Jackson        ""

LVN Connie Porter     UTMB Galveston

Jan Syedeck -        FBI Houston

Mabel Credit     (she is on Gov't list. I have asked Joe if he will have her available.  Maybe no need for a subpoena) BOP Beaumont
Douglas Byrd    (same as above) BOP Beaumont
Mr. Nylen        (same as above)'      BOP Beaumont
Eric Rayburn     (same as above)  BOP Beaumont

So, for right now, we need subpoenaes for the above 6 (**excluding** James Jackson). Do we need more subpoenaes?  If so, I can pick them up on Monday  in Bmt - we would have to FedEx them to you from Bmt...

Regardless, can we start on those subpoenaes???l

k

Great deals on Dell's most popular laptops - Starting at $479

4/17/2009

A167

# Exhibit 41

Page 1 of 2

**Declaration of** Kelvin Smith

**Pursuant to 28 U.S.C. §1746**

1. My name is Kelvin Smith. I've been incarated in the federal system since 1986. In 2005, I, was at U.S.P. Beaumont. People sometimes call me Hollywood.

2. In May 2005, I was on the DB Unit at Beaumont. 3 other inmates from DC were also in DB, named Funk, Rags, and Little C. All I am saying is that they lived there. KS

3. I, remember the day Keith Barnes was killed. Nobody ever talked to me or mentioned anything about killing Keith Barnes.

4. No one from Joseph Ebron's defense, not on attorney and not an investigator, ever talked to me about Keith Barnes. Had Joseph's defense interviewed me and showed me Charles Sherman's (Little C's) statement (cont'd)

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on  5/25/14

Name [signature]

A168

Page 2 of 2

in which he said that there was a discussion before KS the killing with me, about killing Keith Barnes, I would have told them that was not true. I would also have testified on Joe's behalf to everything I have said here.

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is

true and correct.

Executed on ___3-25-14___

Name ___[signature]___

A169

# Exhibit 42



**U. S. Department of Justice**

J&G:  00137

*United States Attorney*
*Eastern District of Texas*

---

*350 Magnolia Avenue, Suite 150*
*Beaumont, Texas 77701-2248*

*Commercial/FTS*
*(409) 839-2538*
*Fax (409) 839-2550*
*(409) 839-2557*

March 16, 2009

Ms. Katherine Scardino
3730 Kirby Drive
Suite 1120
Houston, Texas  77098

RE:  *USA v. Joseph Ebron; No. 1:08-CR-36*

Dear Ms. Scardino:

This letter and the enclosures are pursuant to Judge Crone's order on the disclosure of Jencks/Giglio material.

**A.  CHARLES SHERMAN**

1. Cooperation Agreement (hand delivered to you on March 12, 2009)

2. Advise of Rights form 05/08/2005

3. First statement on 05/08/2005 at 12:06 p.m.

4. Investigative notes from first statement on 05/08/2005

5. Report of second interview 05/09/2005

6. Investigative notes of second interview

7. Two diagrams of weapons made during the second interview

8. Photos of DC inmates shown to Charles Sherman

9. CD of interview of Charles Sherman on 05/11/2005

10. Transcript of interview of Charles Sherman on 05/11/2005

A170

J&G: 00138

11. FBI 302 of interview of Charles Sherman on 05/23/2005

12. FBI 302 dated 08/09/2007

13. Mr. Sherman's mass interview form

14. Two letters from Charles Sherman to FBI Special Agent Tracy Massington

15. Charles Sherman's Amended Judgment & Conviction, case. no. F3351-00

16. Charles Sherman's Judgment & Conviction, case no. DKC-00-0423

17. Charles Sherman's rap sheet

18. Excerpts from Charles Sherman's PSR

19. Charles Sherman's BOP disciplinary records

20. Charles Sherman's psychology records

21. FBI 302 dated 08/24/2005

22. FBI 302 dated 06/08/2005

23. FBI 302 dated 03/02/ 2006

24. Proffer letter dated 08/14/2008

25. Letter from Raymond Kemmerer

## B. WILLIE ANDREWS

1. FBI 302 interview of Willie Andrews on 06/29/2006

2. Email concerning interview of Willie Andrews

3. Willie Andrews rap sheet

4. Willie Andrews Judgment & Conviction, case. no. 4:96-CR-58

5. Willie Andrews mass interview form

6. Pages 6-11 of Willie Andrews PSR

A171

J&G: 00139

7. Willie Andrews psychology records

8. Willie Andrews disciplinary records

## C. JOHNNY BAZILE

1. FBI 302 of Johnny Bazile interview on 02/16/2006

2. Mass interview form

3. Judgment & Conviction of Johnny Bazile, case no. 98-CR-27

4. Excerpt of PSR case no. 98-CR-27, pages 4-15

5. Johnny Bazile's rap sheet

6. Johnny Bazile's BOP disciplinary record

7. Johnny Bazile's BOP psychology report

## D. CHARLES GILES

1. FBI 302 dated 05/20/2005

2. Interview of Charles Giles on 05/09/2005 by BOP Special Investigative Agent Derric Wilson

3. Derric Wilson's notes from interview on 05/09/2005

4. Photo shown to Charles Giles at interview on 05/09/2005

5. Advice of rights form 05/09/2005

6. FBI 302 dated 06/19/2007

7. Letter from Charles Giles dated 06/06/2007

8. Letter from Charles Giles dated 06/20/2007

9. Judgment & Conviction of Charles Giles, case no. 3:02-CR-30015

10. Page 5 of Charles Giles' PSR, case no. 3:02-CR-30015

11. Charles Giles rap sheet

A172

J&G:  00140

12.  Charles Giles BOP disciplinary record

13.  Charles Giles BOP psychology records

## E.  LAMONT BAILEY

1.  FBI 302 dated 10/16/2008

2.  FBI 302 dated 11/24/2008

3.  Judgment & Conviction of Lamont Bailey, case no. M-12254-01

4.  Lamont Bailey's rap sheet

5.  Pages 2, 6 thru 11 of PSR

6.  Inmate record

7.  BOP chronological disciplinary record

8.  BOP email dated 08/18/2005 concerning separation

9.  Letter to Eleanor Holmes Norton

10.  Excerpt from SIS report, pages 3 & 4 dated 08/29/2005

11.  Request for transfer form dated 01/20/2006

12.  Sentencing monitoring computation data

13.  BOP psychology records

14.  FBI Identification Record

15.  BOP Inmate Activity Record

16.  BOP In-Transit Data Form

17.  BOP Transfer Order Form

18.  BOP request for transfer application

19.  Email from Mark Waldo to Paul Perona concerning inmate transers

20.  BOP progress report

A173

J&G:  00141

21.  BOP Psychology reports

## F.  FREDERICK GRAHAM

1.  Page 3 of Frederick Graham's PSR

2.  Judgment & Conviction of Frederick Graham, case no. 4:00-CR-507 SNL

3.  Inmate Data

4.  Inmate disciplinary record

5.  BOP Psychology reports

6.  Inmate History

7.  FBI 302 interview of Graham 1/11/2007

8.  FBI 302 interview of Graham 9/12/2006

9.  Graham mass interview form

10.  Letter from Graham 3/12/2009


Should you have any questions regarding this letter or the enclosures, feel free to contact me at your earliest convenience.

Sincerely,

Joseph R. Batte
Assistant United States Attorney

JRB/bh

A174

# Exhibit 43

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

United States of America
District of Columbia

Case No. F-3351-00

vs.

PDID No. 488-471

Charles C. Sherman    AMENDED    PAGE 1 OF 3

### JUDGMENT AND COMMITMENT/PROBATION ORDER

The above-named defendant having entered a plea of ☒ Not Guilty ☐ Guilty to the Charge(s) of _____
(C) Conspiracy; (D) 1st degree Burglary w/ armed with intent to
Commit assault, (E) 1st degree Burglary w/ armed w/ intent to commit Robbery
and having been found guilty by ☒ Jury ☐ Court, it is hereby ORDERED that the defendant has been
convicted of and is guilty of the offense(s) charged, and is hereby SENTENCED to _____
(C) NLT ten (10) to NMT thirty (30) months
(D) NLT seven (7) to NMT twenty-one (21) years, consecutive to all
    other counts sentences herein imposed
(E) NLT seven (7) to NMT twenty-one (21) years, concurrent with
    Count D, consecutive to all other sentences herein imposed.
☒ MANDATORY MINIMUM term of five (5) years _____ applies to the sentence imposed.
   on counts (D) + (E)
☐ MANDATORY MINIMUM term does not apply.

☒ ORDERED that the defendant be committed to the custody of the Attorney General for imprisonment for
   the period imposed above.

☐ ORDERED that the defendant be committed to the custody of the Attorney General for treatment and super-
   vision provided by the D.C. Department of Corrections pursuant to Title 24, Section 803[b] of the D.C. Code
   [Youth Rehabilitation Act 1985].

☐ ORDERED that the defendant be placed on probation in charge of the Director, Social Services Division,
   and it is further ORDERED that while on probation the defendant observe the following marked conditions
   of probation:

   ☐ Observe the general conditions of probation listed on the back of this order.

   ☐ Cooperate in seeking and accepting medical, psychological or psychiatric treatment in accordance with
      written notice from your Probation Officer.

   ☐ Treatment for ☐ alcohol problems ☐ drug dependency or abuse as follows: _____

   _____

   ☐ Restitution of $_____ in monthly installments of $_____ beginning
      _____ (see reverse side for payment instructions). The Court
      will distribute monies to _____

   ☐ _____

Costs in the aggregate amount of $ 2,400.00 have been assessed under the Victims of Violent Crime
Compensation Act of 1981, and ☐ have ☒ have not been paid. (To be paid from jail wages)

ORDERED that the Clerk deliver a true copy of this order to appropriate authorized official(s) and that the
copy shall serve as the commitment/order for the defendant.

A TRUE COPY

3/14/01    TEST: MAR 2 2 2001
Date

Clerk, Superior Court of the
                                                                    Judge

Certification by Clerk pursuant to Criminal Rule 32(d)

3-14-01    By _____
Date              Deputy Clerk                    Deputy Clerk

Form CD118-1040/Aug. 87

A175

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

United States of America
District of Columbia

Case No. F-3351-00

PDID No. 488-471

vs.

Charles C. Sherman
*AMENDED*

PAGE 2 of 3

### JUDGMENT AND COMMITMENT/PROBATION ORDER

The above-named defendant having entered a plea of ☒ Not Guilty ☐ Guilty to the Charge(s) of _____
(F) Threats to do Bodily Harm; (G) Assault w/ intent to Commit
Robbery w/armed; (H) Robbery w/armed
and having been found guilty by ☒ Jury ☐ Court, it is hereby ORDERED that the defendant has been
convicted of and is guilty of the offense(s) charged, and is hereby SENTENCED to _____
(F) NLT two(2) to NMT six(6) years, concurrent to all other sentences
(G) NLT five(5) to NMT fifteen(15) years, consecutive to all
other sentences herein imposed.
(H) NLT five(5) to NMT fifteen(15) years, concurrent with
Count G, consecutive to all other sentences herein imposed

☒ MANDATORY MINIMUM term of five (5) years _____ applies to the sentence imposed.
on counts (G) + (H)
☐ MANDATORY MINIMUM term does not apply.

☒ ORDERED that the defendant be committed to the custody of the Attorney General for imprisonment for
the period imposed above.

☐ ORDERED that the defendant be committed to the custody of the Attorney General for treatment and super-
vision provided by the D.C. Department of Corrections pursuant to Title 24, Section 803[b] of the D.C. Code
[Youth Rehabilitation Act 1985].

☐ ORDERED that the defendant be placed on probation in charge of the Director, Social Services Division,
and it is further ORDERED that while on probation the defendant observe the following marked conditions
of probation:

☐ Observe the general conditions of probation listed on the back of this order.

☐ Cooperate in seeking and accepting medical, psychological or psychiatric treatment in accordance with
written notice from your Probation Officer.

☐ Treatment for ☐ alcohol problems ☐ drug dependency or abuse as follows:

_____

☐ Restitution of $_____ in monthly installments of $_____ beginning
_____ (see reverse side for payment instructions). The Court
will distribute monies to _____

☐ _____

Costs in the aggregate amount of $2,400.00 have been assessed under the Victims of Violent Crime
Compensation Act of 1981, and ☐ have ☒ have not been paid. (To be paid from jail wages)

ORDERED that the Clerk deliver a true copy of this order to appropriate authorized official(s) and that the
copy shall serve as the commitment/order for the defendant.

A TRUE COPY

TEST: MAR 2 2 2001

3/14/01
Date

Clerk, Superior Court of the
District of Columbia

Judge

Certification by Clerk pursuant to Criminal Rule 32(d).

3-14-01
Date

By _____
Deputy Clerk

Deputy Clerk

Form CD(18)-1040/Aug. 87

A176

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

United States of America
District of Columbia

vs.

Charles C. Sherman

Case No. F-3351-00
PDID No. 488-471

PAGE 3 OF 3

AMENDED

### JUDGMENT AND COMMITMENT/PROBATION ORDER

The above-named defendant having entered a plea of ☐ Not Guilty ☐ Guilty to the Charge(s) of ____ (I) 1st degree Theft; (J) Kidnapping w/armed; (K) Possession of a Firearm During a Crime of Violence; (L) Obstruction of Justice, and having been found guilty by ☐ Jury ☐ Court, it is hereby ORDERED that the defendant has been convicted of and is guilty of the offense(s) charged, and is hereby SENTENCED to ____ (I) NLT three (3) to NMT nine (9) years, concurrent to all other sentences (J) NLT five (5) to NMT fifteen (15) years, consecutive to all other sentences herein imposed. (K) NLT five (5) to NMT fifteen (15) years, consecutive to all other sentences herein imposed; (L) NLT one (1) to NMT three (3) yrs consecutive to all other sentences

☑ MANDATORY MINIMUM term of five (5) years ____ applies to the sentence imposed. on counts (J) + (K)

☐ MANDATORY MINIMUM term does not apply.

☑ ORDERED that the defendant be committed to the custody of the Attorney General for imprisonment for the period imposed above.

☐ ORDERED that the defendant be committed to the custody of the Attorney General for treatment and supervision provided by the D.C. Department of Corrections pursuant to Title 24, Section 803[b] of the D.C. Code [Youth Rehabilitation Act 1985].

☐ ORDERED that the defendant be placed on probation in charge of the Director, Social Services Division, and it is further ORDERED that while on probation the defendant observe the following marked conditions of probation:

☐ Observe the general conditions of probation listed on the back of this order.

☐ Cooperate in seeking and accepting medical, psychological or psychiatric treatment in accordance with written notice from your Probation Officer.

☐ Treatment for ☐ alcohol problems ☐ drug dependency or abuse as follows:

_____

☐ Restitution of $_____ in monthly installments of $_____ beginning _____ (see reverse side for payment instructions). The Court will distribute monies to _____.

☐ _____

Costs in the aggregate amount of $2,400.00 have been assessed under the Victims of Violent Crime Compensation Act of 1981, and ☐ have ☑ have not been paid. (To be paid from jail wages)

ORDERED that the Clerk deliver a true copy of this order to appropriate authorized official(s) and that the copy shall serve as the commitment/order for the defendant.

A TRUE COPY
TEST: MAR 2 2 2001

3/14/01
Date

Clerk, Superior Court of the District of Columbia

Judge

Certification by Clerk pursuant to Criminal Rule 32(d).

3/14/01
Date

By _____
Deputy Clerk

Deputy Clerk

Form CD(18)-1040/Aug. 87

A177

# Exhibit 44

U.S. DISTRICT COURT (Rev. 8/2001) Sheet 1 - Judgment in a Criminal Case with Supervised Release          Judgment Page 1 of 6

# United States District Court
## District of Maryland

UNITED STATES OF AMERICA

v.

CHARLES C. SHERMAN

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed on or After November 1, 1987)

Case Number: DKC 00-0423

Defendant's Attorney: Timothy J. Sullivan

Assistant U.S. Attorney: Odessa Jackson

**THE DEFENDANT:**

[x] pleaded guilty to count(s) ___one___
[ ] pleaded nolo contendere to count(s) _____, which was accepted by the court.
[ ] was found guilty on count(s) _____ after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 922(g)(1) | possession of a firearm by convicted felon | 5/30/00 | 1 |

The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant has been found not guilty on count(s) _____
[ ] Count(s) _____ (is)(are) dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's SSN: 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
Defendant's Date of Birth: 10/17/78
Defendant's U.S.M. No.: 04719-007

Defendant's Residence Address:
2512 Pomeroy Road, # 102 SE
Washington, D.C. 20020

Defendant's Mailing Address:

___May 21, 2003___
Date of Imposition of Judgment

_Deborah K. Chasanow_     5/21/03
Deborah K. Chasanow          Date
United States District Judge

Name of Court Reporter:

I hereby attest and certify on 5/21/03 that the foregoing document is a full, true and correct copy of the original on file in my office and in my legal custody
FELICIA C. CANNON
CLERK, U. S. DISTRICT COURT
DISTRICT OF MARYLAND
By _____ Deputy

A178

U.S. DISTRICT COURT (Rev. 8/2001) Sheet 2 - Judgment in a Criminal Case with Supervised Release     Judgment Page  2  of  6

DEFENDANT:      **CHARLES C. SHERMAN**                     CASE NUMBER:  **DKC 00-0423**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of __46__ months, concurrent with sentence currently serving in Case no. F-3351-00 in the Superior Court of the District of Columbia.

