IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CIVIL NO. 1:14-CV-00539** |
| **v.** | : | **(CRIMINAL NO. 1:08-CR-36)** |
| | : | |
| **JOSEPH EBRON, Defendant.** | : | |

## DEFENDANT JOSEPH EBRON'S AMENDED MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

**Alex Kursman**
**Jennifer Chiccarino**
FEDERAL COMMUNITY DEFENDER
OFFICE FOR THE EASTERN DISTRICT
OF PENNSYLVANIA
Suite 545W—The Curtis
601 Walnut Street
Philadelphia, PA 19106
Phone: 215-928-0520
Fax: 215-928-0826

*Counsel for Joseph Ebron*

July 2, 2025

## PRELIMINARY STATEMENT

The transcripts from trial are consecutively numbered and cited as the date followed by the page number. Petitioner is filing an Appendix with this Petition. Documents in the Appendix are cited as "Ex." for the Exhibit followed by the exhibit number, followed by "A" followed by the page number. This Court's docket in the criminal action 1:08-CR-36 is cited as "Dkt."

All other citations are either self-explanatory or will be explained.

Transcript references in this motion are cited by date and page number.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................................................i

TABLE OF CONTENTS ......................................................................................................i

TABLE OF AUTHORITIES ...............................................................................................iii

STATEMENT OF THE CASE.............................................................................................1

    A. INTRODUCTION .....................................................................................................1

    B. PROCEDURAL HISTORY .......................................................................................1

STATEMENT OF FACTS ....................................................................................................1

    A. THE PREPARATION FOR TRIAL..........................................................................1

    B. THE TESTIMONY AT TRIAL .................................................................................3

    C. EVIDENCE THAT COULD HAVE BEEN PRESENTED AT TRIAL ............................12

ARGUMENT......................................................................................................................12

I.      TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.......................................12

    A. TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT AVAILABLE
        EVIDENCE TO SUPPORT THEIR CHOSEN DEFENSE. .................................................13

        **1.   Counsel Failed to Interview and Present Witnesses Who Could Have Reported
Mosley's Incriminating Admissions and Other Evidence Supporting the Defense.** .......13

        **2.   Counsel Was Ineffective by Failing to Request Relevant Discovery.** ...........................18

    B. TRIAL COUNSEL FAILED TO FAMILIARIZE THEMSELVES WITH, OR OBTAIN
        RECORDS RELATING TO, THE CRIMINAL HISTORY OF THE GOVERNMENT'S
        STAR WITNESS, CHARLES SHERMAN. .................................................................20

        **1.   Deficient Performance** ....................................................................................21

        **2.   Prejudice** ......................................................................................................24

    C. COUNSEL RENDERED INEFFECTIVE ASSISTANCE LEADING TO THE
        IMPROPER INTRODUCTION OF EBRON'S PRIOR MURDER CONVICTION. ......25

        **1.   Counsels' Failure to Identify the Governing Legal Standard Led to the Introduction
of Ebron's Prior Murder Conviction.** ..............................................................26

        **2.   Counsel Had Ebron Testify Against His Wishes.** ...............................................28

    D. COUNSEL FAILED TO OBJECT TO JURY INSTRUCTIONS THAT DID NOT
        SUBMIT ANY LESSER-INCLUDED OFFENSE AND DID NOT EXPLAIN THAT
        AN ACCOMPLICE MAY HAVE A LESS CULPABLE MENTAL STATE. ......................30

    E. THE CUMULATIVE EFFECT OF TRIAL COUNSELS' DEFICIENCIES
        PREJUDICED THE DEFENSE.........................................................................34

II.    PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL
        BY AN IMPARTIAL JURY BY THE INCLUSION OF A JUROR WHO LIED IN HIS
        QUESTIONNAIRE AND DURING VOIR DIRE ON GROUNDS THAT, IF THAT
        JUROR HAD RESPONDED CORRECTLY, WOULD HAVE PROVIDED THE
        DEFENSE WITH A VALID CHALLENGE FOR CAUSE. ........................................34

III.    THE GOVERNMENT DENIED EBRON'S RIGHTS TO DUE PROCESS OF LAW, TO CONFRONT HIS ACCUSERS, AND TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BY SUPPRESSING FAVORABLE MATERIAL EVIDENCE. .....................................................37

A. THE GOVERNMENT FAILED TO DISCLOSE REPORTS OF CONVERSATIONS AND ARGUMENTS BETWEEN MOSLEY AND EBRON IN WHICH EBRON WAS OVERHEARD TELLING MOSLEY THAT BARNES WAS NOT SUPPOSED TO BE KILLED. ..................................................................................................................37

B. THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY FORMS AND INTERVIEWS IN THE POSSESSION OF THE BUREAU OF PRISONS AND OTHER RELATED INVESTIGATIVE AGENCIES. .............................................................39

1.   **Mass Interview Forms** ................................................................................39

2.   **SIS Report** ...................................................................................................39

3.   **After Action Report** ....................................................................................40

IV.    THE GOVERNMENT DENIED EBRON'S RIGHT TO DUE PROCESS OF LAW, TO CONFRONT HIS ACCUSERS, AND TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BY PRESENTING, OR FAILING TO CORRECT, FALSE TESTIMONY OF ITS KEY WITNESS, CHARLES SHERMAN. ..................................................................................40

A. SHERMAN'S FALSE TESTIMONY ...........................................................................41

B. THE GOVERNMENT KNEW, OR SHOULD HAVE KNOWN, THAT SHERMAN'S TESTIMONY WAS FALSE. .......................................................................................43

C. SHERMAN'S FALSE TESTIMONY WAS MATERIAL. ......................................................43

V.    THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES RELIEF. ........................44

PRAYER FOR RELIEF ...........................................................................................................45

## TABLE OF AUTHORITIES

**Federal Cases**

*Allen v. United States*, 164 U.S. 492 (1896) ............................................................ 11

*Beck v. Alabama*, 447 U.S. 625 (1980) ................................................................... 31

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................... 18–19, 37, 38

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ........................................................... 45

*Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) ................................................... 45

*Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) ..................................................... 35

*Ferguson v. State of Ga.*, 365 U.S. 570 ................................................................... 29

*Giglio v. United States*, 405 U.S. 150 (1972) ......................................................... 19

*Glossip v. Oklahoma*, 145 S. Ct. 612 (2025) ................................................ 41, 42, 43, 44

*Green v. Quarterman*, 213 F.App'x 279 (5th Cir. 2007) ........................................... 35

*Harris v. New York*, 401 U.S. 222 (1971) ............................................................... 29

*Keeble v. United States*, 412 U.S. 205 (1973) ......................................................... 30

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................... 45

*Lara v. United States Parole Comm'n*, 990 F.2d 839 (5th Cir. 1993) ................. 30, 32, 33

*Lyons v. McCotter*, 770 F.2d 529 (5th Cir. 1985) ..................................................... 28

*McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548 (1984) ........................... 35

*Napue v. Illinois*, 360 U.S. 264 (1959) ................................................................... 41

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) ........................................... 30

*Rock v. Arkansas*, 483 U.S. 44 (1987) ................................................................... 29

*Rosemond v. United States*, 572 U.S. 65 (2014) ................................................. 30, 33

*Schmuck v. United States*, 489 U.S. 705 (1989) ..................................................... 30

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................. 13, 14

*United States v. Agurs*, 427 U.S. 97 (1976) ........................................................... 43

*United States v. Bagley*, 473 U.S. 667 (1985) ................................................ 39, 40, 41

*United States v. Barham*, 595 F.2d 231 (5th Cir. 1979) ........................................... 44

*United States v. Bishop*, 264 F.3d 535 (5th Cir 2001) ......................................... 35, 36

*United States v. Browner*, 889 F.2d 549 (5th Cir. 1989) ...................................... 30, 31

*United States v. Collins*, 690 F.2d 431 (5th Cir. 1982) ............................................. 30

*United States v. Fesler*, 781 F.2d 384 (5th Cir. 1986) ............................................. 30

*United States v. Mullins*, 315 F.3d 449 (5th Cir. 2002) ........................................... 29

*United States v. Sanders*, 964 F.2d 295 (4th Cir. 1992) ........................................... 27

*United States v. Scott*, 854 F.2d 697 (5th Cir. 1998) ............................................... 35

*United States v. Snarr*, 704 F.3d 368 (5th Cir. 2013) ........................................................... 31, 32

*United States v. White*, 972 F.2d 590 (5th Cir. 1992) .................................................... 30

**Federal Statutes**

18 U.S.C. § 1111 ................................................................................................... 30, 32

18 U.S.C. § 1112 ................................................................................................... 30, 32

18 U.S.C. § 3500 ........................................................................................................... 19

28 U.S.C. § 2255 ......................................................................... i, 10, 11, 4, 46, 5, 6, 8, 9

**Rules**

Fed. R. Crim. P. 16 ............................................................................................... 20, 22, 23

Fed. R. Evid. 609 ...................................................................................................... 24, 26, 27

**Other**

U.S. Const. amend. VI ................................................................................................ 13

28 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure*, § 6132 (2d ed. 2012) ..... 27

## STATEMENT OF THE CASE

### A.  INTRODUCTION

1.      Joseph Ebron was tried, convicted, and sentenced to death for a murder planned by others. Although this Court appointed counsel three years before trial, the defense team interviewed only one witness in person before the month when the trial began and only a handful before the trial ended. Counsel never uncovered abundant, readily available evidence that could have demonstrated why the jurors should not convict Ebron of first-degree murder. Counsels' deficiencies deprived Ebron of effective assistance. In addition, the government failed to disclose material exculpatory information before or during trial, and a juror who had concealed a disqualifying bias participated in deliberations, in violation of due process of law.

### B.  PROCEDURAL HISTORY

2.      The government charged Mr. Ebron and codefendants Marwin Mosley and Michael Bacote with the May 5, 2005, murder of Keith Barnes at the United States Penitentiary ("USP") in Beaumont, Texas. Attorney Katherine Scardino was appointed to represent Ebron on April 26, 2006. Case # 1:07-cr-00142, Dkt. 6. On August 15, 2007, Ebron was indicted with Bacote and Charles Sherman (who later testified for the government) for first-degree murder and conspiracy. Dkt. 20.

3.      Ebron stood trial (under Docket No. 1:08-cr-00036) before this Court and a jury from April 20 to May 8, 2009, and was convicted of first-degree murder and conspiracy on May 11, 2009. He was sentenced to death on May 18, 2009. Ebron appealed and, on May 30, 2012, the Court of Appeals for the Fifth Circuit affirmed the conviction and sentence. On December 23, 2024, President Biden commuted his sentence of death to life imprisonment.

## STATEMENT OF FACTS

### A.  THE PREPARATION FOR TRIAL

4.      Jimmy Phillips was appointed as cocounsel upon the government's notice of intent to

1

seek death. Counsel used investigator J.J. Gradoni for all guilt-phase investigation. Ex. 1, A1. He never interviewed any inmates who had personal knowledge about the incident, nor did he meet Ebron until February 24, 2009. Ex. 2 at 2, A4. By March 5, three weeks before jury selection, he had sent counsel a list of inmates, none of whom he had interviewed. He told counsel he would not have time to do the interviews—except for the inmates already subpoenaed by Bacote's lawyer—before counsel had to file the witness list. He suggested counsel might want to list all the inmates to "CYA." Ex. 3, A14.

5.      On February 20, 2009, Ms. Scardino reviewed the small number of "mass interview" reports the government had turned over in discovery. She asked Mr. Gradoni to speak to those inmates, but the record does not reflect that she ever made any request to discover other mass interview reports that the government had not turned over. Ex. 4, A16.

6.      Mr. Gradoni spoke to only one of the inmates named in the mass interview reports, Roy Wells. He conducted his few witness interviews in March and April, beginning about ten days before jury selection. At USP Beaumont on March 18, he spoke to inmates Wells, Michael Surrell, and Edgar Hayes (the inmate Muslim leader), none of whom lived in the unit where the homicide occurred or had direct knowledge of it. Ex. 5, A17–19; Ex. 6, A20–22; Ex. 7, A23–25.

7.      Mr. Gradoni also determined the BOP location or release status of some inmates who had been interviewed by BOP or FBI officers shortly after the homicide, or who had been placed on the witness list by defense attorneys for co-defendant Bacote, but he took no further action if they were not on the government's witness list. Ex. 8, A26; Ex. 9, A27; Ex. 10, A28; Ex. 11, A29; Ex. 12, A30; Ex. 13, A31. He attempted to interview two government witnesses awaiting the trial in the Federal Correctional Center in Houston, but both declined to speak to him. Ex. 14, A32; Ex. 15, A33. Similarly, Mr. Gradoni attempted to visit government witness Lamont Bailey in Houston but learned from AUSA Batte that he had been moved, was no longer "in the area," and would not be available until the trial began. He was not interviewed. Ex. 16, A34.

