UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JOSEPH EBRON | § | |
| | § | |
| v. | § | Civil No. 1:14-CV-539 |
| | § | Criminal No. 1:08-CR-36 |
| UNITED STATES OF AMERICA | § | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR COLLATERAL RELIEF PURSUANT TO 28 U.S.C. § 2255

After his death sentence was commuted to life imprisonment, Joseph Ebron filed an amended motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255, raising several claims. They are all meritless.

### OFFENSE CONDUCT[1]

On May 6, 2005, inmate Keith Barnes arrived at the United States Penitentiary in Beaumont, Texas (USP-Beaumont). During his intake screening, Barnes told the case manager that he had testified against his codefendants in two murder trials in Washington, D.C.[2] One of the people Barnes testified against was James "Rat" Carpenter. At another penitentiary, inmates had learned of Barnes's cooperation, and as a result, he had spent an extended period of time in the special housing unit (SHU), for his own safety. Barnes was concerned that inmates from D.C. might be aware of his cooperation, but he wanted to be placed in the general population at USP-Beaumont because that would allow him to move about more freely and "program" by

---

[1] This section is drawn from the government's brief and the Fifth Circuit's opinion in Ebron's direct appeal. *See United States v. Ebron*, 683 F.3d 105, 117-20 (5th Cir. 2012); *United States v. Ebron*, Nos. 09-40544 and 10-40108, 2011 WL 3010806, *10-*26 (5th Cir. July 18, 2011).

[2] Washington, D.C. prosecutes what are traditionally considered "state" crimes in D.C. Superior Court. At one time, inmates convicted in that court went to a prison in Virginia. That facility closed in 2001, and the D.C. inmates were transferred to federal prisons throughout the country.

**Response to Section 2255 Motion-Page 1**

participating in recreational activities, working, and taking classes.  After discussion with Special Investigative Supervisors (SIS), it was decided that Barnes could be placed in the general population as he desired.  He was murdered within 24 hours.

Barnes was assigned a cell in the Delta Bravo Unit.  His cell mate, Charles Giles, was in the common area when Barnes entered the cell block at around 9:30-9:40 p.m. and saw him engage in a serious-looking discussion with Michael Bacote and Marwin Mosley, both from D.C.  Charles Cresceno Sherman, another D.C. inmate, was present and recalled that Barnes gave the group an Arabic or Muslim name.  The ruse was unsuccessful, however, because Mosley recognized Barnes and remembered his real name.  Mosley recalled that Barnes "testified on some good dudes at DC (sic) jail," including one named "Rat."  That night, Bacote told his cell mate, Johnnie Bazile, that Barnes was "hot," meaning that he had testified against people.  Bacote was angry that Barnes was at USP-Beaumont.

Mosley wanted to verify Barnes's identity, so the following morning, May 7, 2005, Bacote and Sherman took Barnes to the recreation yard and introduced him to other D.C. inmates in hopes that someone would know him.  That failed, but they ultimately tricked Barnes into revealing his identity.  Later that morning, Bacote and Sherman told Mosley that they had verified Barnes's real name.  Mosley decided to kill Barnes that night, and he began planning the murder with Bacote and Sherman.  They had seen Ebron in the recreation yard and included him in the plot because Ebron was friends with "Rat."[3]  It was decided that Bacote would go into

---

[3] In 2003-2005, Ebron and Carpenter were cell mates at USP-Atlanta in Georgia.  A former guard recalled a time when an agitated Carpenter began kicking the cell door.  When asked why, Carpenter cited his desire to transfer to USP-Coleman in Florida, stating that "they" would not let him "because they know I know he's down there."  The guard gathered that Carpenter was referring to someone who had snitched on him.  Ebron added: "That's my partner, and I'm going to take care of my partner."  In prison vernacular, this meant that Ebron and Carpenter were good friends.  Ebron also stated: "Man, we already know who the ni**er is."  The guard understood

**Response to Section 2255 Motion-Page 2**

Barnes's cell when dinner was announced and delay him while most of the inmates left the unit. Then, Mosley and Ebron would murder Barnes in his cell.

After lunch, Mosley, Bacote, and Sherman found Ebron, who they called "Joe"; told him that the new inmate was Barnes; and asked for his help with the murder. Ebron responded with "bet," meaning "yes" or "okay." Ebron lived in another cell block, so he was to put a t-shirt over his head when he entered the Delta Bravo Unit to prevent detection by the surveillance cameras.

After they met with Ebron, Mosley, Bacote, and Sherman continued planning the murder. They decided that Mosley and Ebron would enter Barnes's cell with their heads covered because of the cameras. Sherman was to put clothes for Mosley by the shower stalls, so he could clean up after the murder. Bacote told Bazile to make sure that Giles was not in the cell because Mosley and Ebron were going to "punish" Barnes. Bazile, who had seen Mosley, Bacote, and Ebron talking in the recreation yard, gathered that Barnes was going to be stabbed. When dinner was announced, Bazile made sure Giles left the unit. As Bazile exited, he saw Ebron coming in with a "white towel" over his head.

Despite the plan, the cameras captured much of the conspirators' activity: Sherman ran to the door as Ebron came in the unit. Bacote went into Barnes's cell to detain him. Shortly thereafter, Ebron walked by the cell with a khaki shirt covering his head, followed by Sherman. Ebron joined Mosley, and they went into Mosley's cell. Mosley then came out and sat at a nearby table. Ebron briefly left the cell, walked over to Mosley, and returned to the cell. Mosley walked across the unit, turned in front of Barnes's cell, and walked back toward his cell, putting a t-shirt around his head. Ebron then exited Mosley's cell and appeared to hand something to Mosley. The two moved near Barnes's cell and waited until Bacote stepped out and gave what

---

Ebron to be referring to the man who had snitched on Carpenter.

**Response to Section 2255 Motion-Page 3**

appeared to be a "thumbs up" in their direction after watching the unit guard leave the common area. Bacote then went back in Barnes's cell as Mosley and Ebron walked quickly toward it and entered it with their heads covered.

Approximately 25 seconds later, Bacote came out of Barnes's cell and joined Sherman. He told Sherman, "Joe put him in an L just like we planned. It's all good." At one point, Sherman looked through the cell door's window and saw Ebron holding Barnes in a headlock while Mosley was facing Barnes. Mosley's arm was moving, but Sherman could not see a knife. Sherman took Mosley's change of clothes to the shower stalls, and he and Bacote loitered near a staircase outside Barnes's cell. The cell door came ajar, and Sherman closed it. When he did, he glimpsed Mosley and Ebron lifting Barnes's body to the top bunk.

A few minutes later, Mosley and Ebron left the cell. Before exiting, they placed a towel over the window. Mosley went upstairs and showered. Ebron immediately left the Delta Bravo Unit; Bazile saw him running away. Ebron went to his unit, showered, and put his clothes in a washing machine. Sherman went to dinner, meeting Mosley and Bacote about 40 minutes later. At Mosley's direction, Sherman removed the towel from Barnes's cell door window.

Rumors about the murder spread among the inmates, and they began to prepare for the inevitable lockdown that would coincide with an investigation. At approximately 7:30 p.m., a confidential informant reported that there had been a murder and that the body was hidden in a cell. The prison conducted an emergency count, and Barnes's body was found on his bunk. He had been stabbed 106 times in an eight-inch by four-inch area over his heart, left lung, and liver. An autopsy later revealed that Barnes died of multiple stab wounds to the chest.

Sherman was rattled after the murder, which concerned Mosley and Bacote. Sherman saw them arguing and pointing at his cell and knew he was in "trouble." He decided to tell the

**Response to Section 2255 Motion-Page 4**

authorities about the murder during the mass interviews that he knew would occur before the lockdown ended.  The following day, Sherman told what he knew in exchange for protection.

During the ensuing investigation, Ebron and Mosley were placed in the SHU.  They were physically examined because of their suspected involvement.  Ebron had no visible injuries, but his palm print was found on the bed frame in Barnes's cell.  Also, DNA analysis revealed a spot of Barnes's blood on Ebron's pants, which were recovered from the washing machine in his unit.

During the lockdown, Bacote confirmed Bazile's suspicions that Barnes was dead, saying that Ebron and Mosley had "punished" him.  Approximately two months later, Bacote's half brother, Lamont Bailey, who had been transferred to USP-Beaumont, was placed in a holding cell in the SHU.  Mosley was in the adjoining cell, and the two—who knew each other from their D.C. neighborhood—discussed the murder.  When Bailey said how stupid it was for Bacote to be involved, Mosley responded that Bacote had merely served as a lookout and that Mosley and "Akh" had committed the crime.  Mosley said that he stabbed Barnes so many times that they had to take breaks and bragged: "We punished the motherf**ker."  Mosley told Bailey that he and "Akh" killed Barnes because he was a snitch.  Bailey remembered Ebron from the D.C. jail in 1997 and had referred to him as "Akh," which he understood to be an abbreviated form of the Arabic word for "brother."  Bailey also recalled that Ebron and "Rat" Carpenter were friends.

## PROCEEDINGS

On August 15, 2007, a federal grand jury sitting in the Eastern District of Texas returned a two-count indictment against Ebron, Bacote, and Sherman,[4] charging Ebron with Barnes's

---

[4] Mosley committed suicide before he could be indicted for Barnes's murder.  Based on intelligence testing, Bacote could not be executed under *Atkins v. Virginia*, 536 U.S. 304 (2002). He pleaded guilty to second degree murder and aiding and abetting and was sentenced to 336 months' imprisonment.  *United States v Bacote*, No. 1:07-CR-142 (E.D. TX June 22, 2009) ECF Doc. 315 (information); *United States v Bacote*, No. 1:07-CR-142 (E.D. TX Sep. 10, 2009) ECF

**Response to Section 2255 Motion-Page 5**

murder and aiding and abetting, in violation of 18 U.S.C. §§ 1111 and 2, and conspiracy to commit murder and aiding and abetting, in violation of 18 U.S.C. §§ 1117, 1111, and 2. Crim. ECF Doc. 2. On September 11, 2007, the government filed a Notice of Intent to Seek the Death Penalty against Ebron. Crim. ECF Doc. 40.