☒ The court makes the following recommendations to the Bureau of Prisons: Mr. Sherman is already designated to FCI Three Rivers in Texas.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ a.m./p.m. on _____.
    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal. If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

    ☐ before 2 p.m. on _____.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146. If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147. For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148. Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

## RETURN

I have executed this judgment as follows:

Defendant delivered on __6-23-03__ to __FCI__ at _Three Rivers_ _TX_ , with a certified copy of this judgment.

_Edward Perez, Warden_
~~UNITED STATES MARSHAL~~

By: _Donna Jones, ISM_
~~DEPUTY U.S. MARSHAL~~

A179

U.S. DISTRICT COURT (Rev. 6/2002) Sheet 3 - Judgment in a Criminal Case with Supervised Release                    Judgment Page  3  of  6

**DEFENDANT:**    **CHARLES C. SHERMAN**                          **CASE NUMBER:** DKC 00-0423

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of ___3 years___.

**The defendant shall comply with all of the following conditions:**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

### A.    STATUTORY CONDITIONS OF SUPERVISED RELEASE

1)    The defendant shall not commit any federal, state or local crime.

2)    In any felony case, the defendant shall not possess a firearm or ammunition as defined in 18 U.S.C. §921.

3)    The defendant shall not illegally use or possess a controlled substance.

4)    The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.
☐ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

5)    If this judgment imposes any criminal monetary penalty, including special assessment, fine, or restitution, ..nall be a condition of supervised release that the defendant pay any such monetary penalty that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment. The defendant shall notify the court of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines, or special assessments.

### B.    STANDARD CONDITIONS OF SUPERVISION

1)    The defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    The defendant shall support his or her dependents and meet other family responsibilities;

5)    The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    The defendant shall notify the probation officer ten days prior to any change in residence or employment;

7)    The defendant shall refrain from excessive use of alcohol;

8)    The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any persons convicted of a felony unless granted permission to do so by the probation officer;

10)    The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;

12)    The defendant shall notify the probation officer within 72 hours of being charged with any offense, including a traffic offense;

13)    The defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court;

, As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendants's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

A180

U.S. DISTRICT COURT (Rev. 6/2002) Sheet 3.01 - Judgment in a Criminal Case with Supervised Release                    Judgment Page 4 of 6

**DEFENDANT:**     **CHARLES C. SHERMAN**                    **CASE NUMBER: DKC 00-0423**

## C.   SUPERVISED RELEASE
## ADDITIONAL CONDITIONS

### 1. SUBSTANCE ABUSE
☒ The defendant shall satisfactorily participate in a treatment program approved by the probation officer relating to substance and/or alcohol abuse, which may include evaluation, counseling, and testing as deemed necessary by the probation officer.

### 2. MENTAL HEALTH
☒ The defendant shall satisfactorily participate in a mental health treatment program approved by the probation officer, which may include evaluation, counseling, and testing as deemed necessary by the probation officer.

### 3. EDUCATIONAL/VOCATIONAL TRAINING
☒ The defendant shall satisfactorily participate in a vocational or educational program as directed by the probation officer.

A181

S. DISTRICT COURT (Rev. 6/2002) Sheet 5, Part A - Judgment in a Criminal Case with Supervised Release                    Judgment Page 5 of 6

DEFENDANT:        CHARLES C. SHERMAN                              CASE NUMBER: DKC 00-0423

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

|          | Assessment | Fine | Restitution |
|----------|------------|------|-------------|
| **Totals:** | $    100 | $    0 | $ |

☐ If applicable, restitution amount ordered pursuant to plea agreement. . . . . . . . . . . . $

## FINE

The defendant shall pay interest on any fine of more than $2,500, unless the fine is paid in full before the 15th day after the date of judgment, pursuant to 18 U.S.C. §3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g).

☒ The court has determined that the defendant does not have the ability to pay a fine; therefore, a fine is waived.

☐ The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ The interest requirement is waived.

    ☐ The interest requirement is modified as follows:

## RESTITUTION

☐ The determination of restitution is deferred until _____. An Amended Judgment in a Criminal Case will be entered after such determination.

☐ The defendant shall make restitution to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below.

| Name and Address of Payee | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---------------------------|-------------------------------|-----------------------------------------|
|                           |                               |                                         |

A182

U.S. DISTRICT COURT (Rev. 8/2001) Sheet 5, Part B - Judgment in a Criminal Case with Supervised Release                    Judgment Page 6 of 6

| DEFENDANT: | CHARLES C. SHERMAN | CASE NUMBER: DKC 00-0423 |
|---|---|---|

## SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment; (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; and (6) penalties.

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A  [x] In full immediately; or

B  [ ] $_____ immediately, balance due (in accordance with C, D, or E); or

C  [ ] Not later than _____; or

D  [ ] Installments to commence _____ day(s) after the date of this judgment.

E  [ ] In _____ (e.g. equal weekly, monthly, quarterly) installments of $_____ over a period of _____ year(s) to commence when the defendant is placed on supervised release.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment through the Bureau of Prisons' Inmate Financial Responsibility Program.

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid:

   [ ] in equal monthly installments during the term of supervision; or

   [ ] on a nominal payment schedule of $_____ per month during the term of supervision.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial circumstances.

Special instructions regarding the payment of criminal monetary penalties:

   [ ] Joint and Several with:

   [ ] The defendant shall pay the following costs of prosecution and/or court costs:

   [ ] The defendant shall forfeit the defendant's interest in the following property to the United States:

A183

U.S. DISTRICT COURT (Rev. 8/2001) Sheet 6 - Judgment in a Criminal Case with Supervised Release                                      Judgment

**DEFENDANT:**        **CHARLES C. SHERMAN**                    **CASE NUMBER: DKC 00-0423**

# STATEMENT OF REASONS
## (Not for Public Disclosure)

☐ The court adopts the factual findings and guideline application in the presentence report. Full presentence report waived: pre-plea criminal history prepared and the court relied on the D.C. Superior Court report.

**OR**

☐ The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):

**Guideline Range Determined by the Court (before departures):**
Total Offense Level:   17
Criminal History Category:  V
Imprisonment Range: 46 to 57 months
Supervised Release Range:  2 to 3 years
Fine Range: S___5,000_____ to $___50,000_____
☒ Fine waived or below the guideline range because of inability to pay.

**Total Amount of Restitution: $_____**

**Restitution is not ordered (or only partial restitution is ordered) because:**      ,
*For all offenses regardless of when committed:*
  ☐ Consideration of restitution not mandated by statute and not appropriate under facts of the case
  ☐ No identifiable victim has suffered physical injury or pecuniary loss
  ☐ Other (see attachment, if necessary)
*For offenses committed prior to April 24, 1996:*
  ☐ Financial circumstances of the defendant
  ☐ Disproportionate complication/prolongation of the sentencing process
*For offenses against property committed on or after April 24, 1996:*
  ☐ Excessively large number of identifiable victims
  ☐ Disproportionate complication/prolongation of the sentencing process
*For offenses committed on or after April 24, 1996 other than crimes of violence*
*or offenses against property or relating to tampering with consumer products:*
  ☐ Financial circumstances of the defendant

☒ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

**OR**

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

☐ The sentence departs from the guideline range:
  ☐ upon motion of the government, as a result of defendant's substantial assistance.
  ☐ for the following specific reason(s):

A184

# Exhibit 45

HFR-29-2001  09:15

```
2L01JUBOPBPCV5
MD01417JC

ATN/JOHNSON
THIS RECORD IS BASED ONLY ON THE FBI NUMBER IN YOUR REQUEST-660747DB9.
BECAUSE ADDITIONS OR DELETIONS MAY BE MADE AT ANY TIME, A NEW COPY
SHOULD BE REQUESTED WHEN NEEDED FOR SUBSEQUENT USE.
- FBI IDENTIFICATION RECORD -

WHEN EXPLANATION OF A CHARGE OR DISPOSITION IS NEEDED, COMMUNICATE
DIRECTLY WITH THE AGENCY THAT FURNISHED THE DATA TO THE FBI.

NAME                                    FBI NO.           DATE REQUESTED
SHERMAN,CHARLES CRESCENO                ████████          2001/04/25

SEX   RACE   BIRTH DATE   HEIGHT   WEIGHT   EYES   HAIR   BIRTH PLACE
M     B      ████████     507      125      BRO    BLK    CALIFORNIA

FINGERPRINT CLASS    PATTERN CLASS                   CITIZENSHIP
PI 74 PI CO 16       WU LS WU WU RS WU WU LS WU LS   UNITED STATES
DM PM 19 PI 16       LS WU       WU           LS WU

1-ARRESTED OR RECEIVED 1997/02/01

AGENCY-US PARK POLICE WASHINGTON (DCPPD0000)
AGENCY CASE-9703360 NAME USED-SHERMAN,CHARLES CRISCENO
CHARGE 1-RSP-POSS STLN PROP
CHARGE 2-NO PERMIT
CHARGE 3-FLEE TO ELUDE POLICE

2-ARRESTED OR RECEIVED 1999/09/16
AGENCY-POLICE DEPARTMENT WASHINGTON (DCMPD0000)
AGENCY CASE-488471 NAME USED-SHERMAN,CHARLES CRESCEDO
CHARGE 1-CARRY PISTOL W/O A LICENSE 1ST OFFENSE

3-ARRESTED OR RECEIVED 2000/06/05
AGENCY-POLICE DEPARTMENT WASHINGTON (DCMPD0000)
AGENCY CASE-486471 NAME USED-SHERMAN,CHARLES CRESEENO
CHARGE 1-BURGLARY FIRST DEGREE

ADDITIONAL CRIMINAL HISTORY RECORD INFORMATION IS MAINTAINED BY THE
FOLLOWING STATES(S):
MARYLAND -STATE ID/MD1970594

ALL ARREST ENTRIES CONTAINED IN THIS FBI RECORD ARE BASED ON
FINGERPRINT COMPARISONS AND PERTAIN TO THE SAME INDIVIDUAL.

THE USE OF THIS RECORD IS REGULATED BY LAW.  IT IS PROVIDED FOR
OFFICIAL USE ONLY AND MAY BE USED ONLY FOR THE PURPOSE REQUESTED.

END OF RECORD
```

FOI EXEMPT

A185
S0287

```
----------------------------------------------------------------------------
07141998 MD0172100                       01-270267            TURNED OVER TO
PRINCE GEORGES CNTY PD          CDS:POSSESSION-MARIHU COMMISSIONER
TRK: 970001488256               02-2712A1
OCA: 528374                     ASSAULT-FIRST DEGREE

03-2712A1
ASSAULT-FIRST DEGREE
04-27036B
HANDGUN IN VEHICLE
05-CL
ARMED ROBBERY

07151998 DISTRICT COURT               BAIL/BOND HEARING      HELD

07161998 DISTRICT COURT               BAIL/BOND HEARING      HELD
08111998 DISTRICT COURT 05/970001488  01                    BOUND OVER
02                      BOUND OVER
03                      BOUND OVER
04                      BOUND OVER
05                      BOUND OVER

08111998 MD017015J                      01-CL0488            CRIMINAL INFO
SEVENTH JUDICIAL CIRCUIT COUR ROBBERY W/DW
T981449A                        02-2736BD
USE A HANDGUN
03-2712A1
ASSAULT-1ST DEGREE
04-27012A

ASSAULT-2ND DEGREE
05-2736BB
TRANSPORT A HANDGUN
06-27286A
POSSESSION OF CDS
MD017015J/T981449A              01                    GUILTY
02                      NOLLE PROSEQUI
03                      NOLLE PROSEQUI
04                      NOLLE PROSEQUI
05                      NOLLE PROSEQUI
06                      NOLLE PROSEQUI

08111998 MD017013C                                           RECEIVED
DEPT OF CORRECTIONS UPPER MAR
OCA: A8420001

08111998 MD017013C                                           RECEIVED
DEPT OF CORRECTIONS UPPER MAR
OCA: A8420001
03191999 MD017015J/T981449A     01                    SENTENCE
10YEARS
SUSPENDED
09 YEARS

03 MONTHS
PROBATION
03 YEARS

03191999 MD017013C                                           RELEASED
DEPT OF CORRECTIONS UPPER MAR                     SENT. EXPIRED
OCA: A8420001                                     03191999
END OF RECORD
```

FOI EXEMPT

A186
S0290

### Social History: (continued)

When queried as to why this took place, the defendant stated his mother was charged with Neglect due to her "drug addiction." In her defense, she has remained sober for at least ten years.

### Education and Training

Defendant Sherman claims to have completed one and a half years of college at Shenandoah University located in Winchester, Virginia. He attended school there between 1996 and 1997. While there, he claims he majored in communications and public relations. The highest grade completed here in the area was the eleventh grade at Eastern High School. He claims he received his GED in 1997 while incarcerated in Upper Marlboro, Maryland.

### Military

Mr. Sherman has never served in the United States Military.

### Marital Status and Living Arrangements

This defendant is single, however he has assumed the responsibility of his fiancée's daughter. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ with ████████████ He described the ████████████████████████████████████████ ██████████

### Financial Status

This defendant is without liabilities or assets of consequence.

### Health

In 1996 he suffered a gunshot wound to his left thigh. As a result of this injury, he claims he cannot climb. Following the shooting, he was hospitalized at three different hospitals (Greater Southeast Community Hospital), (DC General) and (Oxon Hill Hospital). When questioned about psychiatric intervention, he stated he was seen briefly when he was a juvenile. This intervention was rendered by the Department of Human Services. The mother states that he was not able to follow through on the treatment as expected.

### Substance Use/Abuse

At the age of 15, the defendant began to use marijuana. He claims he last used all drugs at the age of nineteen. He drug test on June 6, 2000 was negative. Alcohol use was denied and he claims that he has never been in a drug or alcohol treatment program.

<u>ourt Services and Offender Supervision Agency</u>                         Page 6

## PRIOR CRIMINAL RECORD, WASHINGTON, D.C. (continued):



| | | | |
|---|---|---|---|
| | | | Juv.<br>Clerk's<br>Office |
| | | | " |
| | | | " |
| 8-26-96 | | | " |

### Adult:

**Washington, D.C.**

| ?-1-97 | Receiving Stolen Property<br>No Permit<br>Flee to Elude Police | All Counts sealed, expunged, or non-public record. | NCIC |
|---|---|---|---|
| 1-8-98 | Bail Act Violation<br>M-401-98A | 3-1-98 Nolle Prosequi | DCSC |

**Prince George's County, MD**

| 7-14-98 | Robbery With a Deadly<br>Weapon<br>Count 1<br>CT-98-1449A | 3-19-99 Sentenced on Count 1 to 10<br>years, with 9 years, 3 months and 28<br>days suspended, credit for time<br>served and <u>3 years unsupervised<br>probation.</u> | MDPP |
|---|---|---|---|
| | Use of a Handgun<br>Count 2 | 3-19-99 Nolled | " |
| | Assault First Degree<br>Count 3 | 3-19-99 Nolled | " |
| | Assault Second Degree<br>Count 4 | 3-19-99 Nolled | " |

10/04/90 MON 08:57 [TX/RX NO 8921] 007

# Exhibit 46

** LI   rLD OFFICIAL USE **

J&G: 00079

## PSYCHOLOGY SERVICES INTAKE SCREENING SUMMARY

Date .......: October 29, 2002
Inmate .....: ~~████████~~N, ~~████████~~S          Unit: JIM WELLS
Reg. No ....: 04719-007

Author .....: LYNN KAUFMAN, PH.D.
Title ......: STAFF PSYCHOLOGIST
Institution : FCI/FPC THREE RIVERS

---

### TREATMENT/MENTAL HEALTH HISTORY:

Inmate SHERMAN reported the following:

In-patient treatment: FMC-Springfield following attempted hanging
(3/02-6/02)
Out-patient treatment: Adjustment disorder
Suicide Attempts: One confirmed attempt; multiple threats and gestures
Violence: Armed Robbery, Kidnapping, Armed Burglary, Assault

### MENTAL STATUS:

During the screening interview, the mental status items listed below
were noteworthy and are discussed in the COMMENTS section:

Personal Insight     Mood/Affect
Behavior

His psychological stability for custody is judged to be FAVORABLE.

### DRUG ABUSE HISTORY:

Inmate SHERMAN reports a history of substance abuse.  His primary drug of
addiction/abuse is MARIJUANA (CANNABIS).  He is not interested in drug abuse
treatment.

### PROGRAM/TREATMENT RECOMMENDATIONS:

Based on the interview, the following programs/treatment are recommended:

Psychiatric Consultation

Inmate ~~████████~~ reported an interest in participating in programs/treatment.

### COMMENTS:

Mr. ~~████~~ is a 24-year-old, black male inmate currently serving a 24- to
71-year District of Columbia sentence for Conspiracy to Assault, Armed
Burglary (x2), Threats to Injure a Person, Assault with Intent to Rob while
Armed, Armed Robbery, Theft, Kidnapping while Armed, Possession of a Firearm
During a Crime of Violence and Obstruction of Justice.  His PSI lists prior
juvenile convictions for  Theft, Assault and Threats to do Bodily Harm (x2).
He has prior adult convictions for Receiving Stolen Property and Robbery with
a Deadly Weapon.  According to his PSI, he has numerous juvenile and adult
arrests which were dismissed, nolle prosequi, or no papered (e.g., Armed
Burglary, Assault With a Dangerous Weapon (x2), Theft, Bail Act Violation,

A189

** LIMITED OFFICIAL USE **                                          J&G:  00080

Psychology Services Intake Screening Summary                    Page 2
<span style="background:black;">▆▆▆▆▆▆</span>, <span style="background:black;">▆▆▆▆▆▆</span>
J4719-007

Use of a Handgun, Assault (x2), Transporting Handgun, Possession of Marijuana (x2), Any Other Felony (x2), Carrying a Pistol Without a License (x2), Driving Uninsured Motor Vehicle, Carrying a Handgun, Burglary and Armed Burglary).