8. In the last few days before trial, Ms. Scardino, apparently hoping that other witnesses on the government's list would be available to her, emailed Mr. Batte, "[A]re there any witnesses you have designated that would not be available to us during the guilt phase?" Ex. 17, A36. Mr. Batte responded that his list included witnesses who would not be traveling to Beaumont. Ex. 18, A37–38.

9. By this time, it was too late for significant travel. Mr. Gradoni made the first of only two out-of-town witness trips on April 19, the day before testimony at trial began, when he interviewed James Carpenter at USP Coleman, in Florida. Carpenter had helpful information. Ex. 19 at 4, A42. He testified for the defense nine days later, on April 28. 4/28/09 at 1738. Gradoni never interviewed any other inmate witnesses, including numerous inmates who lived in the unit where the homicide occurred, who appeared in the videotapes shown at trial, or who were identified in discovery.

10. Trial testimony began on April 20, 2009. 4/20/09 at 1. The defense called only four witnesses: Ebron, Carpenter, pathologist Stephen Pustilnik, and a prison employee who described the layout of Barnes's cell. Except for Carpenter and the inmates he saw at USP Beaumont on March 18, Mr. Gradoni had made no efforts to interview any other inmates who were not on the government's witness list. The government witnesses he had attempted to interview had, not surprisingly, refused to speak to him. His guilt-phase witness interviews—all conducted in the month before, or during, trial—comprised the three inmate interviews in Beaumont and the one inmate interview in Florida.

## B. THE TESTIMONY AT TRIAL

11. The government's theory was that Mosley and Bacote solicited Ebron to join a conspiracy to kill Barnes. Ebron testified that he thought he was joining an effort to convince Barnes to check in to administrative segregation because of his status as a snitch.

12. On the key questions of knowledge and intent, it was a credibility contest between Ebron and the government's witness, Charles Sherman. Sherman testified that a new inmate later identified as Keith Barnes arrived on Sherman's unit, the DB unit, on the evening of May 6, 2005.

4/20/09 at 172. Sherman and several inmates from Washington, D.C. ("DC"), suspected that the new inmate was the same person who had testified against an associate of theirs, James "Rat" Carpenter. Marwin "Funk" Mosley asked Sherman and Michael "Rags" Bacote to find out if the new inmate was the person who "snitched" on Carpenter. 4/20/09 at 192–97; 4/28/09 at 1739, 1743.

13.     The next day, May 7, Sherman and Bacote learned Barnes's real name and informed Mosley. 4/20/09 at 198, 200. According to Sherman, Mosley announced, "I'll kill him." Sherman claimed that he, Bacote, and Mosley went to talk to Antone White, the "shot caller" for the DC crew at the prison. White told Mosley he should "run [Barnes] up top," but Sherman testified that Mosley insisted that Barnes should be killed. *Id.* at 202–08.

14.     According to Sherman, Mosley mentioned that Ebron, who knew Carpenter, also knew of Barnes. 4/20/09 at 210. Later that afternoon, Sherman claimed, the three inmates stopped Ebron in the recreation yard and had an explicit conversation about a homicide:

> Funk said, "I need your help." He said, "We're going to kill him tonight." He says, "Come over to the unit when they call the five-minute move to go to chow." And at that point Joe [Ebron] said, "All right. Bet."

4/20/09 at 213. Back on DB unit, Sherman, Mosley, and Bacote continued to plan. They decided that Bacote would enter Barnes's cell and keep him talking, to prevent him from leaving for dinner.

15.     At the dinner hour, Ebron arrived on the unit. Bacote entered Barnes's cell, and Mosley and Ebron put shirts on their heads. 4/20/09 at 215–18. They followed Bacote into the cell, and Bacote left. Bacote and Sherman then sat near the cell as lookouts. *Id.* at 219–20.

16.     The government introduced composite footage from four video cameras that showed events in the common areas of DB unit but did not portray what happened inside the cell. On the video, Bacote enters Barnes's cell at about 5:15 PM. Mosley and Ebron enter the cell at 5:20, and Bacote emerges at almost the same time. 4/21/09 at 526–27, 569, 573. Bacote and Sherman then remain on the stairs. *Id.* at 529. Mosley and Ebron leave the cell at 5:30. Mosley heads upstairs in the

direction of the showers, and Ebron leaves the unit. *Id.* at 573.

17.    Sherman claimed that he could see into the cell from the stairs and saw Ebron holding Barnes in a headlock and Mosley's arm moving. 4/20/09 at 220. The door opened, and Sherman shut it, and he saw Mosley and Ebron lifting Barnes's body to the top bunk. *Id.* at 222.

18.    Correction Officer Mabel Credit responded to an alarm button set off by inmate Charles Giles. Credit noticed blood on the lower bunk bed in Giles's cell and another inmate lying on the top bunk, not moving. It was Barnes, apparently dead. *Id.* at 81–85.

19.    The next day, the authorities conducted what they called "mass interviews" of the whole institution. When Sherman's turn came, he told the staff member that he knew what had happened but needed to get out of the unit immediately. He was placed in administrative segregation (the "SHU" or "hole"). He then gave statements to prison investigators and the FBI, implicating Ebron, Mosley, and Bacote in the killing. *Id.* at 234; 4/29/09 at 1565.

20.    In return for Sherman's testimony, the government agreed (1) not to prosecute him for Barnes's murder, (2) to place him in witness protection, and (3) to send the parole board "a letter asking them could they review my case and it was up to them whether or not they wanted to grant it or deny it." 4/20/09 at 236–37. Sherman acknowledged that he was serving a sentence for robbery but claimed that he had made an altruistic practice of "rob[bing] drug dealers" because of what the crack epidemic had done to his family. *Id.* at 166.

21.    The government presented other inmate witnesses, none of whom had direct knowledge of what had happened. Johnny Bazile, Bacote's cellmate, testified that he learned from Bacote on the afternoon on May 7 that "they were going to punish Keith Barnes." 4/21/09 at 325–29, 338, 374. He testified that Bacote told him that he himself remained in the cell and held Barnes while Ebron and Mosley "punished" him. *Id.* at 354.

22.    Charles Giles, Barnes's cellmate, met Barnes when he arrived at the DB unit on May

6, 2005. The next afternoon, Barnes seemed upset and frightened after spending time on the yard. *Id.* at 391–98, 417. Bazile told Giles to leave the unit, and Giles complied. *Id.* at 422. When Giles returned to his cell after the emergency lock-down, he discovered Barnes' body and alerted Officer Credit. *Id.* at 435. Although Giles initially told the authorities he knew nothing about what had happened, he later agreed to testify in return for a promise to move him to another location and to recommend a sentence reduction. He did not know Ebron. *Id.* at 438–39, 457.

23.    Lamont Bailey, Bacote's half-brother, was a BOP inmate who also knew Mosley from DC. 4/28/09 at 1695–97. Bailey claimed that he knew Ebron from the DC Jail in 1997. He testified that he knew Ebron as "Akh" and used to see him at Muslim services with Rat Carpenter. *Id.* at 1699–1703. Bailey was transferred to USP Beaumont about two months after Barnes's death and soon concluded that he was not safe in population because other inmates seemed to be aware that he was a "snitch." He asked the authorities to place him in the SHU. *Id.* at 1703–07. According to Bailey, he found himself in a holding cage next to Mosley and asked about his brother Bacote's involvement in the Barnes murder. Bailey claimed Mosley responded that Bacote had just stood outside the cell while he and Akh "put in the work" and "punished" Barnes because "he was a snitch." *Id.* at 1710–11.

24.    Bailey acknowledged that, in return for testifying, he had received a promise that the government would protect him from DC inmates and send a letter to his prosecutor asking him to consider moving for a sentence reduction. *Id.* at 1712.

25.    Tommy Brown, M.D., a pathologist, conducted the autopsy and concluded that Barnes died of 106 stab wounds to the chest. 4/23/09 at 849, 857, 861. According to Dr. Brown, the pattern of wounds was consistent with an attack in which Barnes was standing while someone restrained him from behind and someone else stabbed him from the front. *Id.* at 896. He conceded, however, that this amounted to "conjecture, speculation," and that he was "just guessing." *Id.* at 897, 899. The pattern was also consistent with a single assailant sitting on Barnes. *Id.* at 904, 910.

6

26.    Ebron's attorneys presented the testimony of Stephen Pustilnik, M.D., the chief medical examiner for Galveston County. Dr. Pustilnik rejected Dr. Brown's conclusion that Barnes was standing during the attack. Dr. Pustilnik's expert opinion was that Barnes was stabbed on the bottom bunk with one assailant partially covering him and using his body weight to restrain him. Dr. Pustilnik attached significance to these facts: (1) the wounds were inflicted in a small area rather than all over the chest and abdomen, which would have been available to the stabber if a second assailant had restrained Barnes; (2) only one assailant's DNA was under Barnes's fingernails; (3) the first assailant had scratches on his eyebrows; (4) Barnes had no scratches on his own neck and the second alleged assailant had no scratches on his arms; and (5) there was little blood on the bed, suggesting that the blood pooled in the bottom of Barnes's body cavity as he lay on his back. 4/29/09 at 1865–81.

27.    The prosecution introduced a palm print matching Ebron's, lifted from the bunk. 4/23/09 at 946, 970, 986. A DNA sample from a pair of pants found in a dryer in Ebron's unit (Unit AA) compared positively with Ebron's profile. An apparent blood stain on the pants compared positively with Keith Barnes's profile. 4/20/09 at 74; 4/23/09 at 1036; 4/27/09 at 1359, 1361. Barnes had Mosley's DNA under his fingernails, but that testing excluded Ebron. 4/27/09 at 1375–76.

28.    The Court ruled pretrial that the government could introduce evidence of Ebron's involvement in three infractions at USP Atlanta, where he celled with James Carpenter. 4/24/09 at 1207. Carpenter was involved in the infractions, and the Court permitted the testimony because the assaults would "tie the whole motive back to Mr. Carpenter and the aversion to snitches, et cetera, but not just general aversions to snitches but knowing that this particular snitch is a snitch against Mr. Carpenter who is a friend of Ebron." 2/13/09 at 127–28. At trial, the government presented evidence that Carpenter and Ebron were involved in fights with "snitches." 4/23/09 at 1101–03,1137–44.

29.    A detective who had investigated a 1996 DC murder and prepared the case against James Carpenter and his co-defendants described Barnes's cooperation at their trial. 4/24/09 at 1212.

7

30.     Carpenter himself testified for the defense. He had been confined at USP Coleman since 2006 and, before that, at USP Atlanta, where he had shared a cell with Ebron. 4/28/09 at 1739, 1743. He also knew Ebron when they were incarcerated in the DC Jail system. *Id.* at 1743.

31.     Barnes testified against Carpenter and his other co-defendants in 1998. Carpenter was convicted and received a sentence of forty years to life. *Id.* at 1740. In 2002, Barnes prepared a notarized affidavit, indicating that he had lied at the trial. Carpenter received it in 2003 and sent it to his attorney. Carpenter planned to use it in support of a petition for post-conviction relief in the DC Superior Court. *Id.* at 1744–47. Ebron was Carpenter's cellmate when he received the affidavit, and Carpenter told him how he planned to use it. *Id.* at 1747–48.

32.     Carpenter explained the three fights that had resulted in his and Ebron's infractions in Atlanta. None of them involved cooperating witnesses. *Id.* at 1753–58.

33.     Joseph Ebron testified in his own defense. 4/29/09 at 1960. Ms. Scardino led Ebron through an outline of his upbringing that stressed his criminal background and behavior. *Id.* at 1961–64. Counsel elicited Ebron's 1999 murder conviction, *id.* at 1965–67, and his prison infractions, including one for bringing a handmade knife into USP Beaumont from USP Atlanta. The government had not introduced this infraction in its direct case and had not sought to do so before trial. Ex. 20, A48–50. Ebron denied that he knew Lamont Bailey in the DC jail. 4/29/09 at 1967. He described his history of incarceration, first at a DC facility in Lorton, Virginia, then at USP Atlanta. The BOP transferred him to Beaumont on February 16, 2005. *Id.* at 1969–74.

34.     Ebron converted to Islam in 2004. He prayed five times daily, grew a beard "to show [my]self a believer," and studied the Koran. *Id.* at 1983–85. In Beaumont, he "dealt" with both the Muslims and the DC inmates but never joined either group completely. *Id.* at 1987.