Ebron's trial began on April 20, 2009. At the conclusion of the guilt phase, the jury found Ebron guilty on both counts. Crim. ECF Doc. 151. The jury then found him eligible for the death penalty, Crim. ECF Doc. 162, and unanimously returned a verdict of death, Crim. ECF Doc. 185. On June 26, 2009, the Court sentenced Ebron to death on Count One and life imprisonment on Count Two. Crim. ECF Doc. 198.

Ebron timely filed a Notice of Appeal on June 30, 2009. Crim. ECF Doc. 197. In his brief, he raised several challenges to his conviction and sentence, which the Fifth Circuit organized into five categories: (1) issues with a juror's dismissal; (2) alleged evidentiary errors; (3) alleged prosecutorial misconduct; (4) alleged errors at sentencing; and (5) alleged post-trial errors. *United States v. Ebron,* 683 F.3d 105, 124 (5th Cir. 2012). The Fifth Circuit rejected all of Ebron's challenges and affirmed his conviction and death sentence. *Id.* at 158. Ebron then filed a petition for writ of certiorari, which the Supreme Court denied on November 12, 2013. Crim. ECF Doc. 310.

Ebron filed a Section 2255 motion on October 27, 2014, 2255 ECF Doc. 1, but the proceedings were stayed, for the most part, while he challenged his prior murder conviction in the Superior Court in Washington, D.C., 2255 ECF Docs. 6-7, 21-36. On December 23, 2024,

Doc. 326 (amended judgment); *see also United States v. Ebron*, No. 1:08-CR-36, 2010 WL 413239, at *14 (E.D. Tex. Jan. 28, 2010), *aff'd*, 683 F.3d 105 (5th Cir. 2012). Sherman reached an agreement with the government under which, among other things, he would be placed in the witness protection program and not be prosecuted for the murder if he testified truthfully.

**Response to Section 2255 Motion-Page 6**

Ebron's death sentence was commuted to life imprisonment without the possibility of parole. Crim. Doc. 315; 2255 ECF Doc. 37. The Court then ordered Ebron to identify any claims in his Section 2255 motion that still present a live case or controversy. 2255 ECF Doc. 38. Ebron identified six claims, alleging that they, "in whole or part, challenge his criminal convictions in this case." 2255 ECF Doc. 43 at 2. On March 27, 2025, the Court ordered Ebron to file an amended Section 2255 motion by May 28. 2255 ECF Doc. 45. The government was ordered to file a response to the amended motion within 90 days after Ebron filed it. 2255 ECF Doc. 45. Ebron filed the amended Section 2255 motion on May 28, but the Court ordered him to reduce the number of pages and set a deadline of July 2, 2025, for the edited filing. 2255 ECF Doc. 52.

Ebron filed his edited amended Section 2255 motion on July 2, 2025, raising five claims with multiple allegations.[5] 2255 ECF Doc. 53. All are meritless.

GENERAL LAW ON FEDERAL COLLATERAL REVIEW

**A.      Cognizable Claims**

Under Section 2255, a prisoner may move to vacate, set aside, or correct his conviction or sentence. The statute provides four grounds: "(1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is 'otherwise subject to collateral attack.'" *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) (citation omitted).

Although Section 2255 is considered a comprehensive remedy, "it does not encompass all claimed errors in conviction and sentencing," *United States v. Addonizio*, 442 U.S. 178, 185

---

[5] The edited amended motion is referred to as "Amd. Mtn." The exhibits are referred to by "Mtn. Ex." followed by the exhibit's number.

(1979); *see United States v. DeLario*, 120 F.3d 580, 582 (5th Cir. 1997); *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991).  Indeed, the grounds for relief under Section 2255 are narrower than those on direct appeal.  With limited exceptions, relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension; (2) a procedurally-defaulted ground; (3) a claim previously raised and rejected on direct appeal; (4) a "new rule" as defined by *Teague v. Lane*, 489 U.S. 288 (1989); or (5) an error that did not have a substantial and injurious effect or influence on the jury's verdict.  Once a defendant has appealed his conviction, the court is "entitled to presume he stands fairly and finally convicted." *United States v. Samuels*, 59 F.3d 526, 528 and n.6 (5th Cir. 1995) (citing *Shaid*, 937 F.2d at 231-32 and *United States v. Frady*, 456 U.S. 152 (1982)).

**B.       Procedurally Defaulted Claims**

The doctrine of procedural default generally bars consideration of any claim that the movant failed to appropriately raise on appeal.  *Frady*, 456 U.S. at 165; *see United States v. Lopez*, 248 F.3d 427, 433 (5th Cir. 2001).  An exception lies for claims of ineffective assistance of counsel, which are usually raised in a collateral attack rather than a direct appeal.  *See United States v. Willis*, 273 F.3d 592, 597 n.7 (5th Cir. 2001) (citing *United States v. Marroquin*, 885 F.2d 1240, 1245-46 (5th Cir. 1989)).

Courts may consider claims that are procedurally-defaulted in two instances: First, when a movant demonstrates "that the constitutional error 'has probably resulted in the conviction of one who is actually innocent,'" and second, if the petitioner establishes cause and prejudice.  *United States v. Scruggs*, 691 F.3d 660, 670 and n.34 (5th Cir. 2012) (citing *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)).  To establish prejudice, a petitioner must show that the claimed errors infected the entire trial so as to result in a conviction that violated due process.

Response to Section 2255 Motion-Page 8

*See Lopez*, 248 F.3d at 433 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

**C.    Claims Previously Adjudicated on Direct Appeal**

A claim raised and rejected on direct appeal cannot be relitigated in a Section 2255 proceeding.  *United States v. Seyfert*, 67 F.3d 544, 547 (5th Cir. 1995).  But, under a rare exception, an intervening change in the law may justify relitigation of appellate issues in a Section 2255 proceeding.  *Underwood v. United States*, 15 F.3d 16, 18 (2d Cir. 1993); *United States v. Prichard*, 875 F.2d 789, 790-91 (10th Cir. 1989).

**D.    New Rule of Criminal Procedure**

Collateral relief is further limited to claims based on established law.  *Teague*, 489 U.S. at 310.  When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending on direct review.  But the rule applies to convictions that are final only in limited circumstances."  *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted).  New substantive doctrines—those that alter the range of punishable conduct or the class of punishable people—apply retroactively.  *Id.* at 351-52.  The exception for "watershed" procedural rules has been eliminated.  *Edwards v. Vannoy*, 141 S.Ct. 1547, 1555, 1557, 1559-60, 1562 (2021).

**E.    Harmless Error**

After reviewing the government's answer and any pertinent records, this Court must determine whether an evidentiary hearing is warranted.  Rule 8 of the Rules Governing § 2255 Proceedings.  No hearing is required if the movant does not produce "independent indicia of the likely merit of [his] allegations."  *United States v. Edward*, 442 F.3d 258, 264 (5th Cir. 2006) (quoting *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998)).  The movant bears the burden of establishing his claims by a preponderance of the evidence.  *See Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980).  For "trial" errors, the court may grant relief only if the

error "had substantial and injurious effect or influence" in determining the outcome of the case.

*Brecht v. Abrahmson*, 507 U.S. 619, 637 (1993); *see also United States v. Chavez*, 193 F.3d 375, 379 (5th Cir. 1999) (applying harmless error standard in a Section 2255 proceeding).

**RESPONSE TO EBRON'S CLAIMS**

**Claim I:        Trial counsel provided effective assistance.**

Ebron claims that his trial counsel was ineffective in multiple ways.  This claim fails under well-established legal standards.

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."  *Kimmelman v. Morrison,* 477 U.S. 365, 374 (1986). Allegations that counsel was ineffective are evaluated under the guiding principles of *Strickland v. Washington*, in which the Supreme Court cautioned courts to "strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result."  466 U.S. 668, 697 (1984).  Thus, when a convicted defendant complains of ineffective assistance of counsel, he must show that counsel's representation fell below an objective standard of reasonableness *and* that the deficit resulted in prejudice:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient. *This requires showing that counsel made errors so serious that counsel was not function as the "counsel" guaranteed the defendant by the Sixth Amendment.*  Second, the defendant must show that the deficient performance prejudice the defense. *This requires showing that counsel's errors were so serious as to deprive the deferent of a fair trial, a trial whose result is reliable.*  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687 (emphasis added).

As to whether counsel's performance was objectively reasonable, the Court pointed out

Response to Section 2255 Motion-Page 10

that "specific guidelines" are "not appropriate." *Id.* at 688.  The Court further cautioned that

> [j]udicial scrutiny of counsel's performance must be highly deferential.  It is all too temping for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it had proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable… *A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;* that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."… There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955)) (emphasis added; internal citations omitted).

Thus, to meet the first prong of the *Strickland* test, a defendant must show that counsel's performance fell blow the prevailing professional norms.  *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *Roberts v. Thaler*, 681 F.3d 597, 610 (5th Cir. 2012).  And he must overcome a presumption that counsel provided effective assistance.  *Druey v. Thaler,* 647 F.3d 535, 538 (5th Cir. 2011).  "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id.* (quoting *Strickland*, 466 U.S. at 690).  Conclusory assertions of ineffectiveness are insufficient.  *Day v. Quarterman,* 566 F.3d 527, 540 (5th Cir. 2009) (citing *Linecum v. Collins,* 958 F.2d 1271, 1279 (5th Cir. 1992)).

To meet the prejudice prong of the *Strickland* test, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine

**Response to Section 2255 Motion-Page 11**

confidence in the outcome." *Stickland,* 466 U.S. at 694. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. "An error by counsel, even if professional unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. "Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to he prejudicial… Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id.* at 693. An ineffectiveness claim must consider the totality of the evidence before the judge or jury. *Id.* at 695. The "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case, the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696.