Mr. S▆▆▆▆▆ was interviewed by Psychology Staff as a routine psychological screening. He was informed of the limits of confidentiality and the availability of psychological services.

According to his PSI, during the instant offense, Mr. S▆▆▆▆▆ and two associates went to the home of an acquaintance and, at gun point, ransacked the residence and stole a TV and VCR. They then drove the victim to a bank and forced him to withdraw money from his account, which they took. Mr. Sherman's version of the event differed significantly from the victim's. He claimed that the victim had willingly loaned him the money and then filed a false complaint with the police when the two of them disagreed over the repayment schedule.

Mr. S▆▆▆▆▆ was initially assigned to USP-Leavenworth, where he had difficulty adjusting to life in prison. According to information in PDS, he was apparently experiencing a great deal of pressure from older, more predatory, District of Columbia (DC) inmates to engaged in illegal activities. In an apparent effort to obtain protection and favor from staff, he began provide information about the activities of DC inmates to staff. The DC inmates eventually learned of his activities and he was place in protective custody in the Special Housing unit (SHU). He was upset about being held in SHU and, fearing that he might be forced to spend the balance of his sentence there, began agitating for a transfer. His efforts to expedite a transfer included making threats of suicide, threats to accuse staff of sexually assaulting him and a hunger strike. He was briefly placed on suicide watch after threatening to starve himself to death but taken off again after reconsideration the method by which he had chosen to harm himself. Two days later he was discovered (fully conscious) hanging from a noose in his cell. No wounds or ligature marks were reportedly found on his neck. He was subsequently placed on suicide watch and transferred to FMC-Springfield where he was treated for approximately nine weeks. Springfield transferred him to FCI-Greenville, where he was again confined to SHU for protective custody. He began agitating for transfer and making suicidal threats. He was placed on suicide watch. While on watch, he continued to threaten suicide while also reporting that he had no desire to harm himself and was only threatening suicide to draw attention to his situation and expedite a transfer. He was subsequently transferred to this institution.

During the interview Mr. S▆▆▆▆▆ was guarded and evasive. Responses to questions were frequently vague, incomplete or contradictory. Although he reported being depressed, he gave the impression of someone attempting to exaggerate his symptoms.

Mr. S▆▆▆▆▆ described coming from a broken home. Although his PSI (dated February 2001) describes his mother as alive, drug free for ten years and employed as a maintenance worker, Sherman described her as a "crack whore"

*SHERMAN IS A maniplutive bastard who commit crimes then don't want to take responsibility*

A190

** LIM.TED OFFICIAL USE **                                              J&G:  00081

Psychology Services Intake Screening Summary                    Page 3
████████, ███████
/4719-007

and claimed that she had been "killed a long time ago" by someone who slit her throat over a $30 debt. ███████ claimed to have four brothers, all deceased. He stated that two were killed in California prisons and the others "killed on the street." No siblings are mentioned in the PSI. His father is reported to have been absent from the home and had no part in rearing Sherman. The PSI reports Sherman spent approximately six years in foster care (ages 9-15 years). He implied that he was in foster care for a much longer period of time. At least some of his foster families were white and he stated that, because of this, he is "different" from and doesn't feel comfortable around black inmates. He claims to have been "adopted" by a white "clinical therapist," whom he said was the most recent of his foster parents and is helping him appeal his case. He referred to his man "Dad."

Mr. ███████ reported that he was depressed and said that he has been depressed periodically since being incarcerated. He also reported experiencing anxiety, sleep problems, racing thoughts, loss of appetite, feelings of hopelessness and severe headaches. Despite this multitude of symptoms, he said that he had never taken medication and did not want any now. He denied any current suicidal ideation, but hinted that these thoughts come upon him suddenly. He was asked about his prior suicide threats and the attempted hanging. His responses were extremely vague. His description of the attempted hanging consisted of the statement: "They say I hung myself but I don't remember." He refused to provide any additional details. Thought process, thought content, speech, and affect were all within normal limits. Sherman denied ever being sexually assaulted.

Mr. ███████ was screened for substance abuse problems. During his PSI interview, he reported using marijuana between the ages of 15 and 19 years. He denied using any other drugs or alcohol. During the current he would admit only to smoking tobacco. He denied having any interest in participating drug treatment. He was advised to submit a request for treatment to the Drug Abuse Program Coordinator if he desired to be enrolled in substance abuse treatment services. He appears appropriate for placement in the general inmate population. He agreed to report to psychology if his depression worsened or he began experiencing suicidal ideation. Psychology will monitor on a PRN basis. Staff should report unusual behaviors and/or any suicidal comments or gestures made by Mr. Sherman to Psychology immediately. Psychology should be notified if Sherman is placed in SHU. An MDS assignment is not warranted at this time.

A191

# Exhibit 47

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMINAL DIVISION

- - - - - - - - - - - - - -x
                          :
UNITED STATES OF AMERICA  :
                          :
          v.              :   Criminal Action No. F-3351-00
                          :
CHARLES SHERMAN,          :
                          :
          Defendant.      :
                          :
- - - - - - - - - - - - - -x

Washington, D. C.

Monday, December 18, 2000

The above-entitled action came on for a jury trial before the Honorable HAROLD CUSHENBERRY, Associate Judge, in Courtroom Number 312.

THIS TRANSCRIPT REPRESENTS THE PRODUCT
OF AN OFFICIAL REPORTER, ENGAGED BY
THE COURT, WHO HAS PERSONALLY CERTIFIED
THAT IT REPRESENTS HER ORIGINAL NOTES
AND RECORDS OF TESTIMONY AND PROCEEDINGS
OF THE CASE AS RECORDED.

APPEARANCES:

On behalf of the Government:

KRISTINA AMENT, Esquire
Assistant United States Attorney

On behalf of the Defendant:

JOHN HARVEY, Esquire

RECEIVED

OCT 3 2001

DONNA K. HAWKINS
Official Court Reporter    Appeals Coordinator's    Telephone:    879-1035
                            Office

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

A     That she just kept -- she wasn't sure.  All she said was they looked like they were friends and he kept telling him to stop or he told him to stop.

MR. HARVEY: No further questions, Your Honor.

THE COURT:  Thank you. Next witness, Mr. Harvey.

(Thereupon, the witness was excused at 3:58 p.m.)

MR. HARVEY:  At this time the defense would call Mr. Charles Sherman.

Thereupon,                                    (4:00 p.m.)

CHARLES SHERMAN,

having been called as a witness for and on his own behalf, and having been first duly sworn by the Deputy Clerk, was examined and testified, as follows:

DIRECT EXAMINATION

BY MR. HARVEY:

Q     Please state your full name for the record.

A     My first name Charles, C-h-a-r-l-e-s, and my last name Sherman, S-h-e-r-m-a-n.

Q     Where do you live, Mr. Sherman?

A     2512 Pomeroy Road, Southeast, Apartment 102.

Q     Do you know Ashland Griffin?

A     Yes, sir.

Q     Do you know Jimmy Griffin?

A     Yes, sir.

Q     Do you know Mrs. Griffin?

151

A193

A    Yes, sir.

Q    How did you first come to know the three individuals that I just have identified?

A    Me and Jimmy was in the ninth grade.

Q    At what school?

A    Wilson High School. I was staying with an aunt at the time and to go to Wilson in the District because you got to live in a certain district in order to go to that school. And I wanted to go to Wilson and so I was living in that District, but I did not actually reside at that house. The foster aunt was just kind of letting me stay there so I could use the address. And so I went to Wilson and me and Jimmy became friends. And Jimmy took me home one day to his house and he introduced me to Mrs. Griffin and his brother Ashland and Mr. Griffin and Simone wasn't there at the time and Millan was there, the baby sister. And I just got a chance to meet them.

Q    And how did you get along with Mrs. Griffin when you first met her?

A    Well, at first it was okay. I mean, she kind of liked me and I liked going over there to see her and be friends with Jimmy and to come over Jimmy's house and see them all. At first, you know, it was kind of started out okay.

Q    Well, did you live with your mother?

A194

A    No, sir.

Q    Why not?

A    Because I used to have a problem with lying and telling people that my mom was dead.

Q    And why did you do that?

A    Because of the fact that it was probably not in my best interest to probably tell people in regard to what my mom was doing at the time.

Q    And what was your mother's employment?

A    She wasn't working, sir.

Q    What was she doing to sustain her life?

A    She was a prostitute and a crack addict.

Q    Okay. How long have you known that about your mother?

A    Most of my life, sir.

Q    Do you share that often with people?

A    No, sir.

Q    Where do you work?

A    I was at Food Lion in Upper Marlboro and Ourisman Auto Service on Mt. Olivet Road, Northeast, near the Trinidad area.

Q    So you have two jobs?

A    Yes, sir.

Q    Are you married?

A    No, not quite. Not yet.

153

A195

Q    Are you engaged?

A    Yes, sir.

Q    Engaged to who?

A    Cherie Johnson.

Q    Have you ever been convicted of a criminal offense?

A    Yes, sir.

Q    How?

A    Last year I had briefly paid a guy in Maryland to work on my car and I needed it to get back and forth to work. And he worked on my car briefly and he didn't fix it right. I in turn asked him for some of my money back or either fix the car. He refused. We got into an argument, me and the guy fought. In the fight I took fifty dollars of my money from him. Later on that evening, I was arrested. The police arrested me and charged me with robbery because the guy said that in the fight I took the money from him. And so it was no longer a first-degree assault, just fighting. He says it was included in a robbery and I went to jail. I had an attorney and she asked me did I do it. And I told her, yes, ma'am. I told her why. She said that the Government would --

MS. AMENT: Your Honor, I would object to the rest of this.

THE COURT: Sustained as to the hearsay.

MR. HARVEY:  Well, did you have a trial in that

matter?

A   No, sir.

MS. AMENT: Objection, Your Honor.

THE COURT: He said no. Let's move on.

THE WITNESS: I was guilty and I told them I did it.

MS. AMENT: Your Honor.

THE COURT:  There wasn't a question pending and so let's ask the question, Mr. Harvey.

BY MR. HARVEY:

Q   So, what happened after you pled guilty to the offense?

A   The Judge told me that I was on --

MS. AMENT: Objection.

THE COURT:  Sustained. Let's move on.

BY MR. HARVEY:

Q   Did you stay incarcerated?

A   No, sir.

MS. AMENT: Objection.

THE COURT:  Sustained.

BY MR. HARVEY:

Q   So after you got home, did you already know Cheri Johnson?

A   Yes, sir.

Q   And did you resume your relationship with her?

A197

A    Yes, sir.

Q    Let's go back to your relationship with the Griffin family. Did there come a time that you moved in with them?

A    Yes, sir.

Q    What were the circumstances of you moving in with them?

A    It wasn't never really like Mrs. Griffin like sat down and we were -- I just was welcome to move in the house. It was just more like I had spent several nights over there off and on and basically Jimmy, he kind of just would sneak me in and out of the house to spend the night. And finally I guess he just kind of like told his mom that they were staying in a big old house that had a lot of rooms and he just said that I was upstairs sleeping, you know. And his mom agreed to just let me sleep there.

THE COURT:   Go ahead.

BY MR. HARVEY:

Q    So did there come a time when you left that home?

A    Yes, sir.

Q    And what were the circumstances that you left the Griffin home?

A    Like Jimmy came to school one afternoon and all that I know is that Jimmy told me, he was like, man, I can't be your friend no more. He was like, my mom, I told

A198

you that my mom knows a lot of people and she did some investigation work on your background or something like that and he said that she found out that you lied to her about your mom being dead and about other things about your background. And so, he said that my mom said that she didn't want you to come over to the house no more and she didn't want you to be friends with me no more. And he said, but you know, I'm going to always be your man. And so he just left it at that. And I just got my things and just quietly left.

Q     So you heard Mrs. Griffin testify earlier today?

A     Yes, sir.

Q     Did the event that she testified to or some family meeting that you were present at, did that occur?

A     No, she just related to Jimmy and Jimmy just in turn told me that Mrs. Griffin and them didn't want me to come to the house no more. We didn't like sit down and discuss it. No, sir.

Q     So after you left the house, what was your relationship with Jimmy?

A     That was -- it's hard to explain it. It was just a real, for a lot of years, it was just a hit and miss. That's all. We had to be friends, but I spent the night over there, you know, and Jimmy, we would switch clothes, he gave me money and things I need, but it just always

157

A199

had to be where Mr. and Mrs. Griffin didn't know. It was a real, what you call, maybe I don't want to put it like a secret love affair, but it kind of was because we were just sneaking, you know, really throughout the years without his parents ever finding out that we remained friends, but we remained real tight buddies, though.

Q    What type of things would you do with Jimmy when you would hang out with him?

A    It started off us just going to play basketball off and on and playing basketball, but throughout me staying with different females and trying to still go to school and not having a lot of money and I didn't have a lot of clothes anyway, it started to the point to where I would just like contact Jimmy and just ask him could I get some clothes or something. And he would always tell me, come over and get some clothes or, you know, if I told him I ain't have no money, I need to borrow some money, Jimmy would say no problem, and he would like maybe run to the bank or something and loan me a couple of dollars. But other than that, it just became to where we would sneak whenever the parents weren't there, you know, or late at night. And I would spend the night in the basement with him. Just stuff like that. Just sneaking around then. That's all.

Q    What about Ashland?

158

A200

A    What you mean?

Q    Were you friends with Ashland?

A    Yes, sir.

Q    How would you hook up with Ashland?

A    Ashland and I didn't really even begin to be friends until like after me and Jimmy stopped really, really getting tight, you know. Me and Ashland, we grew into a friendship, but it was later on.  We didn't start off being friends.  It took awhile before Ashland even started to like me and then we became real tight.  And it was getting like close to as Ashland was getting a little bit older and Jimmy was starting to branch away from me a little bit anyway.

Q    What do you mean by branching away from you?

A    Well, we were getting older. You know, Jimmy got girlfriends and his little buddies and he just started like kind of distancing himself.  Kind of distancing himself from me.  He would hang out with his buddies more and more.  And when I would come over and see him, he would like, Ashland would tell me Jimmy was gone to the basketball court or Jimmy was gone to Crystal something.  And me and Ashland would sit and stay and play Play Station or sometimes we would go out in the shed when Mr. and Mrs. Griffin wasn't home and probably, you know, smoke a joint or something.  And that was it.  It would be times when

159

A201

Jimmy wasn't there that we used to just, you know, --

Q     Now, let's move forward to when you and Jimmy stopped being friends.

A     What's the question?  I didn't even hear you. I'm sorry.

THE COURT: He hasn't asked you one yet.

BY MR. HARVEY:

Q     What caused you and Jimmy not to be close friends?

A     Jimmy says that he quote unquote accused me of taking a pair of Nikes that I wanted to wear to play basketball in and he said at that point we weren't friends like he said several times before.  But I mean, I did take the Nikes.  I did wear them. I didn't see so much as probably as much as he probably blew it up. I didn't steal them from him. I mean, I asked him could I wear them to play ball in.  And he told me no, and I wore them anyway. I mean, it's just like he has done with my clothes. I have done with other stuff of his that he had told me not to wear, but I guess he didn't appreciate it because the Nikes weren't his.  They were somebody else's.  And when the guy asked for the Nikes back, Jimmy didn't know where they was. And then when him and the guy found out I was wearing them, I got in trouble for it.

MS. AMENT: Your Honor, I think the witness is testifying about things he doesn't know from his own knowledge.

160

A202

THE COURT: Okay. You may continue.

BY MR. HARVEY:

Q    So after the tennis shoes incident, were you and Jimmy friends any more?

A    As far as I consider or Jimmy?

Q    As far as you?

A    As far as I consider, yeah, we were still friends. As far as I consider, yes, sir.

Q    And when you would attempt to contact Jimmy, did he still indicate that he wanted to be your friend?

A    No. A couple of times when I called, he hung the phone up before he went to school and then for a while I just didn't hear from him, and then I would just talk to Ashland.

Q    How long did you and Ashland continue to maintain a friendship after the sneaker situation?

A    All up until this incident. All up until, you know, he says this incident.

Q    How often would you get together with Ashland?

A    Probably once, maybe twice a week. Once or twice every two weeks. And so it wasn't often. Maybe two times a week or something.

Q    And what would you two guys do when you got together?

A    Most of the time it was consumed around playing

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

Play Station and smoking weed, to be honest. That was about it.

Q    And you did that up until this incident that you're here before the jury today?

A    Yes, sir.

Q    All right. Now, let's move to May 5th, 2000. What were you doing in the early part of the morning of that day?

A    That I can't quote a hundred percent. I can't quote a given day what I was doing in my house.

Q    Well, did there come a time when you went to visit Ashland?

A    Yes, sir.

Q    Well, what were the circumstances surrounding you going to see Ashland on that day?

A    I called him after I had came back from the store. I do remember from dropping Cherie and Kiana some food off. And when I caught him, I just told him that I was on my way up there and he knew what I was coming up there for. And he was like I'm sleeping. And I told him to get up and make sure he's up by the time I get there. And he was like whatever, and he went back to sleep. And I told him I was on my way.