35.     While celled with James Carpenter in Atlanta, Ebron learned of Keith Barnes. He knew Barnes had "snitched" on Carpenter at his trial. *Id.* at 1992–93. He did not see Barnes arrive at

8

Beaumont on May 6, 2005, and did not hear his name until the afternoon of May 7, when Mosley, Sherman, and Bacote, with two inmates named Joseph Jackson and Juvie, walked up to him on the yard. *Id.* at 1993–95. Mosley told him a Muslim inmate had arrived from DC and believed the inmate's name was Keith Barnes. Mosley wanted to know if James Carpenter ever told him Barnes was "hot." Ebron responded that the last he heard, Carpenter and Barnes were "working it out" because Carpenter had received Barnes's affidavit. *Id.* at 1998–99. This answer did not satisfy Mosley, who demanded to know, "yes or no, is he hot?" Ebron told him "yes." Mosley said he was going to "put a knife in him." Ebron, who had been at Beaumont longer than Mosley, tried to convince him that a stabbing would cause a "chain reaction" of repercussions with other groups. *Id.* at 2000–03. By the end of the conversation, Ebron thought he had persuaded Mosley to "send him up top" to the SHU. *Id.* at 2003–04. Ebron promised to come to the unit after the institution-wide inmate count. *Id.* at 2004–06.

36.     When Ebron arrived at the DB unit at "chow time," he put his khaki shirt over his head "in the heat of the moment." Before taking Ebron to Barnes's cell, Mosley first wanted to show him some pictures he had mentioned. *Id.* at 2010–11. Then Mosley told him, "Look, man, I don't want you to get on that Muslim shit. I'm going to make sure the dude get checked in with you. We're going to walk him up top." *Id.* at 2011. Ebron agreed, telling Mosley to let him do the talking because Mosley had said previously he wanted to "put the knuckles on him" and Ebron wanted to prevent that. *Id.* at 2011, 2018. Mosley put a shirt on his head and led Ebron to Barnes's cell, where he found Bacote. Mosley stood by the window, and Barnes "backed up to the bunk." Ebron stood near the front of the cell, up against the wall. *Id.* at 2012–15.

37.     Ebron, in an effort to lead the conversation, asked Barnes if he was hot. Barnes began explaining that it was a misunderstanding that he was working out, but Mosley stepped in, drilling Barnes about his trial testimony against Carpenter and his other co-defendant. Mosley called him a snitch and told him he had to go up top. Barnes turned to Ebron and protested that he had just talked

9

to the Muslims, who had given him their protection. *Id.* at 2019–20.

38.     Ebron asked Barnes to come with him to talk to the Muslim leader, but before Barnes could move, Mosley punched him on the side of the head and knocked him down on the bunk. Mosley pulled out a knife, jumped on top of Barnes, and began stabbing him. Ebron, alarmed, yelled at Mosley to let Barnes go, but Mosley continued straddling Barnes and stabbing him. Barnes tried to grab Mosley's hand, and Mosley kept smacking the hand away. When, at one point, Barnes managed to grab Mosley, begging him to "go ahead and let me leave," Mosley promised to stab Barnes's heart out. Mosley yelled to Ebron, "Don't just stand there, get this hot motherfucker off me." Ebron refused. He asked Mosley to let him leave, but Mosley told him, "Don't open the door while I'm like this." *Id.* at 2021–26. Eventually, Barnes's arms collapsed. Mosley took his knife in two hands and stabbed Barnes to death. *Id.* at 2014. After the attack was over, Mosley turned on Ebron and, with a knife in his hand, made Ebron pledge allegiance to DC over the Muslims. *Id.* at 2028–29.

39.     Mosley told Ebron to help him put Barnes's body on the top bunk, and he complied. They covered the body with a blanket. Mosley washed his hands and his knife and cleaned the floor and bed with a rag, which he then flushed down the toilet. Mosley swore Ebron to secrecy on the Koran. As they left, Mosley sent Ebron back to put a towel over the bottom bunk. Then Ebron returned to his unit. *Id.* at 2030–37. Aware that a lockdown was coming, he washed all his clothes. *Id.* at 2037–38. A short time later, Mosley and Bacote sent Sherman to fetch him. Ebron promised again to say nothing, and, at Mosley's instigation, signed his name on the basketball recreation list for the time they had entered Barnes's cell. *Id.* at 2042.

40.     Cross-examination pitted Ebron's credibility against that of other government witnesses. He denied that a crusade against snitches led to the Atlanta assaults and testified that Bailey lied about his alleged conversation with Mosley. *Id* at 2056–58, 2059, 2105.

41.     The only other evidence the defense presented, besides Dr. Pustilnik, was testimony

10

from a BOP employee who photographed and identified Barnes's cell. *Id.* at 1925–28.

42.    In rebuttal, Lieutenant Paul Wingate of the DC Police Department introduced letters Carpenter had written shortly after his arrest in 1996, showing his determination at that time to get revenge against Barnes. 4/30/09, 2132–50.

43.    With no objection from the defense, the Court instructed the jurors to consider only the two charges in the indictment, first-degree murder and conspiracy, without any lesser-included offenses. *Id.* at 2178, 2180. In summation, the defense argued that Sherman had lied and that Ebron had told the truth. Counsel argued that Ebron was not guilty of capital murder. *Id.* at 2206, 2235–37. The government stood by Sherman's testimony, arguing that Ebron participated in a preconceived plan to kill Keith Barnes. *Id.* at 2243–45.

44.    The jurors struggled to decide the credibility contest. They deliberated from 3:56 PM until 5 PM on April 30 and all day on May 1, 2009. At 3:34 PM on May 1, they were "hopelessly deadlocked, cannot reach a unanimous verdict." *Id.* at 2254; 5/1/09 at 2259. The Court told them to continue deliberating and discharged them at 5:12 PM for six days. *Id.* at 2268. At 10:14 on the day they reconvened, May 7, the Court received another note indicating that "there is no way we can arrive at a unanimous decision." 5/7/09 at 2273. The Court gave the circuit's pattern instruction under *Allen v. United States*, 164 U.S. 492 (1896), and sent the jurors back for further deliberations, which continued until it excused them at 4:49 PM. *Id.* at 2274–84. On May 8, the Court received a note from a juror complaining that the jury was hung and "I have been cursed at" and asking "how much more I will have to endure." 5/8/09 at 2288. After questioning each juror individually, the Court excused the embattled juror and released the other jurors for the weekend, then replaced the dismissed juror with an alternate and instructed them to begin deliberations anew. *Id.* at 2310, 2323, 2368; 5/11/09, 2373. After five more hours of deliberations on May 11, the jurors found Ebron guilty of first-degree murder and conspiracy. 5/11/09 at 2374.

11

## C.  EVIDENCE THAT COULD HAVE BEEN PRESENTED AT TRIAL

45.      With an adequate investigation, the defense could have learned that numerous available witnesses would support Ebron's account of the offense.

46.      After the homicide, Mosley made admissions that he and Ebron went to Barnes's cell to make it clear to him that he had to enter administrative segregation, but that Mosley got angry and began stabbing Barnes and that Ebron argued for Mosley to stop. Ex. 21, A51; Ex. 22, A52–54. On other occasions, Mosley said that the killing of Barnes "wasn't supposed to go like that," Ex. 23, A55–57; Ex. 24. A58–61, that the visit to the cell was supposed to force Barnes to go to segregation, Ex. 21, A51; Ex. 25, A62, and that Joseph Ebron was surprised by the stabbing, Ex. 24 at 4, A61.

47.      After the offense, witnesses heard Ebron frequently argue with Mosley (while they were both confined in the SHU), telling him, "this is your weight," and "you know that is you," and "it wasn't supposed to happen." Ex. 24 at 3, A60; Ex. 25 at 2, A62–63. Mosley thought that Ebron was weak because he did not go along with what Mosley had done, and he worried that Ebron might offer to testify against him. Ex. 22 at 2, A53.

48.      Sherman's testimony that DC inmates had an advance discussion about killing Barnes was false. So was Bailey's testimony that he met Ebron when they attended Muslim services together at the DC jail. During 1997–98, and again in 2004, when Ebron was confined at the DC jail, he was not a Muslim and did not attend Muslim services.

## ARGUMENT

## I.     TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.

49.      The defense team never interviewed any inmate who had had direct contact with the murder or those who planned it, and it conducted no interviews at all to prepare a defense until days before jury selection began. They never learned that numerous witnesses could have supported Ebron's defense: that he went to Barnes's cell only to "check him in" and that Mosley acted impulsively

12

on his own. Counsel never requested discovery that could have yielded helpful information. During trial, counsel failed to object to inflammatory and inadmissible testimony, was unprepared for cross-examination of key government witnesses, and failed to ensure that the jurors could give effect to their reasonable doubts about Ebron's intent through instructions on lesser-included offenses. These and other deficiencies in counsels' investigation, preparation, and presentation deprived Ebron of the effective assistance of counsel. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984).

50.    Ebron incorporates all other facts in this pleading in support of this claim.

### A. TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE TO SUPPORT THEIR CHOSEN DEFENSE.

#### 1. Counsel Failed to Interview and Present Witnesses Who Could Have Reported Mosley's Incriminating Admissions and Other Evidence Supporting the Defense.

51.    Counsel failed to adequately review the discovery to determine which witnesses were relevant to their investigation. In turn, neither counsel nor their investigator interviewed any witness who had personal knowledge about Barnes's murder. This was deficient performance.

52.    There is a reasonable probability that, had they interviewed witnesses with information about the murder, the outcome of trial would have been different. A reasonable investigation would have uncovered witnesses who support the defense that Ebron did not participate in the planning or the homicide and cast doubt on the testimony of the government's key witness, alleged co-conspirator Sherman. There is a reasonable probability that, if the jurors had heard from witnesses that Mosley committed the stabbing without warning Ebron, the jury would have reached a different verdict.

a)    Deficient Performance

53.    Counsel were not sufficiently familiar with the discovery provided to them. Because of this, counsel failed to perform necessary investigations. A June 9, 2012, Memorandum and Order by this Court illustrates counsels' deficient performance. Dkt. 305.

54.    This Court issued a Memorandum and Order, in response to a Motion for a New Trial

13

Based on Newly Discovered Evidence, filed by appellate counsel after Ebron's trial was over, on the basis of an affidavit signed by inmate Quinton Jones. Ex. 26, A64–80. An affidavit from counsel, Ms. Scardino, was also attached to the motion, in which she stated she "had no record of Jones's name coming up before he contacted Ebron's investigator" after the trial was over. *Id.* Ex 27 at 7, A87. Counsel, however, was wrong. *Id.* In fact, counsel received, over a year prior to trial, an April 11, 2008, letter from the government in discovery that stated:

> Enclosed is the following summary of evidence that could be considered exculpatory in this case: . . . Inmate #1 alleged that . . . four black males entered cell 305 . . . . [T]he fourth individual was Quintin Jones . . . . Inmate #1 . . . observed Jones flushing a bloody white t-shirt and shank down the toilet of a cell. He further stated Jones told him that all four of the inmates that went into the cell stabbed (Barnes) before he could get out of his bunk. He also claims that Jones threatened him, apparently to prevent Inmate from cooperating with law enforcement.

Ex. 28, A91.

55.     This Court noted that this information, at minimum, "should have alerted defense counsel that Jones potentially possessed knowledge of events surrounding the murder *and the need for further investigation of this inmate*."[1] Dkt. 305 at 8; Ex. 27 at 8, A88. Despite the need for further investigation of Jones, the only investigation counsel performed was that their investigator, one month prior to trial, located Jones at U.S.P. Atwater but did not interview Jones and conducted no further investigation because "[t]his inmate was not on the Government's witness list." Ex. 11, A29.