A.    **Trial counsel was not ineffective in gathering witnesses or discovery.**

1.    **Uncalled Witnesses**

Ebron first claims that his trial team failed to "interview and present witnesses" who allegedly could have reported incriminating admissions by Mosley or provided "other evidence." Amd. Mtn. 13. This is meritless.

Before addressing Ebron's individual claims, it must be noted that his lawyers had copies of surveillance video showing the inmates' movements—including Ebron's—before, during, and after Barnes's murder. *See* 2 R. 497-501, 503-13, 517-76;[6] 3 R. 585, 608-25; Mtn. Ex. 27 at

---

[6] The court reporter number the trial transcripts as volumes 1 through 13. This response will identify the transcripts by volume number followed by "R." and the page number in that volume.

A088 n.3. Thus counsel had evidence identifying the key inmates with material information.

Additionally, Ebron gave his trial team names of inmates to interview, and his investigator

followed up. *E.g.*, Mtn. Ex. 2, 5, 6. Moreover, the trial team appeared to be working in tandem

with Bacote's counsel before he pleaded guilty. *E.g.*, Mtn. Ex. 12 at A030; Mtn. Ex. 28 at A091;

Mtn. Ex. 35 at A161. So, to the extent Ebron speculates that counsel should have interviewed

other inmates, he is simply calling for "more." The Fifth Circuit rejected a similar plea in

another capital case:

> [O]utlining a litany of complaints, Bernard alleges counsel performed deficiently
> in the conduct of the sentencing hearing. … *A plea for "more of the same" does
> not, in the circumstances of this case, show that the experienced trial counsel
> were not functioning as counsel guaranteed to Bernard by the Sixth Amendment.*

*United States v. Bernard*, 762 F.3d 467, 476 (5th Cir. 2014) (citing *Strickland*, 466 U.S. at 687)

(emphasis added).

Ebron also argues that his trial counsel was ineffective in failing to offer testimony from

several inmates. But the Fifth Circuit has long emphasized that "complaints of uncalled

witnesses are not favored, because the presentation of testimonial evidence is a matter of trial

strategy, and because allegations of what a witness would have testified are largely speculative."

*United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983) (quoting *Buckelew v. United

States*, 575 F.2d 515, 521 (5th Cir. 1978)). Thus, the standards for ineffective-assistance-of-

counsel claims alleging uncalled witnesses are stringent and well-established:

> "To prevail on an ineffective assistance claim based upon uncalled witnesses, an
> applicant must name the witness, demonstrate that the witness would have
> testified, set out the content of the witness's proposed testimony, and show that
> the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352
> (5th Cir. … 2010). "An applicant 'who alleges a failure to investigate on the part
> of his counsel must allege with specificity what the investigation would have
> revealed and how it would have altered the outcome of the trial.'" *Id.*

*Trevino v. Davis*, 829 F.3d 328, 338 (5th Cir. 2016) (footnote and internal citation omitted).

**Response to Section 2255 Motion-Page 13**

A decision not to call a witness is presumed to be strategic. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984). Courts will not "second-guess counsel's methods," *King v. Davis*, 883 F.3d 577, 588 (5th Cir. 2018), particularly when the testimony would have been cumulative, *Murray*, 736 F.2d at 282. Indeed, "[t]he decision not to present additional testimony does not constitute ineffective assistance of counsel." *Bernard*, 762 F.3d at 474 (citing *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007)).

Ebron now challenges his lawyers' decisions regarding interviewing and presenting testimony from the following inmates:

**Quinton Jones**: Ebron uses Jones as the primary example of his lawyers' alleged failings, but he fails to (1) show that Jones would have testified; (2) set out the content of the proposed testimony; or (3) show that the testimony would have been favorable. *Trevino*, 829 F.3d at 338. Ebron merely relies on an affidavit Jones provided in 2012. Mtn. Ex. 26 at A078-A079. But post-trial affidavits should be viewed with skepticism. *Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring) ("[W]hen a prisoner's life is a stake, he often can find someone new to vouch for him. Experience has shown, however, that such affidavits are to be treated with a fair degree of skepticism."); *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992); *see United States v. Gresham*, 118 F.3d 258, 267 (5th Cir. 1997).

Here, Jones's affidavit invites particular suspicion. He claims that he approached authorities with a request to "explain[] the whole situation" before trial because he wanted to be moved to another penitentiary. Mtn. Ex. 26 at A079. But Jones was moved and, then, refused to talk with the FBI. *Id.* Years later, however, Jones came forward voluntarily, but only *after* he was moved to the same penitentiary as "Rat" Carpenter. And in his affidavit, Jones includes a paragraph that gratuitously disavows any involvement by Carpenter in his decision to finally

**Response to Section 2255 Motion-Page 14**

disclose his "information" about the murder.[7] *Id.* Moreover, Jones was at the scene with the conspirators shortly before the murder, 2 R. 547, and there was some evidence that he assisted in disposing of evidence after the murder, Mtn. Ex. 28 at A091. If away from Carpenter, Jones's enthusiasm to testify may dim, particularly in light of the scrutiny regarding his involvement it would invite.

Additionally, Jones's affidavit primarily relies on hearsay. The Court has already determined that his testimony would not have been helpful to Ebron:

> [I]n addition to admissibility concerns based on the hearsay nature of the alleged comments that were primarily narratives of past conduct, the court is not persuaded that Jones's proposed testimony would likely produce an acquittal…. Indeed, substantial physical and testimonial evidence of Ebron's guilt was presented at trial. Specifically, aside from Sherman's eyewitness testimony that Ebron participated in the murder by holding Barnes in a headlock while Mosley stabbed him, another inmate, Johnny Bazile, testified that, on the night of Barnes's murder, Bacote told him that Ebron and Mosley had "punished" Barnes. In addition, on April 23, 2009, Dr. Tommy Brown testified that the wounds found on Barnes's body were consistent with a victim being restrained from behind while being stabbed from the front. Thereafter, on April 28, 2009, Lamont Bailey ("Bailey"), another inmate, stated that, in 2005, Mosley told him that he and "Akh" (which was identified as Ebron's Muslim name) killed Barnes. Bailey also offered evidence of Ebron's motive for the murder—he testified that Barnes had served as a government witness against Carpenter, Ebron's former cellmate. Given the strength of the evidence presented at trial, the court finds that Jones's proposed testimony would not likely produce an acquittal.

Mtn. Ex. 27 at A089-A090 (internal footnote and citations omitted).

In short, Ebron fails to show that his lawyers' were ineffective in declining to pursue information from Jones.

**William Mercer:** Ebron complains that counsel failed to "investigate or interview" Mercer before trial, apparently based on Sherman's claim that Mercer provided the shank used to

---

[7] It is not beyond the realm of possibility that Carpenter would try to influence Jones to provide an affidavit to help Ebron. *See, e.g.*, 8 R. 1744-49, 1761-65, 1776-1827 (Carpenter testified that Barnes "voluntarily" provided an affidavit recanting his testimony against Carpenter).

murder Barnes.  Amd. Mtn. 15.  But Ebron did not counter Sherman's claim about Mercer when asked about it before trial by his own investigator.  Mtn. Ex. 2 at A012.  And even if counsel had expended valuable time and resources investigating Mercer, the identity of who provided the shank had nothing to do with *Ebron's* involvement.  Ebron provides a 2014 affidavit from Mercer in which he does not discuss whether he provided the murder weapon but does claim that Mosley told him that Ebron did not know that he (Mosley) was going to stab Barnes.  Mtn. Ex. 21 at A051.  It is questionable whether Mercer would have been willing to testify if he knew that he was implicated in planning the murder, and his post-trial affidavit should be viewed with suspicion.  *Herrera*, 506 U.S. at 423.  As with Jones, Ebron fails to (1) show that Mercer would have testified; (2) set out the content of his proposed testimony; or (3) show that the testimony would have been favorable.  *Trevino*, 829 F.3d at 338.

**Kelvin Smith:** Ebron criticizes counsel for not investigating Smith, who was a leader—but not the "shot caller"—of the D.C. inmates at USP-Beaumont.  Amd. Mtn. 15.  Ebron provides a post-trial affidavit from Smith in which he disputes Sherman's testimony that Smith approved the plan to murder Barnes, *see* 1 R. 259-62, claiming that "Nobody ever talked to me or mentioned anything about killing Keith Barnes."  Mtn. Ex. 41 at A168-A169.  Given the significant evidence of Ebron's guilt outlined above and in the Court's order denying Ebron's motion for new trial, Mtn. Ex. 27 at A089-A090, counsel's performance was not constitutionally deficient in failing to gather impeachment evidence on a minor point.  Whether the other conspirators were given a green light to murder Barnes by the second-in-command of their group—contrary to what their leader advised—has no bearing on Ebron's participation.

**Joseph Jackson:** Ebron argues that his lawyers should have interviewed Jackson before trial.  Amd. Mtn. 15-16.  He provides an affidavit from Jackson, Mtn. Ex. 23 at A055-57, but that

post-trial affidavit should be viewed with particular skepticism, given that Jackson—Mosley's cell mate at the time of the murder—is visible on the surveillance recordings with the conspirators shortly before the murder and was suspected of being involved in the offense. *See Herrera*, 506 U.S. at 423; 3 R. 607, 690-91; Mtn. Ex. 34 at A160; Mtn. Ex. 36 at A162; Mtn. Ex. 38 at A164. Ebron testified that Jackson came in and spoke with him while Ebron was in Mosely's cell before the murder. 8 R. 2010; *see also* 8 R. 2086-87. But in his affidavit, Jackson mentions nothing about his involvement before the murder and merely recounts an alleged conversation between Ebron and the now-deceased Mosley *after* the murder. It is unlikely, however, that Jackson would be willing to testify, given that he could still be charged if further facts of his involvement surface.