Q    And was anybody with you?

A    No, sir.

162

A204

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

Q    Damien Nicholas wasn't in the car with you?

A    No, sir.  Damien Nicholas and no female was not with me at Ashland's house.  No, sir.  Not at no point in time.

Q    You talking about May the 5th?

A    Yes, sir.

Q    All right.  Before May the 5th, had you and Damien ever gone to Ashland's house?

A    Yeah, I took Damien up there before.

Q    Describe to the ladies and gentlemen of the jury the circumstances where you and Damien went to Ashland's house?

A    Briefly I just --- I bumped into Damien and when I bumped into Damien, he had told me that he wasn't doing nothing that day.  And I told him I was going up my buddies house; did you want a ride?  And he said yeah.  And we rode up there.  And I introduced him to Ashland.  We didn't do much of nothing.  We just kind of sat around and joked and talked about little or nothing and played Play Station and went out back and smoked some marijuana and came back and you know, just --

Q    Was anybody with you when you went up there?

A    No.  Just me and Damien and Ashland, and then two of Ashland's buddies came over the house.

Q    Do you remember their names?

163

A205

A    Nicknames. Not probably their real names, no, sir.

Q    Well, what nicknames do you remember?

A    One nickname was Miles and the other briefly another nickname was, I can't even think of the other guy, but one of them was a Miles, but they all nicknames. I don't know their real names.

Q    So when you and Damien went to the house, did you go inside?

A    Yes, sir.

Q    How close are you to Damien Nicholas?

A    We were friends. Real close when we were in elementary, but through the years, I haven't seen Damien in a long time and I had only just recently bumped into him maybe about two years ago. And so it wasn't like no real tight friendship. I recently found out that he lived uptown and when I bumped into him, we just started talking a little bit about old times, elementary. And then after that, I just gave him my phone number and we just kind of seeing each other here and there, but we didn't kind of like hang out all the time or nothing like that.

Q    Did you see him maybe like twice a week?

A    I probably seen Damien more like once a week. Maybe not even quite once a week. Maybe once every two weeks, Damien. It wasn't often that I seen Damien, but to get uptown to Ashland's house you got to ride all the way uptown.

A206164

And so sometimes Damien lives up there by 13th Street, and so I would sometimes, if I was going up to Ashland's house, ride up through there to see if Damien was home. Most of the time he wasn't never home.

Q    Do you know Michelle Howe?

A    Yes, sir.

Q    How do you know Michelle Howe?

A    I have known her through Damien.

Q    How long have you known her?

A    I don't know Michelle that well. Maybe about a year.    Last year we all went to the park one time and that was about it.

THE COURT: Ladies and gentlemen, I'm going to stop the direct examination at this point. We can't get much farther into it this afternoon because I have to handle another case. And rather than move into a different subject area, I would rather start tomorrow. You may step down.

(Thereupon, the witness was excused.)

THE COURT: What I anticipate, ladies and gentlemen, and that is we will finish this case tomorrow. We obviously will hear the rest of Mr. Sherman's direct examination and cross examination and any redirect, but we should be able to wrap the case up tomorrow. It may be that we won't do closing arguments and instructions until Wednesday morning,

A207165

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

but I want to get all of the evidence in tomorrow. And we will finish all of the evidence tomorrow on all sides of the case and then there will be closing arguments and instructions Wednesday morning.

Remember, you cannot discuss the case at all over the evening recess, and we will finish the case tomorrow. Thank you very much. Madam Juror in Seat No. 13, you have an issue? Why don't you just remain and I will talk to you with the lawyers present.

(Thereupon, the jury was excused at 4:20 p.m.)

THE COURT: Can you come to the bench for a second.

(Thereupon, Juror No. 13 and the lawyers approached the bench.)

THE COURT: Hi. You're juror in Seat No. 13.

THE JUROR: When the trial first started I was to take a driver's test on the 15th and I was under the impression the trial would take four days. And I rescheduled the test for the 20th, but in the process of doing this, I got a letter from my insurance company which is if I don't take the test and get the results to them, they will take the insurance for my car. And so the test is scheduled for two o'clock on Wednesday which is the 20th of this month.

THE COURT: I don't think that will be a problem.

A208

I don't think that will cause a problem.

JUROR NO. 13: Okay. I just wanted to make you aware.

THE COURT: I will make sure you get there.

THE JUROR: Okay. Thank you.

(Thereupon, the juror and counsel returned from the bench, and the juror was excused.)

THE COURT: The juror in Seat No. 13 is our alternate and so she would not deliberate in any event. So it's not a problem if we have to let her go Wednesday. That's not a problem. Okay. Thank you very much. I will see you tomorrow at ten o'clock and we will finish up the evidence. I will have a copy of the instructions which I tried to clean up. I have made some of the changes that we have been talking about and some of which the Government knows. And there will be a copy if you want to remain here in the courtroom for about five more minutes, they will be down and you can have them over the evening to take a look at

MR. HARVEY: Thank you, Your Honor.

MS. AMENT: Thank you, Your Honor.

(Thereupon, the proceedings were adjourned for the day at 4:25 p.m.)

*    *    *    *    *    *

167

A209

CERTIFICATE OF REPORTER

I, Donna K. Hawkins, an Official Court Reporter for the Superior Court of the District of Columbia, do hereby certify that I reported, by machine shorthand, the proceedings had and testimony adduced, in the case of the UNITED STATES OF AMERICA v. CHARLES SHERMAN, Criminal Action No. F-3351-00, in said court, on the 18th day of December 2000.

I further certify that the foregoing 167 pages constitute the official transcript of said proceedings as transcribed from my machine shorthand notes and reviewed with my backup tapes, to the best of my ability.

In witness whereof, I have hereto subscribed my name, this ___day of May 2001.

_____
Official Court Reporter



RECEIVED

OCT 3 2001

Appeals Coordinator's Office

A210

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CRIMINAL DIVISION

- - - - - - - - - - - - - -x
                          :
UNITED STATES OF AMERICA   :
                          :
         v.                :      Criminal Action No. F-3351-00
                          :
CHARLES SHERMAN,           :
                          :
         Defendant.        :
                          :
- - - - - - - - - - - - - -x

                                   Washington, D. C.

                                   Tuesday, December 19, 2000

        The above-entitled action resumed for a jury trial before the Honorable HAROLD CUSHENBERRY, Associate Judge, in Courtroom Number 312.

                THIS TRANSCRIPT REPRESENTS THE PRODUCT
                OF AN OFFICIAL REPORTER, ENGAGED BY
                THE COURT, WHO HAS PERSONALLY CERTIFIED
                THAT IT REPRESENTS HER ORIGINAL NOTES
                AND RECORDS OF TESTIMONY AND PROCEEDINGS
                OF THE CASE AS RECORDED.

                APPEARANCES:

                On behalf of the Government:

                KRISTINA AMENT, Esquire
                Assistant United States Attorney

                On behalf of the Defendant:

                JOHN HARVEY, Esquire

DONNA K. HAWKINS
Official Court Reporter          Telephone:  879-1035

STOCK FORM FMRRN

THE CORBY GROUP  1-800-255-5040

A211
169

TABLE OF CONTENTS

WITNESSES

| For the Defense: | Direct | Cross | Redirect |
|---|---|---|---|
| Charles Sherman | 173(Cont) | 186 | 217 |
| Nathaniel Covington | 230 | | |
| Cheri Johnson | 239 | 242 | 245 |

Government (Rebuttal:

| Ashland Griffin | 250 | 252 | 252 |
|---|---|---|---|
| Don Lee | 253 | 259 | 267 |
| Harry Kelly Johnson | 274 | | |

EXHIBITS

| | Received |
|---|---|
| Defense No. 10 | 238 |
| Government No. 16 | 279 |

MISCELLANY

Afternoon Session - - - - - - - - - - - - - - - - - - - - 271

Court Reporter's Certificate - - - - - - - - - - - - - 291

A212

STOCK FORM FMRRW

THE CORBY GROUP 1-800-255-5040

P R O C E E D I N G S

THE DEPUTY CLERK:  Returning, Your Honor, to the trial calendar, United States v. Charles Sherman, F-3351-00. Parties please state your name.

MS. AMENT: Kristina Ament and Paralegal Christopher English on behalf of the United States.

MR. HARVEY:  Good morning, Your Honor. John Harvey on behalf of Charles Sherman.

THE COURT:  Okay. I believe all jurors are here and I believe we will finish up the evidence today.  I have the Court Reporter Division and Central Recording was able to find the relevant portion of the Rule 11 inquiry. They did not do it in time for the Government's case in chief. If it becomes relevant in rebuttal, it's available, but we don't have anything to worry about right now.

MR. HARVEY:  Well, Your Honor --

MS. AMENT:  Well, for the Court's information, I do intend to cross-examine concerning the statements that have been made to that person.

MR. HARVEY:  Well, Your Honor, I would ask that the defense be allowed to do surrebuttal because that is something --

THE COURT:  We haven't even gotten to that rebuttal yet.

MR. HARVEY:  Well, the point is that if the

171

A213

Government intends to call this person in rebuttal, he made certain statements that I believe the defense should be able to rebut in their case. And I don't think it's appropriate for me to address those issues now.

THE COURT: Mr. Harvey, it's the identity of this witness, what he would ask he would have testified in direct. And if you don't have a witness available to contradict these alleged statements --

MR. HARVEY: The witness that would contradict his statement is Mr. Sherman.

THE COURT: Well, that's fine. You can deal with it in direct or you can recall him.

MR. HARVEY: I'm simply asking the Court that with respect to that witness, I would request the ability to call him in surrebuttal.

THE COURT: That's fine. You can do that. That's fine if that's all the witness you're talking about. That's fine. Okay, let's bring the jury in so we can finish up.

(Thereupon, at 10:11 a.m., the witness returned to the stand; and the jury returned to the courtroom.)

THE COURT: Okay. You can have a seat, Mr. Sherman. You were previously sworn and, of course, you remain under oath. You may continue with your direct examination, Mr. Harvey.

MR. HARVEY: Thank you, Your Honor.

DIRECT EXAMINATION (CONTD)

172
A214

STOCK FORM FMARK

THE CORBY GROUP 1-800-255-5040

BY MR. HARVEY:

Q    When we left off yesterday, we were talking about your friendship with Jimmy. Do you recall that?

A    Yes, sir.

Q    Now, you indicated that you took his tennis shoes?

A    Yes, sir.

Q    Do you believe you stole them?

THE COURT: We have been over this, Mr. Harvey. Let's not make it cumulative. In fairness to that -- we're trying to finish this up. You asked these questions yesterday. He gave the answers yesterday and so let's move on.

BY MR. HARVEY:

Q    Why did you take the tennis shoes?

A    Because I wanted to wear them to play basketball in.

Q    Did you feel that you had the -- did you feel that there was any part of your relationship that would allow you to take the tennis shoes?

A    Yes, being friends for so long. Yes, sir.

Q    Had you ever done that before?

A    Yes, sir.

Q    Under what circumstances?

A    Asking to wear several things of Jimmy's and he might say -- I would ask him can I wear a sweater or something and he would say no. And I would get it anyway and wear it. It was no big thing. It wasn't like I stole it.

A215<sup>73</sup>

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

Q    After you wore it, did you return it?

A    Yes, sir. He would do the same with my stuff if I had something he wanted to wear.

Q    Did he return the things that he borrowed of yours?

A    Yes, sir.

Q    Let's talk about you Ashland.  After the incident with the tennis shoes, what was your relationship with Ashland?

A    It got like we were already kind of tight before me and Jimmy broke off, but like when Jimmy said that he didn't want me to call the house no more and not to come up to the house, I called the house and I would talk to Ashland.  And I asked him where Jimmy was and had Jimmy calmed down and Ashland had told me like previously, you know Jimmy just needs some time to cool off.  And he said after Jimmy cools off, he said everything will be back to normal.  And so for the meanwhile until we was hoping that Jimmy's attitude cooled off and burned off, we just continued to -- I just continued to come up there to see Ashland and before I would come, I would ask him you talk to Jimmy; where he at; he asked about me.  And Ashland like say, you know, no, Charles.

THE COURT:  This is a narrative.  We need a question interposed.  Ask a question and get a specific answer.

174

A216

BY MR. HARVEY:

Q      What else did you do with Ashland during that time period?

A      Basically the same stuff me and Jimmy did. It was really nothing different. Play Play Station, borrow each other's clothes, not on a regular basis, but I borrowed more of Ashland's clothes than he borrowed of mine because I ain't have many. Borrowed money from him or borrowed ---

Q      Did you play basketball with Ashland?

A      Sir?

Q      Did you play basketball with Ashland?

A      No, sir. Ashland don't really know how to play basketball like that.

Q      Now, let's talk about May 5th, the year 2000. Why did you go to Ashland's house?

A      I went to his house because I was previously told from him that I could borrow some money from him.

Q      Well, let's go to a time before May the 5th. When did you talk to Ashland about borrowing some money from him?

A      I talked to Ashland about, maybe not even a whole two weeks before I went to his house and I told him that I needed to borrow the money. I told him that I was getting a raise from my boss and he knew that I had been

175

A217

working on both of my jobs. And we just really debated on really the whole situation which was just whether or not when and if I could pay him back the money before his mom would be able to actually check the bank account and know that his money was not in the bank. That was really just all me and Ashland was going over. It wasn't whether I could borrow the money. It was just when I was going to pay it back. That was all that was the problem.

THE COURT: So that the jury understands that last response, this discussion you're talking about occurred two weeks before you actually ever went to the bank?

THE WITNESS: Yes, sir. Yes, sir.

THE COURT: Okay.

BY MR. HARVEY:

Q   All right. So let's move forward to the 5th. Did you go to Ashland's house?

A   Yes, sir.

Q   When you got there, what happened?

A   He was still sleep and he came to the door and I went upstairs and I sat on the bed for a little while. And he went in the bathroom and changed his clothes and put on a tee-shirt, and I don't know if he had on some jeans or what he had on. And then we left from his house.

Q   What were you wearing?

A   Specifically I couldn't tell you. I only -- I could

A218 176

just basically tell you from the bank tape, you know, what I had on, and agree that that was me and what I had on, but I couldn't tell you exactly what I had on.

Q    So, how did you -- what happened that you left the house?    After Ashland got through getting dressed, what did you do next?

A    Went and got in the car and went to the bank.

Q    What car did you drive?

A    Cherie's.

Q    All right. Is that the black vehicle, the photograph that has been shown to the jury?

A    Yes, sir.

Q    Who drove the car?

A    I did.

Q    Where did Ashland sit?

A    On the passenger's side.

Q    The front seat, the back seat?

A    The front seat.

Q    Was anybody else in the car?

A    No, sir.

Q    When you got to the bank, what happened?

A    When we got to the bank, we went in the bank, stood in line and waited for like the people to move out the way and then we got up to the bank teller and I didn't hear all of what he was talking to her about because I

A219

wasn't even really paying attention. I was kind of, you know, just standing there wandering off looking around or whatever, but I was -- I don't know what I was doing that the bank teller says in reference to my noise. I don't know if I was beebopping as you might want to call it. It's making a sound noise with my mouth.

Q    What is that?

A    It's like when you go putt, putt, putt putt.

Q    Just making a sound like a rapper?

A    Yes, sir. But I don't know that in specific or what noise I was making, but I know I was bothering him and he didn't want me bothering him because he was trying to focus on whatever he was doing with the bank teller. And so I just stood there and waited for him to get the money.

Q    How much money were you going to borrow from him?

A    The agreement was for me to borrow a thousand dollars. That's how I ended up with nine hundred and seven dollars.

Q    Did you ever get a chance to look at the computer screen?

A    Not really. I mean, I seen it turn around, but I wasn't looking at it or paying attention like standing over him staring at it. No.

Q    Okay. After he got the money at the bank, what happened next?

178

A220

A    Briefly, I talked to the bank teller for a little while and then after that we turned around and started to leave out the bank.  And that's when we had a discussion about when I was going to actually give him the money back.

Q    Now, before we get to Ashland, did you talk to the bank teller about opening up an account?

A    Yes, sir.

Q    And did you open up an account at that bank?

A    No, sir.

Q    Why not?

A    Because for one, I didn't even know --- I had just really asked her how do you open up a bank account there.  And she gave me a little card and she handed it to me and she gave me a pen and told me to fill it out.  And so I filled the paperwork out and then she asked me did I want to open up an account.  And I told her no, not at the time.  I just wanted to know how.  And she told me it was a Chevy Chase Bank near where I lived at in Washington.  And I told her, yeah, up on Pennsylvania Avenue.  And the bank teller told me something in reference to it, if I got a bank account in the District near where I lived at or something because if I got a bank account in Maryland, it would take longer for the checks to balance or something like that in reference to the jurisdiction or

179

A221

something.  And so you know, but I didn't have no --
I wasn't going to open no account anyway.  I just wanted
to know how.  I wanted her to tell me how in case I did
while I was just standing there not doing anything anyway.

Q    Okay.  So you went back -- after you left the
bank teller, then Ashland had the money?

A    Yes, sir.

Q    And then you started talking to him about the cash?
What transpired with respect to him giving you the money?

A    Well, he had already given me the money and --

Q    While you were still in the bank?

A    No, we were like -- I don't know, we were
probably at the door. Maybe at the door, yes, sir.  The
bank door.  Either at the door or maybe outside the door,
but I believe to my best recollection, it was probably right
at the door.