56.     Counsel was, or should have been, aware of many inmates who, like Jones, possessed knowledge of events surrounding the murder of Barnes. Counsel received discovery indicating that, at one time, the government suspected several other inmates of involvement in Barnes's murder. The

---

[1] This Court also noted that defense counsel were made aware at Ebron's trial that Jones was at a table with Mosley, that Bacote and Sherman watched Barnes exit his cell and go into the shower area, and that "[w]hen a defendant becomes aware of evidence early in a trial, it is incumbent upon the defendant to seek a continuance or demonstrate efforts to obtain evidence before it will be considered newly discovered." Dkt. 305 at 9; Ex. 27 at 9, A89.

fact that none of them were charged and none of them became government witnesses should have suggested to competent counsel that they might have information favorable to the defense. Counsel, however, unreasonably failed to investigate or interview these witnesses. Instead, counsel and Gradoni focused almost exclusively on the inmates who were on the government's witness list. Indeed, Mr. Gradoni stopped work on inmate witnesses once he learned that they were *not* on the government witness list. Specifically, counsel failed to investigate or interview the following witnesses that they knew, or should have known, potentially possessed knowledge of the events surrounding the murder:

- <u>William Mercer:</u>[2] Counsel were provided with Sherman's transcribed pretrial interview in which Sherman stated that he witnessed Mercer pass Mosley a knife as part of the plan to kill Barnes. Ex. 29 at 39, A124. In another interview provided to counsel, Sherman stated that Mercer and another inmate were supposed to supply the weapons for the murder and that Mercer supplied the murder weapon to Mosley. Ex. 30, A150; Ex. 31, A152. Counsel were also provided with a chain of custody log, which detailed that on May 9, 2005, four days after Barnes's murder, BOP officials seized a knife from Mercer's wheelchair. Ex. 32, A158. Despite receiving information that directly implicated Mercer in Barnes's murder, counsel failed to investigate or interview Mercer.

- <u>Kelvin Smith</u>: Counsel were provided with a report in discovery that stated that Kelvin Smith[3] was "[n]ot directly involved in assault [on Barnes] but believed to be the overseer to insure that it was completed and when it was completed." Ex. 34, A160. Counsel were also provided with a transcribed pretrial interview of Sherman, in which Sherman stated that Smith told Mosley and Sherman to kill Barnes. Ex. 29 at 49, A143. Counsels' investigator located Smith at FDC Houston TX and noted that "Kelvin Smith has been succeeded [sic; subpoenaed] by the [sic] Bacote's defense team." Ex. 35, A161. No other investigation, or interview, of Smith was conducted by counsel.

- <u>Joseph Jackson</u>: Counsel received, in discovery, several still frame photographs of Joseph Jackson, Ebron, and Mosley near Barnes's cell minutes before Barnes's murder. Ex. 36, A162; Ex. 37, A163. Counsel also received in discovery a Memorandum from officials at USP Beaumont that lists Joseph Jackson as a potential suspect in Barnes's murder. Ex. 38, A164. Counsel also received a report in discovery that lists Joseph Jackson and his register number, 33186-007, and that identifies him as a "[p]ossible conspirator to [Barnes's] murder." Ex. 34, A160. Neither counsel nor their investigator investigated or interviewed Jackson. Instead, counsel and their investigator mistakenly believed that "Joseph Jackson" was named "James Jackson" and believed there were

---

[2] Counsel received, in discovery, a photograph of William Mercer, which noted his registration number and his alias as "Go Go." Ex. 33, A159. Additionally, defense counsel were informed by their investigator that "Go Go" is William Mercer. Ex 2, A14.

[3] The report notes that Kelvin Smith's alias is "Hollywood." Ex. 34, A160.

15

too many "James Jacksons" to interview in the BOP.[4] Ex. 39, A165.

- Andrew Patrick: Counsel received a photograph in discovery that was titled "United States Penitentiary Beaumont Texas Disruptive Group/Security Threat Group Photo Sheet." Included in the photo were Andrew Patrick, Marwin Mosley, William Mercer, Joseph Ebron, and Joseph Jackson. Ex. 33, A159. Neither counsel nor their investigator attempted to investigate or interview Patrick.

57.    Had counsel interviewed these witnesses and undertaken a reasonable investigation, they also would have learned about Lonnie Gooding and Luther Fuller, two inmates who were housed in the Segregated Housing Unit with Ebron and Mosley after Barnes's murder.

58.    Instead, the only inmates interviewed by the trial defense team were Roy Wells, Edgar Hayes, Michael Surrell, and James Carpenter, none of whom lived in the unit where the homicide occurred and none of whom had any direct knowledge of the murder. Ex. 5, A17–19; Ex. 6, A20–23; Ex. 7, A23–25; Ex. 19 at 4, A42. As could reasonably be anticipated where counsel limited their investigation to potential witnesses for the government, none of the inmates interviewed had the potential to support the defense account of the events surrounding Barnes's murder. Counsels' failure to investigate and interview the above-noted witnesses who, like Jones, warranted "the need for further investigation," Dkt. 305 at 8, was deficient performance.

b)    Prejudice

59.    Counsels' deficient performance prejudiced Ebron. Each of these inmates cast doubt on the testimony of the government's only alleged eyewitness, co-conspirator Sherman, and support the defense that Ebron did not agree to or participate in Barnes's murder.

60.    Ebron's testimony was in direct conflict with Sherman's testimony. The government corroborated Sherman's testimony through inmate Lamont Bailey, who testified that Mosley told him

---

[4] Investigator Gradoni's wrote a memorandum about "James Jackson" on April 23, 2009, when Ebron's trial had already started. Additionally, counsel, in an April 23, 2009, email to her secretary after trial had begun, listed "James Jackson" as a witness that she wanted available for trial. Ex. 40, A167.

16

that he and Ebron went into Barnes's cell and murdered Barnes. 4/27/09 at 1496–97.

61.    In closing, the government seized on Bailey's testimony to support Sherman's testimony over Ebron's: "Marwin Mosley spoke from the grave through Lamont Bailey and said 'We stabbed him so many times we had to take a break. We punished him.'" 4/30/09 at 2197.

62.    Had counsel conducted a reasonable investigation and interviewed the above-noted witnesses, they would have been able to argue powerfully to the jury that "Marwin Mosley spoke from the grave" through many inmates who, in fact, corroborated Ebron's testimony.

63.    Mercer states that on the date of Barnes's murder, Mosley approached him and told him that he killed Barnes. Specifically, Mosley stated that although the plan was to send Barnes to the segregated housing unit, Mosley decided to kill Barnes while he was in Barnes's cell. Mercer further states that Mosley told him that Ebron did not know that he was going to stab Barnes. Ex. 21, A51.

64.    Mosley also detailed Barnes's murder to Andrew Patrick. Mosley stated that "he walked into the cell, [he and Barnes] had a few words, and then he got on top of Barnes and immediately began hitting Barnes with the shank." Mosley further stated that "[Ebron] looked shocked by what happened." Patrick also overheard Ebron and Mosley arguing about Barnes's murder. Patrick heard Ebron say to Mosley, "You're wrong slim. It wasn't supposed to happen." Ex. 24 at 3, A60.

65.    Mosley also confided in Luther Fuller about Barnes's murder. Mosley told Fuller that after he and Ebron entered Barnes's cell, Barnes refused to go to the segregated housing unit. Mosley "had enough and started stabbing Barnes." Mosley stated that Ebron was panicked and wanted to leave the cell but could not open the cell door while Mosley was stabbing Barnes. Afterwards, Mosley thought Ebron was weak for not participating in the murder. Fuller also heard Ebron and Mosley argue, and it was clear that Ebron did not agree with, or condone, Barnes's murder. Ex. 22 at 2, A53.

66.    After Barnes's murder, Joseph Jackson also overheard Ebron and Mosley arguing. Specifically, he heard Ebron say to Mosley, "I don't know why you did that. It wasn't supposed to go

17

like that, you wrong man." Mosley did not deny Ebron's accusations. Ex. 23 at 2, A56.

67. Lonnie Gooding also overheard conversations between Ebron and Mosley after Barnes's murder. Gooding heard Ebron say to Mosley, "[T]his is you, you know this is you. This is your weight, there is no use in everyone going down, you know this is you." Ex. 25, A62–63.

68. Other witnesses would have contradicted Sherman's testimony. Kelvin Smith states that, contrary to Sherman's account, he never told anyone to kill Barnes. Indeed, he attests that Sherman's pretrial statement was a lie. Ex. 41, A168.

69. Had counsel reasonably investigated and interviewed these witnesses, they could have supported Ebron's defense that Mosley killed Barnes without Ebron's consent. Counsel could have called these witnesses to corroborate Ebron, or their investigation may well have influenced their decision about whether Ebron should testify. There is a reasonable probability that, whichever decision they made, the witnesses would have led the jury to find Ebron not guilty of first-degree murder.

70. This deficiency is especially prejudicial in combination with counsels' inadequate advocacy and advice concerning Ebron's right to testify. If counsel had performed properly, either (1) Ebron could have testified free of impeachment with a damning prior murder conviction, *see* Claim I.G, *infra*, and his testimony could have been supported with the accounts of other inmates who had personal knowledge, or (2) Ebron could have exercised his right not to testify and relied on other witnesses to present his defense. Either way, there is a reasonable probability of a different outcome.

### 2. Counsel Was Ineffective by Failing to Request Relevant Discovery.

71. Counsel failed to request in discovery a host of evidence that, if properly investigated, would have led them to find exculpatory and impeaching evidence. There is a reasonable probability that, had counsel done so, there would have been a different result.

a) Trial Counsel Performed Deficiently in Failing to Seek Relevant Discovery.

72. Counsel made boilerplate pretrial requests for all material under *Brady v. Maryland*, 373

18

U.S. 83 (1963), The Jencks Act, 18 U.S.C. § 3500, and *Giglio v. United States*, 405 U.S. 150 (1972). *See* Dkt. Nos. 8, 12, and 13. None of the motions invoked the specifics of the case, though by the time the motions were filed, Ms. Scardino had been representing Ebron for more than two years. The Jencks motion argued that the Court should give special consideration to Jencks issues because "Coastal Corporation, at least one private investigation firm, the Commodities Futures Trading Commission, and possibly others all engaged in investigations and interviews of the applicable witnesses." Dkt. No. 13 at 4. This appears to have been pasted from a motion in another case; neither the Commodities Futures Trading Commission nor Coastal Corporation were involved in this case.

73.    Meanwhile, counsel failed to request many of the basic documents they needed to conduct an adequate investigation of Ebron's case. Based on the statements of prison expert Mark Bezy, as well as investigation by counsel, those documents include, but are not limited to:

- **SIS Report**: After a suspected homicide, the BOP "conducts an extensive review of the incident to determine the causes and to make thorough recommendations for preventing the recurrence of such incidents in the future. The review leads to a Special Investigative Supervisor ("SIS") Report that summarizes the incident and analyzes the circumstances that led to it. Here, counsel never requested the SIS Report.

- **After-Action Report**: The BOP review process after a prison homicide also includes an investigation initiated by the regional director. This investigation typically results in an "After-Action Report," which examines the causes of the incident and makes recommendations for changes in prison policy. Despite the likelihood of discovering relevant information in the report, counsel never requested it.

- **Mass Interview Forms**: Given the severity of the incident, the BOP should have interviewed, at a minimum, all inmates on the unit where the homicide took place and all inmates from DC. Counsel knew that mass interviews were conducted in Ebron's case, because the government produced a small sampling of mass interview forms during discovery. Counsel never requested all of these forms. The government did not produce forms for potential witnesses who had relevant information about the homicide and who were identified in other discovery that counsel received, including William Mercer, Kelvin Smith, Joseph Jackson, and Andrew Patrick (*see* Claim II.A.1, *infra*). Counsel should have known that these witnesses would have given interviews to the BOP in the days after the homicide and should have requested their reports.

- **SHU Records**: Inmates, including Luther Fuller, overheard Ebron and Mosley make statements after the homicide that tended to inculpate Mosley and exculpate Ebron.

19

Ex. 22 at 2, A53. Counsel would have known of the existence of these witnesses if they had requested basic records relating to who was housed in the SHU during the time period immediately after the homicide, when both Ebron and Mosley were there.

Counsel made no discovery requests that identified any potential witness or issue in the case.

74.    Counsels' deficient discovery requests were intertwined with their deficient guilt-phase investigation. Because they did little investigation, they did not know, outside of generically described *Brady* material, what items were "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). Counsels' inadequate discovery requests constituted deficient performance.

        b)    Counsels' Deficient Performance Prejudiced Ebron.

75.    Counsels' deficient performance prejudiced Ebron. Because Ebron acknowledged being in Barnes's cell at the time of the homicide, any evidence that could have shed light on (1) his intent in entering the cell, and (2) his actions once inside the cell, were critically important. Counsel failed to develop evidence on those questions from available witnesses, including Mercer, Smith, Jackson, Patrick, and Fuller. These witnesses supported Ebron's assertions that he never intended to hurt Barnes and entered his cell only to encourage him to "check himself in" to the SHU. There is a reasonable probability that, but for counsels' failure, the jury would have heard this critical evidence about Ebron's actions and intent and would have had reasonable doubt as to his guilt of first-degree murder.