**Andrew Patrick:** Ebron complains that his lawyers should have interviewed Patrick, who was not present during the murder. Amd. Mtn. 16. Ebron provides an affidavit from Patrick that is substantively similar to the one provided by Jackson. *Compare* Mtn. Ex. 24 at A058-A061 (Patrick) *with* Mtn. Ex. 23 at A055-A057 (Jackson). However, Patrick provides a description of the murder—allegedly from Mosely—that does not jive with the medical examiner's testimony, which was based on physical evidence. *Compare* Mtn. Ex. 24 at A060-A061 *with* 4 R. 854-83 (Brown's testimony). Patrick's post-trial affidavit thus should be viewed with suspicion. *See Herrera*, 506 U.S. at 423.

**Lonnie Gooding and Luther Fuller:** Ebron further argues that his trial team should have discovered Gooding and Fuller, both of whom were housed in the SHU with Ebron and Mosley after Barnes's murder. Amd. Mtn. 16. Both of these inmates provided post-trial affidavits that are substantively similar to Jackson's and Patrick's. *Compare* Mtn. Ex. 23 at A055-A057 (Jackson) *and* Mtn. Ex. 24 at A058-A061 (Patrick) *with* Mtn. Ex. 22 at A052-A054

**Response to Section 2255 Motion-Page 17**

(Fuller) and Mtn. Ex. 25 at A062-A063 (Gooding). Again, these should be viewed with suspicion. *See Herrera*, 506 U.S. at 423.

In summary, with the exception of Smith, Ebron argues that these inmates would have either obviated the need for Ebron to testify or supported his story. Amd. Mtn. 18. But, had any of these men actually heard what they now claim to have heard, they would have come forward before trial. The similarity of their post-trial recollections indicates a lack of credibility. Moreover, Ebron knew who was in the SHU with him and Mosley after the murder, yet he did not give any of these names to his lawyers as possible witnesses. Ebron fails both prongs of the *Strickland* test with this claim.

### 2.    Discovery

Ebron next argues that—despite receiving court-ordered discovery and requesting even more—his counsel was ineffective in failing to obtain the following items: an SIS report that reviewed the incident in light of how to prevent similar events in the future; a BOP after-action report that focused on prison policies; mass interview forms[8] from all of the "approximately thirteen [or] 1400" inmates at USP-Beaumont when the murder occurred, 3 R. 594; and SHU

---

[8] This Court (Clark, J.) described the mass interview process in a civil case:

> [I]n protecting cooperating defendants, uniformity in treatment of prisoners is a key to protecting those cooperators. [An SIS officer] explained that during an investigation involving numerous witness interviews, he conducts every interview in the same manner to ensure uniformity. This is known as a "mass interview." For example, he may schedule every inmate interview to last three minutes. One inmate might enter the interview room and say nothing for the three minutes. When that inmate exits, a second inmate might enter the interview room and explain everything that happened leading up to the crime under investigation. Nevertheless, [the officer] will ask that inmate to leave when three minutes have elapsed. By treating each inmate in the same way, [the officer] curbs suspicion regarding who has, and has not, offered information during their inmate interview.

*United States v. McCraney*, 99 F. Supp.3d 651, 657 (E.D. Tex. 2015).

**Response to Section 2255 Motion-Page 18**

records showing who was housed in the SHU with Ebron and Mosely after the murder.  Amd. Mtn. 19-20.  Aside from repeating his claims about the other D.C. inmates in the SHU with Ebron and Mosley—whose identity Ebron knew without resort to records—Ebron does not discussed what the documents contained or how the information would have helped him even though he has had more than ten years to review the materials.  Thus this claim invites no meaningful response and should be denied as a "conclusory and speculative allegation[]." *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) (quoting *Hughes v. Johnson*, 191 F.3d 607, 629 (5th Cir. 1999)); *see also Day*, 566 F.3d at 540 (citing *Lincecum v. Collins*, 958 F.2d 1271, 1279 (5th Cir. 1992)).

**B.     Ebron's counsel adequately prepared to cross-examine Charles Sherman.**

Ebron argues that his trial team was ineffective in preparing to cross-examine testifying co-conspirator Sherman regarding his criminal history.  Ebron cites no legal authority for his position, and given the extensive cross-examination of Sherman by Ebron's lawyer, this claim amounts to a mere "plea for more of the same."  *Bernard*, 762 F.3d at 476 (citing *Strickland*, 466 U.S. at 687).  Ebron fails to show, under the circumstances of this case, that "experienced trial counsel [was] not functioning as counsel guaranteed … by the Sixth Amendment."  *Id.*

As an initial matter, Ebron mischaracterizes Sherman as the government's "star witness." Amd. Mtn. 20.  Although Sherman provided details of the conspirators' actions before, during, and after the murder, Ebron's own exhibits show that Sherman's lawyer still did not know whether he would testify less than a month before jury selection.  Mtn. Ex. 48 at A273 (email dated February 26, 2009, in which lead counsel Katherine Scardino wrote, "I talked to Sherman's lawyer last Friday (Pat Black, public defender in Tyler) and Pat told me that there is no signed 'plea deal' at this time.  Sherman wants something that the Gov't is not giving.  Pat said whether

he testifies or not is not 'etched in stone' = his words."); Trl. Doc. 93 (minute entry showing that voir dire began on March 23, 2009). Thus the government was prepared to try the case *without* Sherman. Moreover, Sherman was the second witness on the first day of trial, and his testimony consumed approximately three hours. 1 R. 161 (trial resumed at 2:00 p.m. shortly before Sherman took the stand), 316 (he left the courtroom at 5:15 p.m.). The government did not rest its case-in-chief, however, until 4:25 p.m. on the seventh day of trial. 7 R. 1738. In short, Sherman's testimony was *part* of a carefully-constructed case; it was not *the* case.

Moreover, Ebron focuses on immaterial differences between Sherman's testimony and his criminal history, discrepancies of which the government was not aware until years after trial. *See* Mtn. Ex. 55 at A311 (citing discrepancies regarding whether Sherman had siblings and in his description of one of his earlier crimes as robbing "drug dealers"). But it is not likely that correction of the discrepancies—or cross-examination on them—would have swayed the jury. The jury knew that Sherman was an inmate at a U.S. penitentiary—"the highest level of security," 1 R. 168—and that he participated in planning Barnes's murder, was present outside the cell when it happened, and provided assistance after the crime, 1 R. 192-227. Both the government and Ebron addressed Sherman's criminal history, 1 R. 165-68, 254-57, but Ebron's lawyer deftly used it to show how Sherman had manipulated the prison system, 1 R. 250-57. The majority of Ebron's lengthy cross-examination was designed to cast doubt on Sherman's account of the crime and to show the various discrepancies in the several statements he gave following the crime, 1 R. 239-50, 257-303, questioning far more apt to resonate with the jury.

In summary, in the oft-distinguished *Rompilla v. Beard*, 545 U.S. 374, 385, 389-90 (2005), the Supreme Court made clear that it did not intend to require defense counsel to scour files "looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any

needle there." *Id.* (citing *Strickland*, 466 U.S. at 699). Ebron fails to show deficit performance in his lawyer's handling of Sherman or prejudice resulting therefrom. This claim is meritless.

**C.     Counsel was not ineffective in filing a *successful* motion in limine, and nothing in the record supports Ebron's allegation that he did not want to testify.**

Ebron claims that his trial counsel was ineffective, first, in filing a motion in limine— which was *granted*—that he believes was not specific enough. Second, Ebron claims that counsel coerced him into testifying. Neither claim need detain the Court for long.

**1.     The Motion in Limine**

Before trial, Ebron filed a broad motion in limine that included a request for the Court to "enter an order instructing the Government, its agents, its employees and its witnesses not to mention, allude to or refer to, in any manner, to any prior convictions or alleged violations of the law by the Defendant in this cause in the presence of the jury prior to a ruling of this Court as to its admissibility." Trl. Doc. 41 at 1. The government did not oppose the motion as to Ebron's 1999 convictions, but pointed out that they would be admissible if Ebron chose to testify. Trl. Doc. 59 at 1. After hearing the motion, the Court granted it, ordering the government "to refrain from proffering or referring to any previous convictions of Defendant … prior to a ruling by this court as to the admissibility of such evidence." Trl. Doc. 61 at 1.

Despite the unequivocal win on his motion in limine, Ebron now argues that the motion was not sufficient, apparently because counsel did not argue that his prior murder conviction would not be admissible under *any* circumstances. Amd. Mtn. 25-28. Ebron cites a Fourth Circuit case in support of this theory, Amd. Mtn. 27, but the Fifth Circuit has long held that a testifying defendant may be impeached with prior convictions that are similar to the crime for which he is on trial. *See, e.g.*, *United States v. Lopez*, 979 F.2d 1024, 1033-35 (5th Cir. 1992) (admission of nearly 20-year-old prior conviction for possession of marihuana admissible for

impeachment in trial for conspiring to possess and distribute marihuana "[b]ecause [Fed. R. Evid.] 403 provides valid grounds to admit the prior conviction"); *United States v. Langston*, 576 F.2d 1138, 1139 (5th Cir. 1978) (court did not err in advising defendant, who claimed that he lacked the requisite mental state to commit bank robbery, that his prior convictions for robbery by assault, robbery, and larceny would be admissible if he chose to testify); *United States v. Turner*, 960 F.2d 46, 464-651 (5th Cir. 1992) (defendant who testified in trial for mailing threatening communications could be impeached with prior convictions for aggravated sexual abuse, burglary of a habitation, and possession of a deadly weapon in a penal institution).  And Ebron's reliance on *Lyons v. McCotter*, 770 F.2d 529, 531 (5th Cir. 1985), is misplaced.  In that case, defense counsel was constitutionally ineffective in failing to object when the prosecutor questioned a *witness*—not the defendant—about the details of the *defendant's* past criminal record.  *Id.* at 531-35.  *Lyons* had nothing to do with impeaching a testifying defendant.