Q    Okay.  Inside the bank still?

A    Yes, sir.

Q    All right.  And so when you left out the bank,
what happened next?

A    Ashland stated to me, am I sure that I'm going
to give this back to him by the end of the month.  And
when he said that, I said no.  And he was like wait, wait
a minute. You said you would be able to give it back to
me by the end of the month.  And I told Ashland no, I didn't

A222<sup>180</sup>

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

tell you that. And he was like, didn't you tell me you are getting a raise from your boss. And I said yeah. And he said didn't you tell me you will be able to pay it back by the end of the month? And I said no, Ashland, I didn't tell you that on the phone. And I told you I was getting a raise, but I told you I would be able to pay the money back by the end of next month. And then he started stating well, nah, he can't do it. He started talking about that's not going to work and that I switched my story on the phone from when I previously told him that I would give him back the money, and it wasn't true. I didn't switch my story up. I told him when I was going to pay him back the money and he knew I meant it. I ain't never not paid him back. And so he was like no, moms is going to be checking my bank account and when she do, you know, we already know the deal with her. And she can't know he took the money out the bank. And for sure, she can't know he loaned it for me. That's for God sake, forbidden that you loan some money to Charles.

Q    So what happened? Did you give him his money back?

A    No, sir. That's why I'm in trouble.

Q    Well, why didn't you give him the money back?

A    I was wrong. I didn't mean to, I guess to probably stir up so much commotion over nothing over not giving him his money back, but with all due respect, I felt

A223

as though at the time he was Indian giving with all due respect. He was Indian giving, and so excuse my language, when he asked for the money back, I told him hell, no, I wasn't giving it back to him. And he stated to me again could he get it back. And I told him no, I'm not giving you the money back. You done lent it to me. It's in my hand now and you just not going to take it back. You know that I needed the money. And so that was that and he got in the car and we argued briefly on my way taking him home about was I going to give him the money back. And I told him I was not going to give it back to him and to don't Indian give. And I told him before he got out the car I did not deny that I was not going to pay him back. I still told him then Ashland, I'm keeping the money, but I'm going to pay you back. I let him know very clearly I'm going to pay you back. And at that time he got to his house and he got out the car and he was like, he stuck his head in the window and he was like, you know, well, we will see what good that money does you where you're going to be at And I guess I blew it off as if, you know, whatever. And I pulled off, but I was -- I admit I was wrong. I had no right to take his money, you know. It was his. He gave it to me, but he asked for it back and I was wrong. But I'm not on the stand for taking his money. I'm on the stand for some robbery stuff.

182

A224

MS. AMENT: Objection.

THE COURT: Mr. Sherman, there is not a question, sir.

BY MR. HARVEY:

Q    Did you burglarize Ashland Griffin's home?

A    No, sir.

Q    Did you kidnap him at gunpoint and take him to the bank?

A    No, sir.

Q    Did you take his money and not give it back at gunpoint?

A    Not at gunpoint, no, sir.

Q    Did you slam him up against the wall while you were in the Griffin house?

A    No, sir.

Q    While pointing a gun at him?

A    No, sir. I don't even own a gun, sir.

Q    Let's talk about Damien. Before May 5th, how often did you and Damien get together?

A    Maybe once every two weeks. Once, twice, maybe. More times on the phone than actually in person.

Q    After this event, after you borrowed the money from Ashland, when is the next time you saw Damien?

A    After I borrowed the money from Ashland?

Q    Yes.

A    Maybe I guess maybe a week before I got arrested

A225

STOCK FORM FMPRN

THE CORBY GROUP 1-800-255-5040

I was trying to get Damien a job.

Q   Why were you trying to get him a job?

A   Because he wasn't working. He wasn't doing anything

Q   Where?

A   Oh, where?

Q   Yes.

A   I was trying to get him a job more so at Ourisman garage  because Damien would be better with his hands. He's not really good with interacting with people or whatever.

Q   Now, it was about a month after you borrowed the money that you got arrested; right?

A   Yes, sir.

Q   After you got arrested, did you see Damien after that?

A   Yes, sir.

Q   Where did you see him?

A   Over D. C. Jail.

Q   When Damien came to see you over at the D. C. Jail, what did you talk about?

A   When he first came over there, I didn't even really talk to him. I talked to Cherie because you only got like a half hour on the visit.  And so I talked to her briefly.  She had told me prior to that that Damien had called the house and asked where was I.   And she told him

that I was locked up.  And so when they came to see me, I talked to her for a little while and then started talking to Damien about why I was locked up.

Q    Okay.  What did you tell him?

MS. AMENT: Objection.

THE COURT: Overruled.

MR. HARVEY: I told Damien, Ashland my friend uptown, the one you met last year, and he was like, at first he didn't even know who I was talking about.  And I just told him again. I said the one I took you up his house. And he said oh, yeah, the one with the big house uptown. And I was like yeah, I said he has got me in jail now. And I said that he done said that I done robbed him.  And he told the police that I got a person with a gun that done came in his house and he got the police riding around looking believing that he has been robbed and took to a bank and made him give up some money to me.  And I stated to him at that time, Damien was like, are you okay? And I kept telling him then that I was all right; that they had no evidence.  I said that I would be home. I did tell him that. I said I will be home in about a hundred days when I go to court.  I said they don't have anything on me. I didn't do anything wrong.  And I said that I will be home, you know, and it's going to blow over in a minute.  And I told them that regardless of how much

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

A227

he's saying that this happened, it's nothing that is going to -- I know that it's going to follow his story. It's going to just change up like lies always do. That's all.

Q     And did you ask Damien to do anything for you while you were locked up?

A     I did ask him to call Ashland. I never even gave him Ashland's phone number. I never asked him to call Ashland and threaten Ashland. All I simply did was ask him to call Ashland and please tell Ashland to tell the prosecutor that he had made it up and that it was not true and to tell her the truth, so that I could get out of jail. And I told Damien to call Ashland and let Ashland know that, you know, he was mad, and it's one thing and it done blew over now. Now you done told these people this story and now I'm really in jail with criminals and real people doing real stuff now. And so it's no longer just a joke no more. And it's real now. And Damien said he would do it for me, but I never gave him Ashland's phone number. And so he never could do it anyway.

MR. HARVEY: Court's indulgence. No further questions, Your Honor.

THE COURT: Okay. Ms. Ament.

MS. AMENT: Thank you, Your Honor.

CROSS EXAMINATION

186

A228

BY MS. AMENT:

Q    Good morning, sir.

A    Good morning.

Q    You're Charles Sherman; correct?

A    Yes, ma'am.

Q    And you live on Pomeroy Road in the Southeast part of the city?

A    Yes, ma'am.

Q    You live there with Cherie Johnson; correct?

A    Yes, ma'am.

Q    Now, what's your relationship with Cherie Johnson?

A    That is my soon to hopefully to be wife, I guess, one day.

Q    But she's not your wife, is she?

A    No, ma'am.

Q    Never has been, has she?

A    No, ma'am.

MR. HARVEY:   Objection.   Calls for a legal conclusion.

THE COURT:   Overruled.

MR. HARVEY:   Your Honor, actually, it does.   If we can approach.

THE COURT: Not on that point. Let's move on.

BY MS. AMENT:

Q    Now, Mr. Sherman, you met Jimmy Griffin when the

187

two of you went to Wilson High School in D.C.; isn't that right?

A    Yes, ma'am.

Q    And you and Jimmy Griffin became friends, didn't you?

A    Yes, ma'am.

Q    And Jimmy took you to his home?

A    Yes, ma'am.

Q    And Jimmy introduced you to his family?

A    Yes, ma'am.

Q    He introduced you to his mother?

A    Yes, ma'am.

Q    His father?

A    Yes, ma'am.

Q    His sister Millan, his baby sister?

A    Yes, ma'am.

Q    And his brother Ashland?

A    Yes, ma'am.

Q    Now, the Griffins were kind to you, weren't they, Mr. Sherman?

A    Yes, ma'am.

Q    They tried to help you out?

A    You got to be more specific on that.

Q    Did you think they tried to help you?

A    No, ma'am.  Everybody wasn't incorporated in it.

188

A230

It was just Jimmy. Nobody else was incorpoated in helping me do anything. I only got to stay there based on Jimmy and it was only for a week or two and just spending the night. Everything came through Jimmy. Nobody like sat down and tried to actually help me do anything. No, ma'am. I was just a friend of his and he was just helping me out.

Q    Now, Mr. Sherman, you have told Marcia Griffin that your mother was dead, didn't you?

A    Yes, ma'am.

Q    And in fact, as you told us yesterday, you told that story a lot; isn't that right?

A    Yes, ma'am, to everybody.

Q    Mr. Sherman, that statement got people to feel bad for you, didn't it?

A    I can't answer that because I don't know. No, ma'am.

Q    But you told people that to get people to feel bad, didn't you?

A    No, ma'am.

Q    There were lots of other things you could have said about your absent mother, weren't there?

A    No, ma'am.

Q    She lived in another town, how about that?

MR. HARVEY:    Your Honor, that's irrelevant.

189

A231

THE COURT:   Overruled.

MR. HARVEY:   It calls for speculation.

THE COURT:   Overruled.

THE WITNESS: Me telling people that my mom was dead, it just basically, it eliminated me from having any other questions being asked about my family and my personal life.  And if I told people that she was in another state, that would lead to another question.  And it just would lead, you know -- you know, one lie tells another lie and it just keeps going.  And so just say that she died and they just leave it alone.  I'm sorry to hear that and they leave it alone.

BY MS. AMENT:

Q    So nobody asked you how she died or when she died?

A    No, ma'am.  They tried to leave it down because they don't really want to bring it up that anybody is deceased in your family.

Q    Because they feel sorry for you?

MR. HARVEY:   How can he testify?

MS.AMENT:   Because they feel sorry for you, Mr. Sherman; isn't that right?

THE WITNESS:   I can't answer that. No, ma'am.

BY MS. AMENT:

Q    Well, when you mentioned to all these people that your mother was dead, did their faces sometimes change?

A232

A    Yes, ma'am.

Q    Did they sometimes say I'm sorry?

A    Yes, ma'am.

Q    Did they sometimes say that was really bad for you?

MR. HARVEY:  Objection.  Asked and answered, Your Honor.

THE CORUT:  Overruled.

THE WITNESS:  They would just say I'm sorry to hear that.  I'm sorry that that happened.  And I'd say it's okay and leave it alone.

BY MS. AMENT:

Q    Now, Mr. Sherman, there came a point in time when the Griffins' kindness to you, their family's kindness ended, didn't there?

A    The Griffins' kindness ended?

Q    Yes.  You testified that they were kind to you?

A    Yes, ma'am.

Q    And that ended, didn't it?

A    No, ma'am.

Q    There came a time when you weren't allowed to stay in their home any more?

A    Yes, ma'am.

Q    Now, Mr. Sherman, you didn't feel good about that, did you?

A    I knew it was coming anyway, and so it didn't

191

A233

really bother me.  No, ma'am.

Q    It didn't bother you at all?

A    That I couldn't stay there any more?

Q    Yes, Mr. Sherman, that you couldn't stay there any more?

A    Not really.  No, ma'am. It boethered me a little that they probably didn't want me and Jimmy to be friends, but not thatI couldn't stay there. No, ma'am.

Q    You liked staying there, didn't you?

A    Yes, ma'am.

Q    Now, Mr. Sherman, you continued to be friends with Jimmy Griffin even after you weren't staying with his family, didn't you?

A    Yes, ma'am.

Q    And you would see each other and do things together?

A    Yes, ma'am.

Q    Play basketball together; isn't that right?

A    Yes, ma'am.

Q    And you sometimes still went over to Jimmy's house; isn't that right?

A    Yes, ma'am.

Q    Now, you testified that friendship didn't last?

A    That me and Jimmy's friendship didn't last?

Q    Yes.  You and Jimmy's friendship?

192

A234

A    Yes, ma'am.

Q    Now, you stated that -- well, actually, let me ask you this. Let's talk about the incident with the tennis shoes. Do you remember that?

A    Yes, ma'am.

Q    Now, you asked Jimmy Griffin if you could wear his Nikes, didn't you?

A    Yes, ma'am.

Q    And he said no, didn't he?

A    He didn't actually say no. Jimmy just kind of said that they weren't mine. He said that they were Bean's shoes and he said that Bean didn't want nobody to wear his tennis shoes. And so he said he couldn't let nobody wear them.

Q    So he told you that he couldn't let you wear the shoes, didn't he?

A    Yes, ma'am.

Q    And Mr. Sherman, you took them anyway; isn't that right?

A    Yes, ma'am.

Q    You wore them anyway?

A    Yes, ma'am.

Q    And when Jimmy Griffin confronted you, you were wearing them; isn't that true?

A    Yes, ma'am.

193

A235

Q    And Jimmy Griffin wasn't happy about that, was he?

A    No, ma'am.

Q    And he told you that your friendship was over, didn't he?

A    Yes, ma'am.

Q    Because he confronted you wearing shoes that you had taken from him?

A    I still didn't look at it as I took anything from him. He's my friend and I wouldn't never take nothing from my friend. And so I didn't take anything from him. I just -- I wore something that I didn't have no business wearing, but it was something that we always do to each other. And so --

Q    He accused you, Mr. Sherman, of stealing from him, didn't he?

A    Yes, ma'am.

Q    And he arrived at that conclusion becuase you took something he had told you you couldn't have?

MR. HARVEY:  Objection.

THE COURT:  Sustained.

THE WITNESS: Yes, ma'am.

THE COURT:  Sustained.

BY MS. AMENT:

Q    And your testimony here today is that you didn't steal it; is that right?

A    I'm not saying that I didn't steal it. I'm just

A236
194

saying that I didn't steal it maybe in the context that legal terms that you probably putting it in, no, ma'am.

Q    I'm not asking you for legal determinations, Mr. Sherman.

THE COURT: I think we have been over it, Ms. Ament.  Let's move on.

BY MS. AMENT:

Q    So you just borrowed the tennis shoes; is that your testimony today?  You just borrowed them?

A    No, ma'am.  I didn't have permission to wear them.

Q    Now, after that you and Jimmy Griffin weren't friends any more, were you?

A    No, ma'am.

Q    Now, Mr. Sherman, on May 5th of this year, you needed some money; isn't that right?

A    Yes, ma'am.

Q    And you needed that money to make a car payment, didn't you?

A    Yes, ma'am.

Q    And what's the car that you needed to make a payment on?

A    Cherie's car note and car insurance, I think.

Q    And Cherie's car note was for a black Nissan, wasn't it?

A    Yes, ma'am.

195

A237

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

Q    Cherie's car note was for -- well, I would like to show you what has been admitted into evidence as Exhibit No. 4A to 4D or 4A to 4E.  That's Cherie's car that is in those pictures, isn't it, Mr. Sherman?

A    Yes, ma'am.

Q    And you got to drive Cherie's car when you needed a car, didn't you?

A    Yes, ma'am.

Q    So on May 5th you took Cherie Johnson's car; isn't that right?

A    Yes, ma'am.

Q    Now, is it your testimony before this jury that you did not pick up Damien Nicholas in that car?

A    Yes, ma'am.

Q    You did not pick him up?

A    Yes, ma'am.  You won't find a hair fiber in there of his.  No, ma'am.  If you swept the whole car over five thousand times, you wouldn't.

Q    And it's your testimony that you didn't go to Damien Nicholas' home that morning; is that right?

A    Yes, ma'am.  I didn't even stop by his house at all that day.

Q    So you went to Ashland Griffin's home?

A    Yes, ma'am.

Q    Who else was home at Ashland's house when you got

there?

A    Ashland had told me on the phone that --

Q    No, I'm asking you, I'm not asking what he told you. Who else was home?

A    I'm only going on what he told me on the phone and from what he told me on the phone was to come at a time when no one was there.

THE COURT:  The question is only when you got there, who else was there?

THE WITNESS: Nobody else was there, ma'am.

BY MS. AMENT:

Q    And you walked into that house where you had been before; is that right?

A    Yes, ma'am.

Q    And you talked to Ashland Griffin?

A    Yes, ma'am.

Q    Did you go to Ashland Griffin's room?

A    Yes, ma'am.

Q    And did you go to any other rooms?

A    No, ma'am.

Q    And it's your testimony that no one else -- Mr. Sherman, are you crying again?

MR. HARVEY: Objection, Your Honor.

THE COURT:  Sustained.

BY MS. AMENT:

A239197

Q    Mr. Sherman, isn't it that you cry the same way that you get people to feel sorry for you?

MR. HARVEY:  Objection, Your Honor.

THE COURT: I can't see if he's crying, but let's just move on to a different area.

BY MS. AMENT:

Q    All right, Mr. Sherman.  Showing you what has been admitted into evidence as Exhibit 10H, G, and J --

THE COURT:  The record will reflect that they have been shown to counsel.

BY MS. AMENT:

Q    That's the house you went to; isn't it, Mr. Sherman?

A    Yes, ma'am.

Q    It's on Locust Road, isn't it?

A    Yes, ma'am.

Q    And you parked your car on the street that is pictured in that photograph, didn't you?

A    Yes, ma'am.

THE COURT:  So the record is clear, he has a number of photographs in his hand.  If you want to ask him -- there should be numbers on the back -- which one is the number that reflects the house, Mr. Sherman?

THE WITNESS:  4G.

THE COURT: Okay. You asked him a question about where the car was parked.  Do you see that in any of those

A2408

photographs?