**B. TRIAL COUNSEL FAILED TO FAMILIARIZE THEMSELVES WITH, OR OBTAIN RECORDS RELATING TO, THE CRIMINAL HISTORY OF THE GOVERNMENT'S STAR WITNESS, CHARLES SHERMAN.**

76.    Charles Sherman was the government's star witness, who testified that Mosley, Bacote, Ebron, and he agreed to murder Barnes. 4/20/09 at 221. He was the government's only witness who allegedly observed the killing. He testified that during the killing, he observed Ebron put Barnes in a headlock while Mosley stabbed Barnes to death. *Id.* Although Sherman's veracity and truthfulness were central to Ebron's defense and the government's case, counsel failed to familiarize themselves with the discovery provided or investigate even the most rudimentary of records relating to Sherman,

20

including his criminal history. This was deficient performance.

77.     Counsels' deficient performance prejudiced Ebron. Sherman lied numerous times throughout his testimony. Sherman's lies, however, went uncorrected. Sherman's lies would have been easily contradicted by records related to his prior criminal history. There is a reasonable probability that, had counsel familiarized themselves with Sherman's criminal history and obtained relevant records, they could have effectively impeached Sherman so that the jury would have disbelieved him and found Ebron not guilty of first-degree murder.

### 1.     Deficient Performance

78.     Over a month before Sherman's testimony, on March 16, 2009, the government provided counsel with the following material related to Sherman's criminal history:

- March 14, 2001, Amended Judgment and Conviction for conspiracy, first-degree burglary while armed with intent to commit assault, first-degree burglary while armed with intent to commit robbery, threats to do bodily harm, assault with intent to commit robbery, robbery while armed, first-degree theft, kidnaping while armed, possession of a firearm during a crime of violence, and obstruction of justice (No. F3351-00); Ex. 43, A175–77.

- May 21, 2003, Judgment for possession of a firearm by a convicted felon (No. DKC 00-0423); Ex. 44, A178–83; and

- Excerpts of a Pre-Sentence Report, which notes that on July 14, 1998, Sherman was convicted of robbery with a deadly weapon. Ex. 45 at 3–4, A187–88.

Ex. 42, A170–74.

79.     In addition, counsel received in discovery an October 29, 2002, Psychology Services Intake Screening Summary of Sherman at FCI Three Rivers, which contained relevant impeachment material related to Sherman's March 14, 2001, convictions. Ex. 46, A189–91.

80.     Although counsel were provided with Sherman's criminal history, they failed to familiarize themselves with, or obtain relevant documents relating to, these convictions. This failure became evident at Ebron's trial. When counsel cross-examined Sherman on his criminal history not related to his 2001 armed robbery conviction, the following exchange occurred:

21

| Ms. Scardino: | Have you ever been convicted of a felony of moral turpitude other than the armed robbery that we discussed earlier? |
|---|---|
| Sherman: | Yes ma'am. |
| Ms. Scardino: | And what would that be? |
| Sherman: | One firearm possession. |
| Ms. Scardino: | I'm sorry. Say that again. |
| Sherman: | One firearm possession. |
| Ms. Scardino: | And when was that Mr. Sherman? |
| Sherman: | I believe in 2000—or '99 or 2000. |
| Ms. Scardino: | And was that in Washington, DC? |
| Sherman: | No ma'am. It was in Maryland. |
| Ms. Scardino: | Maryland? |
| Sherman: | Yes, ma'am. |
| Ms. Scardino: | Did you go to prison? |
| Sherman: | Yes, ma'am—no, I didn't go to prison. I went to the county jail. |
| Ms. Scardino: | And how long did you stay incarcerated on those charges? |
| Sherman: | I believe about eight months—seven, eight months. |
| Ms. Scardino: | And that was in 2000, and then the armed robbery was after that? |
| Sherman: | No the firearms possession I believe was in like, '98; and the robbery was in 2000, yes ma'am. |
| Ms. Scardino: | So the armed robbery is what your in prison for now— |
| Sherman: | Yes ma'am. |

4/20/09 at 256–57.[5]

81.     Had counsel adequately reviewed the discovery, they would have known that Sherman's conviction for possession of a firearm by a felon occurred in 2003 in Washington, D.C., and that his 1998 conviction in Maryland, for which he served eight months at the county jail, was for armed robbery. Counsel were also oblivious of the facts underlying Sherman's 2001 conviction for armed robbery and additional charges. Sherman testified on direct examination that he was currently serving a sentence of twenty-six to seventy-eight years' imprisonment for armed robbery and claimed: "Being as though my family was all in trouble behind crack cocaine, I basically—I despised drug dealers because of what happened to my mom. So, me and a couple buddies had devised a plan to start robbing drug dealers. So, that's what I did; I robbed drug dealers." *Id.* at166.

---

[5] The robbery conviction that Sherman testified about in this exchange was his March 14, 2001, armed robbery conviction in Washington, D.C., in which he received a sentence of twenty-six to seventy-eight years' imprisonment.

82.     This testimony was false. Sherman's crimes stemmed from greed, not a desire to avenge the wrong done to his family. Both the discovery provided to counsel and the transcript relating to this conviction could have enabled counsel to expose Sherman's false testimony. Counsel, however, did not use the discovery or obtain relevant documents relating to Sherman's criminal history. Her impeachment on this issue was thus woefully hamstrung:

> Ms. Scardino:  And that armed robbery, didn't you take—you had a gun to some-body's head and took them to a bank and told them to get all the money, didn't you?
> Sherman:       Yes, ma'am.
> Ms. Scardino:  Dope dealers have bank accounts?
> Sherman:       Yes, ma'am.
> Ms. Scardino:  They do. And that was a dope dealer that you robbed and took to a bank with a knife at—or a gun at his back?
> Sherman:       Yes ma'am.

*Id.* at 254–55.

83.     Had counsel reviewed the discovery, they would have known that the pre-sentence investigation report related to this robbery conviction explained:

> Mr. Sherman and two associates went to the home of an acquaintance and, at gun point, ransacked the residence and stole a TV and VCR. They then drove the victim to a bank and forced him to withdraw money from his account, which they took. *Mr. Sherman's version of the event differed significantly from the victim's. He claimed that the victim had willingly loaned him the money and then filed a false complaint with the police when the two of them disagreed over the payment schedule.*

Ex. 46 at 2, A190 (emphasis added).

84.     Had counsel obtained the transcript of Sherman's trial relating to this robbery, they would have learned that Sherman's testimony in that trial completely contradicted his testimony in Ebron's trial. Sherman testified, not that he robbed a drug dealer, but that the victim was a friend whom he took to the bank to borrow money. Ex. 47, A218, 220 (*United States v. Charles Sherman*, NT 12/19/00 at 178). Sherman further testified that the reason that he was "in trouble" was that he did not repay the victim. *Id.* at A218. His testimony at the two trials was irreconcilable and would have shown to the jury that he had perjured himself at one or both trials.

85.    At the very least, counsel could have used the Amended Judgment and Commitment/Probation Order to impeach Sherman with the fact that his twenty-six-to-seventy-eight-year sentence was not just for an armed robbery, but for conspiracy, first-degree burglary while armed with intent to commit assault, first-degree burglary while armed with intent to commit robbery, threats to do bodily harm, assault with intent to commit robbery, robbery while armed, first-degree theft, kidnaping while armed, possession of a firearm during a crime of violence, and obstruction of justice (no. F3351-00), some of which involve a dishonest act or false statement. Ex. 43, A175–77.

86.    Counsels' failure to familiarize themselves with and use the discovery, and to engage in the most basic investigation of the government's key witness, was deficient performance.

### 2.    Prejudice

87.    Ebron was prejudiced by counsels' deficient performance. It was the defense theory that Sherman was a liar. Because counsel were unprepared, Sherman's testimony on direct examination that he "robbed drug dealers" went unrebutted, and the jury was left with the false impression that Sherman was a loving son whose familial devotion led him astray. Had counsel reviewed the discovery and obtained the relevant documents, they would have been able to forcefully impeach Sherman, showing the jury that Sherman was a liar and a thief who had obstructed justice and perjured himself in the past. There is a reasonable probability that, if the jurors had been made aware that Sherman had lied to them on direct examination, they would have disregarded the entirety of his testimony and found Ebron not guilty of first-degree murder.

88.    Additionally, Sherman's false statement that "I robbed drug dealers," 4/20/09 at 166, opened the door to his previous robbery conviction, which would have otherwise been inadmissible under Fed. R. Evid. 609. Specifically, on July 14, 1998, Sherman was convicted of robbery with a deadly weapon in Prince George's County, Maryland. Ex. 45 at 4, A188. Sherman testified about this 1998 robbery-with-a-deadly-weapon conviction during the trial for his March 14, 2001, convictions:

24

> Last year I had briefly paid a guy in Maryland to work on my car and I needed it to get back and forth to work. And he worked on my car briefly and he didn't fix it right. I in turn asked him for some of my money back or either fix the car. He refused. We got into an argument, me and the guy fought. In the fight I took fifty dollars of my money from him. Later on that evening, I was arrested. The police arrested me and charged me with robbery because the guy said that in the fight I took the money from him. And so it was no longer a first-degree assault, just fighting. He says it was included in a robbery and I went to jail. I had an attorney and she asked me did I do it. And I told her yes, ma'am. I told her why.

Ex. 47 at 154, A196.

89.     Sherman's 1998 robbery-with-a-deadly-weapon conviction, and his statement describing that conviction, could have been used to impeach his characterization of his prior criminal history that he only "robbed drug dealers." However, counsel failed to obtain a certified copy of that conviction or to even learn of the conviction itself. Counsel did not even attempt to impeach Sherman with this conviction and was noticeably confused about Sherman's criminal history. This area of impeachment would have also shown that Sherman lied during direct examination.

90.     As the government made clear in closing argument, the jurors' decision rested on whether they believed Sherman or Ebron: "[A]ccording to Joseph Ebron, somebody is lying. And you know, he's right about that. Somebody is lying and you have to decide." 4/30/09 at 2200. There is a reasonable probability that, if the jurors had been aware that Sherman lied to them under oath, they would have disbelieved his testimony and found Ebron not guilty of first-degree murder.

## C. COUNSEL RENDERED INEFFECTIVE ASSISTANCE LEADING TO THE IMPROPER INTRODUCTION OF EBRON'S PRIOR MURDER CONVICTION.

91.     Counsel made a series of errors that led to the improper introduction of testimony that Ebron had been convicted of murder in 1999.[6] First, counsel made a constitutionally deficient effort to have evidence of Ebron's criminal history excluded. *See* Dkt. No. 41. Although the relevant standard requires the Court to make an offense-specific assessment weighing the prejudicial effect

---

[6] Counsel were also ineffective in failing to adequately investigate Ebron's prior conviction. *See* Claim II.A.2, *infra.*

against the probative value of each conviction, counsels' pro forma motion did not even specify which prior convictions it sought to exclude. The motion also failed to cite the relevant legal standard, *see* Fed. R. Evid. 609(a)(1), let alone explain why introduction of the murder conviction would be unfairly prejudicial to Ebron's defense. Second, once the Court had denied counsels' in limine motion, counsel mistakenly assumed that the government would rely on Ebron's conviction as substantive evidence, regardless of whether he testified. Ex. 48, A273. This led counsel to instruct Ebron—against his wishes—that he had to testify, creating an opening for the conviction to be admitted. Finally, when Ebron testified, counsel introduced the conviction on direct examination, 4/29/09 at 1965–67, thereby waiving Ebron's right on appeal to contest the admission of his conviction as improper. In all steps of the process that led to introduction of the conviction, counsel performed deficiently.

92.     This deficient performance prejudiced Ebron. The introduction of the prior murder conviction improperly encouraged the jury to believe that he had a propensity to kill. There is a reasonable probability that, but for the improper introduction of Ebron's prior murder conviction—made possible only by counsels' deficient performance—the jury would have acquitted him.

### 1.     Counsels' Failure to Identify the Governing Legal Standard Led to the Introduction of Ebron's Prior Murder Conviction.

93.     Counsel filed an omnibus motion in limine seeking an order barring the government, from, inter alia, referring to Ebron's "prior convictions . . . in the presence of the jury prior to a ruling of this Court as to its admissibility." Dkt. 41 at 1. The motion also made a largely duplicative, though equally sparse, request that the government not be allowed to reference Ebron's "prior criminal record" (including convictions, criminal charges, and arrests) without a Court ruling. *See id.* at 6–7.

94.     Counsels' motion did not (1) cite Federal Rule of Evidence 609, the standard for admissibility; (2) identify which convictions Ebron's counsel wished to exclude; or (3) explain why the unidentified convictions failed to satisfy the unidentified standard for admissibility.