In short, no amount of pre-trial briefing could have prevented admission of Ebron's prior murder conviction as impeachment after he took the witness stand and claimed that he did not intend to be involved in murdering Barnes.  Ebron's argument that counsel should have done "more," *Bernard*, 762 F.3d at 476, is meritless.

## 2.    The Decision for Ebron to Testify

Ebron now argues that he did not want to testify on his own behalf, Amd. Mtn. 28, but he points to *nothing* in the record to support the claim.  Indeed, Ebron's own exhibits show that he and his trial team began discussing whether he would testify—knowing that his prior murder conviction would be admitted—more than a year before the trial began.  *See* Mtn. Ex. 2 at A010 ("Ebron stated that if he testified, he would take full responsibility for his first Homicide conviction as a juvenile because he did in fact take part in the murder.").  The trial team

Response to Section 2255 Motion-Page 22

continued to consider the issue as trial neared.  In an email dated February 26, 2009—

approximately two months before the guilt phase commenced—Ebron's lead counsel addressed

the strategic reasons for Ebron to testify:

> Also—please give me your thoughts on this—I am thinking that with his criminal history—the only, ONLY, chance Ebron has of getting a life sentence is if HE makes himself different than what their perception of him will be by the time the Gov't finishes their case.  That means he has to testify.  He will admit to all his transgressions.  Murder at age 15, and a plea of not guilty to the '99 murder, but the jury found him guilty.  He has a story and we might make it work—it is just BEAUMONT!! Next to ORANGE and VIDOR!!  It is a real gamble… but a sure loser if he does not testify, in my humble opinion.

Mtn. Ex. 48 at A273 (emphasis in original).

The weighing process continued until the day Ebron testified.  When the Court named the

remaining defense witnesses, Ebron's lead counsel added, "And then possibly Mr. Ebron."  8 R.

1852.  Counsel advised that they would know after the next witness, a doctor who would testify

that Ebron's version of how Barnes died was medically possible.  *Id.*; *see also* 9 R. 2212

(Ebron's lawyer argued that the doctor's "theory of what happened in this case … is almost the

same as Joe Ebron's.").

In short, the record does not support Ebron's post-trial claim that he did not want to

testify.  To the contrary, it shows that this was a long-considered strategic decision between

Ebron and his lawyers.  As noted in *Strickland*,

> the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'… There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

466 U.S. 689.

Ebron's bare allegation fails to overcome the presumption.  Moreover, after arguing in

the preceding section that counsel could have briefed away the admissibility of his prior murder

conviction, Ebron argues in this section that counsel erred in calling him because "it should have been clear to counsel that Ebron's criminal record would not be admissible unless he testified." Amd. Mtn. 29.  While Ebron now correctly understands the law, that does not show that the reasoned strategic decision for him to testify was constitutionally infirm.  And the strategy of introducing the evidence through Ebron—taking the punch out of cross-examination—was undeniably sound.

Finally, Ebron overemphasizes the importance of his prior conviction in the context of the trial.  The jury knew from the outset that Ebron was a convict assigned to a high-security prison.  And neither party spent much time on the prior murder conviction.  Ebron's testimony consumed 160 pages in the record.  8 R. 1960-2124.  His direct testimony on the 1999 murder conviction took less than three pages and contained no details.  *Id.* at 1965-67.  Cross-examination on the point did not amount to two pages.  *Id.* at 2049-50.  The Court properly instructed the jury on how to consider the prior offense.  9 R. 2172.  And, during the lengthy closing arguments, one prosecutor referred to Ebron as a "convicted murderer" in one sentence, *id.* at 2195, while Ebron's lawyer simply explained the jury instruction on prior convictions, *id.* at 2208-09.  This claim is meritless.

**D.    Counsel's decision to not object to the absence of lesser included offense instructions was an effective, evidence-based strategy, and an objection to the aiding and abetting instruction would have been frivolous.**

Ebron claims that his trial counsel was ineffective in failing to request jury instructions on second degree murder and involuntary manslaughter.  Amd. Mtn. 30-32.  Ebron is wrong because the evidence did not support an instruction for either offense.  And an objection would have undercut the trial strategy of arguing actual innocence based on Ebron's testimony.  Ebron further argues—based on an incorrect view of the law—that his lawyers were ineffective in

failing to object to the jury instruction on aiding and abetting.  Amd. Mtn. 30-32.  This argument is meritless, too.

A defendant is entitled  to a jury instruction on a "lesser included offense whenever two independent prerequisites have been met: (1) the elements of the lesser offense must be a subset of the elements of the charged offense; and (2) the evidence at trial must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater." *United States v. Browner*, 889 F.2d 549, 550-51 (5th Cir. 1989) (citing *Schmuck v. United States*, 489 U.S. 705, 715-16 & n.8 (1989); *Keeble v. United States*, 412 U.S. 205, 208 (1973)).  It is clear that, under certain facts, both second degree murder under 18 U.S.C. § 1111(a) and involuntary manslaughter under 18 U.S.C. § 1112(a) can be lesser included offenses of first degree murder under Section 1111(a).  *E.g.*, *Browner*, 889 F.2d at 551-54.  Nevertheless, the evidence in this case did not support an instruction on either offense.

On direct appeal, the Fifth Circuit summarized what it characterized as the "competing narratives" of Barnes's murder presented at trial, focusing on Sherman's and Ebron's testimony. *Ebron*, 683 F.3d at 117-20.  As set out above, the government's case-in-chief relied on much more than Sherman's testimony, but the court's summary accurately reflects Ebron's agreement to participate—and his participation—in the murder:

> After lunch, Mosley, Sherman, and Bacote set out to look for Ebron, and located him on a walkway heading towards Delta Bravo.  Mosley and Bacote then had a conversation with Ebron in which they told him about Barnes's presence at USP–Beaumont.  Mosley told Ebron about the plan to kill Barnes and asked for his help.  Ebron agreed to participate.  Bacote subsequently jumped in the conversation and told Ebron to wrap his shirt over his head when he entered Delta Bravo in order to avoid detection by surveillance cameras. …
>
> Once dinner was called, Ebron entered Delta Bravo and, at some point, Bacote went into Barnes's cell.  When Sherman saw Ebron in Delta Bravo around dinnertime, Ebron had his khaki shirt wrapped around his head.  Ebron and Mosley subsequently entered Barnes's cell.  After Ebron and Mosley entered the

cell, Bacote exited and situated himself on some stairs that were outside of Barnes's cell.  Sherman subsequently joined Bacote on these stairs.

From these stairs, Sherman was able to look into Barnes's cell.  When he looked in, he saw Ebron holding Barnes in a headlock, while Mosley's arms were "motioning."  This observation was consistent with their plan to kill Barnes: Ebron was to hold Barnes while Mosley stabbed him.

*Id.* at 118-19.

The summary of Ebron's testimony, which the jury did not believe, shows the contrast in

the parties' narratives and why instructions on lesser included offenses were not supported:

During the afternoon of May 7th, Ebron was walking back to Alpha Alpha when he was approached by seven D.C. inmates, including Sherman, Bacote, and Mosley.  As Mosley and Ebron walked toward Alpha Alpha, Mosley mentioned Keith Barnes and asked Ebron if Carpenter, who at one point was Ebron's cell mate at USP–Atlanta, ever said anything about Barnes testifying against Carpenter.  Ebron responded by stating that he did not know the whole situation, but heard that Barnes and Carpenter were "working it out."

After hearing Ebron's response, Mosley again asked Ebron whether Barnes had testified against Carpenter.  This time, Ebron provided an unequivocal affirmative answer.  *Upon hearing this, Mosley told Ebron that he was "going to put the knife in [Barnes]."  Ebron then suggested to Mosley that stabbing Barnes was unnecessary.  Instead of stabbing Barnes, Ebron indicated that all they had to do was convince Barnes to request segregation.*  Mosley did not agree with this suggestion—he thought it "was too easy for Keith Barnes."

Despite Mosley's disagreement, *Ebron continued trying to convince Mosley that stabbing Barnes was unnecessary.  After Ebron rejected Mosley's suggestion that, at the very least, they beat Barnes up, Mosley told Ebron to get Barnes out of Delta Bravo that day.  Ebron agreed to do so.*

Not long after 5:00 p.m., Ebron left Alpha Alpha and entered Delta Bravo.  Despite being prohibited from entering another unit, Ebron made his way into Delta Bravo and concealed his identity by placing his khaki shirt on his head.  *Once inside Delta Bravo, Ebron met up with Mosley and asked him where Barnes was located so that he could walk Barnes to the lieutenant's office.  Once there, Barnes would then request administrative segregation and thus be removed from Delta Bravo.*  Rather than telling Ebron where Barnes was located, Mosley began mentioning pictures that he and Ebron had previously talked about.  Mosley and Ebron then went into Mosley's cell to view these pictures.

*After a few minutes, Ebron again asked Mosley about Barnes.  In response,*

*Mosley told Ebron that they were going to walk Barnes to the lieutenant's office. Mosley then left his cell and walked towards Barnes's cell; Ebron followed him. Before entering Barnes's cell, Ebron told Mosley to "chill out" and to let him do the talking. Because Mosley had previously revealed his preference to beat Barnes up, Ebron wanted to make clear that they were not going to physically harm Barnes.*

When they entered the cell, Bacote and Barnes were having a conversation. As soon as he entered Barnes's cell, Mosley walked behind Barnes; Ebron stood by the front of the cell. Before exiting the cell, Bacote introduced Ebron as Barnes's "Sunni Muslim brother." After Ebron asked Barnes a couple of questions, Mosley jumped into the conversation and started asking Barnes questions about Barnes's case and his codefendants. Ultimately, Mosley got Barnes to admit that he was indeed Keith Barnes. In response to this admission, Mosley stated, "Yeah. You a snitch."