THE WITNESS: I was parked right there in front of the house.

THE COURT: Okay.  What number is that?

THE WITNESS:  4G.

THE COURT:  Okay. You may continue.

BY MS. AMENT:

Q    Now, Mr. Sherman, you and Ashland Griffin eventually left that house, didn't you?

A    Yes, ma'am.

Q    And you drove into Silver Spring, Maryland?

A    Yes, ma'am.

Q    How long did that drive last?

A    About five minutes or about eight minutes.

Q    So it took you about five minutes to drive to the Chevy Chase Bank; is that correct?

A    About eight minutes actually.

Q    About eight minutes?

A    Yes, ma'am.

Q    So after that eight-minute drive, you parked in the parking lot; correct?

A    Yes, ma'am.

Q    And you and Ashland Griffin walked into the Chevy Chase Bank?

A    Yes, ma'am.

STOCK FORM FWRRN

THE CORBY GROUP 1-800-255-5040

A241

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

Q    And you got in line?

A    Yes, ma'am.

Q    And you talked to each other as you were standing in line, didn't you?

A    Not that I recall. I don't know. I don't know if I said anything to him or not. I don't know.

Q    And you went up to the teller's window; correct?

A    Yes, ma'am.

Q    And that was the bank teller that we saw here in court; is that right?

A    Yes, ma'am.

Q    And Ashland Griffin talked to the teller?

A    Yes, ma'am.

Q    And he made some arrangements about what to do with his money; didn't he?

A    Yes, ma'am.

Q    Because he had to do some transfers to get the money altogether so that he could get it out; isn't that right?

A    I don't know specifically. Like I said, I don't know because I wasn't listening. I was just standing there looking around, you know.

Q    Now, Mr. Sherman, you talked to the bank teller too, didn't you?

A    Yes, ma'am.

200

A242

Q    And you asked about opening a bank account?

A    Yes, ma'am.

Q    And she gave you some paper and some information?

A    Yes, ma'am.

Q    And you didn't give anything back to her?

A    No, ma'am.

Q    You took it with you?

A    No, actually, I did give her back the papers and told her that she could throw them away. I said I just wanted to fill it out and to see how to do it. That's all, but I didn't take anything with me, no, ma'am.

Q    And you went back out into the parking lot?

A    Yes, ma'am.

Q    Now, where did your discussion with Ashland Griffin take place?

THE COURT:    About what, Ms. Ament?

MS. AMENT:    About what was going to happen with the money after they left the bank.

THE COURT: Okay.

THE WITNESS: Probably at the door to the bank as were leaving out.

BY MS. AMENT:

Q    Inside or outside?

A    Outside like pushing the door out going outside.

Q    And were you talking as you walked or were you

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

A243

standing still?

A    We talked briefly as we were walking to the door and then when we got outside, we kind of like stood there. We didn't even get in the car. We just stood outside and talked about this for a minute.

Q    Now, when you were back inside the bank after the -- the teller gave Ashland Griffin the money; correct?

A    Say that again, please.

Q    Back inside the bank, the teller, Ms. Ngameni, who we saw here in the courtroom?

A    Yes, ma'am.

Q    She gave Ashland Griffin the money, didn't she?

A    Yes, ma'am.

Q    How much did she give him?

A    From where are you asking me to go on. I asked to borrow a thousand dollars. That's what I expected to get. I was told that he was only able to withdraw nine hundred and seven dollars and so that's obviously what he got.

Q    All right.    When you were told that it was only nine hundred and seven?

A    At the Police Station. I had, once I got to the Police Station and he had told me when I stated to the officer that I wanted to borrow a thousand dollars, I told him that I did only get nine hundred and seven dollars though, and so I was short. But it didn't even matter at

202

A244

that point.

Q   So when Ashland Griffin got that money, he didn't tell you anything to the effect of Charles, I'm sorry I can't get the whole thousand dollars, but here's nine hundred and seven?

A   No, ma'am.  I didn't even know that it was short until I had realized that it was ninety-three dollars short.

Q   So in fact, the first time you learned it was nine hundred and seven dollars was when you got home?

A   Yes, ma'am.

Q   It wasn't at the Police Station?

A   When I got to the Police Station, they had asked me, you know, about the particular charges.

Q   Mr. Sherman, my question to you was --

MR. HARVEY:  Objection.  The witness was trying to finish answering the question and she has to let him finish before she goes.

THE COURT: You may answer the question.

THE WITNESS: Okay.  The first time I knew was at my house.

BY MS. AMENT:

Q   So Ashland Griffin gave you the money where?

MR. HARVEY: Objection.  Asked and answered.

THE COURT:  Sustained.

203

A245

MR. HARVEY:  At least twice.

THE COURT:  Again --

THE WITNESS: Just as we were leaving.

THE COURT: Just one second.  Would you come to the bench?

MR. HARVEY: Yes, Your Honor.

(Bench conference.)

MR. HARVEY: Your Honor, that at least twice should not have been said.  I apologize.

THE COURT: This is the last time.  I have been as tolerant as I can be and I certainly don't want to do anything to further create in your client's mind that I have been unfair to him. He obviously thinks that I have been.  And as you made an objection to ask me to recuse myself, but quite apart from his feelings, he's on trial for some very serious charges and he's facing a lot of serious charges.  And I expect him to do things that I wouldn't expect from an attorney who is licensed and a professional and has an obligation to the Court, and to the administration of justice.  And so I allow him to say a lot of things that I would never tolerate from an attorney and you're way over the line. I don't how much more clear I can be to you, Mr. Harvey.  It's just unprofessional and I don't know how much clearer. I'm not going to point a finger at you, but I'm losing respect for

A24604

you as a lawyer.  Let's move on.

(Open court.)

MS. AMENT:  Was the objection sustained, Your Honor?

THE COURT: It was sustained.

MS. AMENT:  Thank you, Your Honor.

THE COURT:  The objection was sustained. You may move on to another question.

MS. AMENT: Thank you very much, Your Honor.

BY MS. AMENT:

Q    Now, Mr. Sherman, it's your testimony that you and Ashland Griffin got back into Cherie Johnson's Nissan; isn't that right?

A  Yes, ma'am.

Q    Now, when you got back in there, were you still discussing the money?

A    Briefly. It turned into more.  And so probably an argument at that point.

Q    And it's your testimony that you drove Ashland Griffin home?

A    Yes, ma'am.

Q    So you drove him -- it was about another eight minute drive to get back to Griffin's home; is that right?

A    Yes, ma'am.  I assume so. Yes, ma'am.

Q    Now, did you go back into the Griffin home when

STOCK FORM FMRPIN

THE CORBY GROUP 1-800-255-5040

A247 05

you dropped him off?

A    No, ma'am.

Q    What did you do?

A    Pulled off and went home.

Q    So you never went to Damien Nicholas' house after leaving Ashland Griffin?

A    I never even went to Damien's house at all that day. I never even talked to Damien at all that whole day.

MS. AMENT:    Court's indulgence, Your Honor.

BY MS. AMENT:

Q    All right. Now, Mr. Sherman, eventually you were arrested in this case; correct?

A    Yes, ma'am.

Q    And while you were at D. C. Jail, Damien Nicholas came to visit you there?

A    Yes, ma'am.

Q    Now, Damien Nicholas is a friend of yours, isn't he?

A    Yes, ma'am.

Q    And he came to visit you along with your soon-to-be not yet wife; is that correct?

A    Yes, ma'am.

Q    And you visited in the visiting room there at the jail; is that right?

A    Yes, ma'am.

206

A248

Q    And you talked on the phone; is that correct?

A    Yes, ma'am.

Q    And you put the little earpiece of the phone up to your ear and you talked through the mouth part; is that right?

A    Yes, ma'am.

Q    And Damien did the same when he talked to you and Cherie Johnson did the same when she talked to you; right?

A    Yes, ma'am.  I had to have both of them on my ears.

Q    What was that?

A    I had to have both of the phones on my ears while I talked to them because it's two receivers.  And so I could talk to both of them.

Q    But you always didn't talk to both of them at the same time, did you?

A    I talked to Cherie first and then talked to both of them together.

Q    And you talked to Damien by yourself too, didn't you?

A    No, ma'am.  Cherie was on the phone.

Q    And that was -- the first time they came to visit you was on June 7th; correct?

A    Yes, ma'am.

Q    And they came to visit you again on June 28th;

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

A249

is that right?

A    Whatever day that they came the second time, yes, ma'am.

Q    And you talked to Cherie?

A    Yes, ma'am.

Q    And you talked to Damien?

A    Yes, ma'am.

Q    Now, you asked -- well, you told Damien why you were locked up, didn't you?

A    Yes, ma'am.

Q    And you asked him to call Ashland Griffin, didn't you?

A    Yes, ma'am.

Q    Now, Mr. Sherman, what were you wearing on May 5th?

A    That I couldn't tell you.  You would have to play the video tape.  I couldn't tell you that.

MS. AMENT:  Court's indulgence, Your Honor.

BY MS. AMENT:

Q    Now, Mr. Sherman, on May 5th you were wearing a white tee-shirt; is that correct?

A    I said I can't tell you that.

Q    And you had a black tee-shirt over it?

A    I would have to see the video tape. I can't tell you what I was wearing. I don't know.

Q    How tall are you, Mr. Sherman?

208

A250

A    I'm five-six.

Q    And how much do you weigh?

A    About a hundred and fourteen pounds.

Q    And how much did you weigh on May 5th?

A    About a hundred and sixteen pounds.

THE COURT:  Could you step down for just one second.  Approach the bench.

(Bench conference.)

THE COURT: I understand sometimes, Ms. Ament, in a situation where the identification of a person is at issue, certainly corroborating the accuracy of the complainant's testimony with respect to what the person was wearing is important.  In this case there is not an issue of identity. He has admitted that he is in the bank, no matter what he's wearing. It's not even an issue in the case.  And so to have to go through, I think is unnecessary.  It's not a stranger case or a case  where you have to corroborate your complainant's version by saying the complainant was accurate by the description of the clothing.  The defendant has admitted he's the one in the bank.  Everyone knows he's the one in the bank.

MR. HARVEY:  Your Honor, could I make a request? I understand that Ms. Ament has a particular limitation and because of that, her Assistant is constantly helping her, but there are times when the discussions get kind of

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

A2549

loud and those discussions are heard by me. And if I can hear them, I'm certain the members of the jury can hear them as well. And I would simply request when they have their discussions that they be quiet.

THE COURT: I have not been able to hear anything.

MR. HARVEY: But I have.

THE COURT: But you're closer and I understand that point. Thank you.

(OPen court.)

BY MS. AMENT:

Q    I would like to show you what has been marked and admitted into evidence as Government's Exhibit No. 9. Now, that's a group of pictures, isn't it, Mr. Sherman?

A    Yes, ma'am.

Q    And one of those pictures is of Damien Nicholas, isn't it?

A    Yes, ma'am.

Q    Now, Mr. Sherman, you testified yesterday that you have met Michelle Howe; is that right?

A    Yes, ma'am.

Q    And how do you know Michelle Howe?

A    I don't really know her like that. I met her maybe like twice altogether. I think the second time, the second time I met her, we all went to the basketball court together. Me, her, Damien, two of Ashland's friends

A252

and Ashland up in Shepherd Park. I only met her like twice.

Q    And Michelle Howe is an African-American woman; isn't she?

A    Yes, ma'am.

Q    And she has got highlights in her hair, doesn't she?

A    I don't know. She changes her hair.

Q    Now, I would like to show you Government's Exhibit No. 7. That's another group of pictures, isn't it, Mr. Sherman?

A    Yes, ma'am.

Q    And Michelle Howe's picture is one of those, isn't it?

A    Yes, ma'am.

Q    Now, Mr. Sherman, you talked to some other --- you talked to somebody else other than Damien Nicholas while you were in the jail, didn't you?

A    Yes, ma'am.

Q    And in fact, you talked to another inmate about this case; isn't that right?

A    Yes, ma'am.

Q    Now, that inmate is an older man, isn't he?

A    Ma'am?

Q    He's an older gentleman, isn't he?

211
A253

A    Yes, ma'am.

MR. HARVEY: Objection, Your Honor. Exceeds direct examination.

THE COURT: Overruled.

MR. HARVEY: May we approach, Your Honor?

THE COURT: Certainly. Step down.

(Bench conference.)

MR. HARVEY: We're getting into the area that we discussed before. I asked him no questions about that purposely because the Government -- you had indicated to me that I would not be able to do that now beyond asking him did you talk to him. And I guess that's fine, but I asked him no questions about this on direct examination.

THE COURT: Right. And I indicated that to speed this along since we know this person is going to testify, if you want to put in denial in your case yourself, you said you would rather have surrebuttal, but once his credibility is an issue, once he has denied committing the offense with respect to the admission he has made to other persons and once he's on the witness stand, this is a credibility issue, you know. And if he admits it, then we won't have to rebut it. And of course, you can probably handle it yourself and just have him deny it and maybe it will all go away if he denies it. And they will probably have to go to call the witness.

212
A254

STOCK FORM FMRRN

THE CORBY GROUP 1-800-255-5040

(Open court.)

THE COURT: You may proceed.

BY MS. AMENT:

Q    All right. Mr. Sherman, when you were initially arrested in this case, you were arrested on a charge of burglary while armed; is that correct?

A    Yes, ma'am.

Q    And when you talked to this inmate in the jail, he's an older gentleman; correct?

A    Yes, ma'am.

Q    And he has the nickname O.T. for Oldtimer, doesn't he?

A    Yes, ma'am.

Q    And you consulted with him, didn't you?

A    Yes, ma'am.

Q    And you told him that you were charged with breaking and entering while armed; isn't that right?

A    Yes, ma'am.  That's what I believe the charge was.

Q    And then you described how you and Damien went to Ashland Griffin's house.  You described that to Mr. Johnson,  O.T., didn't you?

A    No, ma'am.

Q    You never told him that you went to Ashland Griffin's house with someone else?

A    No, ma'am.

213
A255

Q    And you never described to this person how you told him you had a gun and went into the house, did you?

A    No, ma'am.  The only thing I did was when I got over to D. C. Jail, I didn't know who to talk to about my case.  Some of the guys over at the jail had told me numberous times to not talk to anybody about your case. They said the reason for that was because when you --

MS. AMENT: Your Honor, would the witness just --

THE COURT:   Sustained. Just one second. Sustained. Is there a specific question?  He has denied talking to O.T. and he has denied telling O.T. that he committed this offense.

MS. AMENT:  Well, you did talk to O.T., didn't you?

THE WITNESS:  All I did was simply tell him, he claimed to be a law librarian.  And all I did was simply tell him, I showed him the paperwork thatmy lawyer gave me with everything on it that Ashland had accused me of doing.  And I told him everything that Ashland had said I did and why Ashland had said I did.  And then he gave me his advice as far as what I should do as far as the case.  And in turn I have now found out different. You know, as what guys do in jail.

BY MS. AMENT:

Q    And isn't it a fact, Mr. Sherman, that you also told him that your accomplice on that day had come and

214
A256

visit you?

A    No, ma'am.

Q    And isn't it a fact that you told O.T. that your accomplice in this case had come to visit you with your girlfriend Cherie?

A    No, ma'am. I told him that my fiancee had came to see me and that a friend of mine had came with my fiancee. I didn't never say anything about an accomplice or anything like that. No, ma'am.

Q    And didn't you also tell O.T. that the person who had been driving the car that you used in this kidnapping was your accomplice's cousin?

A    No, ma'am. Not atall. Everything that he is stating that he knows from me telling him, all he's doing different is just saying that I admitted something just to get out of a charge in jail like all criminals do.

THE COURT:   Ask another question.

THE WITNESS:   That's the only thing he has done.

THE COURT: Okay. Let's move on.

BY MS. AMENT:

Q    Didn't you also tell O.T. that you had come to court and cried for fifteen minutes to come to try to get something from the Judge?

MR. HARVEY: Objection, Your Honor.

THE COURT: Overruled.

215

A257

THE WITNESS: No, ma'am. Everything you're hearing is something to try to get him out of jail. That's all. He does know about my case. I told him in detail about it. And all he's doing is telling you that I admitted it. That's all.

THE COURT: Okay. Let's ask another question. Anything further, Ms. Ament?

MS. AMENT: Court's indulgence, Your Honor.

BY MS. AMENT:

Q    Now, Mr. Sherman, you're the same Charles Sherman who was convicted in Maryland of robbery; is that correct?

A    Yes, ma'am.

THE COURT: Ladies and gentlemen, you just heard evidence that Mr. Sherman has been previously convicted of a crime. His prior criminal conviction is admitted into evidence solely for your consideration in evaluating his credibility or believability as a witness. The fact that Mr. Sherman was convicted of a crime in the past is not evidence that he is guilty of the other offenses for which he has been charged in this case. You must not draw any inference of guilt against Mr. Sherman from his prior conviction. You may only consider this prior conviction in evaluating his credibility or the believability of his testimony in this case.

MS. AMENT: No further questions, Your Honor.

THE COURT: Redirect.

216

A258

REDIRECT EXAMINATION

BY MR. HARVEY:

Q    Do you know what a common law wife is?

A    Yes, sir.

MS. AMENT: Objection, Your Honor.

THE COURT: Overruled. You may ask the question since you asked the question about whether or not they were married. Go ahead.

BY MR. HARVEY:

Q    Do you know what a common law wife is?

A    From what I understand, probably so. Yes, sir.