95.     In response to the motion, the government stated that it intended to use Ebron's 1999

murder conviction as impeachment if he testified but did not object to Ebron's request for an in limine ruling on its admissibility. *See* Dkt. 59 at 1. The Court held a hearing on the motion, but neither side presented any evidence or arguments regarding the admissibility of Ebron's record; the hearing focused entirely on other matters. The Court granted Ebron's omnibus motion in part on grounds unrelated to the conviction and denied the "balance" of the motion without specifically addressing the admissibility of Ebron's criminal history. Dkt. 61.

96.     Counsels' failure to identify Rule 609 as the governing standard or to offer any analysis as to why Ebron's prior murder conviction should be excluded under that standard constituted deficient performance. There was no strategic reason not to support the motion with authority and reasoning. Yet both in their written submission and during the hearing, counsel never explained either the substantial prejudice Ebron would suffer if the prior murder conviction were introduced in the trial or the comparatively minimal probative value of the conviction to his character for truthfulness.

97.     Counsels' deficient performance prejudiced Ebron. There is a reasonable probability that, had counsel rendered professionally competent assistance with respect to the motion in limine, the Court would have excluded the conviction and Ebron would have been acquitted. Under Rule 609, a court must exclude evidence of an accused's prior conviction if the danger of its causing unfair prejudice to the defendant outweighs its probative value to the accused's truthfulness. The rule embodies a "predisposition toward exclusion." 28 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure*, § 6132 (2d ed. 2012). Where the past conviction and current charge are the same or similar, courts typically exclude the prior conviction because of the danger that the jury will believe that the defendant has a propensity to commit that offense. *United States v. Sanders*, 964 F.2d 295, 297 (4th Cir. 1992). This is especially true of violent crimes, which "generally have limited probative value concerning the witness's character for truthfulness." 4 Weinstein's Federal Evidence § 609.05(3)(b).

98.     The erroneous admission of Ebron's conviction was prejudicial. This was a close case:

27

the jury deliberated for five days over Ebron's guilt, even though it was uncontested that Ebron was present in Barnes's cell at the time of the homicide. The jury further demonstrated its ambivalence toward Ebron's intent and level of involvement in the homicide by finding, at the eligibility phase, that the government had not proved that Ebron either (1) intentionally killed Barnes or (2) intentionally inflicted serious bodily injury that resulted in Barnes's death.

99.     The Fifth Circuit has explained that it can "hardly imagine anything more prejudicial" to a defendant than a jury's learning that he has committed a similar offense before. *Lyons v. McCotter*, 770 F.2d 529, 534 (5th Cir. 1985) (citation omitted). Here, in light of the extremely prejudicial nature of the evidence and the closeness of the case, there is a reasonable probability that, but for the admission of Ebron's conviction, he would have been acquitted.

### 2.    Counsel Had Ebron Testify Against His Wishes.

100.     Ebron did not want to testify at trial. After the Court denied counsels' motion to exclude evidence of Ebron's criminal record, counsel erroneously believed that Ebron's criminal history would be admitted *regardless of* whether he testified. Counsel told the defense team in February 2009:

> Here is basically the Gov't's case:
>
> 1)     palm print of Ebron on upper bunk of Cell 305 ("the" cell);
> 2)     Security video showing the time and people going into cell; Ebron identified by other people and snitch as one who goes into cell at critical time;
> 3)     Charles Sherman's testimony;
> 4)     Ebron's criminal history (this IS his 3rd murder .... )

Ex. 48, A273.

101.     Since counsel believed that Ebron's criminal history would be a key part of the government's case whether or not he testified, they did not perceive any additional risk in his testifying and being impeached by his prior murder conviction. *See id.* Counsel thus advised Ebron that he had to testify and failed to explain that the choice whether to testify was his, not theirs.

102.     Counsels' failure to appreciate the government's limited ability to introduce Ebron's

28

conviction, as well as their strong-arming their client into testifying, violated professional norms and was deficient performance. The Fifth Amendment privilege against self-incrimination

> is fulfilled only when an accused is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." The choice of whether to testify in one's own defense must therefore be "unfettered," since that choice is an exercise of the constitutional privilege.

*Harris v. New York*, 401 U.S. 222, 230 (1971) (Brennan, J., dissenting) (citations omitted). Conversely, "it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). In tandem, both rights together empower "a criminal defendant to choose between silence and testifying in his own behalf." *Ferguson v. State of Ga.*, 365 U.S. 570, 602 (Clark, J., concurring). Counsel failed to enable Ebron to make that informed choice.

103.    Notwithstanding the Court's pretrial ruling, it should have been clear to counsel that Ebron's criminal record would not be admissible unless he testified. Indeed, the government stated that it would rely on the murder conviction only to impeach Ebron if he testified. Further, lawyers are required to consult with their clients regarding the decision whether to testify and must abide by their clients' wishes. Tex. Disciplinary R. of Prof'l Conduct 1.02(a)(3). Failure to respect a client's decision whether to testify constitutes deficient performance per se, even if counsel had a sound strategic basis for overriding the client's choice. *See United States v. Mullins*, 315 F.3d 449, 456 (5th Cir. 2002).

104.    Ebron was prejudiced by counsels' error. Even assuming, arguendo, that Ebron's conviction was properly admitted as impeachment, it could not have been admitted at all had he not testified. Few pieces of evidence are more prejudicial to an accused than evidence of a prior conviction for a similar offense. By contrast, much of the substance of Ebron's testimony could have been introduced through other witnesses.[7] There is a reasonable probability that, but for counsels' deficient

---

[7] As discussed in Claim I.A.1, *supra*, counsel performed deficiently in failing to identify and/or locate

performance in misunderstanding the Court's pretrial ruling and the applicable law, and in compelling Ebron to testify, the jury would have voted to acquit.

### D. COUNSEL FAILED TO OBJECT TO JURY INSTRUCTIONS THAT DID NOT SUBMIT ANY LESSER-INCLUDED OFFENSE AND DID NOT EXPLAIN THAT AN ACCOMPLICE MAY HAVE A LESS CULPABLE MENTAL STATE.

105.    Counsel performed deficiently by failing to object to the absence of lesser-included-offense instructions on second-degree murder and involuntary manslaughter. Counsel were also deficient in not objecting to aiding-and-abetting instructions that failed to make clear that the jury could find an aider-and-abettor had a lesser degree of intent (i.e., no premeditation with respect to murder), and thus a lesser degree of culpability, than the principal. *See Rosemond v. United States*, 572 U.S. 65, 76, 81–82 (2014) (jury instructions invalid where they fail to require that guilty finding possible only where intent is proven to extend to the entire crime charged); *Richards v. Quarterman*, 566 F.3d 553, 569, 571–72 (5th Cir. 2009) (counsel ineffective for failing to request instruction on lesser-included offense).

106.    A defendant is entitled to a lesser-included-offense instruction where "the elements of the lesser offense are a subset of the elements of the charged offense," *Schmuck v. United States*, 489 U.S. 705, 716 (1989), and where "the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater," *Keeble v. United States*, 412 U.S. 205, 208 (1973); *see also United States v. White*, 972 F.2d 590, 604 (5th Cir. 1992). Where evidence supports it, second-degree murder is a lesser-included offense of first-degree murder.[8] *United States v. Collins*, 690 F.2d 431, 436 (5th Cir. 1982). Involuntary manslaughter is also a lesser-included offense of murder, where evidence supports it.[9] *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989).

---

these witnesses.

[8] One difference between first- and second-degree murder is that first-degree murder involves premeditation. *See* 18 U.S.C. § 1111(a). Second-degree murder "is the unlawful killing of a human being with malice aforethought." *Id.* Malice aforethought "encompasses three distinct mental states: (1) intent to kill; (2) intent to do serious bodily injury; and (3) extreme recklessness and wanton disregard for human life ('depraved heart')." *Lara v. United States Parole Comm'n*, 990 F.2d 839, 841 (5th Cir. 1993).
[9] Involuntary manslaughter "is an unlawful killing of a human being without malice." *See* 18 U.S.C.

107.    In emails to and from the government regarding jury instructions, counsel never proposed or argued for an instruction on any lesser-included offenses, and none were submitted to the Court. Dkt. 66. The instructions provided the jury only two choices: first-degree murder or outright acquittal. Counsel did not object before the Court instructed the jury. 04/30/2009 at 2165.

108.    The jury instructions, as given, failed to provide the jurors any way to implement in their verdict the defense that the evidence did not prove premeditation and that, if anything, Ebron was guilty of a lesser offense, such as second-degree murder or involuntary manslaughter. Counsel conceded in closing that the crime in question was murder. *See, e.g.*, *id.* at 2212, 2216. The instructions on Count 1 required that the jurors find both malice *and* premeditation. *Id.* at 2178–79. Similarly, on Count 2, the conspiracy charge, the instructions contemplated only premeditated murder. *Id.* at 2180.

109.    Counsels' theory of the case was that Ebron agreed to check Barnes in but was a mere bystander while Barnes was killed; such behavior could support a conviction of second-degree murder or involuntary manslaughter, depending on Ebron's mental state. Thus, it was deficient performance to fail to ensure that lesser-included-offense instructions be given so that the jury could find something less than premeditated first-degree murder. Not only the federal criminal code, but the Constitution, guaranteed Ebron an instruction on one or more lesser-included offenses. *Beck v. Alabama*, 447 U.S. 625, 627 (1980); *United States v. Snarr*, 704 F.3d 368, 390 (5th Cir. 2013). Counsel performed deficiently.

110.    There is a reasonable probability that, had the jurors been properly instructed, they would have found that the evidence supported one of these lesser offenses. On direct examination,

---

§ 1112(a). Involuntary manslaughter occurs "[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." *Id.* A conviction for involuntary manslaughter requires that the defendant "(1) act[ed] with gross negligence, meaning a wanton or reckless disregard for human life, and (2) [had] knowledge that his or her conduct was a threat to the life of another or knowledge of such circumstances as could reasonably have enabled the defendant to foresee the peril to which his or her act might subject another." *United States v. Fesler*, 781 F.2d 384, 393 (5th Cir. 1986).

Ebron testified that his understanding had been that he and Mosley were going to Barnes's cell to check him in, but that instead Mosley suddenly killed Barnes. 04/29/2009 at 2000–03, 2021–27. Ebron did nothing to assist the killing and little to stop it, and afterwards he helped Mosley move the body and cover the area where the homicide had occurred. *Id.* at 2026, 2030–32. Counsel thus argued in closing that there was no premeditation—that Ebron was merely present at the scene of the crime. Counsel quoted from the "mere presence" portion of the aiding-and-abetting instruction, and told the jury, "You heard yesterday what happened in that cell. Mere presence is something I talked to every one of you about, also, every single one of you." 04/30/2009 at 2226.

111.    This absence of premeditation, along with the evidence presented at trial, could have supported a conviction of involuntary manslaughter rather than first-degree murder. The jury could have found that Ebron had gone into Barnes's cell with Mosley for the purposes of conversation and persuasion, or of physical threats or harm, but not of killing. The jury could have further found, in light of the evidence, that Ebron's failure to stop Mosley or call for help, and his assistance with the moving of Barnes's body, amounted to a grossly negligent and reckless disregard for human life that threatened to place that human life in peril. *See* 18 U.S.C. § 1112(a); *Lara v. Parole*, 990 F.2d 839, 841 (5th Cir. 1993). The jury could have found involuntary manslaughter instead of first-degree murder.

112.    Alternatively, the evidence could have supported a conviction of second- rather than first-degree murder, in light of the defense's theory of the case and evidence presented at trial. Provided that same evidence—the absence of a plan to kill, failure to intervene physically on Barnes's behalf, assistance with moving the body—the jury could have found, not premeditation, but only malice aforethought. *See* 18 U.S.C. § 1111(a); *Lara*, 990 F.2d at 841.

113.    Counsel was also deficient in not objecting to the Court's instruction on aiding and abetting, which failed to convey that the aider-and-abettor could have a lower degree of intent, and thus a lesser level of culpability, than the principal. The instruction on aiding and abetting read in part:

32

> If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit *a crime*, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct.

04/30/2009 at 2182 (emphasis added). The instruction then went on to say:

> [Y]ou may not find the defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons and that the defendant voluntarily participated in its commission with the intent to violate *the law*.
>
> You may find the defendant guilty of either count of the indictment if you are convinced that the government has proved each of the following beyond a reasonable doubt:
>
> first, that the offense of *murder* and/or conspiracy to commit murder was committed by some person;
>
> second, that the defendant associated with *the criminal venture*;
>
> third, that the defendant purposefully participated in *the criminal venture*; and
>
> fourth, that the defendant sought by action to make *that venture* successful.