Mosley then declared that Barnes needed to be removed from the general population. Upon hearing this, Barnes turned to Ebron and stated, "Akhee. I just talked to the Muslims. They gave me my protection—they gave me their protection." As soon as Barnes made this statement, Ebron wanted to get out of the cell and talk to Barnes in private. After Ebron and Barnes agreed to leave Barnes's cell, Mosley punched Barnes on the side of his head. This blow caused Barnes to fall on the bottom bunk of the bed located in his cell.

Once Barnes was on the bed, Mosley jumped on Barnes, straddled him, and started stabbing him with a chrome knife that was tied around his fist. Barnes fought back against Mosley, but could not stop Mosley in his quest to "stab [Barnes's] heart out." *According to Ebron, he did not participate in the assault. Indeed, not only did Ebron plead with Mosley to stop stabbing Barnes, but he also refused Mosley's request for help in subduing Barnes.*

After he made sure that Barnes was dead, Mosley hopped off Barnes's corpse, grabbed a towel, and unsuccessfully attempted to close the cell door. Mosley then yelled outside the door and requested assistance in closing the cell door. The door was closed from the outside after Mosley made his request.

*When the door closed, Mosley confronted Ebron and asked him why he did not assist in Barnes's murder. In response, Ebron stated that he "wasn't trying to be part of no murder." After feeling threatened by Mosley, Ebron agreed to help Mosley place Barnes's body on the top bunk.* Mosley then washed his hands, cleaned off his knife, and wiped down areas he may have touched. Mosley and Ebron then left the cell.

*Id.* at 119-20 (emphasis added; internal footnote omitted); *see also* 8 R. 1960-2125.

Nothing about Ebron's testimony would have supported a conviction for second degree

murder or involuntary manslaughter. "[S]econd degree murder under the federal statute includes (1) the physical element of unlawfully causing the death of another, and (2) the mental element of malice, satisfied either by an intent to kill, an intent to cause serious bodily injury, or the existence of a depraved heart." *Browner*, 889 F.2d at 552. "[I]nvoluntary manslaughter under the federal statute differs from murder only in that it requires a reduced level of culpability in committing the same physical act." *Id.* at 553. But Ebron did not admit committing *any* act that caused Barnes's death, and his testimony would not have supported a finding of culpability at *any* level. It was all or nothing. Thus, there was no basis for counsel to request instructions on lesser included offenses or object to their absence.[9] *Id.* at 551.

In addition to his testimony, Ebron's exhibits to his Section 2255 motion show that his strategy was to claim innocence. In February 2009, Ebron told his trial team essentially the same story summarized above. Mtn. Ex. 2 at A003-A007. He stuck with it, leaving counsel to conclude that "the only, ONLY, chance Ebron has of getting a life sentence is if HE makes himself different than what their perception of him will be by the time the Gov't finishes their case. That means he has to testify." Mtn. Ex. 48 at A273. As noted in *Strickland*, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy." 466 U.S. 689. Ebron fails to overcome the presumption. Indeed, if counsel had requested instructions on lesser included offenses, they would have undercut their trial strategy and Ebron's testimony. This claim is meritless.

Ebron also argues that his lawyers were ineffective in failing to object to the jury

---

[9] If believed, Ebron's testimony about helping lift Barnes's body to the top bunk *might* have supported an instruction for accessory after the fact under 18 U.S.C. § 3. But accessory after the fact is not a lesser included offense of murder or even aiding and abetting murder. *E.g.*, *United States v. Avants*, 367 F.3d 433, 450 (5th Cir. 2004).

**Response to Section 2255 Motion-Page 28**

instruction on aiding and abetting based on the notion that the jury should have been instructed that an "aider-and-abettor could have a lower degree of intent, and thus a lesser level of culpability, than the principal." Amd. Mtn. 32-34. But that is not the law. Rather, to be convicted of aiding and abetting under 18 U.S.C. § 2, "a defendant 'must *share in the intent to commit the offense*….'" *United States v. Meyer*, 63 F.4th 1024, 1038 (5th Cir. 2023) (emphasis added) (quoting *United States v. Fischel*, 686 F.2d 1082, 1087 (5th Cir. 1982). Indeed, the Supreme Court has made clear that, for aiding and abetting, "[a]n intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to the specific and entire crime charged." *Rosemond v. United States*, 572 U.S. 65, 76 (2014).

The Fifth Circuit has noted that "it is well-settled 'that a district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law.'" *United States v. Brannan*, 98 F.4th 636, 638-39 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2736 (2025) (quoting *United States v. Richardson*, 676 F.3d 491, 507 (5th Cir. 2012)). Here, the Court's instruction on aiding and abetting correctly stated the law and tracked the Fifth Circuit's pattern jury instruction for 18 U.S.C. § 2. *Compare* 9 R. 2182-84 *with* 5th Cir. Pattern Jury Instructions (Criminal Cases) § 2.04 (2019 ed.). The Court did not err in giving the instruction, and Ebron's counsel was not ineffective in declining to object to it.

**E.    There is no error to cumulate.**

The law on cumulative error is set out under Claim V. Here, the response is simple: because Ebron has failed to demonstrate any error, "there is nothing to cumulate." *Ebron*, 683 F.3d at 130; *see also Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987).

**Claim II:    Ebron's claim that his jury included a juror who lied on his questionnaire, preventing a challenge for cause, is procedurally barred and meritless.**

Ebron claims that a juror, identified here as "RD," lied on his questionnaire about his

brother's death in prison[10] and, in so doing, prevented a valid challenge for cause. This claim is procedurally defaulted because it could and should have been raised on direct appeal. Moreover, the record shows that the claim is meritless because RD came forward later and, after questioning him, Ebron's lawyer declined to make a challenge for cause.

**A.      This claim is procedurally barred.**

Claims that a trial court erred in ruling on challenges to the venire should be raised on direct appeal. *E.g.*, *United States v. Sanders*, 133 F. 4th 341, 375-78 (5th Cir. 2025) (direct appeal from now-commuted death penalty); *United States v. Snarr*, 704 F.3d 368, 378-82 (5th Cir. 2013) (direct appeal from death penalty); *United States v. Bernard*, 299 F.3d 467, 474-5 (5th Cir. 2002) (same); *United States v. Webster*, 162 F.3d 308, 340-45 (5th Cir. 1998) (same); *cf.*, *United States v. Skilling*, 561 U.S. 358, 385-99 (2010) (on writ of certiorari from direct appeal). Ebron could—and should—have advanced this claim at trial and on direct appeal. Because he did not, the claim is defaulted. *See Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley*, 523 U.S. at 622; *Frady*, 456 U.S. at 169; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).

Ebron generally claims that his lawyers were "ineffective for failing to question [RD] on the circumstances surrounding [his brother's] incarceration, or to realize that [RD] lied on his questionnaire" and argues that the alleged failure resulted in prejudice. Amd. Mtn. 37. But conclusory assertions of ineffectiveness are insufficient. *Day v. Quarterman*, 566 F.3d 527, 540 (5th Cir. 2009) (citing *Lincecum*, 958 F.2d at 1279). Thus the claim is procedurally barred.

**B.      This claim is meritless because there is no showing of bias, actual or implied.**

Although Ebron relies on inapposite law from the Ninth Circuit, the Fifth Circuit has

---

[10] Ebron does not point to the transcript of RD's individual voir dire, so it appears that this complaint is that RD did not supplement his answers to the questionnaire at that time.

clear law on the two types of bias, actual and implied:

> A juror is biased if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" … Bias may be either actual or implied.

*Green v. Quarterman*, 213 F. App'x 279 (5th Cir. 2007) (unpublished) (internal citations omitted).

> Actual bias exists when a juror fails to answer a material question accurately because he is biased. … In the majority of situations, the party seeking a new trial must demonstrate bias through admission or factual proof. … Bias may, however, be implied or presumed in extreme circumstances, including when the juror is employed by the prosecuting agency, is a close relative of a participant in the trial, or is somehow involved in the transaction that is the subject of the trial. … Indicia of partiality are particularly problematic when coupled with the juror's lies or other efforts to hide a potential disqualification. …
>
> * * *
>
> On the other hand, inaccurate responses to voir dire questions are excused when caused by inattention or when a query does not elicit the specific information relevant to the juror's disqualification. … Failure to disclose a conviction due to a mistaken, but honest belief the record was expunged, or due to embarrassment, also does not suggest bias. … Even when a juror's non-disclosure is dishonest as opposed to mistaken, his behavior is not a basis for reversal unless the dishonesty appears to be rooted in bias or prejudice. …

*United States v. Bishop*, 264 F.3d 535, 554-55 (5th Cir 2001) (internal citations omitted).

Here, the record does not show actual or implied bias on RD's part. RD completed a juror questionnaire on March 23, 2009. Mtn. Ex. 49, p. A296. He answered the question regarding whether he or any close friends or relatives had been victims of or witnesses to a crime with a story about a renter who was burglarized. Mtn. Ex. 49, p. A281. When asked if any close friends or relatives had been arrested for or convicted of a crime, RD answered that his son had been arrested. *Id.* And RD answered no when asked whether he had ever known anyone who was the victim of a homicide or was closely related to one. *Id.* The issue apparently did not come up during voir dire, and RD was selected as an alternate juror.