Q    Well, what is your understanding of a common law wife?

A    It's somebody who is in a six-month relationship with somebody and they stay in the same household.

Q    Had you lived in the same household with Cherie Johnson for over six months?

A    Yes, sir.

Q    All right. So do you consider her to be your wife?

A    Yes, sir.

Q    You indicated on cross-examination that you had certain bills that you needed to pay and that's why you borrowed the money from Ashland. What were the bills that you had to pay?

A    Let me think back to May. Car note, the car

insurance. We had an eighteen hundred dollar phone bill that I wasn't going to dare try to pay off, but I was going to try to at least put down something on it because they had turned our phone off. And so in order to get it turned back on, you just have to put down something and just the phone bill, the car insurance, the car note and some food. And that's all for me and Cherie and the baby.

Q     You indicated that when you went over to the jail, you asked some of the guys if there was somebody you could talk to?

A     Yeah, I had asked them. Yes, sir.

Q     And who did they tell you that you could talk to about legal matters?

A     Well, the guys had directed me to some guy that worked in the law library who was not an inmate who was actually a worker there. And a few other guys had directed to the guy that Ms. Ament has named as being O.T. to talk to because he was considered not a jailhouse -- I mean, he was not considered the actual worker that worked in the jail, but he was like what you call a jailhouse lawyer inside that particular unit. He would quote unquote help individuals with their cases. But the old guys told me, you know, not to discuss anything about my case because people try to get off of their charges like that with saying

A260

that you admitted something, but I did anyway.

Q    So you went and talked to O.T.?

A    Yes, sir.

Q    What did you ask him?

A    The first thing, the first question I wanted to know from him when I first met him and they had told me he knew a little bit about the law, I wanted to know initially, the first thing I remember asking him before I even started telling him about my case was what can you do to somebody who accuses you of a crime and how can you prove that you didn't do it. That was the first thing I wanted to know from the start. And then that opened up initially all of the other -- my telling him about the case. He gave me some numbers to different organizations and I got on the phone and I started trying to call everybody that I could.

Q    Okay. And then what did you tell him about your case?

A    At first I didn't have no paperwork on my case. My lawyer hadn't given me any paperwork. And so I just was telling him first-hand from what the police had read to me in Ashland's statement at the Police Station that he said that I did. And I just told him that I borrowed some money from Ashland and I told him briefly that me and Ashland had been friends for years. I told him Ashland's

A264119

mom does not allow for me to be friends with neither him nor his brother nor borrow any money from either one of them. And I said that Ashland lent me some money.

MS. AMENT: Your Honor, I'm going to object.

THE COURT: Overruled. He's explaining all the things that he claims that he told this person O.T. You may continue.

THE WITNESS: I told him that Ashland had lent me the money and I said that due to the fact that I decided to keep the money and not give it back to him, I said that Ashland has now told the police and has his mom believing I took the money from him. And I told him, I said they have the bank video. And I said they took fingerprints of this place he claims that I had another person in there. And I said there is no fingerprints of this other guy that was supposed to have been there. I said that he done told them that I took merchandise out their house, radios and jewelry and boom boxes and all types of accessories that's in their bedrooms. I told him that Ashland had stated that I had did this and that the police at this time was running around town looking for some accomplices and looking for some people that he allegedly said that I did this with.

BY MR. HARVEY:

Q    Now, you indicated that you went to him for help. Help with what?

A26220

A    He wanted to know -- he asked me in detail for me to tell him in detail what had happened because when I asked him initially, I wanted to know from him -- I said Mr. Johnson, I said, when you get arrested there are a lot of things that's against you as far as like people finding you guilty or trying to find you guilty. But what is in your favor to help you when somebody is accused you of something that you didn't do. And so then that's when he asked me, well, you have to sit down and tell me in detail what it is that they accused you of doing. And so I had to tell him in detail what it is that they accused me of doing. And at a later time when my attorney finally brought me the paperwork, I ended up showing him the paperwork and letting him read all the paperwork for himself and through time, just kept consulting with him.

Q    Now, are you referring to me or referring to someone else as being your attorney at that time?

A    The old attorney.

Q    So this other attorney gave you some paperwork with respect to your case, your case file?

A    Yes, sir. He gave me all of the, like apparently like the police papers or whatever that Ashland wrote and he gave me all the papers of Ashland's statement and what Ashland said at the Police Station and what apparently happened. And after I let Mr. Johnson read them

A263

and all, then I sent them home because he in turn told me don't leave them in jail because other people at that time would read it and say that you admitted that you did it to get off of their charges. And so I sent them home to Cherie after I let him review them.

Q    This is what O.T. told you?

A    Yeah, and now he's --

THE COURT: Okay. That's another question.

BY MR. HARVEY:

Q    Showing you what has been marked as Government's No. 8A, I would ask you to look at these camera shots. Do you have a cold?

A    Yes, sir.

Q    All right. I'm showing you the first photograph on the bottom going up. Do you recognize what's in that photograph?

A    Yes, sir.

Q    All right. What's in the photograph?

A    That's me and that's Ashland.

Q    All right. Identify who you are by description, what you're wearing if you can tell and what Ashland is wearing?

A    From the way Ashland stands, I know that's Ashland. And so that's me and I have a black shirt on and Ashland has a white tee-shirt on.

222
A264

Q    All right. Let's go to the next shot. What's that a photograph of?

A    That's Ashland and that's me behind him.

Q    All right. So for the record, Ashland is still wearing the white tee-shirt?

A    Yes, sir.

Q    And you're standing behind him?

A    Yes, sir.

Q    All right. Let's go to the third photograph. What's happening in this photograph?

A    That's Ashland there and he was pulling out some papers. I don't know if he was getting together his, looks like, I don't know if he was getting together his checks or his paperwork, his pin number or what, but that's me beside him right there.

Q    All right. Let's go to the fourth photograph. What do you see happening there?

A    He turned around and me and him was just talking briefly and I don't know about what, but we were just talking.

Q    Let's go to the fifth photograph. What's happening here?

A    Ashland is standing there and that was me looking over at that lady that was standing there.

Q    Let's look at the sixth photograph. What's happening here?

A    Ashland is at the teller and I'm just standing

STOCK FORM FWRRN

THE CORBY GROUP 1-800-255-5040

A265

there trying to figure out why don't he hurry up, really.

Q    The next photograph?

A    I can't really see anything.

Q    Can you tell what you're wearing by these photographs?

THE COURT: Other than what he has previously described already.

MR. HARVE:  Yes.  Do you have any other article of clothing on that you have not previously described?

THE WITNESS: Bluejeans. I had on a white tee-shirt with a black tee-shirt over it and bluejeans and it looks like I had on some boots, some brown, yeah, my brown boots.

BY MR. HARVEY:

Q    Did you have a apron on?

A    Yeah, I think my work apron, yes, sir.

Q    From where?

A    From Food Lion.

Q    Okay. Mr. Sherman, did you commit this offense?

A    No, sir.  As God is my witness, I didn't.

MR. HARVEY: No further questions, Your Honor.

THE COURT:  Thank you very much. You may step down. The Court Reporter needs a break and we will take ten minutes.  I want to finish this so that we can get finished with the trial.  We will take ten minutes.  Thank you.

(Thereupon, at 11:25 a.m., the jury was excused.)

224

A266

THE COURT: I would assume since we didn't have any questions with regard to the prosecutor that's going to end the defense case since you did not ask him any questions at all about that. And so we're going to -- that's going to be it. And we will go ahead and wrap this case up.

MR. HARVEY: Your Honor, I will have to apologize, but I'm going to have to admit that I made a mistake and in trying to focus on moving along, I did not question him about that act. That's my mistake and not his. Let me tell you what I would request of the Court.

THE COURT: -- second so we can productively end this trial. Mr. Sherman has a right, a constitutional right to put on a defense. And one of the things you proffered to me yesterday was that you wanted to call an Assistant U. S. Attorney apparently to corroborate a claim that Mr. Sherman has made that Mr. Nicholas had robbed him, kidnapped him and somehow --

MR. HARVEY: Not Mr. Nicholas..

THE COURT: Well, someone else had done it and Ashland found out about it and therefore, somehow Ashland and Damien knew about this. And therefore, they entered into this conspiracy. I assume it must have happened according to this theory of the case that after they left the bank, after this failed transaction, that somehow Damien was contacted. Damien then goes to the house and they

225

A267

somehow, I guess, burglarize the premises and they get everyone involved on a conspiracy to shift the blame. Damien decides to plead to a life offense for an offense that he didn't commit. And that's your theory of the case and that's what your client says he wants the jury to hear. And you want him to get on the witness stand and say yeah, I was -- there was some other burglary and I was kidnapped. And if he wants to say that, he's perfectly entitled to say it if that's his defense and if he wants the jury to hear it. If he wants to get on the stand and say it, he can say it, but I will not have a prosecutor, I can't imagine why the prosecutor would come in and just provide hearsay testimony. But if he wants to get on the witness stand and suggest there was a reverse conspiracy going on, then that's fine and we will take ten minutes. And if he wants to get on the witness stand and say something else that he did not testify to, then that's fine.

MR. HARVEY: That's what we will do.

THE COURT: Let's take ten minues. That's all we need to say about it. If he wants to get on the stand, that's fine.

MR. HARVEY: I do, Your Honor, but basically, the point I wish to be made to the jury is just that he did report it to the police and that he did have those conversations with Mr. Flood. Now we could stipulate if the

226

A268

Government would agree to stipulate that he did come in, met with the U. S. Attorneys office and tell them that story. I mean, that's pretty much along the line of what the Government was able to do with some of the other witnesses to verify certain things and certain aspects of Ashland's testimony. And that is all that I want Mr. Flood for is for him to testify that this gentleman came to him and told him this story more than a year before this occurred with respect to Ashland.

THE COURT: Again, if Mr. Sherman --- part of the defense theory is not only this aborted transaction, but some of this reverse conspiracy, then that's fine if he wants to testify to that. Now, maybe the prosecutor will say sure, I will stipulate that he came and told me about this so we don't have to put the prosecutor on. And if he wants to argue these different theories of why he's not responsible or why Damien may have falsely accused him and pled guilty to an offense he didn't commit and subjected himself to life imprisonment, that's completely his choice. If he wants to do that, he can do that. I'm not the gatekeeper. Any defense theory he wants to put on is entirely up to him. And so maybe Ms. Ament will think about and I will stop talking. The Court Reporter has already --- it's four minutes past the break I promised her and we will take ten minutes. Thanks.

227

A269

(Thereupon, at 11:30 a.m., the proceedings were recessed; and the proceedings resumed at 11:40.)

THE COURT: Mr. Sherman, your lawyer wants to ask you do you want to get back on the witness stand and do you want to put this in with Mr. Flood. I told you what I think. This is your choice.

THE DEFENDANT: Yeah.

MR. HARVEY: Come on back.

(Thereupon, the witness returned to the stand.)

THE DEFENDANT: No, no, no need, no need.

THE COURT: Let's recall the case for the record.

THE DEPUTY CLERK: Okay. Calling Your Honor's trial calendar, United States v. Charles Sherman, Case No. F-3351-00.

THE COURT: The parties are here. I was about to bring the jury in because counsel for Mr. Sherman indicated that he wanted to reopen the direct examination. I understand there has been some discussion about it, Mr. Sherman. Do you wish to re-take the witness stand or not?

THE DEFENDANT: No, sir.

THE COURT: You have discussed this with your lawyer and gotten his advice?

THE DEFENDANT: Yes, sir.

THE COURT: And it's your decision that you don't wish to say anything further in regard to the matter we were

228

A270

discussing?

THE DEFENDANT: Yes, sir.

MS. AMENT: Your Honor, may I just inquire then through counsel whether I can page Mr. Flood and tell him he's free to go?

THE COURT: Yes, you can.

Okay. Now, all we need to do is tie together this -- is there any other testimonial evidence that the defense is going to present other than any documents that we need to put in. And then we will see if there is any rebuttal and we will break for lunch because Mr. Harvey has -- the Government proffered that they want some rebuttal, and he needs to listen to a tape. But let me ask Mr. Harvey is there any further testimonial evidence?

MR. HARVEY: Yes, two other witnesses, Your Honor. They will both be short.

THE COURT: Are they here now?

MR. HARVEY: Yes.

MS. AMENT: And Your Honor, do I have Lewis and Jencks information for these witnesses?

MR. HARVEY: She knows who both of them are and one is the police officer, Officer Covington and Cherie Johnson. And she also knows her and has placed her before the grand jury, and so she has that.

THE COURT: Okay. That's fine then. Let's finish

A271₂₂₉

up the defense case then.  And let's get these last two witnesses in and see if we can at least get the direct on, O.T., if he's going to testify.  And then this afternoon we will be able to argue the case to the jury and instruct probably Wednesday morning.

(Thereupon, the jury returned to the courtroom at 11:45 a.m.)

THE COURT: Your next witness, Mr. Harvey.

MR. HARVEY: Your Honor, at this time the defense would call Officer Nathaniel Covington.

Thereupon,                                    (11:46 a.m.)

NATHANIEL COVINGTON,

having been called as a witness for and on behalf of the Defense, and having been first duly sworn by the Deputy Clerk, was examined and testified, as follows:

DIRECT EXAMINATION

BY MR. HARVEY:

Q     Please state your full name spelling your last name for the record.

A     Officer Nathaniel Covington, last name spelled C-o-v-i-n-g-t-o-n.

Q     And how are you employed, Officer Covington?

A     The Metropolitan Police Department, Fourth District, Crime Scene Search Unit.

Q     And what does the Crime Scene Search Technician do?

A272

# Exhibit 48

**Rachel Davis**

| | |
|---|---|
| **From:** | <kascar@aol.com> |
| **To:** | <shellischade@sbcglobal.net>; <jj@gradoni.com> |
| **Cc:** | <Susanr1961@aol.com>; <rachel@kscardino.net> |
| **Sent:** | Thursday, February 26, 2009 7:41 AM |
| **Subject:** | US V. EBRON - DEADLINE FOR DEFENSE WITNESS LIST |

In the new trial scheduling order, the judge says that we have until MARCH 10, 2009, to name our witnesses. Shelli, you gave us a list a while back. Have you spoken to these people? If not, they are useless. Please call people - get a good, complete working list of witnesses. I worked all last weekend on the discovery - I went through every page - indexed everything. This weekend Jimmy is going to go through and pull out names of people from the discovery documents who we want to put on our witness list - and also the exhibits. Those are due also.

Time is getting short and I do not want to be caught lacking....

Here is basically the Gov't's case:

1) palm print of Ebron on upper bunk of Cell 305 ("the" cell);
2) Security video showing the time and people going into cell; Ebron identified by other people and snitch as one who goes into cell at critical time;
3) Charles Sherman's testimony;
4) Ebron's criminal history (this IS his 3rd murder....)

I talked to Sherman's lawyer last Friday (Pat Black, public defender in Tyler) and Pat told me that there is no signed "plea deal" at this time. Sherman wants something that the Gov't is not giving. Pat said whether he testifies or not is not "etched in stone" = his words.

Also - please give me your thoughts on this - I am thinking that with his criminal history - the only, ONLY,chance Ebron has of getting a life sentence is if HE makes himself different than what their perception of him will be by the time the Gov't finishes their case. That means he has to testify. He will admit to all his transgressions. Murder at age 15, and a plea of not guilty to the '99 murder, but the jury found him guilty. He has a story and we might make it work - it is just BEAUMONT!! Next to Orange and Vidor!! It is a real gamble...but a sure loser if he does not testify, in my humble opinion.

k

---

Looking for work? Get job alerts, employment information, career advice and job-seeking tools at AOL Find a Job.

A273
2/26/2009

# Exhibit 49

# A274-A296
# FILED UNDER SEAL

# Exhibit 50

Page 1 of ___1___

**Declaration of** Randal "Kyle" Tubbleville

**Pursuant to 28 U.S.C. §1746**

My name is Randal "Kyle" Tubbleville, I was an alternate on Mr. Ebron's federal capital trial. There were several things about Mr. Ebron's trial that surprised me.

First, the judge in the trial, Judge Crone, fell asleep several times during the trial.

Second, juror Ronald Dunbar, during a smoke break told me that his nephew, Dale Dunbar, was killed in prison. I asked him about Dale because I recognized Ronald Dunbar's last name. That's when he told me that Dale was his nephew and that Dale was killed in prison

I declare, under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on September 12 2014

Name Kyle Tubbleville

A297

# Exhibit 51

**DECLARATION OF** Vickie Foreman
**PURSUANT TO 28 U.S.C. § 1746**

After Dale Dunbar died, our family was notified within the year, that he was killed by another inmate. An investigator told me that they were investigating another prisoner for his death. When Dale was in the hospital, I tried to take a picture of him because he had a boot mark on his face. It looked like

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3-31-15

Signature: Vickie Foreman

A298

# Exhibit 52

-----Original Message-----
From: webform@tdcj.texas.gov <webform@tdcj.texas.gov>
Sent: Monday, April 7, 2025 1:10 PM
To: PIA <PIA@tdcj.texas.gov>; Webadmin <webadmin@tdcj.texas.gov>
Subject: Results from your online form - Information Act Request


Submitted: Monday, April 7th, 2025 at 01:09 PM.


Name: Sara McLachlan
Co/Org: Federal Defender's Office
Phone: 215-928-0520


Redact? Yes
Method: E-Mail
E-Mail: sara_mclachlan@fd.org


Request:


I am seeking information on all Texas Department of Criminal Justice inmates who died in custody in July 2006.