*Id.* at 2183–84 (emphasis added). Thus the instruction conveyed that Ebron could be found guilty of first-degree murder if he acted "with the intent to commit *a* crime" and "with the intent to violate *the* law." The instruction failed to convey that aiding and abetting applies only where the intent applies to the *specific* crime, not "*a* crime" or "*the* law" in general. *See Rosemond*, 572 U.S. at 76 ("[A] person aids and abets a crime when . . . he intends to facilitate *that offense's* commission. An intent to advance some lesser or different offense is not . . . sufficient: Instead, *the intent must go to the specific and entire crime charged. . . .*" (emphasis added; internal citation omitted)). Here, the instructions failed to account for the possibility that Ebron's intent did not extend to the entire, specific crime and failed to make clear that a finding of premeditation was necessary for a guilty finding for first-degree murder; instead, the instructions contemplated intent only in connection with "a crime" or "venture" in general, and they failed to distinguish between first- and second-degree murder or a lesser form of homicide. Counsels' failure to object to this misleading error in the jury instructions was deficient performance.

114.    Individually and in combination, the failure to object to the absence of lesser-included-

33

offense instructions and the failure to object to the flaws in the aiding-and-abetting instruction prejudiced Ebron because the evidence could have supported a conviction of a lesser offense. Even with their options limited to first-degree murder or acquittal, the jurors struggled for part or all of five days with their verdict. There is a reasonable probability that, had counsel proposed an instruction on second-degree murder and involuntary manslaughter, or had they objected to their absence, lesser-included-offense instructions would have been given and, in turn, the jurors would have understood, and found, that Ebron had a lower level of intent and culpability. Likewise, there is a reasonable probability that, had the instructions properly conveyed that in order to find him guilty on the aiding-and-abetting theory of liability, the jurors would have had to find that his intent extended to the entire, specific crime of first-degree murder, they would have found that his intent did not extend to first-degree murder, even if they thought the principal actor (Mosley) guilty of first-degree murder.

### E. THE CUMULATIVE EFFECT OF TRIAL COUNSELS' DEFICIENCIES PREJUDICED THE DEFENSE.

115.   Ebron's defense was that he did not join in any premeditated plan to murder Barnes. His attorneys advanced that defense solely on the basis of his unsupported word, opposed by that of Charles Sherman. Even on that basis, the jurors deliberated for five days. There is a reasonable probability that if the jurors had heard from all the readily available witnesses, if counsel had effectively cross-examined Sherman and had otherwise performed effectively throughout the trial, and if the jurors had received proper aiding-and-abetting instructions and instructions to consider lesser-included offenses, they would have found Ebon not guilty of first-degree murder.

### II.   PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY BY THE INCLUSION OF A JUROR WHO LIED IN HIS QUESTIONNAIRE AND DURING VOIR DIRE ON GROUNDS THAT, IF THAT JUROR HAD RESPONDED CORRECTLY, WOULD HAVE PROVIDED THE DEFENSE WITH A VALID CHALLENGE FOR CAUSE.

116.   Ebron incorporates all other facts in this pleading in support of this claim.

34

117.    Juror Ronald Dunbar served as a juror at trial.[10] His brother, Dale, was killed in a prison cell in circumstances eerily similar to those at issue here. Juror Dunbar lied to the Court, on his juror questionnaire and in voir dire, about his brother's killing. Had he told the truth, his answers would have provided a valid challenge for cause. A new trial is warranted. *See McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *see also United States v. Scott*, 854 F.2d 697, 698 (5th Cir. 1998) (relief warranted when a party demonstrates "that a juror failed to answer honestly a material question on voir dire [and] that a correct response would have provided a valid basis for challenge for cause").

118.    In *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998), a new trial was ordered where a juror did not disclose that she or any close family members were crime victims. It was later discovered that the juror's brother was killed six years earlier. She explained that she did not disclose the killing because she thought her brother's death was an accident. The court found she was biased because her explanation was contradicted by evidence showing that she must have known her brother was shot. *Id.* at 975–77; *see also United States v. Bishop*, 264 F.3d 535, 554 (5th Cir 2001) (citing *Dyer* approvingly); *Green v. Quarterman*, 213 F.App'x 279, 281 (5th Cir. 2007) (same). When a juror "consciously censor[s] information," it is proof of implied bias, which provides a valid basis for a challenge for cause. *See Scott*, 854 F.2d at 699; *see also Bishop*, 264 F.3d at 554–55 (explaining a valid strike for cause can occur when "a juror fails to answer a material question accurately because he is biased" or "in extreme circumstances" where bias may be implied, including when a juror lies to "hide a potential disqualification").

119.    Here, Dunbar failed to answer the following three questions correctly:

- Have you or have any close friends/relatives been the victim of, or witness to, any kind of crime?

- Have you ever known anyone who was either the victim of a homicide or was closely related to the victim of a homicide?

- Have you or anyone in your family or a close friend or associate ever been arrested, charged or convicted of a crime and/or served any time in jail or prison?

---

[10] Dunbar was an alternate juror. When Juror Brittany Johnson was dismissed, he took her place.

35

Ex. 49 at 8, A281.

120.    Dunbar answered that his only close friend or relative who was a victim of a crime was his renter, Robert, whose vehicle was burglarized. He also answered that he did not know anyone who was a homicide victim. Finally, Dunbar answered that the only person in his family who had been arrested, charged, or convicted of a crime was his son for not paying a ticket. *Id.*

121.    Dunbar failed to disclose that his brother was convicted of several crimes, sentenced to prison, and while in prison was murdered. Ex. 50, A297 (Decl. of Kyle Tubbleville). On April 20, 2009, Dunbar alerted the Court that he had failed to disclose an incident during voir dire, and told the Court that his baby brother, Dale Dunbar, while incarcerated, fell out of his bunk and died three days later. 4/20/09 at 7. The Court asked Dunbar if there was any suggestion of foul play, to which Dunbar replied, "[T]hey never knew." *Id.* Juror Dunbar, however, knew that his brother was killed in prison.

122.    During a break in Ebron's trial, Dunbar told another juror, Kyle Tubbleville, that Dale Dunbar was killed in prison. Ex 50, A297. Juror Tubbleville explains that he knew Dale Dunbar, asked Juror Dunbar if they were related, and was told that Dale was killed in prison. *Id.*

123.    Juror Dunbar's sister, Vickie Foreman, explains that "[a]fter Dale Dunbar died, [the Dunbar] family was notified within the year, that he was killed by another inmate . . . . When Dale was in the hospital, [Ms. Foreman] tried to take a picture of him because it looked like he had a boot mark on his face." Ex. 51, A298 (Decl. of Vickie Foreman).

124.    Records from the Texas Department of Criminal Justice ("TDCJ") confirm that on July 14, 2006, Dale Dunbar was killed in prison. Specifically, a spreadsheet provided by TDCJ explains that Dale Dunbar was killed in prison, that the manner of death was a homicide, and that the immediate cause of death was a skull fracture with hemorrhage. Ex. 52 at 2, 4, A300, 302. Correspondence from TDCJ explains that another prisoner, "Offender Thomas," was charged with "appropriate disciplinary" for Dunbar's killing. Ex. 53 at 2, A307.

125.    As with the juror in *Dyer*, had Dunbar answered the jury questionnaire, or the Court's voir dire, honestly, his answers would have provided a valid challenge for cause. The facts surrounding Dale Dunbar's death (a prison murder) and the facts surrounding the charges against Ebron (a prison murder) would have raised a material question concerning actual or implied bias. Because Dunbar failed to give an honest answer to a material question that, if answered honestly, would have served as a valid basis for a challenge for cause, Ebron is entitled to a new trial. And because he repeatedly lied to the Court, Dunbar's bias must be inferred.

126.    Counsel was ineffective for failing to question Dunbar on the circumstances surrounding Dale Dunbar's incarceration, or to realize that Dunbar lied on his questionnaire. Counsels' deficiency prejudiced the defense because, but for counsels' deficiency, there would have been valid grounds to challenge Dunbar for cause. Ebron is entitled to a new trial.

### III.    THE GOVERNMENT DENIED EBRON'S RIGHTS TO DUE PROCESS OF LAW, TO CONFRONT HIS ACCUSERS, AND TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BY SUPPRESSING FAVORABLE MATERIAL EVIDENCE.

127.    Ebron incorporates all other facts in this pleading in support of this claim.

128.    The Government violated due process under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny when it withheld favorable information from the defense at trial.

### A.    THE GOVERNMENT FAILED TO DISCLOSE REPORTS OF CONVERSATIONS AND ARGUMENTS BETWEEN MOSLEY AND EBRON IN WHICH EBRON WAS OVERHEARD TELLING MOSLEY THAT BARNES WAS NOT SUPPOSED TO BE KILLED.

129.    At trial, it was undisputed that Ebron and Mosley entered Barnes's cell and that while they were there, Barnes was killed. The sole issue in the guilt-phase proceedings was whether Ebron intentionally participated in planning to kill, or killing, Barnes. The evidence implicating Ebron rested on the testimony of the government's key witness, and only alleged eye-witness, Sherman.

130.    During the closing argument in the guilt phase, the government relied on Sherman's

37

testimony to establish Ebron's guilt. 4/30/09 at 2196–99. It then cited another witness, Lamont Bailey, as corroboration for Sherman's testimony. The prosecutor argued: "Marwin Mosley spoke from the grave through Lamont Bailey and said 'We stabbed him so many times we had to take a break. We punished him.'" *Id.* at 2197. The government contrasted Sherman's testimony with Ebron's testimony, which it described as uncorroborated, self-serving lies. *Id.* at 2200–02.

131.    Upon information and belief, the government had, or should have been aware of, evidence that impeached Sherman and corroborated Ebron's testimony. Witnesses have stated that after Barnes's murder, Ebron and Mosley had conversations in which they discussed that Ebron did not know that Mosley was going to kill Barnes. Some of those witnesses have stated that prison guards at USP Beaumont overheard the conversations:

- Lonnie Gooding states that Ebron told Mosley in the SHU, "This is you, you know this is you." Gooding also states that "[t]here were guards present and everyone could hear the conversation between Funk and Joe." Ex. 25 at 1–2, A62–63.

- Luther Fuller states that Ebron told Mosley publicly in the SHU that "he didn't agree with what [Mosley] did to Barnes." Ex. 22 at 2, A52.

- Andrew Patrick heard Ebron arguing with Mosley across the space between the cell about how "[i]t wasn't supposed to happen." He also overheard heated discussions between Ebron and Mosley in the yard. Ex. 24 at 3, A60.

- Joe Jackson also heard Mosley and Ebron argue in the cell range and the recreation cages about how "it wasn't supposed to go like that." Ex. 23 at 2, A56.

132.    The guards who were present during these discussions among inmates facing homicide charges would have been practicing sound correctional policy to record them. Nevertheless, the government failed to disclose any such information to Ebron's defense, despite defense counsels' June 5, 2008, Motion Pursuant to *Brady v. Maryland* for Production of Exculpatory Evidence. Dkt. 12.

133.    The undisclosed evidence was favorable. Had it been disclosed, it would have corroborated Ebron's testimony and directly supported his defense. It was also material because "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

38

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

134.    Evidence that corroborated Ebron's version of events—that he did not plan to kill, or participate in killing, Barnes—would have had a profound impact on this case and undermines the confidence in the verdict. There is a reasonable probability that, had the jury heard that Mosley and Ebron argued regarding Ebron's displeasure with Mosley's killing of Barnes, the jury would have believed Ebron's testimony and found him not guilty of first-degree murder.

## B. THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY FORMS AND INTERVIEWS IN THE POSSESSION OF THE BUREAU OF PRISONS AND OTHER RELATED INVESTIGATIVE AGENCIES.

135.    Upon information and belief, the government suppressed several BOP interviews and reports related to Barnes's murder. These interviews and reports are likely favorable to the defense, and there is a reasonably probability that their disclosure would have resulted in a different outcome.

### 1.    Mass Interview Forms

136.    Special Investigative Supervisor Eric Rayburn testified that after Barnes's murder, BOP staff conducted mass interviews of the entire institution. 4/23/09 at 1032.

137.    Although the authorities interviewed the entire institution, defense counsel received only about sixteen mass interview forms.[11] As shown above, many inmates have provided exculpatory information related to Ebron's involvement in Barnes's killing. These same inmates, and others, likely provided BOP investigators with exculpatory information during their mass interviews. The government did not disclose these mass interview records to defense counsel.