**Response to Section 2255 Motion-Page 31**

Before opening arguments on the first day of trial, the Court advised counsel that RD had contacted the jury coordinator and told her that he had a relative who had died while in prison. 1 R. 6. Ebron's lawyer then suggested, "perhaps we should just question him to make sure that that is, in fact, what happened and somebody wasn't murdered in prison." *Id.* The Court agreed, and the following took place outside the presence of other jurors with RD under oath:

> THE COURT: I've been informed that there was some incident that you didn't discuss earlier that you were concerned might have an impact.
>
> ALTERNATE JUROR [RD]: Yes, ma'am. I had a baby brother who was incarcerated that fell out of his top bunk and died three days later while he was—I think it was either in Teague, Texas, or Mexia. I'm not sure.
>
> THE COURT: Okay. Well, there was no suggestion that somebody did him in. I mean, he just fell out? Or what's—
>
> ALTERNATE JUROR [RD]: Well, they never knew—I don't know what the investigation ever turned up or anything. That was three years ago.
>
> THE COURT: Okay. Was anybody ever prosecuted for causing his death?
>
> ALTERNATE JUROR [RD]: Not that I'm aware of.
>
> THE COURT: Okay. Well, did the family believe that it wasn't an accident or not?
>
> ALTERNATE JUROR [RD]: There was never anything brought up about it. I had a sister that had called the warden, but they never—nothing ever became of anything. So...
>
> THE COURT: Okay. Counsel, do you want to ask any questions of [RD]?
>
> * * *
>
> MS. SCARDINO: You brought this up to, I guess, Ms. Harper; is that correct?
>
> ALTERNATE JUROR [RD]: Yes, ma'am, when I came in this morning because I—I had no idea what this case was going to be about until we came in here that day and I know more things and the more I thought about it—
>
> MS. SCARDINO: Okay. *But you're not harboring any kind of ill will toward the prison or some suggestion that nobody—that your relative was murdered and that nobody ever investigated or anything like that, are you*?

> ALTERNATE JUROR [RD]: *No, ma'am.*
>
> MS. SCARDINO: Okay. *And whatever happened with your relative—your brother would not have anything to do with what we're doing in this case; is that right?*
>
> ALTERNATE JUROR [RD]: *Yes, ma'am. True.*
>
> MS. SCARDINO: Okay. I have no further questions.
>
> THE COURT: Does the government have questions?
>
> MR. BATTE: No, I don't have any questions, your Honor.
>
> THE COURT: *All right. Is there anything about that incident, [RD], that would prevent you from being a fair and impartial juror in this case?*
>
> ALTERNATE JUROR [RD]: *No, ma'am.*

1 R. 7-8 (emphasis added).

After excusing RD, the Court asked the lawyers whether they thought he should be excused, and the following took place:

> THE COURT: All right. With that information *is there any motion that he needs to be excused?*
>
> MS. SCARDINO: *No, ma'am. I believe, from the defense table over here, he's all right.* Thank you.
>
> * * *
>
> THE COURT: Okay. All right. So, he'll stay as our first alternate.

*Id.* at 8 (emphasis added).

The Court then excused the "extra person," presumably brought in in case RD was excused, *id.* at 9, and the jury was sworn. RD ended up on the jury after a seated juror was dismissed for misconduct during deliberations. *See Ebron*, 683 F.3d at 122-23.

The record thus shows that RD—irrespective of whether his initial failure to mention his brother's death was due to accident, embarrassment, or even dishonesty, *e.g.*, *Bishop*, 264 F.3d at

555—was not biased. But Ebron now claims—*sans* proof—that RD intentionally lied about his knowledge of his brother's death, which Ebron inaccurately argues is "eerily similar" to his murder of Barnes. Amd. Mtn. 35. Ebron submits exhibits showing that RD's brother, identified here as "DD," was found bleeding from his nose and ear on the floor of his cell in a state prison on June 26, 2006—nearly three years before Ebron's trial—and was airlifted to a hospital where he was in a coma until pronounced dead on July 14, 2006. Mtn. Ex. 53 at A307. The Texas Department of Criminal Justice classified the death as a homicide. Mtn. Ex. 52 at A300. DD's cell mate was disciplined, but no one was charged with murder. Mtn. Ex. 53 at A307.

On March 31, 2015—nearly nine years after DD's death—RD's sister signed an affidavit stating that "our family" was notified "within the year" after DD's death that investigators believed that he had been "killed by another inmate" and were investigating the inmate. Mtn. Ex. 51 at A298. The sister further claimed that she visited DD and "tried" to take a picture of what she believed to be a "boot mark" on his face. *Id.* Ebron also presents an affidavit from an alternate juror, identified here as "RT," that was executed more than five years after trial and contains factual inaccuracies. Mtn. Ex. 50 at A297. RT claims that he knew DD, so he asked RD about DD because they had the same last name. *Id.* RT alleges that "he told me that [DD] was his nephew and that [DD] was killed in prison." *Id.*

As an initial matter, other than the fact that DD and Barnes were both inmates, there is nothing "eerily similar" about DD's death and the way Ebron murdered Barnes. DD's death may have been at the hands of another inmate, but there is no indication that the incident involved weapons, more than one assailant, or was even intentional. Whatever happened to DD, Ebron completely fails to show anything akin to the intense premeditation that led to Barnes's murder.

More important, Ebron's exhibits do not show what RD actually knew about his brother's

**Response to Section 2255 Motion-Page 34**

death at the time of Ebron's trial. Ebron's reliance on the Ninth Circuit's *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998), is thus misplaced. There, the court presumed prejudice because a juror lied about multiple circumstances that would have disqualified her for service and offered implausible explanations for her lack of candor. *See Bishop*, 264 F.3d at 555. Here, RD came forward, admitted his omissions, and was fully questioned by Ebron's counsel, who decided not to challenge RD for cause. 1 R. 7-8. And despite RD's sister's vague claim that "our family" was notified of an investigation within a year of DD's death, she does not state that RD was told about the investigation. Mtn. Ex. 51 at A298. In short, Ebron offers nothing to contradict what RD told the Court or to show that he was biased. There was no error.

**Claim III:     The prosecution team honored its obligations to disclose exculpatory material to Ebron.**

Revisiting Claim I-A, Ebron alleges—with no support other than "information and belief," *i.e.*, wishful thinking—that the government withheld exculpatory materials under *Brady v. Maryland*, 373 U.S. 83 (1963). This is nonsense.

Prosecutors must disclose all substantial material evidence favorable to the defense, whether it relates to guilt, punishment, or the credibility of witnesses. *Brady*, 373 U.S. at 87; *Giglio v. United States*, 405 U.S. 150, 154 (1972). To establish a *Brady* violation, a defendant must show that "the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material." *United States v. Brown*, 650 F.3d 581, 587-88 (5th Cir. 2011). Evidence is material if there is "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citing *Strickland*, 466 U.S. at 694). Thus, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a

verdict worthy of confidence." *Kyles v. Whitely*, 514 U.S. 419, 434 (1995).  To prove a reasonable probability of a different result, the "likelihood of a different result must be substantial, not just conceivable." *Richter,* 562 U.S. at 111.  "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality.'" *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).

Evidence is not "suppressed" if the defendant either knew, should have known, or with the exercise of due diligence could have learned, the essential facts permitting him to take advantage of the exculpatory evidence.  *See Bigby v. Dretke*, 402 F.3d 551, 574-75 (5th Cir. 2005); *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).  By extension, prosecutors have no obligation to discover potentially exculpatory evidence that they do not possess and of which they are not aware.  *United States v. Flores*, 135 F.3d 1000, 1006 (5th Cir. 1998); *United States v. Walker*, 559 F.3d 365, 373 (5th Cir. 1977).  But if a member of the prosecution team knows of *Brady* material, courts will impute that knowledge to the prosecutors.  *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009).  The courts determine on a case-by-case basis whether a given actor belongs to the prosecution team.  *Id*.  Generally, the prosecution team extends to the prosecutors and agents working on the case: it would "stretch *Brady* beyond its scope" to "effectively impose a duty on prosecutors to learn of any favorable evidence known by any government agent."  *United States v. Taylor*, 942 F.3d 205, 225 (4th Cir. 2019).

On collateral review, an inmate must advance *specific* claims relating to an alleged *Brady* violation.  *See Johnson v. Mitchell*, 585 F.3d 923, 934-935 (6th Cir. 2009).  Mere speculation about the existence of undisclosed records will not satisfy the petitioner's pleading burden.  *See United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009) (defendant must produce some evidence to support an inference that the government possessed or knew about material evidence it failed

to disclose).  In other words, a petitioner may not support a *Brady* claim with "conclusory and speculative allegations."  *Murphy*, 205 F.3d at 814 (quoting *Hughes*, 191 F.3d at 629).

**A.  Allegations by inmates about conversations between Ebron and Mosley in the SHU**

Based on the post-trial affidavits Ebron gathered from Gooding, Fuller, Patrick, and Jackson—all of whom tell suspiciously similar stories, *compare* Mtn. Ex. 23 at A055-A057 (Jackson) *and* Mtn. Ex. 24 at A058-A061 (Patrick) *with* Mtn. Ex. 22 at A052-A054 (Fuller) and Mtn. Ex. 25 at A062-A063 (Gooding)—Ebron argues that the government must have known about and suppressed alleged conversations between himself and Mosley while they were in the SHU after they murdered Barnes.  This is not true.

Other than the inmates' post-trial claims, which do not appear to be credible, there is no proof that these alleged conversations took place, and the post-trial affidavits should be viewed with suspicion.  *See Herrera*, 506 U.S. at 423.  Indeed, only Gooding alleges that guards *may* have overheard the conversations.  Mtn. Ex. 25 at A063.  But he does not name the guards, which is telling because inmates typically know who the guards are.[11]  Moreover, the Court has personal knowledge about the layout of the SHU at USP-Beaumont from presiding over the joint trial of Mark Isaac Snarr and Edgar Baltazar Garcia and seeing videos of the SHU.[12]  Therefore, the Court knows that the guard stations are not inside the corridors or "ranges" in that unit, and

---

[11] As set out in the government's brief in *Snarr*, one of the guards who was stabbed by Snarr and Garcia testified that inmates watch the guards "24 hours a day 7 days a week" and know their personalities and habits.  *United States v. Snarr*, No. 10-40525, 2012 WL 2513628, at *108 (5th Cir. June 21, 2012) (U.S. brief).