Date Range: 07/01/2006 - 07/31/2006

A299

| TDCJ ID | DOD | LAST NAME | | MANNER OF DEATH |
|---|---|---|---|---|
| 01315758 | 7/2/2006 | GEERING, MARSHALL B | Natural | LIVER DISEASE |
| 01165426 | 7/3/2006 | SILVA, SAMUEL | Natural | CARDIOVASCULAR |
| 00471844 | 7/4/2006 | KRISCH, CHARLIE D | Natural | LIVER DISEASE |
| 00779477 | 7/5/2006 | HICKS, ABRAHAM | Natural | LIVER DISEASE |
| 00568964 | 7/5/2006 | GREEN, HENRY M | Suicide | SUICIDE |
| 01359143 | 7/7/2006 | MULLINEX, JOHN | Natural | CARDIOVASCULAR |
| 00582531 | 7/8/2006 | WOODS, CHARLES N | Natural | CARCINOMA |
| 00315307 | 7/10/2006 | MCCULLOUGH, KENNETH W | Natural | CARCINOMA |
| 00574903 | 7/10/2006 | REYNOSA, DAVID | Natural | LIVER DISEASE |
| 01094409 | 7/10/2006 | MILLER, JAMES R | Suicide | SUICIDE |
| 01208647 | 7/11/2006 | SIMS, LEE | Natural | CARDIOVASCULAR |
| 00999131 | 7/11/2006 | OBRIEN, DERRICK S | Lethal Injection | LETHAL INJECTION |
| 01302879 | 7/12/2006 | ESPINO, ALEJANDRO A | Natural | CARDIOVASCULAR |
| 00697014 | 7/12/2006 | DANIEL, JOE R | Natural | OTHER NATURAL |
| 01334267 | 7/13/2006 | WALKER, MICHAEL D | Homicide | HOMICIDE |
| 00675485 | 7/13/2006 | ROSALES, GUADELUPE | Natural | LIVER DISEASE |
| 01186336 | 7/14/2006 | DUNBAR, DALE C | Homicide | HOMICIDE |
| 01362726 | 7/15/2006 | ROBLES, REYNALDO C | Natural | CARDIOVASCULAR |
| 00749879 | 7/15/2006 | KING, THOMAS W | Natural | LUNG |
| 01356214 | 7/15/2006 | PERRY, TODD R | Natural | OTHER NATURAL |
| 00379082 | 7/15/2006 | WEATHERFORD, JAMES B | Natural | OTHER NATURAL |
| 00840641 | 7/15/2006 | VILLARREAL, MICHAEL A | Suicide | SUICIDE |
| 01353338 | 7/16/2006 | MOORE, DONALD C | Natural | LUNG |
| 00600468 | 7/17/2006 | AARON, JOHNNY R | Natural | LIVER DISEASE |
| 00739994 | 7/19/2006 | ROBERTS, VERTIS | Natural | CARCINOMA |
| 00999234 | 7/19/2006 | BROWN, MAURICEO M | Lethal Injection | LETHAL INJECTION |
| 00509791 | 7/20/2006 | MCCOY, LUTHER M | Natural | AIDS RELATED DEATH |
| 00999084 | 7/20/2006 | ANDERSON, ROBERT J | Lethal Injection | LETHAL INJECTION |
| 00633356 | 7/21/2006 | HUNTER, JAMES E | Natural | CARDIOVASCULAR |
| 00748584 | 7/21/2006 | WILLIAMS, SEBASTIAN | Natural | CARDIOVASCULAR |
| 00603378 | 7/21/2006 | BAKER, RONALD L | Natural | KIDNEY |
| 00304717 | 7/22/2006 | SMITH JR, WILLIE L | Natural | CARCINOMA |
| 01135926 | 7/22/2006 | MORRIS, SHANE A | Suicide | SUICIDE |
| 00526704 | 7/23/2006 | HUTCHINS, BILLY R | Natural | CARCINOMA |
| 00386229 | 7/25/2006 | JERNIGAN, JERRY W | Natural | CARDIOVASCULAR |
| 00879246 | 7/26/2006 | HUFF, LLOYD H | Natural | CARCINOMA |
| 00624066 | 7/28/2006 | FLORES, MARK A | Suicide | SUICIDE |
| 00658061 | 7/29/2006 | VARUGHESE, MATHEW | Natural | CARDIOVASCULAR |
| 00749701 | 7/29/2006 | ROMERO, HIPOLITO C | Natural | LIVER DISEASE |
| 00878823 | 7/29/2006 | BACOS, ABRAHAM | Suicide | SUICIDE |
| 01332172 | 7/30/2006 | VEO, GEORGE E | Natural | CARCINOMA |
| 01139473 | 7/30/2006 | PRUITT, CHESTER P | Natural | CARCINOMA |
| 01193773 | 7/30/2006 | TYLER, WILBUR C | Natural | CARDIOVASCULAR |
| 00731941 | 7/31/2006 | PIPER, DARNOLD R | Natural | CARCINOMA |
| 00504905 | 7/31/2006 | WILSON, MELVIN L | Natural | CARCINOMA |

A300

| 00853263 | 7/31/2006 | COX JR, BILLY M | Natural | LUNG |
|----------|-----------|-----------------|---------|------|

A301

| IMMEDIATE CAUSE OF DEATH | UNDERLYING CAUSE OF DEATH |
|---|---|
| CIRRHOSIS | HEP C |
| ASHD | |
| SEPSIS | RENAL FAILURE |
| CIRRHOSIS | HEP C |
| ASPHYXIA | SUICIDE BY HANGING |
| CARDIOMYOPATHY (VARICELL | |
| CARCINOMA OF COLON | |
| HEPATOCELLULAR CARCINOMA | CIRRHOSIS |
| CIRRHOSIS | HEP C |
| ASPHYXIA | SUICIDE BY HANGING |
| CONGESTIVE HEART FAILURE | ASHD |
| | |
| AORTIC DISSECTION | HTN |
| UNDIFFERENTIATED SCHIZOPHRENIA | BIPOLAR DISORDER |
| BLUNT TRAUMA TO THE HEAD | |
| CIRRHOSIS | HEP C |
| SKULL FX W/ HEMORRHAGE | |
| MYOCARDIAL INFARCTION | ASHD |
| BRONCHOPNEUMONIA | S/P CVA |
| VIRAL ENCEPHALITIS | BRONCHOPNEUMONIA |
| ASPIRATION PNEUMONIA | HUNTINGTON'S CHOREA |
| ASPHYXIA | SUICIDE BY HANGING |
| BRONCHOPNEUMONIA | GRAVES DISEASE |
| BLEEDING ESOPHAGEAL VARICES | CIRRHOSIS |
| HEPATOCELLULAR CARCINOMA | CIRRHOSIS |
| | |
| BRONCHOPNEUMONIA | AIDS |
| | |
| ASHD | HTN |
| CONGESTIVE HEART FAILURE | HYPERTENSION |
| ASPIRATION PNEUMONIA | ESRD |
| HEPATOCELLULAR CARCINOMA | CIRRHOSIS |
| ASPHYXIA | SUICIDE BY HANGING |
| PNEUMONIA | SEPSIS |
| AORTIC DISSECTION | HTN |
| CARCINOMA OF LUNG | HIV |
| ASPHYXIA | SUICIDE BY HANGING |
| MYOCARDIAL INFARCTION | ASHD |
| HEPATORENAL SYNDROME | CIRRHOSIS |
| ASPHYXIA | SUICIDE BY HANGING |
| HEPATOCELLULAR CARCINOMA | CIRRHOSIS |
| CARCINOMA OF LUNG | |
| MYOCARDIAL INFARCTION | ASHD |
| CARCINOMA OF LUNG | |
| CARCINOMATOSIS | |

A302

| PULMONARY EMBOLISM | S/P COLECTOMY |
|---|---|

A303

| ASSOCIATED CAUSE OF DEATH |
| --- |
| |
| |
| CIRRHOSIS |
| |
| |
| |
| |
| HEP B |
| |
| |
| |
| |
| |
| |
| |
| |
| COPD |
| ASHD |
| |
| |
| HTN CARDIOVASCULAR DISEASE |
| HEP C |
| AIDS |
| |
| |
| |
| |
| |
| HEP B |
| |
| HEPATOCELLULAR CARCINOMA |
| |
| |
| |
| |
| HEP C |
| |
| HEP C |
| |
| |
| |
| |

A304

A305

# Exhibit 53



# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Brad Livingston
Executive Director

Sharon Howell
General Counsel

## Facsimile Transmission
. Date: 5/7/2015

This fax is confidential and may be subject to attorney–client privilege. It is intended for the addressee or an agent of the addressee only. Any unauthorized use of this fax is strictly prohibited. If you have received this fax by mistake, please immediately notify issuer by telephone and return this fax to issuer by mail at our expense.

TO:     Alex Kursman                          Fax Number:      (215) 928-0826
        Federal Community Defender
        Office for the Eastern District of    Phone Number:    (803) 929-6150
        Pennsylvania


FROM:   Robin Whitney                         Fax Number:      (936) 437-6994
        Assistant General Counsel
        Office of the General Counsel         Phone Number:    (936) 437-6003

. Number of Pages Including Cover Page: 2

| REQUESTED RESPONSE: | Urgent | For your review | ☐ Reply ASAP | ☐ Please call sender | ☐ Please comment |
|---|---|---|---|---|---|

RE:  Offender Dale Crandall Dunbar, TDCJ # 1186336

Comments:  Please find attached the responsive information for your request.

P.O. Box 4004, Huntsville, Texas 77342    Phone: 936-437-6700  Fax: 936-437-6994
www.tdcj.texas.gov    sharon.howell@tdcj.texas.gov

A306

05/07/2015  12:03   9364376994          OGCHUNTSVILLE                        PAGE  02/02



# Texas Department of Criminal Justice

**Brad Livingston**
Executive Director

May 6, 2015

Alex Kursman
Assistant Federal Defender
Federal Community Defender
Office of Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA  19106

Dear Mr. Kursman:

This letter is in regards to your open records request you made with our office.   Per our telephone conversation last week, below is a basic summary of the death of the offender you requested.   I have also forwarded your request to our medical department at UTMB who will contact you directly.   Please feel free to contact me should you need any further assistance.

### Summary of Offender Death

*On 6/26/2006, Offender Dunbar, Dale TDCJ #1186336, W/M/42/G2 and Offender Thomas, Michael TDCJ #1253681, W/M/34/G2 were found in cell K-211.  Offender Dunbar was found on the floor during a routine security check bleeding from nose and ear.  Offender Dunbar was air lifted to Hospital Galveston and has been in a drug induced coma, possibly brain dead with a frontal lobe fracture.  On 7/14/2006, the attending physician at Hospital Galveston pronounced Offender Dunbar deceased.*

*TDCJ received Offender Dunbar on 9/10/2003 to serve 6 years for delivery of Marijuana from Orange County and Assault from Ellis County.  Offender Thomas was charged with appropriate disciplinary.*

Sincerely,

Robin L. Whitney
Assistant General Counsel

---

*Our mission is to provide public safety, promote positive change in offender behavior, reintegrate offenders into society, and assist victims of crime.*
**Office of the General Counsel**
Sharon Felfe Howell, General Counsel – sharon.howell@tdcj.texas.gov
P.O. Box 13084 Capitol Station                                      P.O. Box 4004
Austin, Texas 78711-3084                                      Huntsville, Texas 77342-4004
Phone (512) 463-9899, FAX (512) 936-2159            Phone (936) 437-6700, FAX (936) 437-6994
www.tdcj.texas.gov

A307

# Exhibit 54



U.S. Department of Justice

Federal Bureau of Prisons

*Office of the Director*                    *Washington, DC 20534*

May 11, 2005

MEMORANDUM FOR THE DEPUTY ATTORNEY GENERAL

FROM:       Harley G. Lappin, Director
            Federal Bureau of Prisons

SUBJECT:    Information Memorandum

PURPOSE:    To inform you of an inmate homicide at the United States Penitentiary (USP),
            Beaumont, Texas.

DISCUSSION: On Saturday, May 7, 2005, at 7:20 p.m., the cellmate of inmate Keith Barnes
called for staff assistance, stating there was blood on his bed. Staff entered the cell and found
inmate Barnes on the top bunk bed covered with a sheet. He had multiple stab wounds and did
not display any vital signs. Staff administered medical emergency treatment and transferred him
to a local hospital where he was pronounced dead at 9:06 p.m.

The cell was sealed as a crime scene. The FBI was contacted and is conducting an investigation.
The autopsy has been completed, which revealed numerous stab wounds. The crime scene has
been released by the FBI.

Inmate Barnes was a 29-year-old offender serving a Life sentence imposed in the District of
Columbia Superior Court for Murder While Armed and Conspiracy to Commit Robbery. His
cooperation with the Federal Government led directly to the conviction of his two co-defendants.
His next of kin has been notified of his death.

Inmate Barnes arrived at USP Beaumont on Friday, May 6. Preliminary investigative
information indicates that on Saturday, May 7, several inmates on the outdoor recreation yard
asked inmate Barnes for his name. At first, he would only provide them with his Muslim name.
However, he eventually gave another inmate his given name. Coincidentally, this inmate knew
one of inmate Barnes's co-defendants and was aware of his cooperation. Subsequently, he and
several other District of Columbia inmates met to discuss whether to assault or kill inmate
Barnes in retaliation for his cooperation with the Federal Government.

A review of the videotape from a camera located in the general area of the crime scene shows
that four inmates approached inmate Barnes' cell at 5:20 p.m. on May 7. Two of the inmates
entered the cell and asked inmate Barnes' cellmate to leave the area. Two other inmates stood

outside the cell to serve as lookouts. The four inmates left the scene at 5:30 p.m. One of the inmates who served as a lookout has agreed to cooperate with the FBI.

Prior to his arrival at USP Beaumont, inmate Barnes was confined at the United States Penitentiary (USP), Coleman, Florida. While at USP Coleman, he was housed in Administrative Detention (AD) status in the Special Housing Unit. Inmate Barnes requested this placement, stating inmates in the general population were aware of his cooperation with the Federal Government. Staff investigated inmate Barnes' concerns but were unable to verify a threat because inmate Barnes would not provide the names of specific inmates who posed a direct threat. Therefore, he was classified as an "unverified protection" case. Ordinarily, unverified protection cases remain in AD status for 18 to 24 months with clear conduct prior to being reviewed for transfer to the general inmate population in another BOP facility. After remaining in AD status for approximately 25 months, inmate Barnes was transferred to USP Beaumont, and arrived at that facility on Friday, May 6, 2005. An intake screening was conducted, and due to his previous cooperation, the institution's Special Investigative Supervisor also interviewed the inmate. The inmate stated that he wished to enter the general population and was unaware of any threat to his personal safety at that institution.

An after-action review is currently being conducted. The after-action team will follow-up their review with a written report and recommendations.

Please contact me if you require additional information.

cf:    Regional Director, SCR    (FAXED)
       Warden, Beaumont USP    (FAXED)
       IPPA

A309
GD0044

# Exhibit 55



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Texas*

---

*110 N. College, Suite 700*       *Telephone:  (903) 590-1400*
*Tyler, Texas 75702-7237*        *Fax:        (903) 590-1439*

June 18, 2013

Ms. Donna F. Coltharp
Assistant Federal Defender
Federal Building
727 E. Durango Blvd., Suite B-207
San Antonio, Texas 78206-1278



Mr. Jimmy R. Phillips, Jr.
Attorney at Law
515 N. Velasco Street
Angleton, Texas 77515

Re:  *United States v. Joseph Ebron*, No. 12-6956 (ED TX No. 1:08CR36)

Dear Ms. Coltharp and Mr. Phillips:

Before Charles Sherman testified in Mr. Ebron's trial, we provided excerpts from the presentence report in *United States v. Charles Sherman*, No. F-3351-00, Superior Court of the District of Columbia, along with other discovery materials. We trust you still have the materials provided.

The prosecutor in Washington, D.C., recently reviewed Mr. Sherman's testimony from Mr. Ebron's trial and pointed out two items that appear to be inconsistent with the facts set out in Mr. Sherman's presentence report and with his testimony in his own trial. First, during Mr. Ebron's trial, Mr. Sherman testified that he had four brothers— two in prison and two who were deceased— and one sister. Mr. Sherman's presentence report reflects, however, that he is "an only child born to Angela Kamra and Charles Ray Sherman." Second, when asked to describe his prior conviction during Mr. Ebron's trial, Mr. Sherman stated that he "robbed drug dealers" and indicated that the victim in that offense had been a drug dealer. This description is inconsistent with his testimony from the D.C. trial and

A310

Ms. Coltharp and Mr. Phillips
June 14, 2013
Page 2

with his version of events in the presentence report, as well as with the D.C. prosecutor's understanding of that case.

In order for you to evaluate this information, we are enclosing the transcript of Mr. Sherman's testimony from his trial in D.C., which was not provided before Mr. Ebron's trial. At the time, we did not have the transcript and did not search for it because we did not believe that it could be relevant. If you have any questions, or need further information, please let me know.

Very truly yours,

John M. Bales
United States Attorney

Joseph R. Batte
Assistant United States Attorney

TLK/

cc:    Mr. Curtis Gannon
       Office of the Solicitor General
       950 Pennsylvania Ave., NW
       Washington, D.C. 20530-000

cc:    Judge Marcia Crone
       300 Willow
       Beaumont, Texas  77701

A311