### 2.    SIS Report

138.    After a homicide at a BOP prison, the BOP conducts an extensive review of the

---

[11] Mark Bezy, the former CEO (Warden) at Federal Correctional Complex, Terre Haute, Indiana, has reviewed records and provided opinions on several matters at issue in this case. Mr. Bezy explains that all of these interviews are recorded, and are referred to as "Mass Interviews."

incident. The review and investigation begins at the prison and results in an "SIS report." This report is an investigative summary of the incident and is required by national BOP policy. Defense counsel were never provided with the SIS report relating to Barnes's murder. In light of the reports of inmates who heard Ebron's and Mosley's arguments, the SIS report should have reflected similar information.

### 3.    After Action Report

139.    In discovery, counsel were provided with a May 11, 2005, letter from Harley Lippin, the Director of the BOP, to the Deputy Attorney General that states, inter alia, "An after action review is currently being conducted. The after action team will follow-up their review with a written report and recommendations." Ex. 54, A308. The "after action team" looks into causal factors for the incident and makes recommendations for corrective measures.

140.    Current counsels' investigation produced extensive exculpatory and impeachment information. The investigation and corresponding report created by the "after action team" likely uncovered similar information. There is a reasonable probability that, had it and other suppressed material been disclosed to the defense, the jury would not have found Ebron guilty of first-degree murder.

### IV.    THE GOVERNMENT DENIED EBRON'S RIGHT TO DUE PROCESS OF LAW, TO CONFRONT HIS ACCUSERS, AND TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BY PRESENTING, OR FAILING TO CORRECT, FALSE TESTIMONY OF ITS KEY WITNESS, CHARLES SHERMAN.

141.    Ebron incorporates all other facts in this pleading in support of this claim. [12]

---

[12] On June 18, 2013, the government wrote appellate counsel, Donna Coltharp and Jimmy Phillips, a letter that states, "[W]hen asked to describe his prior conviction during Ebron's trial, Mr. Sherman stated that he 'robbed drug dealers' and indicated that the victim in that offense had been a drug dealer. This description is inconsistent with his testimony from the D.C. trial and with his version of events in the presentence report . . . ." Ex. 55, A310–11. The government's letter further states, "At the time, we did not have the transcript and did not search for it because we did not believe that it could be relevant." Ex. 55, A311. However, the government did have in its possession, and had reviewed, the presentence report that contradicted Sherman's trial testimony. On June 6, 2008, defense counsel for codefendant Bacote, Mr. Cunningham, specifically requested Sherman's presentence report because it contained possible *Brady* information. 6/6/08 at 28. AUSA Batte responded that he had the presentence report and did not "have any problem tendering the presentence report to the

142.     Charles Sherman was an unindicted coconspirator and the government's only alleged eyewitness to Barnes's murder. He testified that Ebron agreed to, and participated in, Barnes's murder. 4/20/09 at 221. Sherman's testimony was in direct conflict with the testimony of Ebron. *Id.* at 2032. The jurors had to decide whom to believe, Ebron or Sherman. To bolster Sherman's credibility, the government presented, or failed to correct, testimony relating to his criminal history that it knew, or should have known, was false. Because Sherman's credibility was essential to securing a first-degree murder conviction against Ebron, his false testimony affected the outcome of Ebron's trial. Thus, a new trial is warranted under *Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny. *Napue*, 360 U.S. at 272 (explaining that when the government knowingly uses false testimony to secure a conviction, a new trial is warranted if that testimony "may have had an effect on the outcome of the trial").

143.     In *Glossip v. Oklahoma*, 145 S. Ct. 612 (2025), the Supreme Court vacated the defend- ant's conviction because the prosecution failed to correct false testimony by its key witness. Specifi- cally, the witness in *Glossip* lied when he denied being treated by a psychiatrist for bipolar disorder and receiving lithium for a mental disorder. *Id.* at 627. The Supreme Court explained that materiality anal- ysis under *Napue* must consider what would have happened "[h]ad the prosecution corrected [the false testimony] on the stand. . . . [A] correction would have revealed to the jury not just that [the witness] was untrustworthy . . . , but also that [the witness] was willing to lie under oath." *Id.* at 628. A witness's "willingness to lie . . . to the jury" is never irrelevant. *Id.* "A lie is a lie, no matter what its subject." *Id.*

## A. SHERMAN'S FALSE TESTIMONY

144.     Sherman testified on direct examination that he was currently serving a sentence of

---

court for [its] inspection." *Id.* at 29. AUSA Batte continued that the presentence report "would be *Giglio* material [only if it is] impeachment evidence that they could use at trial." *Id.* at 30. Although the prosecutor had Sherman's presentence report, which contradicted Sherman's trial testimony, he failed to correct Sherman's testimony or disclose the presentence report to defense counsel. This is a clear violation of *Giglio* and its progeny.

twenty-six to seventy-eight years' imprisonment for an "armed robbery." 4/20/09 at 166.[13] Sherman testified that "[b]eing as though my family was all in trouble behind crack cocaine, I basically—I despised drug dealers because of what happened to my mom. So, me and a couple buddies had devised a plan to start robbing drug dealers. So, that's what I did; I robbed drug dealers." *Id.*

145.    This testimony was false. Sherman's "armed robbery" conviction had nothing to do with robbing drug dealers. Instead, it involved deceit, threats, and violence against an innocent victim. The pre-sentence investigation report related to Sherman's robbery conviction recounts:

> [D]uring the instant offense, Mr. Sherman and two associates went to the home of an acquaintance and, at gun point, ransacked the residence and stole a TV and VCR. They then drove the victim to a bank and forced him to withdraw money from his account, which they took. *Mr. Sherman's version of the event differed significantly from the victim's. He claimed that the victim had willingly loaned him the money and then filed a false complaint with the police when the two of them disagreed over the payment schedule.*

Ex. 46 at 2, A190.

146.    Sherman's testimony at his "robbery" trial contradicts his testimony at Ebron's trial. At his own trial, Sherman testified, not that he had robbed a drug dealer, but that the victim was a friend of Sherman's whom he took to the bank so that he could borrow money. Ex. 47, A220. Sherman testified that the reason that he was "in trouble" was that he did not repay the victim. *Id.* at A218. Armed with this information, counsel could have forcefully impeached Sherman with his prior testimony, proving that Sherman lied under oath (either at Ebron's trial, or at his own trial, or both).

147.    Indeed, four years after Ebron's trial, the government, in a June 8, 2013, letter, informed Ebron's appellate counsel that Sherman's testimony that he "robbed drug dealers" and that the victim in the above-noted offense was a drug dealer was inconsistent with Sherman's "testimony

---

[13] Sherman's twenty-six-to-seventy-eight year sentence stemmed not only from armed robbery but from convictions for conspiracy, first-degree burglary while armed with intent to commit assault, first-degree burglary while armed with intent to commit robbery, threats to do bodily harm, assault with intent to commit robbery, robbery while armed, first-degree theft, kidnaping while armed, possession of a firearm during crime of violence, and obstruction of justice (No. F3351-00).

from the D.C. trial and his version of events in the pre-sentence report." Ex. 55, A310–11.

## B. THE GOVERNMENT KNEW, OR SHOULD HAVE KNOWN, THAT SHERMAN'S TESTIMONY WAS FALSE.

148.    When Sherman testified in Ebron's case, the government was in possession of Sherman's pre-sentence report, which contradicted his trial testimony. On June 6, 2008, Cunningham, defense counsel for co-defendant Bacote, in a hearing before this Court, specifically requested Sherman's pre-sentence report because it contained possible *Brady* information. 6/6/08 at 28. The government responded that it had the pre-sentence report in its possession and did not "have any problem tendering the pre-sentence report to the court for [its] inspection." *Id.* at 29. The government continued that the pre-sentence report "would be *Giglio* material [if it is] impeachment evidence that they could use at trial." *Id.* at 30.[14]

149.    As described above, Sherman's description of his "armed robbery conviction" in his pre-sentence report contradicted his testimony at Ebron's trial. The government had this pre-sentence report in its possession and thus knew, or should have known, that Sherman's testimony regarding this conviction was false. As in *Glossip*, this knowledge was enough to require the prosecutor to correct Sherman's testimony. *Glossip*, 145 S. Ct. at 627.

## C. SHERMAN'S FALSE TESTIMONY WAS MATERIAL.

150.    A conviction obtained by the knowing use of perjured testimony must be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). The Fifth Circuit has found false testimony material where there was a material discrepancy between the testimony of the government witness and the defense witness and the credibility of the witnesses was key to the jury's determination of guilt or

---

[14] The government provided the defense with excerpts of Sherman's pre-sentence report. None of those excerpts contained any information relating to the underlying facts of the crime or Sherman's version of the crime. Ex. 45 at 4, A188.

43

innocence. *United States v. Barham*, 595 F.2d 231, 242–43 (5th Cir. 1979); *Glossip,* 145 S. Ct. at 627–28 (a disclosure that a key witness lied while testifying reveals not only that the witness is untrustworthy but also that the witness is willing to lie under oath: "Such a revelation would be significant in any case . . . especially . . . where [the witness] was already 'nobody's idea of a strong witness.'").

151.    Here, Sherman's credibility was crucial to securing a first-degree murder conviction against Ebron. Sherman, a prison witness with a long criminal history, was the only witness who testified that Ebron conspired to kill Barnes. 4/20/09 at 221. He was also the only government witness who purportedly observed Barnes's murder. Sherman testified that he watched Ebron put Barnes in a headlock while Mosley stabbed Barnes to death. *Id.*

152.    Sherman's testimony was at diametric odds with Ebron's. In their deliberations, the jurors had to choose whom they believed, Ebron or Sherman. Indeed, the government argued in closing that the jurors' decision rested on whether they believed Sherman or Ebron. 4/30/09 at 2200.

153.    The government did not disclose that Sherman lied on direct examination. Thus, the jury was left with the belief, based on Sherman's false testimony, that although he was serving twenty-six to seventy-eight years' imprisonment for an armed robbery, he was a Robin Hood–like figure who "robbed drug dealers" because he observed what drugs had done to his mother. 4/20/09 at 166.

154.    Sherman's false testimony created the false impression that he was not an unsavory character who had lied, stolen, and obstructed justice in the past, but instead was a person who pursued justice. The jury's false impression of Sherman led them to credit his testimony over Ebron's and thus affected the outcome of trial. This Court should vacate Ebron's conviction.

V.    **THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES RELIEF.**

155.    Ebron incorporates all other facts in this pleading in support of this claim.

156.    Each of the constitutional errors described above merits relief. Further, regardless of the prejudice each error caused to Ebron's defense individually, their cumulative impact was

44

devastating. At the guilt-innocence phase, the jury that deliberated for five days may well have rendered a different verdict if Ebron had received effective assistance of counsel following a reasonable pretrial investigation and had the benefit of twelve impartial jurors, full disclosure of exculpatory and impeachment information, and a fair trial. In light of the record as a whole, the cumulative effect of the errors more likely than not contributed to the verdict. *See Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (citing *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985)). There is a reasonable probability that, together, they affected the outcome of Ebron's trial and had a substantial and injurious effect on the result. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). This Court should therefore grant Ebron relief from his convictions.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Ebron prays that this Court (1) order such discovery as appropriate to resolve Mr. Ebron's claims for relief; (2) conduct an evidentiary hearing on all claims involving disputed material facts; (3) vacate Ebron's convictions and order a new trial; and (4) grant such additional relief as may be necessary and appropriate.

Respectfully Submitted,

/s/ Alex Kursman
Alex Kursman
Jennifer Chiccarino
Assistant Federal Defenders
Federal Community Defender Office
  for the Eastern District of Pennsylvania
601 Walnut Street—The Curtis
Suite 545
Philadelphia, PA 19106
(215) 928-0520
alex_kursman@fd.org
jennifer_chiccarino@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of July 2025, I electronically filed the foregoing Amended

Motion to Vacate, Seat Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 using the Court's

CM/ECF system. Electronic notice will be provided to the following individuals:

| | |
|---|---|
| **Joseph R. Batte** | **Traci Kenner** |
| Assistant United States Attorney | Assistant United States Attorney |
| United States Attorney's Office | United States Attorney's Office |
|   for the Eastern District of Texas |   for the Eastern District of Texas |
| 350 Magnolia St. | 350 Magnolia St. |
| Suite 150 | Suite 150 |
| Beaumont, TX 77701 | Beaumont, TX 7770 |

/s/ Alex Kursman
Alex Kursman