[12] The government's brief in *Snarr* described the SHU, citing the video of the crime: "The SHU at USP-Beaumont was a two-story unit containing four hallways with cells, referred to as the A, B, C, and D ranges. … Entry to the SHU was controlled by a sally port and each range within the SHU had only one entrance. … The SHU had a separate recreation area consisting of six outdoor cages built along an outdoor hallway. …  *United States v. Snarr*, No. 10-40525, 2012 WL 2513628, at *9 n.10 (5th Cir. June 21, 2012) (U.S. brief).

the guards do not "hang out" on the ranges.

In short, Ebron fails to identify even one guard that allegedly overheard the purported conversations. He cannot show that the government withheld *anything* from him. This claim is both speculative and meritless. *Johnson*, 585 F.3d at 934-935; *Price*, 566 F.3d at 910; *Murphy*, 205 F.3d at 814.

**B.      Allegations about mass interview reports, SIS report, and BOP after-action report**

Ebron's second claim extends the speculation from above. Assuming that the allegations in the post-trial affidavits he obtained from inmates are true, Ebron speculates that those inmates "likely provided BOP investigators with exculpatory information during their mass interviews." Amd. Mtn. 39. They did not. The government provided Ebron's trial counsel with all of the mass interview forms that contained even arguable exculpatory information.

Ebron further claims that, "[i]n light of the reports of inmates who heard Ebron's and Mosley's arguments, the SIS report should have reflected similar information" and that the BOP after-action report "likely uncovered similar information." Amd. Mtn. 40. This is unmitigated speculation, and a petitioner may not support a *Brady* claim with "conclusory and speculative allegations." *Murphy*, 205 F.3d at 814 (quoting *Hughes*, 191 F.3d at 629). Indeed, none of the four inmates Ebron relies on alleges that he provided the "information" in their belated stories to anyone connected with the government, Mtn. Ex. 22-25, and one was not even at USP-Beaumont when the murder occurred, Mtn. Ex. 22 at A052. This claim is meritless.

**Claim IV:      The government did not knowingly present false testimony through Charles Sherman, and the discrepancies later identified in his testimony were not material.**

Revisiting Claim I-B, Ebron seeks a new trial, arguing that the government presented testimony from Sherman that it knew or should have known was false. Amd. Mtn. 40-44. This

Response to Section 2255 Motion-Page 38

claim is procedurally defaulted because it could have been raised on direct appeal.  The claim also fails substantively because the discrepancies were not material.

**A.        Ebron has procedurally defaulted this claim.**

As set out above, the government was not aware of the discrepancies in Sherman's testimony until 2013 and immediately notified Ebron's counsel when they were discovered. Mtn. Ex. 55 at A310-11.  Nevertheless, the transcript of Sherman's testimony from his D.C. trial was transcribed in 2001, Mtn. Ex. 47 at A210, so Ebron could have raised this issue at trial or on direct appeal.  He did not and, as set out under Claim I-B, does not show cause for failing to raise the claim, demonstrate actual prejudice, or show actual innocence.  Therefore, this claim is procedurally defaulted.  *See Massaro*, 538 U.S. at 504; *Bousley*, 523 U.S. at 622; *Frady*, 456 U.S. at 169; *Coleman*, 501 U.S. at 753.

**B.        Ebron fails to show that the discrepancies were material.**

In addition to being procedurally defaulted, this claim lacks substantive merit.  It is close to axiomatic that an inmate may receive relief "if the government knowingly used perjured testimony to convict [him], even as to matters only affecting the credibility of a witness." *Dupart v. United States*, 541 F.2d 1148, 1150 (5th Cir. 1976) (citing *Napue v. Illinois*, 360 U.S. 264 (1959)); *but see Vicars v. United States*, 488 F.2d 531, 532 (5th Cir. 1973) (alleged perjury by government witness "not rise to constitutional dimension" in a Section 2255 proceeding).  But to establish that he was convicted based on perjury, "the defendant must show (1) the statements in question are actually false; (2) the prosecution knew that the statements were false; and (3) the statements were material." *United States v. Haese*, 162 F.3d 359, 365 (5th Cir. 1998) (*citing United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997)).  Minor inconsistencies in a witness's testimony or between witness' testimony are not perjury.  *United States v. Jones*, 614

F.2d 80, 82 (5th Cir. 1980); *Haese*, 162 F.3d at 365.

Here, the government provided extensive material about Sherman before trial. *See* Mtn. Ex. 42 at A170-71. The government, however, did not have *all* of the materials from Sherman's prior trial in the Superior Court of the District of Columbia. During Sherman's testimony, he described his crime as "robbing drug dealers." 1 R. 166. But it was made clear that the prior conviction was for robbery; was a violent felony; resulted in a sentence of 26 to 78 years' imprisonment; and landed Sherman in a U.S. penitentiary, which he testified was "basically the highest that you can go in the [federal] prison system." 1 R. 166-69. During cross-examination, Ebron's counsel brought out more detail:

> Q.  I mean, you're the same guy who committed this crime of armed robbery not very long prior to [Barnes's murder], weren't you?
>
> A.  Yes, ma'am.
>
> Q.  And that armed robbery, didn't you take—*you had a gun to somebody's head and took them to a bank and told them to get all the money*, didn't you?
>
> A.  Yes, ma'am.

1 R. 254-55 (emphasis added).

Years after Ebron's trial, the prosecutor discovered two discrepancies in Sherman's testimony and sent a letter to the Court and Ebron's counsel that included the following:

> The prosecutor in Washington, D. C., recently reviewed Mr. Sherman's testimony from Mr. Ebron's trial and pointed out two items that appear to be inconsistent with the fact set out in Mr. Sherman's presentence report and with his testimony in his own trial. First, during Mr. Ebron's trial, Mr. Sherman testified that he had four brothers—two in prison and two who were deceased—and one sister. Mr. Sherman's presence report reflects, however, that he is "an only child born to Angela Kamra and Charles Ray Sherman." Second, when asked to describe his prior conviction during Mr. Ebron's trial, Mr. Sherman stated that he had "robbed drug dealers" and indicated that the victim in that offense had been a drug dealer. This description is inconsistent with his testimony from the D.C. trial and with his version of events in the presentence report, as well as with the D.C. prosecutor's understanding of that case.

**Response to Section 2255 Motion-Page 40**

Mtn. Ex. 55 at A310-11.

The prosecutor also included a copy of Sherman's testimony from his D.C. trial, noting that, at the time of Ebon's trial, "we did not have the transcript and did not search for it because we did not believe that it could be relevant."  Mtn. Ex. 55 at A311.

Ebron now seeks a new trial based on Sherman's statement that he robbed drug dealers, but assuming that the description was false, Ebron still fails to show that "the prosecution knew that the statements were false; and … the statements were material."  *Haese*, 162 F.3d at 365. The letter sent to counsel shows that the prosecutor did not know that Sherman's description was inaccurate at the time he made it.  Mtn. Ex. 55 at A311.  Moreover, the statement was not material.  As set out above, the jury was informed by both sides that Sherman had committed a violent robbery, one that involved holding a gun to the victim's head and taking him to a bank to withdraw money.  Whether the victim was a drug dealer—or not—was not material.  *Haese*, 162 F.3d at 365.  Thus, in addition to being barred, this issue is meritless.

**Claim V:** **Ebron cannot rely on the cumulative error doctrine because there are no errors to cumulate and, even if there were, any error would be harmless.**

In his final claim, Ebron argues that the errors he alleges in his other claims, considered cumulatively, warrant relief.  Mtn. 44-45.  Not so.

"Under the cumulative error doctrine, relief may be obtained only when constitutional errors so fatally infect the trial that they violate the trial's fundamental fairness."  *United States v. Fields*, 761 F.3d 443, 483 (5th Cir. 2014) (quoting *United States v. Stephens*, 571 F.3d 401, 412 (5th Cir. 2009)); *see also Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993).  Seldom applied, the Fifth Circuit has "repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances," pointing out that "the possibility of cumulative error is often

**Response to Section 2255 Motion-Page 41**

acknowledged but practically never found persuasive." *United States v. Delgado*, 672 F.3d 320, 343-44 (5th Cir. 2012) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1454, 1456 (5th Cir. 1992). Habeas relief, in particular, is not appropriate "where the cumulative errors complained of are not of a constitutional dimension." *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997) (quoting *Derden*, 978 F.2d at 1454); *see also Bernard*, 762 F.3d at 482.

Ebron alleges that his claims, considered together, demonstrate prejudice. But the argument fails at the most fundamental level because there are no errors. As the Fifth Circuit pointed out in Ebron's direct appeal, "the cumulative error doctrine does not apply for one simple reason: there is nothing to cumulate." *Ebron*, 683 F.3d at 130. Moreover, Ebron cannot show harm because of the overwhelming evidence of his guilt. The errors he now complains of do not bring into question the fairness of the trial or the validity of the jury's verdict.

## Conclusion

For the reasons stated above, the United States urges the Court to deny Ebron's Section 2255 motion on all grounds.

Respectfully submitted,

JAY R. COMBS
UNITED STATES ATTORNEY
Eastern District of Texas

/s/ Joseph R. Batte
JOSEPH R. BATTE
ASSISTANT UNITED STATES ATTORNEY
350 Magnolia, Suite 150
Beaumont, Texas 77701
(409) 839-2538
(409) 839-2550 (fax)
Joe.Batte@usdoj.gov
Texas Bar No. 01918070

/s/ Traci L. Kenner
TRACI L. KENNER
ASSISTANT UNITED STATES ATTORNEY
110 N. College, Suite 700
Tyler, Texas 75702
(903) 590-1400
(903) 590-1439 (fax)
Traci.Kenner@usdoj.gov
Texas Bar No. 11307070

**Certificate of Service**

I certify that on December 17, 2025, this document was served by the Court's ECF system and by email on Alex Kursman and Jennifer Chiccarino, counsel for Ebron.

/s/ Traci L. Kenner
Traci L. Kenner
Assistant United States Attorney

**Response to Section 2255 Motion-Page 43**